IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| PENGUIN RANDOM HOUSE LLC, LAURIE HALSE ANDERSON, JOHN GREEN, MALINDA LO, JODI PICOULT, SCOTT BONZ as parent and next friend of H.B., IOWA STATE EDUCATION ASSOCIATION, MARI BUTLER ABRY, ALYSON BROWDER, AND DANIEL GUTMANN, | ) ) ) ) ) ) ) ) | Case No. 4:23-cv-00478 |
| | ) | **PLAINTIFFS' BRIEF** |
| Plaintiffs, | ) ) | **IN SUPPORT OF MOTION FOR** |
| | ) | **PRELIMINARY** |
| v. | ) | **INJUNCTION** |
| | ) | |
| JOHN ROBBINS in his official capacity as President of the Iowa State Board of Education, MCKENZIE SNOW in her official capacity as Director of the Iowa State Department of Education, CHAD JANZEN in his official capacity as Chair of the Iowa State Board of Educational Examiners, URBANDALE COMMUNITY SCHOOL DISTRICT BOARD OF DIRECTORS, ROSALIE DACA, in her official capacity as Urbandale Community School District Superintendent, NORWALK COMMUNITY SCHOOL DISTRICT BOARD OF DIRECTORS, AND SHAWN HOLLOWAY, in his official capacity as Norwalk Community School District Superintendent, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTS .............................................................................................................................. 3

    I.    SENATE FILE 496 REQUIRES DISTRICTS AND EDUCATORS TO REMOVE BOOKS FROM LIBRARY SHELVES OR FACE HARSH PUNISHMENT. ........................................................................................... 3

        A.    SENATE FILE 496 IS A DEPARTURE FROM IOWA'S PRIOR PROCEDURES CONCERNING REVIEW AND REMOVAL OF LIBRARY BOOKS FROM SCHOOL LIBRARIES. ............................... 3

        B.    THE AGE-APPROPRIATE STANDARD. ............................................... 4

        C.    THE IDENTITY AND ORIENTATION PROHIBITION. ...................... 5

        D.    HARSH PENALTIES FOLLOW FROM FAILURE TO COMPLY WITH SENATE FILE 496. ................................................................. 7

    II.    SENATE FILE 496 HAS LED TO ARBITRARY AND INCONSISTENT REMOVAL OF BOOKS FROM LIBRARIES. ..................................................... 7

    III.    PLAINTIFFS HAVE SUFFERED OR IMMINENTLY WILL SUFFER HARM DUE TO SENATE FILE 496. ................................................................. 9

        A.    PRH AND AUTHORS. ............................................................................ 9

        B.    PARENT OF MINOR STUDENT. ....................................................... 10

        C.    EDUCATORS. ........................................................................................ 11

    IV.    THE PROPOSED RULES DO NOT CURE SENATE FILE 496'S DEFECTS. ................................................................................................. 11

ARGUMENT ................................................................................................................... 12

    I.    PRELIMINARY INJUNCTION STANDARD. .................................................. 12

    II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. .................... 13

        A.    THE AGE-APPROPRIATE STANDARD VIOLATES THE FIRST AND FOURTEENTH AMENDMENTS. .................................... 14

        B.    THE IDENTITY AND ORIENTATION PROHIBITION VIOLATES THE FIRST AND FOURTEENTH AMENDMENTS. ...... 30

    III.    PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM. ............... 36

    IV.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST LIE IN FAVOR OF PLAINTIFFS. ................................................................................. 37

CONCLUSION ................................................................................................................ 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accord Minnesota Voters All. v. Mansky*,
    585 U.S. ----, 138 S. Ct. 1876 (2018) .................................................................... 24

*Accord Video Software Dealers Ass'n v. Webster*,
    968 F.2d 684 (8th Cir. 1992) .................................................................................. 31

*Accord Woodis v. Westark Cmty. Coll.*,
    160 F.3d 435 (8th Cir. 1998) .................................................................................. 31

*Am. Booksellers Ass'n, Inc. v. Virginia*,
    882 F.2d 125 (4th Cir. 1989) .................................................................................. 19

*Ashcroft v. Free Speech Coal.*,
    535 U.S. 234 (2002).................................................................................................. 27

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963).................................................................................................... 22

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982).......................................................................... 15, 18, 23, 24, 26

*Benson Hotel Corp. v. Woods*,
    168 F.2d 694 (8th Cir. 1948) .................................................................................. 13

*Book People, Inc. v. Wong*, No. 1:23-CV-00858-ADA,
    2023 WL 6060045 (W.D. Tex. Sept. 18, 2023)...................................................... 23

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973).................................................................................................. 27

*Burnham v. Ianni*,
    119 F.3d 668 (8th Cir. 1997) .................................................................................. 24

*Campbell v. St. Tammany Par. Sch. Bd.*,
    64 F.3d 184 (5th Cir. 1995) .............................................................................. 14, 23

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
    473 U.S. 788 (1985).................................................................................................. 23

*Counts v. Cedarville Sch. Dist.*,
    295 F. Supp. 2d 996 (W.D. Ark. 2003) ................................................ 14, 15, 17, 21

*D.M. by Bao Xiong v. Minnesota State High Sch. League*,
    917 F.3d 994 (8th Cir. 2019) .................................................................................. 42

*Dataphase Sys., Inc. v. CL Sys., Inc.*,
    640 F.2d 109 (8th Cir. 1981) .............................................................................. 13, 14

*Elrod v. Burns*,
    427 U.S. 347 (1976).................................................................................................. 41

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Erznoznik v. City of Jacksonville,*
  422 U.S. 205 (1975) .............................................................................................. 19, 28

*F.C.C. v. Fox Television Stations, Inc.,*
  567 U.S. 239 (2012) ....................................................................................... 30, 34, 38

*Fayetteville Pub. Libr. v. Crawford Cnty., Arkansas,* No. 5:23-CV-05086,
  2023 WL 4845636 (W.D. Ark. July 29, 2023) ................................................... 29, 41

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) ...................................................................................................... 33

*Interactive Digital Software Ass'n v. St. Louis Cnty. Mo.,*
  329 F.3d 954 (8th Cir. 2003) ...................................................................................... 28

*Johnson v. United States,*
  576 U.S. 591 (2015) ............................................................................................. 30, 39

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
  385 U.S. 589 (1967) ...................................................................................................... 36

*Kolender v. Lawson,*
  461 U.S. 352 (1983) ...................................................................................................... 36

*Lamont v. Postmaster General,*
  381 U.S. 301 (1965) ...................................................................................................... 17

*Martin v. Struthers,*
  319 U.S. 141 (1943) ...................................................................................................... 22

*Miller v. California,*
  413 U.S. 15 (1973) ................................................................................... 18, 28, 29

*Minarcini v. Strongsville City Sch. Dist.,*
  541 F.2d 577 (6th Cir. 1976) ............................................................................... 18, 26

*Powell v. Noble,*
  798 F.3d 690 (8th Cir. 2015) ...................................................................................... 41

*Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.,*
  670 F.2d 771 (8th Cir. 1982) ...................................................................................... 15

*Prison Legal News v. Livingston,*
  683 F.3d 201 (5th Cir. 2012) ...................................................................................... 22

*Reed v. Town of Gilbert, Ariz.,*
  576 U.S. 155 (2015) ...................................................................................................... 22

*Salvail v. Nashua Bd. of Ed.,*
  469 F. Supp. 1269 (D.N.H. 1979) .............................................................................. 23

*Shipley Inc. v. Long,*
  454 F. Supp. 2d 819 (E.D. Ark. 2004) ...................................................................... 29

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Stanley v. Georgia,*
  394 U.S. 557 (1969) .................................................................................... 17

*Stutzka v. McCarville,*
  420 F.3d 757 (8th Cir. 2005) ........................................................................ 8

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
  393 U.S. 503 (1969) .................................................... 14, 17, 18, 23

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
  455 U.S. 489 (1982) .................................................... 31, 34, 38

*Virginia v. Am. Booksellers Ass'n, Inc.,*
  484 U.S. 383 (1988) .................................................................................... 21

*Virginia v. Am. Booksellers Ass'n, Inc.,*
  488 U.S. 905 (1988) .................................................................................... 19

*W. Virginia State Bd. of Educ. v. Barnette,*
  319 U.S. 624 (1943) .................................................................................... 18

*Willson v. City of Bel-Nor, Mo.,*
  924 F.3d 995 (8th Cir. 2019) ....................................................................... 14

**Statutes**

Fed. R. Civ. P. 65 ............................................................................................. 13

H.S.B. 222, § 16 ............................................................................................... 27

Iowa Admin. Code r. 281-12.2(256) ............................................................... 35

Iowa Admin. Code r. 281-12.3(15) ................................................................. 12

Iowa Code § 216.2(10) ..................................................................................... 6

Iowa Code § 216.2(14) ..................................................................................... 6

Iowa Code § 256.11 .......................................................................................... 7

Iowa Code § 256.11(19)(a) .............................................................................. 4

Iowa Code § 256.11(9)(a)(1) .................................................................. 4, 5, 35

Iowa Code § 256.11(9)(a)(2) .................................................................... 7, 8

Iowa Code § 272.2(4) ....................................................................................... 7

Iowa Code § 279.27(1) ..................................................................................... 7

Iowa Code § 279.78 .......................................................................................... 7

Iowa Code § 279.80 .......................................................................................... 6

Iowa Code § 279.80(2) ............................................................................... 7, 35

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

Iowa Code § 280.6 ................................................................................................................ 5

Iowa Code § 702.17 .......................................................................................................... 4, 29

Iowa Code § 728.1(5) ........................................................................................................... 5

Iowa Code § 728.2 ............................................................................................................ 4, 42

S.S.B. 1145, § 16 ............................................................................................................. 5, 27

## INTRODUCTION

Iowa Senate File 496 (SF 496) is an unprecedented assault on school libraries.[1]  The two provisions of the law that Plaintiffs challenge in this case have resulted in the removal of hundreds of books from school libraries across the State of Iowa, even before the penalty provision for violations goes into effect on January 1, 2024.

Before SF 496, qualified professionals – librarians and other educators – curated school libraries based on best practices, educational objectives, and the First Amendment.  Now, the Iowa Legislature has mandated the removal of two broad, poorly defined categories of books:

- First, SF 496 requires that library books for K-12 students be "age-appropriate" (the "Age-Appropriate Standard" or the "Standard").  This means that any book containing a "description of a "sex act" must not be made available to a student, regardless of the student's age.

- Second, SF 496 prohibits any "program" or "promotion . . . relating to gender identity or sexual orientation" for K-6 students, which appears to apply and is being applied to library books (the "Identity And Orientation Prohibition" or the "Prohibition").

Neither the Standard nor the Prohibition accounts for the "literary, artistic, political, or scientific value" of books "taken as a whole," as the First Amendment requires.

These two book removal provisions have unleashed chaos and fear upon the Iowa education community, which has struggled to determine what the Standard and Prohibition mean and what they require.  This includes educators who face penalties for noncompliance, school districts that face penalties for noncompliance and must implement the provisions, and state administrators who have ultimate authority to enforce the law.  For example, Defendant John Robbins, President of the Iowa State Board of Education, stated during a State Board meeting that, in talking with educators about SF 496, "there's a lot of confusion" about the scope of the

---

[1] As used herein, the term "school libraries" includes traditional school libraries as well as classroom collections of books that teachers maintain, which are essentially classroom libraries.

prohibitions and that he has talked to people "in the field" who hope the State Board or somebody else "provides direction because right now, we're kind of either guessing what is right or wrong, and not being in violation of the law." Ex. L-3 at 1. Robbins is right: everyone appears to be guessing.

Confusion about the meaning of the vague prohibitions has resulted in overbroad interpretations, resulting in violations of the First Amendment through the removal of protected literature. School districts across the State have removed from school libraries award-winning books, classic books that have been on shelves for decades, and books that are commonly included on Advanced Placement exams. Each school district appears to interpret the prohibitions differently, resulting in vastly different removal lists among the districts whose lists are publicly available. Authors whose books must be removed from school libraries in one or more Iowa school districts due to SF 496 include Plaintiffs Laurie Halse Anderson, John Green, Malinda Lo, and Jodi Picoult (the "Authors"), as well as Maya Angelou, Margaret Atwood, William Faulkner, James Joyce, Aldous Huxley, Toni Morrison, George Orwell, Alice Walker, and Richard Wright. Many of the Authors' books have been published by Plaintiff Penguin Random House ("PRH"). Far from targeting "pornography" as the State contends, these two library book prohibitions have resulted in the removal of renowned, pedagogically important literature. The recently proposed rules by the Iowa Department Of Education provide no clarification of these two prohibitions.

Provisions like those in SF 496 that require the removal of award-winning books serve no valid educational purpose. The Age-Appropriate Standard harms the student-plaintiff (H.B.) by undermining her right to receive information in school libraries; it harms the Authors and PRH by requiring the removal of their books from school libraries based on an impermissible, overbroad content-based restriction; and it harms the educator-plaintiffs and their members (the

"Educators")[2] by requiring them to choose between censoring protected speech and facing penalties, including loss of their livelihood.  The Identity And Orientation Prohibition harms the Authors and PRH by requiring the removal of their books from school libraries based on an overbroad content-based restriction and harms the Educators by penalizing them if they fail to comply with the incomprehensible prohibition.

Plaintiffs PRH and the Authors disseminate information and ideas of interest and value to students, like H.B.  Matching students to books is an inherently individual exercise.  Not every book is for every person at every point in their life.  For that reason, each student has the right to choose whether to read any particular book from a school library.  Authors, publishers, students, and parents rely on trained educators to facilitate voluntary book discovery through individualized consideration of a student's unique maturity, reading level, interests, and life experiences. Yet SF 496 bars all consideration of context.  Neither the value of a work, nor a student's readiness and desire to read it, count for anything.  If the First Amendment has any force in public schools, the book removal provisions in SF 496 must be enjoined.

## FACTS

I.   **Senate File 496 Requires Districts And Educators To Remove Books From Library Shelves Or Face Harsh Punishment.**

A.   **Senate File 496 Is A Departure From Iowa's Prior Procedures Concerning Review And Removal Of Library Books From School Libraries.**

Prior to the passage of Senate File 496, Iowa had a comprehensive system to regulate the removal of particular books from school libraries.  Under Iowa school districts' preexisting procedures, qualified educators would review books that had been challenged by community

---

[2] The Educators are Mari Butler Abry, Alyson Browder, Daniel Gutmann, and the Iowa State Education Association (ISEA).

members, considering each book in light of specific educational criteria and the merits of the books as a whole.  *See* Abry Decl. (Ex. I) ¶ 20.  In addition, Iowa law forbade the dissemination or exhibition of obscene materials to minors under statutes that predate SF 496.  *See*, *e.g.*, Iowa Code § 728.2.  Despite these existing protections, Iowa lawmakers drafted and enacted SF 496, which contains two additional restrictions on books available to students in school libraries: the Age-Appropriate Standard and the Identity And Orientation Prohibition.[3]  SF 496 is a solution in search of a problem.

### B.    The Age-Appropriate Standard.

Senate File 496 mandates that a school district's "library program" must contain "only age-appropriate materials."  This provision explicitly excludes "material with descriptions or visual depictions of a sex act" from "age-appropriate materials," therefore requiring the removal of those materials from school libraries.  Iowa Code §§ 256.11(9)(a)(1), (19)(a) (SF 496 §§ 2, 4).  The term "sex act" or "sexual activity" is defined elsewhere in the Iowa Code as follows:

> 1.  Penetration of the penis into the vagina or anus.
> 2.  Contact between the mouth and genitalia or mouth and anus or by contact between the genitalia of one person and the genitalia or anus of another person.
> 3.  Contact between the finger, hand, or other body part of one person and the genitalia or anus of another person, except in the course of [medical examination or treatment].
> 4.  Ejaculation onto the person of another.
> 5.  By use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus.
> 6.  The touching of a person's own genitals or anus with a finger, hand, or artificial sexual organ or other similar device at the direction of another person.

Iowa Code § 702.17.

The Standard applies equally to kindergarten through twelfth grade and takes no account of the age of the student who may want to access the removed materials from the school library.

---

[3] The prohibitions appear to apply both to traditional school libraries and classroom collections.

The Standard also disregards context (including how a particular "sex act" is portrayed) and the book's literary, scientific, medical, artistic, or political value "as a whole"; instead, it is a blanket prohibition on books that describe a "sex act."  In an implicit admission that books that contain a description of a sex act may have value, SF 496 provides an exception to the Standard: for "[r]eligious books such as the Bible, the Torah, and the Koran," which "shall not be excluded from any public school or institution in the state." *Id*. §§ 256.11(9)(a)(1) (SF 496 § 2), 280.6.

Legislative history suggests that the Standard was originally intended to restrict obscene content in schools.  Previous versions of the bill were based upon the definition of obscenity set forth by the Supreme Court and Iowa's existing obscenity laws. *See* Iowa Code § 728.1(5); S.S.B. 1145, § 16.  However, the enacted version of Senate File 496 ultimately ignored the obscenity standard and instead proscribed all books with "descriptions" or "visual depictions" of a "sex act."

Iowa elected officials have publicly characterized the Standard as protecting Iowa students from pornography.  For example, Iowa State Representative Skyler Wheeler, Chair of the House Education Committee, claimed that the Standard restricts only "sexually explicit material" that is akin to pornography: "Porn doesn't belong in school libraries.  Books that don't contain porn can remain on the shelves." Ex. L-3 at 2.  Governor Kim Reynolds stated that Senate File 496 prohibits school library books that are "pornographic" and described the prohibited books as "nasty," making clear her opposition to the content of the books targeted by SF 496.  Ex. L-4 at 5.  By enacting the Standard and characterizing its purpose as purging pornography from school libraries, Iowa lawmakers have stigmatized the many books that have been removed, as well as the students who seek to read them.

### C.    The Identity And Orientation Prohibition.

SF 496 also forbids Iowa school districts from providing any program or promotion "relating to gender identity or sexual orientation" to students in kindergarten through sixth grade.

*See* Iowa Code § 279.80 (SF § 16).  "Gender identity" is defined as a gender-related identity of a person, regardless of the person's assigned sex at birth.  *Id*. § 216.2(10) .  "Sexual orientation" is defined as actual or perceived heterosexuality, homosexuality, or bisexuality.  *Id*. § 216.2(14) .

The Prohibition is vague and impossible to apply in a consistent or constitutionally permissible manner.  It does not explain what the State of Iowa considers a "program" or "promotion," and it neither clarifies nor provides any bounds as to what types of content "relat[es]" to gender identity or sexual orientation.  Under the plain language of the Prohibition, nearly all books that contain a mere mention of a person's gender or of the gender-composition of a relationship or marriage are prohibited.  If the prohibition were strictly applied to both LGBTQ+ and heteronormative couples – as it is written – school libraries "wouldn't have any books left." Abry Decl. (Ex. I) ¶ 17.

"Countless" educators have "voiced their bewilderment" over the lack of clarity in these terms and asked for guidance from the State to no avail.  Beranek Decl. (Ex. H) ¶ 12.  Indeed, it is not even clear to the education community whether the Prohibition applies to school libraries. Some schools have determined that the Prohibition applies to school libraries and therefore requires removal of certain library books; others have not implemented the prohibition in school libraries and await further guidance from the State Defendants.  Gutmann (Ex. K) ¶ 7.  For example, Norwalk applied the prohibition to school libraries, but Urbandale, which had initially applied both prohibitions to identify over 300 books for removal, ultimately narrowed its list to include only books that implicated the Age-Appropriate Standard.  *Id*.; H.B Decl. (Ex. C) ¶ 3. Urbandale awaits further guidance from the State.  *See* Beranek Decl. (Ex. H) ¶¶ 12, 19.

Despite the all-encompassing language of the Prohibition, Iowa legislators claim that it was intended to apply only to LGBTQ+ individuals and relationships.  Iowa State Senator Rozenboom

stated his belief that the Prohibition prohibits schools only from making books with gay or transgender characters available to students in kindergarten through sixth grade. Ex. L-5 at 3. Several school districts have interpreted the Prohibition "to mean that libraries are not allowed to have books that include LGBTQ+ characters." Abry Decl. (Ex. I) ¶ 17.

### D.  Harsh Penalties Follow From Failure To Comply With Senate File 496.

Starting on January 1, 2024, the State of Iowa, through Defendants[4] and possibly others, will begin enforcing the Standard through a system of penalties that SF 496 imposes. *See* Iowa Code § 256.11(9)(a)(2) (SF 496 § 2). Those penalties include harsh measures like disciplinary action, loss of teaching licenses, and termination of employment. *Id.* §§ 256.11(9)(a)(2) (SF 496 § 2), 272.2(4), 279.27(1). By subjecting both districts and their educators to penalties, SF 496 places much of the burden of enforcement on school districts, including the school district Defendants here, to ensure that their educators implement the Standard. *Id.* § 256.11(9)(a)(2) (SF 496 § 2).

## II.  Senate File 496 Has Led To Arbitrary and Inconsistent Removal Of Books From Libraries.

In advance of January 1, 2024 – when Iowa will begin to enforce the Standard against districts and educators – school districts across the state have started to remove books from library shelves that they believe may implicate SF 496. Beranek Decl. (Ex. H) ¶ 11. Some school districts have published lists of books that they have identified as subject to removal from their school libraries; the books on those lists are inconsistent and vary broadly across districts. *Id.* at ¶ 22; Abry Decl. (Ex. I) ¶¶ 13, 14.[5] For example, the Nevada Community School District has identified

---

[4] *See* Iowa Code §§ 256.11 (SF 496 § 1, 2), 279.78 (SF 496 § 14), 279.80(2) (SF 496 § 16).

[5] Attached as Exhibit L-1 is a list of books that school districts have identified for removal from school libraries. Attached as Exhibit L-2 is a comparison of books that have been removed from five Iowa school districts. These lists are taken directly from the Des Moines Register's database of those books, which it compiled from public school district records

for removal 179 books that have not been designated for removal by any other district that has published a similar list.  Ex. L-1.  Other school districts have not published explicit lists of books that they intend to remove from their libraries, but those districts have required libraries to remove books all the same.  *See* Beranek Decl. (Ex. H) ¶¶ 11–12.

School districts and educators are confused about how to implement the Age-Appropriate Standard and the Identity And Orientation Prohibition.  *Id.* at ¶ 12; Abry Decl. (Ex. I) ¶ 22.  In May 2023, the Iowa Association of School Librarians and the Iowa Library Association requested guidance from the State Department of Education regarding how to implement the law, including on the following topics:

a. What resources and standards will the Department of Education apply to identify and classify the age-appropriateness of school library materials?  When will teacher librarians and library workers be trained in these resources?
b. Will classic literature that is part of the Advanced Placement curriculum for AP Literature and Composition now be illegal due to age-appropriateness?  How will the College Board be made aware that Iowa's Advanced Placement courses in Literature and Composition can no longer provide required classic literature due to the age-appropriateness definition?
c. How are "programs," "curriculum," "promotion," and "instruction" defined in [the Identity And Orientation Prohibition]? Would this section be interpreted to include the contents of library books, book displays, or book recommendations that relate to gender identity or sexuality?
d. Does [the Identity And Orientation Prohibition] imply that library books also cannot relate to gender identity or sexual orientation in grades K-6? If so, by what guidelines will that be determined?
e. Would promotion or recommendation of library books with content related to gender identity or sexual orientation be prohibited for libraries serving grades K-6 under [the Identity And Orientation Prohibition]?
f. Does gender identity or sexual orientation standards include the full spectrum of expression including heteronormative content?
g. Does the bill apply to library materials?  If so, how will one-room school libraries serving K-12 be required to physically shelve and manage materials filtered as age-appropriate and age-inappropriate based on grade rather than reading level or interest?

(https://databases.desmoinesregister.com/database-books-removed-from-libraries-in-iowa-school-districts/).  The list of books that Iowa school districts have identified for removal from school libraries is appropriate for judicial notice. *See Stutzka v. McCarville*, 420 F.3d 757, 760 n. 2 (8th Cir. 2005).

    h.  Will the presence of materials that may be age-appropriate for some students but not deemed age-appropriate for all students be considered a violation of this law?

Ex. A-1 at 1–3.

But the State of Iowa has failed to provide the requested guidance.  The lack of guidance is especially problematic because SF 496 imposes harsh penalties for violations but does not identity any "metric or tool" that the State will use to assess districts' and educators' compliance efforts.  Abry Decl. (Ex. I) ¶ 22.  The confusion has caused school districts and educators "to err on the side of removing books" out of fear of being penalized.  Browder Decl. (Ex. J) ¶ 18.  Some educators, like plaintiff Alyson Browder, are "hesitant to purchase new literature for students as the standards for new literature are the same vague standards as for literature already on the shelves."  *Id.* ¶ 15.  Many teachers have "reduc[ed] book collections in their classrooms or eliminat[ed] them altogether out of fear of retaliation or discipline."  Beranek Decl. (Ex. H) ¶ 12.

## III.  Plaintiffs Have Suffered Or Imminently Will Suffer Harm Due To Senate File 496.

### A.  PRH And Authors.

Penguin Random House ("PRH") is the world's largest trade publisher and is "proud to publish a vast range of ideas and stories from across the spectrum of identities, viewpoints, and perspectives." Dye Decl. (Ex. A) ¶ 3.  Many of PRH's books have been removed from school libraries in Iowa due to Senate File 496.[6] *Id.* ¶ 5.  SF 496's restrictions prevent PRH "from carrying out [its] mission of putting [its] authors in communication with readers by imposing a state blockade." *Id.* ¶ 13.

---

[6] These books include *Beloved* by Toni Morrison, *Song of Solomon* by Toni Morrison, *The Bluest Eye* by Toni Morrison, *Last Night at the Telegraph Club* by Malinda Lo, *Ulysses* by James Joyce, *As I Lay Dying* by William Faulkner, *Push: A Novel* by Sapphire, *Breathless* by Jennifer Niven, *The Fault in Our Stars* by John Green, *Looking for Alaska* by John Green, *The Handmaid's Tale* by Margaret Atwood, and *I Know Why The Caged Bird Sings* by Maya Angelou.  Dye Decl. (Ex. A) ¶ 5.

Plaintiffs John Green, Laurie Halse Anderson, Malinda Lo, Jodi Picoult are authors of critically acclaimed novels, aimed at children and young adults, that have been removed from school libraries in Iowa due to Senate File 496.  Anderson Decl. (Ex. D) ¶ 1; Green Decl. (Ex. E) ¶ 1; Lo Decl. (Ex. F) ¶ 1; Picoult Decl. (Ex. G) ¶ 1.  Their books "make young adults feel seen." Picoult Decl. (Ex. G) ¶ 5.

The Standard and Prohibition have taken away a key forum through which PRH and Authors reach young readers.  School libraries are an important channel for PRH and Authors to speak to students – their intended audiences – through their books.  Anderson Decl. (Ex. D) ¶ 11; Picoult Decl. (Ex. G) ¶ 7; Lo Decl. (Ex. F) ¶ 8; Dye Decl. (Ex. A) ¶¶ 10–13.  If students are not able to access PRH's or the Authors' books in their school libraries, they will have to discover them elsewhere (or not at all), imposing a burden on access to PRH's and Authors' speech.  Dye Decl. (Ex. A) ¶ 13.  PRH and Authors' books appeal to students at particular times in their lives, so the opportunity to speak to those students may be lost if Plaintiffs' books cannot be found in school libraries.  *Id.*  Library censorship of books not only reduces readership for the specific books being removed; it also reduces readership of PRH's and Authors' other works because a student who reads one of their books is more likely to then read another.  *Id.*

Further, by falsely labeling PRH's and Authors' books as "pornography" that those Plaintiffs have made available for students, Iowa has stigmatized those books.  Picoult Decl. (Ex. G) ¶ 7.  This stigmatization "travels . . . beyond the school setting" and further decreases the likelihood that students will read PRH's and Authors' books both in school and in the future.  Dye Decl. (Ex. A) ¶ 13.

**B.      Parent of Minor Student.**

Plaintiff Scott Bonz is the parent of minor student H.B., a senior in public school in the Urbandale School District. Because of SF 496, H.B. has been unable to find books that she

intended to read in the school library, including *The Color Purple*, *The Handmaid's Tale*, and *Looking For Alaska*.  H.B. Decl. (Ex. C) ¶ 6.  H.B. has also been unable to read or discuss in school the books that Urbandale has targeted for removal without risking stigma and judgment from her teachers and fellow students.  *Id.* at ¶¶ 8-10.

### C.   Educators.

The Iowa State Education Association ("ISEA") represents teachers, librarians, and other education professionals who work in Iowa school districts and schools.  ISEA has communicated with educators throughout the state who fear being disciplined for violating SF 496, who are confused by and afraid of its vague language and the inconsistency among district removal lists, and who are frustrated by the lack of state guidance.  Beranek Decl. (Ex. H) ¶ 12.  Many of these educators are afraid to speak up about the law, and others have left or may leave the profession in Iowa due to SF 496.  *Id.* at ¶¶ 13–14.  Many of ISEA's members have been forced to remove books from their classroom to attempt to avoid the risk of future penalization.  *Id.* ¶ 11.

Plaintiffs Mari Butler Abry, Alyson Browder, and Daniel Gutmann are Iowa educators who "provide quality, relevant, readily accessible, and inclusive reading material for [their] students." Gutmann Decl (Ex. K) ¶ 13.  They "want students to see themselves in the stories they read and explore worlds beyond their own."  Browder Decl. (Ex. J) ¶ 6.  As a result of SF 496, they have been or will be forced to remove broad swaths of non-obscene books from their school libraries, which had previously been deemed appropriate by education professionals, or expose themselves and their school districts to penalties.  Abry Decl. (Ex. I) ¶¶ 19, 22; Browder Decl. (Ex. J) ¶ 13; Gutmann Decl. (Ex. K) ¶ 7.

## IV.   The Proposed Rules Do Not Cure Senate File 496's Defects.

On November 15, 2023, the Iowa State Board of Education issued proposed rules concerning SF 496 (the "Proposed Rules").  *See* Iowa State Board of Education, Notice of Intended

Action (Nov. 15, 2023) (attached to the Complaint as ECF No. 1-2).  The Proposed Rules purport

to offer guidance regarding Senate File 496, but do not clarify its vague terms.  While the Proposed

Rules state that a "reference or mention of a sex act in a way that does not describe or visually

depict a sex act" does not constitute a description or visual depiction of a sex act, they nowhere

contain a definition of "description."  *See id*. at Item 2 (amending Iowa Admin. Code r. 281-12.2).

Similarly, the Proposed Rules instruct the Iowa State Department of Education not to "conclude

that a neutral statement regarding sexual orientation or gender identity" violates the Identity And

Orientation Prohibition, but they neither define nor provide examples of a "neutral statement."  *Id*.

at Item 5 (amending Iowa Admin. Code r. 281-12.3(15)).   Neither these statements nor the

Proposed Rules as a whole provide meaningful guidance to districts or educators on how to

interpret or implement the Standard or the Prohibition.

## ARGUMENT

### I.      Preliminary Injunction Standard.

Federal Rule of Civil Procedure 65 governs the Court's issuance of preliminary injunctions.

Whether to issue injunctive relief is a matter addressed to the sound discretion of the trial court.

*See Benson Hotel Corp. v. Woods*, 168 F.2d 694, 696-97 (8th Cir. 1948).  Preliminary injunctions

exist to "prevent such a change in the relations and conditions of persons and property as may

result in irremediable injury to some of the parties before their claims can be investigated and

adjudicated."  *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 n.5 (8th Cir. 1981) (en

banc).  *See also Benson*, 168 F.2d at 696 (explaining that the purpose of a preliminary injunction

is "to prevent a threatened wrong or any further perpetration of injury, or the doing of any act

pending the final determination of the action whereby rights may be threatened or endangered").

In determining whether to grant a motion for preliminary injunction, the Court weighs the

following four considerations:  (1) the movant's likelihood of success on the merits, (2) the threat

of irreparable harm to the moving party, (3) the balance between the harm to the movant if the injunction is denied and the harm to other party if the injunction is granted, and (4) the public interest. *Dataphase Sys.*, 640 F.2d at 114. "When a Plaintiff has shown a likely violation of his or her First Amendment rights, the other [considerations] are generally deemed to have been satisfied." *Willson v. City of Bel-Nor, Mo.*, 924 F.3d 995, 999 (8th Cir. 2019).

## II.     Plaintiffs Are Likely To Succeed On The Merits.

Plaintiffs in this case challenge two provisions of SF 496 that require the removal of books from school libraries – the Age-Appropriate Standard and the Identity And Orientation Prohibition. Plaintiffs challenge these two provisions only insofar as they require the removal of books from school libraries and classroom collections, as opposed to textbooks and other books that are part of the curriculum. This case does not involve any other aspects of SF 496. In particular, this case does not involve the authority and discretion that the government has over curriculum.

While the government has substantial discretion to make decisions concerning school curriculum and instruction, its decisions to remove books from school libraries "must withstand greater scrutiny within the context of the First Amendment than would a decision involving a curricular matter." *See Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 189 (5th Cir. 1995). The government's decision to remove books from school libraries due to the ideas they contain must be "justified by some exigency of the educational environment." *See Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1002 (W.D. Ark. 2003); *see also Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511, 514 (1969) (explaining that students' First Amendment rights in schools can be restricted where "necessary to avoid material and substantial interference with schoolwork or discipline" and when the exercise of those rights would "interrupt[] school activities," "intrude in the school affairs or the lives of others," or cause "disorder"). "[T]o avoid a finding that it acted unconstitutionally, the [government] must establish that a substantial and

reasonable governmental interest exists for interfering with the students' right to receive information." *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 777 (8th Cir. 1982).

In contrast to the compulsory nature of the government's curriculum and instructional decisions, a student's involvement with school libraries is entirely voluntary.  Students have substantial autonomy to decide whether to check out and read library books at all and, if they do, which books to read.  School libraries are unique sources of information and ideas for students, and students' rights to receive information and ideas are at their apex in school libraries.  "The right to read a book is an aspect of the right to receive information and ideas," and "a school library is an 'environment especially appropriate for the recognition of the First Amendment Rights of students.'" *Counts*, 295 F. Supp. 2d at 999 (quoting *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 868 (1982) (plurality decision)).

A school library is meant to expose students to a broad range of ideas and viewpoints – even if the government disagrees with those ideas.  *See Pico*, 457 U.S. at 868-69 ("[S]tudents must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding. The school library is the principal locus of such freedom.").  A school library "is a place to test or expand upon ideas presented to [a student], in or out of the classroom." *Id.*

Here, the State has enacted two provisions that unconstitutionally censor library books, in violation of the rights of students, publishers, authors, and educators.  The Court should enjoin enforcement of both the Age-Appropriate Standard and the Identity And Orientation Prohibition.

## A. The Age-Appropriate Standard Violates The First And Fourteenth Amendments.

The Standard requires the removal of countless award-winning, classic books from school libraries based the Iowa Legislature's apparent view that any book that contains a "description" of

a sex act is "pornography."  The Court should enjoin the Standard because (1) it violates H.B.'s and other students' rights to receive information under the First Amendment, (2) it is a content-based restriction that serves no valid purpose, in violation of the First Amendment rights of PRH, the Authors, and other publishers and authors, (3) it is an overbroad content-based restriction that sweeps up a substantial amount of protected speech, and (4) it is unconstitutionally vague, in violation of the Due Process Clause, subjecting the Educators, their districts, and other educators and districts throughout Iowa to penalties for failure to comply with a poorly defined censorship requirement.

### 1.    The Age-Appropriate Standard Violates Students' Rights to Receive Information.[7]

The Standard violates students' First Amendment right to receive information because it purports to require the removal from Iowa school libraries of books that contain a description of a "sex act" (1) without any valid reason for doing so and (2) without accounting for the age of the prospective reader as the First Amendment requires.  The First Amendment bars the government from restricting students' right to receive information unless a substantial, or at least reasonable, state interest exists for interfering with that right.  No such interest exists here.  To protect students' rights, the Age-Appropriate Standard must be enjoined.

The State of Iowa and its school districts "do not possess absolute authority over their students."  *Tinker*, 393 U.S. at 511.  Students have "fundamental rights which the State must respect" because they "are 'persons' under our Constitution."  *Id.*  They do not "shed their constitutional rights" at "the schoolhouse gate" and "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate."  *Id.* at 506, 511.  Rather, the

---

[7] Subsection II(A)(1) addresses Count II of Plaintiffs' Complaint.

"right to receive information and ideas, regardless of their social worth, is fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).  *See also Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring) ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them.  It would be a barren marketplace of ideas that had only sellers and no buyers.").

The Standard is not justified by any sufficient governmental interest.  Defendants cannot demonstrate that this sweeping removal requirement is "justified by some exigency." *See Counts*, 295 F. Supp. 2d at 1002.  Nor can they show that it is "necessary to avoid material and substantial interference with schoolwork or discipline." *See Tinker*, 393 U.S. at 511, 514.  Government officials such as Defendants may not remove books from school libraries "simply because they dislike the ideas contained in those books." *Pico*, 457 U.S. at 870, 872 (explaining that the First Amendment establishes that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion" (quoting *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943))).  Nor may Defendants "'winnow' the library for books the content of which occasioned their displeasure or disapproval." *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 581 (6th Cir. 1976).

But that is precisely what Defendants purport to do through the Standard.  While the State of Iowa has a legitimate interest in not providing students with access to books that are obscene, a book is not obscene merely because it contains a description of a sex act.  The Supreme Court has defined obscenity as "limited to works" (a) "which, taken as a whole, appeal to the prurient interest in sex"; (b) "which portray sexual conduct in a patently offensive way"; and (c) "which, taken as a whole, do not have serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. 15, 24 (1973).

16

However, under the guise of protecting students from "pornography," the Standard ignores the obscenity standard and requires the removal from school libraries of all books that contain a description of a "sex act." Even if the book is highly acclaimed or has won awards. Even if the book is commonly included in Advanced Placement exams. Even if the book advances educational objectives. Even if the book contains only a single, brief description of a sexual encounter. Even for high school students who are at least sixteen years old (and therefore legally able to consent to sex acts under Iowa law). Even for students who are adults under Iowa law. And even if the book has been on the shelves of Iowa school libraries for many years or decades and if it can be found in school libraries throughout the nation.

Furthermore, when applied to minors, the obscenity standard must account for the age of the reader. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975). Under the Standard, H.B. – a 17-year-old high school senior – is prohibited from accessing certain books in her school library just as a kindergarten student is prohibited from accessing those same books. But even if a book is obscene or inappropriate for inclusion in a school library for kindergarteners, it does not follow that the same book is obscene or inappropriate for inclusion in a high school library. A book is not obscene as to all minors if it has serious value for a legitimate minority of minors, such as older minors. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 488 U.S. 905 (1988); *Am. Booksellers Ass'n, Inc. v. Virginia*, 882 F.2d 125 (4th Cir. 1989), *cert. denied*, 494 U.S. 1056 (1990). *See also Erznoznik*, 422 U.S. at 213–14 ("Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them."). Despite this requirement, the Standard applies to all school libraries and students without differentiating based on the age of the prospective reader and therefore violates the First Amendment.

17

The Standard has already caused H.B. and numerous other students to lose access to countless library books, and it will continue to do so.  H.B. sought to check out three award-winning books from her school library this school year, but she was unable to do so because those books had been removed due to SF 496:

- *Looking For Alaska* by John Green is a coming-of-age school story and teen romance about a boarding school student who is bullied.  The novel won the ALA's Michael L. Printz Award, was a finalist for the Los Angeles Times Book Prize, and was a Bestseller of *The New York Times*.

- *The Color Purple* by Alice Walker tells the story of a poor, young, uneducated African-American girl named Celie who lives in rural Georgia in the early 1900s.  The novel details Celie's encounters with racism, sexism, and abuse.  The novel won the 1983 Pulitzer Prize for Fiction and the National Book Award for Fiction.

- *The Handmaid's Tale* by Margaret Atwood is a dystopian novel that criticizes elements of contemporary American society by imagining a future in which the U.S. government is overthrown by a patriarchal cult.  The novel won the 1985 Governor General's Award and the first Arthur C. Clarke Award in 1987. H.B. Decl. (Ex. C) ¶ 6.

As a result of the Standard, students are deprived of "relevant and important conversations that are sparked by the works of great authors."  *Id.* ¶ 11.  It takes away tools that students need "to access information and tools for navigating life" and "[cheats them] of books that contain facts and histories that are critical to [their] participation in society and our democracy and advancing [their] critical thinking skills."  *Id.* at ¶¶ 7, 11.

H.B. also risks incurring reputational and other harm as a result of the Standard.  H.B. has read many of the books that Iowa school districts have labelled as inappropriate and identified for removal from school libraries under S.F. 496, and H.B. intended to read other books that are to be removed.  *Id.* at ¶¶ 4, 6.  While H.B. found many of these books to be beneficial to her life and to understanding her friends' personal experiences, she now fears that her reputation may suffer because those books have been labeled "pornography" and inappropriate by the State of Iowa and its school districts.  *Id.* at ¶ 8.  And while H.B. may be able to obtain and read books that have

been designated for removal from places other than her school library, she is less likely to do so because of the stigma that arises from the books being labeled as "pornography." *Id.* at ¶¶ 8–10. In that way, the Standard and accompanying stigma chill H.B. and other Iowa students' First Amendment rights to receive information. *See Counts*, 295 F. Supp. 2d at 999 (holding that stigma associated with reading certain books, access to which has been limited by a school library, is a sufficient "burden" for an "actual concrete and particularized invasion" of a student's First Amendment right to receive information). But for the Standard, this harmful stigma would not exist.

Just as the Standard harms H.B., it harms other Iowa students who wish to read books that are being removed from school libraries. H.B. is just one of hundreds of thousands of students in Iowa whose First Amendment rights are being violated by the Standard. "[I]n the First Amendment context, '[l]itigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988). Because of the stigma associated with interest in books that have been designated for removal, and because of the burden associated with advocating for students' First Amendment rights, many Iowa students will likely be deterred from challenging the provisions of SF 496. *See* H.B. Decl. ¶¶ 8–10. To protect the First Amendment rights of Iowa students, the Court should enjoin Defendants from enforcing the Standard.

> **2.     The Age-Appropriate Standard Is An Impermissible Content-Based Restriction.[8]**

The Authors' and PRH's right to have their books read by others is commensurate with Iowa students' right to read.  The First Amendment "embraces the circulation of books as well as their publication." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963).  *See also Martin v. Struthers*, 319 U.S. 141, 143 (1943) (First Amendment "embraces the right to distribute literature"); *Prison Legal News v. Livingston*, 683 F.3d 201, 212 (5th Cir. 2012) ("[A]n interest in distributing books . . . is precisely the type of interest at the core of First Amendment protections.").  Publishers and authors have the right to speak through their books without having those books censored by impermissible content-based restrictions.  "Content-based laws – those that target speech based on its communicative content – are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

When the Constitution establishes that the government "may not abridge the right to free speech," it "means what it says." *Tinker*, 393 U.S. at 513.  Therefore, it permits only "reasonable regulation of speech-connected activities in carefully restricted circumstances." *Id.*  Although the State of Iowa has significant authority over state curriculum and instructional decisions, its decisions are afforded less deference "when the challenged decision involves a noncurricular matter," such as school libraries.  *Campbell*, 64 F.3d at 188 (citing *Pico*, 457 U.S. at 868-70 (comparing the "compulsory environment of the classroom" to "the school library and the regime of voluntary inquiry that holds sway there")); *Book People, Inc. v. Wong*, No. 1:23-CV-00858-ADA, 2023 WL 6060045, at *15 (W.D. Tex. Sept. 18, 2023) (noting the "sharp distinction between

---

[8] Subsection II(A)(2) addresses Count I of Plaintiffs' Complaint.

cases involving textbooks and library books.").  "When First Amendment values are implicated," government officials who remove books from a "school library must demonstrate some substantial and legitimate government interests." *Salvail v. Nashua Bd. of Ed.*, 469 F. Supp. 1269, 1275 (D.N.H. 1979).

At a minimum, school libraries are nonpublic forums.  Within nonpublic forums, content-based restrictions must be (1) reasonable in light of the purpose of the forum and (2) viewpoint neutral.  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 806 (1985).  *Accord Minnesota Voters All. v. Mansky*, 585 U.S. ----, 138 S. Ct. 1876, 1889 (2018) (holding that the state "must be able to articulate some sensible basis for distinguishing what [speech is allowed] from what [speech is not allowed]" inside a polling place); *Burnham v. Ianni*, 119 F.3d 668, 676 (8th Cir. 1997) ("Since the purpose of the [display] case was the dissemination of information about the history department, the suppression of exactly that type of information" – photos concerning military history – "was simply not reasonable.").

The Standard is a content-based restriction that is unreasonable in light of the purpose of school libraries.  As the Supreme Court has recognized, a school library is a place where students "can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum." *Pico*, 457 U.S. at 868−69.  "[S]tudents must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding." *Id.*  A school library is meant to be a "regime of voluntary inquiry," affording students "an opportunity at self-education and individual enrichment that is wholly optional." *Id.* at 869.

The Standard disregards the purposes of school libraries and is unreasonable in light of those purposes.  Many of the books that have been removed from school libraries under the Standard, *see* Ex. L-1, actually epitomize the educational goals of schools and school libraries,

including books that are commonly addressed on Advanced Placement exams[9] and books covering

important educational topics such as:

- the effects of bullying,[10]

- coming of age,[11]

- responding to trauma and grief,[12]

- duty and mortality,[13]

- repression,[14]

- injustice,[15]

- sexual assault,[16]

---

[9] The books *The Color Purple*, *Native Son*, *The Handmaid's Tale*, *As I Lay Dying*, *Beloved*, *1984*, *Brave New World*, *Speak*, and *Shout* have been removed from several districts and are commonly covered on Advanced Placement exams.

[10] Jodi Picoult's *Nineteen Minutes* "reflects [the author's] viewpoint on bullying, marginalization, and the ramifications when a child who is 'othered' is failed by peers, parents, and their school community."  Picoult Decl. (Ex. G) ¶ 3.

[11] Maya Angelou's *I Know Why the Caged Bird Sings* is an autobiographical coming-of-age story about the author's early years that illustrates how strength of character and love of literature helped her overcome racism and trauma.

[12] Toni Morrison's *Beloved* explores themes of mother-daughter relationships, the psychological effects of slavery, the effect of slavery on African-American families, manhood and masculinity, pain and generational trauma, and heroism.  John Green's *The Fault in Our Stars* describes a romance between two teenagers with cancer.  Alice Walker's *The Color Purple* is described above.

[13] William Faulkner's *As I Lay Dying* reflects on themes of existentialism, mortality, the fight between self-interest and duty, and the relationship between childbearing and death.

[14] Margaret Atwood's *The Handmaid's Tale* is described above.  Aldous Huxley's *Brave New World* depicts a technologically advanced future where humans are genetically bred, socially indoctrinated, and pharmaceutically anesthetized to uphold an authoritarian ruling order at the cost of freedom.  George Orwell's *1984* depicts a totalitarian government that has brainwashed its population into unthinking obedience to its leader, Big Brother.

[15] Richard Wright's *Native Son* both condemns social and racial injustice and paints an unsparing portrait of the Black experience in America, revealing the tragic effects of poverty, racism, and hopelessness on the human spirit.

[16] Laurie Halse Anderson's *Speak* is about a freshman in high school who was sexually assaulted

- the human body,[17] and

- coming to terms with one's identity.[18]

There is no conceivable legitimate reason for the State of Iowa to mandate the removal of school library books merely because they contain a description of a sex act – which is what the Standard requires – without any regard to the value of those books when considered as a whole. As discussed above, none of these books is "obscene."  They were all marked for removal without regard to their literary merit.  And there is no evidence that the presence of any of these books in school libraries interferes with schoolwork or discipline or causes disorder.  Instead, the available evidence shows that the Standard is an attempt by many of Iowa's elected officials "to prescribe what shall be orthodox" and to enforce their "displeasure or disapproval" upon all students who rely upon school libraries to expand their horizons, inquire freely, and enrich their lives.  *Pico*, 457 U.S. at 870; *Minarcini,* 541 F.2d at 581.  Because the State of Iowa cannot demonstrate any reasonable basis for the Standard in light of the purposes of school libraries, this prohibition is an impermissible content-based restriction.

### 3.  The Age-Appropriate Standard Is Unconstitutionally Overbroad.[19]

Even if the State of Iowa could articulate a valid purpose for removing books from school

---

by a senior at a party.  Her nonfiction poetry memoir *Shout* recounts Anderson's personal experience with sexual assault and perspective on sexual violence.  Anderson "write[s] not only to help survivors find solace and understanding as they unpack their trauma, but to implore parents to get over their squeamishness about discussing human sexuality to create a safe and nurturing environment for their children."  Anderson Decl. (Ex. D) ¶ 10.

[17] David Macaulay's *The Way We Work: Getting to Know the Amazing Human Body* is an illustrated guide that presents the inner workings of the human body and human anatomy.

[18] Malinda Lo's *Last Night at the Telegraph Club* is a "coming-of age novel about a Chinese-American girl" discovering her identity as a lesbian that seeks to "normalize the experience of being a queer woman."  Lo Decl. ¶¶ (Ex. F) 6, 5.  John Green's *Looking for Alaska* is described above.

[19] Subsection II(A)(3) addresses Count I of Plaintiffs' Complaint.

libraries based on the Standard, the prohibition is unconstitutionally overbroad for at least two reasons. First, the Standard bars minors from accessing books that contain a description of a "sex act" even where those books are not obscene under the obscenity standard as applied to minors. Second, the Standard makes no attempt to differentiate, as it constitutionally must, between books that may be obscene as to all minors versus books that may be obscene only for students who are younger minors (and are not obscene for students who are older minors, like H.B., or adults).

A statute that burdens otherwise-protected speech is facially invalid when that burden is not only real but "substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). The overbreadth doctrine bars the state from restricting even unprotected speech where "a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002).

While prior versions of SF 496 suggest that the Standard evolved from an attempt to bar obscene materials,[20] the enacted prohibition goes much farther than the definition of obscenity allows. The Standard requires the removal of books from school libraries with no consideration of the purpose or offensiveness of the description of sexual activity or the "literary, political, or scientific value" of the books, "taken as a whole" as required by *Miller*. *See* 413 U.S. at 24. Although Iowa has an interest in protecting minors from materials that are obscene, "the government's role in helping parents to be the guardians of their children's well-being is [not] an unbridled license to governments to regulate what minors read and view." *Interactive Digital Software Ass'n v. St. Louis Cnty. Mo.*, 329 F.3d 954, 959-60 (8th Cir. 2003). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed

---

[20] *See* S.S.B. 1145, § 16; H.S.B. 222, § 16 (initial bill proposing a notification and right to opt out of "any activity or instruction that involves obscene material or sexually explicit material").

solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213-14 (striking ordinance as overbroad).  The Standard requires removal from school libraries of obscene and non-obscene books alike and therefore is unconstitutionally overbroad.

The Standard is also impermissibly overbroad because it impedes the Authors and PRH from communicating through their books to Iowa kindergarten through twelfth-grade students without accounting for the age of readers.  Books must be considered in relation to the age and maturity of the students who may access them.  *See Erznoznik*, 422 U.S. at 214 n.11 ("[T]he age of a minor is a significant factor.").  The Standard prevents older minors from accessing in school libraries books that contain descriptions of sex acts, even where those books are not obscene as to those older minors.  A prohibition that restricts an older minor such as H.B. from accessing books such as *The Color Purple*, *The Handmaid's Tale*, and *Looking for Alaska* from school libraries violates the First Amendment.  H.B. Decl. (Ex. C) ¶ 6.

The overbreadth of the Standard prevents the Authors and PRH from having their books discovered and read in school libraries, and therefore communicating protected speech in the form of their messages, to their chosen audience.  Iowa cannot "effectively stifle[] the access of adults and older minors to communications and materials they are entitled to receive and view" just because such material may be "harmful to the youngest of minors."  *Shipley Inc. v. Long*, 454 F. Supp. 2d 819, 829-30 (E.D. Ark. 2004).  *See also Fayetteville Pub. Libr. v. Crawford Cnty., Arkansas*, No. 5:23-CV-05086, 2023 WL 4845636, at *16 (W.D. Ark. July 29, 2023) (granting preliminary injunction and finding obscenity restriction on library books to be overbroad, even where the statutory language was consistent with the *Miller* standard, where restriction burdened older minor and adult access to books appropriate for their reading level).

Finally, the Standard is overbroad on its face.  The statute prohibits books containing a description of a "sex act."  Under that plain language, a book that refers to the "penetration of his penis into her vagina" (a near-verbatim quote from the statutory definition of "sex act," see Iowa Code § 702.17[21]) must be removed from Iowa school libraries, because that phrase describes a "sex act."  By that logic, the State of Iowa has determined that the text of the Standard itself is inappropriate for Iowa students to access through school libraries.  This example further illustrates that the Standard bears no relationship to the obscenity standard and therefore is an overbroad regulation of protected speech.  Moreover, the Standard is underinclusive due to its exemption for religious texts.  The Court should enjoin enforcement of the Standard.

### 4.     The Age-Appropriate Standard Is Unconstitutionally Vague.[22]

The Standard violates the Due Process Clause because it is unconstitutionally vague, failing to provide clear standards to those who are subject to the law and to those who have authority to implement and enforce the law.  This ambiguity has created confusion for many educators and school districts throughout Iowa, causing them to err on the side of caution by overly censoring and self-censoring protected speech.  For this additional reason, the Court should enjoin the Standard.

Vague laws, like the Standard, are unconstitutional.  *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which

---

[21] The statutory definition of a sex act discusses sexual activity more explicitly than do some of the books that school districts have determined must be removed from school libraries under the Age-Appropriate Standard. *See, e.g.*, *Last Night At The Telegraph Club* by Malinda Lo ("she took Kath's hand and moved it to the cleft of her body . . . Kath put her hand between Lily's legs").  If the statutory definition of "sex act" is not obscene, it then follows that the less explicit descriptions of a "sex act" found in books identified for removal are also likely not obscene and therefore that the Age-Appropriate Standard is overbroad.

[22] Subsection II(A)(4) addresses Count III of Plaintiffs' Complaint.

regulate persons or entities must give fair notice of conduct that is forbidden or required."). Imprecise statutory terms that leave "grave uncertainty" about how to understand their scope are void for vagueness, even if some parts of what the terms encompass might be "straightforward" exercises of government power. *Johnson v. United States*, 576 U.S. 591, 597, 602 (2015). It violates due process to punish someone for violating a law where the law "fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Id.* at 595. *Accord Woodis v. Westark Cmty. Coll.*, 160 F.3d 435, 438 (8th Cir. 1998). When a law deters or "threatens to inhibit the exercise of constitutionally protected rights," including First Amendment rights, a "more stringent vagueness test" applies. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). *Accord Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 689–90 (8th Cir. 1992).

The Standard is unconstitutionally vague because it fails to clearly articulate how school districts should determine which books must be removed from Iowa school libraries. Rather, the Standard requires the removal of books containing a "description" of a "sex act," without explaining what constitutes a description or what level of detail is necessary for the standard to apply. It is unclear, for example, whether a book that contains the phrase "spent the night together" (or other phrases that might imply a sexual interaction) is descriptive enough to offend the Standard. *See* Abry Decl. (Ex. I) ¶ 14. Nor is it clear whether a book that states that two characters "made passionate love" or "had sexual intercourse" must be removed. And the penalty for failure to discern whether the State of Iowa might deem a book ripe for removal is extreme, given the statutory vagueness and lack of guidance: license sanctions, adverse employment actions, and even termination.

The varying book removal lists that some Iowa school districts have developed in an

attempt to satisfy SF 496 illustrate how the Standard is susceptible to vastly different interpretations.  As demonstrated by those lists, Iowa school districts have reached different determinations with regard to whether and which books must be removed from their libraries under the Standard.  *See* Ex. L-2.

- George Orwell's *1984* is a classic dystopian novel that novel that most, if not all Iowa school districts likely own in their library collections.  Of the thirty-seven school districts whose removal lists are available, five have determined that *1984* must be removed as a result of the Standard and approximately thirty-two apparently have determined that its removal is not required.  *See* Ex. L-1.

- Similarly, John Green's *The Fault in Our Stars*, which is one of the best-selling books of all time, appears on eight school districts' removal lists, which means that approximately twenty-nine have determined that its removal is not required.  *Id.*

- Margaret Atwood's *The Handmaid's Tale* is a popular award-winning novel that most, if not all Iowa school districts likely own.  It appears on seventeen removal lists, which means that approximately twenty have determined that the Standard does not require its removal. *Id.*

One school district – the Nevada Community School District – has apparently determined that 238 books must be removed due to SF 496.  *Id.*  In contrast, United Community School District has apparently determined that only six books must be removed due to SF 496.[23]  *Id.*  If the Standard were sufficiently clear to comport with the Due Process Clause, it would not have resulted in Iowa school districts making such wildly different determinations of which books that must be removed from school libraries.

Some of the Defendants have admitted that the law is vague.  For example, Iowa State Board of Education President John Robbins stated during a State Board meeting that, in talking with educators about SF 496, people "in the field" have asked for guidance "because right now, we're kind of either guessing what is right or wrong, and not being in violation of the law."  Ex.

---

[23] It is not apparent which books these two school districts have listed for removal due to the Age-Appropriate Standard and which they listed due to the Identity And Orientation Prohibition.

L-3 at 1.  Educators across the State of Iowa agree that the Standard is vague, especially in light of the lack of meaningful state guidance and lack of clarity surrounding the enforcement mechanisms.  Gutmann Decl. (Ex. K) ¶ 8.  Those educators find themselves unable to confidently apply the Standard without fear that they will inadvertently violate that law, putting themselves and their school districts at risk of penalties.  Abry Decl. (Ex. I) ¶ 22; Browder Decl. (Ex. J) ¶ 17.  Vague laws also give rise to concerns about arbitrary or discriminatory enforcement, such as imposition of penalties on educators from a minority group or out-group.  Without clear guidance to educators, they cannot be expected to apply the Standard in a way that does not risk exposing them to unpredictable enforcement by the state.  *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.").

As is typical with vague restrictions on free speech, the Standard has chilled protected First Amendment activity.  Defendant Urbandale admitted that it had adopted "a fairly broad interpretation" of the Standard "because if our interpretation was too finite, our teachers and administrators could be faced with disciplinary actions."  Ex. L-6 at 3.  Urbandale Superintendent Rosalie Daca further explained Urbandale's decision to sacrifice free speech in order to protect administrators and educators from being penalized for violating the Standard:

> As someone who is tasked with the livelihood of 450 teachers and administrators, I owe it to every staff member and their family to be careful, mindful, and intentional about the guidance we provide knowing that if our guidance is wrong, we could jeopardize their professional and personal lives….  This has weighed heavily on my mind and heart.

Ex. L-7 at 3.

The Standard incentivizes school districts to apply overbroad interpretations of its prohibitions because districts are both tasked with implementing the law and subject to its penalties.  The harm resulting from the vagueness of the Standard disproportionately harms

educators, who must err on the side of censorship or risk losing their employment and licensure.

The treatment of Jodi Picoult's *Nineteen Minutes* exemplifies how the law's ambiguity and penalties for non-compliance have combined to undermine protected speech. Although *Nineteen Minutes* is not pornographic, numerous school districts have removed it from school libraries as a result of the Standard. Picoult explains that part of one character's journey in *Nineteen Minutes* "involves being sexually bullied by her boyfriend":

> It is a non-graphic depiction of date rape, described with clinical language. The objectionable word is "erection," not the act of sexual assault itself. It is not pornography; it is not titillating; it is not sex for the sake of gratuitous sex. The scene is endemic to the message of the book; it encapsulates the realization that being bullied takes a lot of different forms.

Picoult Decl. (Ex. G) ¶ 4. Numerous Iowa school districts decided to err on the side of removing this novel from their libraries, presumably due to the possibility that enforcers of the law could decide that the Standard requires that *Nineteen Minutes* be removed. This illustrates why vague regulations, such as the Standard, that "threaten[] to inhibit the exercise of constitutionally protected rights" violate the Due Process Clause. *See Vill. of Hoffman Ests.*, 455 U.S. at 499.

Finally, the Proposed Rules will not cure the unconstitutional vagueness of the Standard because, assuming they are enacted, "a person of ordinary intelligence" cannot discern the difference between a "reference or mention of a sex act" and a "description of a sex act." *See Fox Television Stations*, 567 U.S. at 253. No clarification of the vague Standard results from tying it to "a person of ordinary intelligence," and the disparate treatment of books in school districts across the state demonstrates this. The Standard must be enjoined.

### B.    The Identity And Orientation Prohibition Violates The First And Fourteenth Amendments.

The Prohibition is ambiguous and overbroad. Under this prohibition, an Iowa school district "shall not provide any" program or promotion (among other things) "relating to gender

identity or sexual orientation to students in kindergarten through grade six."  Iowa Code §
279.80(2) (SF 496 § 16).  Although it is unclear whether this prohibition applies to library books
and what it means if it applies, school districts and educators who violate the Prohibition may lose
their employment and licensure.

The Prohibition appears, and is being interpreted by Iowa school districts, to require the
removal of books from school libraries that "relate" to "gender identity" or "sexual orientation."
Despite requests from the Iowa Association of School Librarians and the Iowa Library
Association, the Iowa State Department of Education has not provided any guidance regarding
whether the Prohibition applies to school library books, book displays, or book recommendations.
Nor do the Proposed Rules provide any guidance on this issue.  Accordingly, different school
districts have taken vastly different positions.  Norwalk, for example, has applied this prohibition
to library books, whereas Urbandale (after initially applying this prohibition to library books) is
waiting for guidance from the State Defendants.  Gutmann Decl. (Ex. K) ¶ 7; H.B. Decl. (Ex. C)
¶ 3.

Because a "library program" appears to be a "program," the Prohibition appears to apply –
and is being applied – to library books.[24]  The Court should enjoin the Prohibition with respect to
school libraries for two reasons:  (1) it is an overbroad content-based restriction that violates the
First Amendment and (2) it is unconstitutionally vague in violation of the Due Process Clause.
The Supreme Court views "vagueness and overbreadth as logically related and similar doctrines."
*Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983).  *See also Keyishian v. Bd. of Regents of Univ.
of State of N.Y.*, 385 U.S. 589, 609, (1967) ("Where statutes have an overbroad sweep, just as

---

[24] "Library program" is a term used in SF 496, Iowa Code § 256.11(9)(a)(1) (SF 496 § 2), as well
as in Iowa Department of Education regulations, Iowa Admin. Code r. 281-12.2(256).  The term
appears to encompass collections books.

where they are vague, the hazard of loss or substantial impairment of those precious [First Amendment] rights may be critical since those covered by the statute are bound to limit their behavior to that which is unquestionably safe." (internal citation and quotation marks omitted).).

### 1. The Identity And Orientation Prohibition Is An Overbroad Content-Based Restriction.[25]

The Prohibition sweeps so broadly that it appears to apply to any book that "relat[es]" to the gender identity (e.g., male) or sexual orientation (e.g., heterosexual) of any person. Because the Prohibition targets speech based on its content – speech about gender identity and sexual orientation – it constitutes a content-based restriction. As explained above, content-based restrictions applied to school libraries must be reasonable in light of the purpose of school libraries and viewpoint neutral. Content-based restrictions also must not be overbroad, which means they cannot prohibit or chill a substantial amount of protected speech. No purpose asserted by the State of Iowa can justify the broad prohibition and substantial chilling effect imposed by the Prohibition.

As used in the Prohibition, the terms "gender identity" and "sexual orientation" are defined so broadly that they encompass all gender identities (such as male, female, or nonbinary) and all sexual orientations (such as heterosexual, homosexual, or bisexual). When combined with the relational term used in the prohibition – "relating to" – the Prohibition appears to require the removal of all library books that mention a character's gender identity or sexual orientation. Even if the prohibition were construed not to encompass books that merely refer to a character's gender identity, it nevertheless appears to encompass any book that portrays or refers to a marriage or romantic relationship between two persons whose gender identity is referenced, which reveals (and "relat[es] to") the sexual orientation of those two persons.

---

[25] Subsection II(B)(1) addresses, in part, Count IV of Plaintiffs' Complaint.

The Prohibition infringes on the First Amendment rights of publishers and authors not to have their books removed from school libraries merely because they relate to the gender identity or sexual orientation of a character.  There is no valid reason for removing such a broad category of books, including *Morris Micklewhite and the Tangerine Dress* by Christine Baldacchino, which portrays a boy who is bullied for wearing a dress during playtime, and *My Moms Love Me* by Anna Membrino, which shows two moms spending time with their child.  Based on the removal of these books, it appears that the Prohibition is being applied to books solely because they do not conform to gender stereotypes.

Some books that are subject to removal due to the Prohibition may expose children to differences in identity, familial composition, and gender roles in society.  For example, the purpose of Malinda Lo's writing is to "normalize the experience of being a queer woman."  Lo Decl. (Ex. F) ¶ 5.  If books that contain Lo's message or theme must be removed due to the Prohibition because they address the gender identity or sexual orientation of their characters, then the Prohibition must encompass any other book that mentions the gender identity or sexual orientation of a character:

- *Families* by Sarah Schuette describes the relationships of children to their nuclear and extended families and their community.  It refers to different members that a person can have in their family, which necessarily relates to gender identity (a mom is presumably a female) and sexual orientation (a married mom and dad are presumably heterosexual).

- *Pete the Cat: Rock On, Mom and Dad!* by James Dean and Kimberly Dean tells the story of Pete thanking his parents – Mom and Dad – with a special surprise.  Pete's Mom is female and his Dad is male, which means that this book "relates to" both gender identity and sexual orientation.

- *Just Like Me* by Vanessa Brantley-Newton discusses gender roles, heterosexual parents, and the feelings and interests of girls.  It relates both to gender identity and sexual orientation.

Plaintiffs do not suggest that any of these books should be removed from Iowa school libraries,

only that the Prohibition is so broad that it appears to encompass these books. The inclusion of the biographical civil rights book *Who Was Harvey Milk* by Corinne A. Grinapol on multiple book removal lists suggests that the Prohibition would also require that all books that refer to a person's sexual orientation – "heterosexual, homosexual, or bisexual" – must be removed from school libraries for kindergarten through sixth grade students. There is no possible justification that could overcome the First Amendment to enable the removal of such a wide array of books.

### 2. The Identity And Orientation Prohibition Is Unconstitutionally Vague.[26]

The prohibition on books "relating to gender identity or sexual orientation" does not come close to satisfying the "stringent vagueness test" imposed by the Due Process Clause. *See Vill. of Hoffman Ests.*, 455 U.S. at 499. It does not provide "a person of ordinary intelligence fair notice of what is prohibited." *Fox Television Stations*, 567 U.S. at 253. And it is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.*

The lack of clear standards has resulted in arbitrary and unequal enforcement of the Prohibition. Some districts have decided that the prohibition does not apply at all to school libraries; other districts have determined that the prohibition applies to school libraries because, out of an abundance of caution, they do not want to subject the district itself, its administrators, and its educators to penalties. Gutmann Decl. (Ex. K) ¶ 13; Abry Decl. (Ex. I) ¶ 17; H.B. Decl. (Ex. C) ¶ 3. And it appears that virtually all of the books that appear on school districts' removal lists based on the Prohibition have been removed because they portray non-heteronormative characters or relate to non-heteronormative themes. Books that discuss heterosexual parents, Moms and Dads, and gender roles (of boys and girls) are not marked for removal, whereas a

---

[26] Subsection II(B)(2) addresses Count VII of Plaintiffs' Complaint.

biography of a homosexual civil rights pioneer – Harvey Milk – is marked for removal (by Norwalk).   Regulations that impede First Amendment rights at the whim of regulators are unconstitutionally vague.  *See Johnson*, 576 U.S. at 595.

Despite receiving questions from educators and organizations that represent educators about the scope of the Prohibition, the State of Iowa has refused even to state whether the prohibition applies to library books – which further illustrates the provision's vagueness.  In May 2023, the Iowa Association of School Librarians and the Iowa Library Association wrote to the Iowa State Department of Education seeking guidance regarding SF 496, as it applies to library books.  Ex. A-1 at 1–3.  Plaintiffs are not aware of any representative of the State Department of Education or any governmental entity with authority concerning SF 496 providing answers to any of these questions.  Rather, the clearest statement concerning application of the Prohibition came from SF 496 Floor Manager Ken Rozenboom, who stated that the prohibition requires schools to remove books with any gay or transgender characters so that kindergarten through sixth grade students cannot access them:  "For all of human history, that was not an issue," Rozenboom said, apparently referring to the existence of non-heteronormative characters. Ex. L-5 at 3. While this statement suggests that the facially neutral prohibition is meant to discriminate against LGBTQ+ viewpoints, it in no way clarifies the scope and meaning of the prohibition.

The State Defendants may contend that the Iowa State Board of Education is in the process of addressing some of these questions.  On November 15, 2023, the Board of Education issued the Proposed Rules, which contain a clause that states "the department will not conclude that a neutral statement regarding sexual orientation or gender identity violates" the Prohibition.  ECF No. 1-2, Item 5.  This ambiguous clause in the Proposed Rules is no less vague than the ambiguous language in the Prohibition itself.

The Proposed Rules only add to the confusion and do not resolve the facial overbreadth of the Prohibition. The attempt to exonerate a "neutral statement regarding sexual orientation or gender identity" only reveals that the prohibition is hopelessly overbroad. That language in the Proposed Rules raises more questions than it answers. What does "neutral statement" mean in relation to gender identity and sexual orientation? If a character in a book who is identified as homosexual is described as having good friends and a healthy level of self-esteem, is that a neutral statement about the character's sexual orientation or is it too positive? If two male characters are portrayed smiling while holding hands, is that a neutral statement? If two characters whose gender identities are mentioned are described as being happily married, is that a neutral statement?

The State of Iowa could easily clarify whether it believes the Prohibition applies to library books, but it has refused to do so. Instead, librarians, teachers, administrators, and school districts are left with an unconstitutional choice: (a) risk penalties, including termination of employment and loss of licensure or (b) err on the side of caution and remove constitutionally protected books that may offend the Prohibition. Many educators subjected to the prohibition have proceeded with caution, censoring books that "relate to" gender identity or sexual orientation to the detriment of authors, publishers, students, and educators because to do otherwise would create undue risk. Speech is chilled; books are stigmatized and removed. For all of these reasons, the Prohibition violates the Due Process Clause as unconstitutionally vague.

## III.    Plaintiffs Are Likely To Suffer Irreparable Harm.

Plaintiffs will suffer irreparable harm if a preliminary injunction is not granted because the Age-Appropriate Standard and Orientation And Identity Prohibition abridge their First Amendment rights. "It is well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The rights of H.B.

and other students to receive information will be impeded, and those students will face negative stigma.  The protected speech of PRH and the Authors will be impeded, chilled, and stigmatized. And the Educators and other educators will be at risk of punishment, including loss of employment and licensure, if they do not err on the side of censoring protected speech.

## IV.      The Balance Of The Equities And Public Interest Lie In Favor Of Plaintiffs.

The balance of the equities and public interest decidedly favor Plaintiffs, given the infringement on their constitutional rights.  "When the government opposes the issuance of a preliminary injunction, the final two factors – the balance of the equities and the public interest – merge." *Fayetteville Public Library*, 2023 WL 4845636, at *21.  "[I]t is always in the public interest to protect constitutional rights." *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) (internal quotations and citation omitted).

In contrast, Defendants will suffer no harm if the preliminary injunction is granted. Existing Iowa laws are sufficient to protect minors from accessing obscene materials from their school libraries.  *See* Iowa Code § 728.2. In addition, school districts have adequate procedures in place for community members to challenge specific books that may be inappropriate for minors. Those procedures allow for evaluation of the value of the book as a whole and can be used by the public to challenge specific library books without requiring the removal of wide swaths of constitutionally protected books.  *See* Abry Decl. ¶ 20.  Regardless, Defendants have no legitimate interest in enforcing the Age-Appropriate Standard and Orientation And Identity Prohibition because they violate the First Amendment.

## CONCLUSION

Senate File 496's Age-Appropriate Standard and Identity And Orientation Prohibition violate Plaintiffs' First Amendment rights.  For the reasons set forth above, the Court should enjoin enforcement of those provisions.

Dated:  December 8, 2023

THE WEINHARDT LAW FIRM

By: /s/ Mark E. Weinhardt
     Mark E. Weinhardt     AT0008280
     Todd M. Lantz       AT0010162
     Jason R. Smith       AT0014862
     2600 Grand Avenue, Suite 450
     Des Moines, Iowa  50312
     Telephone: (515) 244-3100
     mweinhardt@weinhardtlaw.com
     tlantz@weinhardtlaw.com
     jsmith@weinhardtlaw.com

     Frederick J. Sperling
     Adam J. Diederich
     Kirstie Brenson
     Meera Gorjala
     ArentFox Schiff LLP
     233 South Wacker Drive, Suite 7100
     Chicago, Illinois 60606
     Telephone: (312) 258-5500
     frederick.sperling@afslaw.com
     adam.diederich@afslaw.com
     kirstie.brenson@afslaw.com
     meera.gorjala@afslaw.com
     (admitted *pro hac vice*)

     *Attorneys for Plaintiffs*

     Christy A.A. Hickman   AT0000518
     Becky S. Knutson      AT0004225
     Iowa State Education Association
     777 Third Street
     Des Moines, Iowa 50309
     Telephone:  (515) 471-8004
     Christy.Hickman@isea.org
     Becky.Knutson@isea.org

     *Attorneys for the Educator Plaintiffs*