| | |
|---|---|
| PENGUIN RANDOM HOUSE LLC, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>JOHN ROBBINS in his official capacity as President of the Iowa State Board of Education, et al.,<br><br>    Defendants. | Case No. 4:23-cv-00478-SHL-SBJ<br><br><br>**MOTION FOR LEAVE TO FILE OVERLENGTH BRIEF (UNRESISTED)** |

Defendants John Robbins, in his official capacity as President of the Iowa State Board of Education, McKenzie Snow, in her official capacity as Director of the Iowa State Department of Education, and Chad Janzen, in his official capacity as Chair of the Iowa State Board of Educational Examiners ("State Defendants"), pursuant to Local Rule 7(h), hereby request leave to allow the State Defendants to file an overlength Brief Resisting Plaintiffs Motion for a Preliminary Injunction.

1.    The State Defendants seek leave to file its Brief Resisting Plaintiffs Motion for a Preliminary Injunction of 23 pages.

2.    The issues addressed by the State Defendants' Brief Resisting Plaintiffs Motion for a Preliminary Injunction are of substantial public importance and require thorough analysis.

3.    The State Defendants' request for 3 additional pages is a minor deviation from the local rules.

4.    A copy of the Brief Resisting Plaintiffs Motion for a Preliminary Injunction is attached to this motion.

5.     Counsel for State Defendants contacted counsel for Plaintiffs, and they do not resist the filing of an overlength brief by the State Defendants.

6.     For these reasons, good cause exists for the proposed overlength Brief Resisting Plaintiffs Motion for a Preliminary Injunction.

WHEREFORE, State Defendants pray this Court grant their motion for leave to file an overlength brief resisting Plaintiffs Motion for a Preliminary Injunction up to and including 23 pages.

Respectfully submitted,

BRENNA BIRD
Attorney General of Iowa

/s/ *Eric Wessan*
Eric Wessan
Solicitor General

/s/ *Daniel Johnston*
Daniel Johnston
Assistant Attorney General

/s/ *Alexa Den Herder*
Alexa Den Herder
Assistant Solicitor General

Iowa Department of Justice
Hoover State Office Building
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-5191
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
daniel.johnston@ag.iowa.gov
alexa.denherder@ag.iowa.gov

ATTORNEYS FOR STATE DEFENDANTS

*Original filed electronically.*
*Copy electronically served on all parties of record.*

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served on counsel for all parties of record by delivery in the following manner on December 19, 2023:

- ☐ U.S. Mail
- ☐ Hand Delivery
- ☐ Federal Express
- ☒ CM/ECF
- ☐ FAX
- ☐ Overnight Courier
- ☐ Other

Signature: /s/ Daniel Johnston

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| PENGUIN RANDOM HOUSE LLC, *et al.*, Plaintiffs, v. JOHN ROBBINS, in his official capacity as President of the Iowa State Board of Education, *et al.*, Defendants. | Case No. 4:23-cv-00478-SHL-SBJ RESISTANCE TO PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 4

BACKGROUND ................................................................................................. 4

LEGAL STANDARD FOR PRELIMINARY INJUNCTION ................................. 7

ARGUMENT ....................................................................................................... 8

   I.   Plaintiffs claims cannot succeed on the merits. ......................................... 8

   A.   The Library Program is constitutionally permissible under the government speech doctrine. ................................................................. 8

   B.   The Instruction Section does not create constitutional concerns........... 18

   II.   The other injunction factors weigh against an injunction. ........................ 24

CONCLUSION ................................................................................................. 26

# TABLE OF AUTHORITIES

## Cases

*ACLU of Fl., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
  557 F.3d 1177 (11th Cir. 2009) ............................................................... 16

*Arkansas Educ. Television Comm'n v. Forbes*,
  523 U.S. 666 (1998) ........................................................................ 9, 10, 11

*Arkansas Times LP v. Waldrip as Tr. of Univ. of Arkansas Bd. of Trustees*,
  7 F.4th 1386 (8th Cir. 2022)................................................................... 25

*Behlmann v. Century Sur. Co.*,
  94 F.3d 960 (8th Cir. 2015) .................................................................... 23

*Bethel Sch. Dist. No. 403 v. Fraser*,
  478 U.S. 675 (1986) .................................................................... 12, 13, 17

*Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982) ............................................................................... 15

*Board of Regents of Univ. of Wis. System v. Southworth*,
  529 U.S. 217 (2000) ................................................................................. 8

*C.K.-W. ex rel. T.K. v. Wentzville R-IV Sch. Dist.*,
  619 F. Supp. 3d 906 (E.D. Mo. 2022) ..................................................... 15

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
  473 U.S. 788 (1985) ............................................................................... 17

*Dean v. Warren*,
  12 F.4th 1248 (11th Cir. 2021)............................................................ 9, 10

*Doe ex rel. Doe v. Governor of N.J.*,
  783 F.3d 150 (3d Cir. 2015) ..................................................................... 9

*Dolan v. U.S. Postal Serv.*,
  546 U.S. 481 (2006) ........................................................................ 14, 23

*Downs v. L.A. Unified Sch. Dist.*,
  228 F.3d 1003 (9th Cir. 2000) ................................................................ 16

*Dubin v. United States*,
  99 U.S. 110 (2023) ................................................................................. 22

*Farkas v. Miller*,
  151 F.3d 900 (8th Cir. 1998) ............................................................ 15, 23

*FCC v. Pacifica Found.*,
  438 U.S. 726 (1978) ............................................................................... 12

*Gember v. City of Lincoln, Neb.*,
  2007 WL 2904091 (D. Neb. Sept. 26, 2007)............................................ 10

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ............................................................................... 23

*Gundy v. City of Jacksonville Fla.*,
  50 F.4th 60 (11th Cir. 2022).............................................................. 10, 13

*Hazelwood Sch. Dist. v. Kulmeier,*
484 U.S. 260 (1988) ............................................................ 12, 15, 17

*Keeton v. Anderson Wiley,*
644 F.3d 865 (11th Cir. 2011) ................................................... 10

*Knights of Ku Klux Klan v. Curators of the Univ. of* Missouri,
203 F.3d 1085 (8th Cir. 2000) ................................................... 12

*L. H. v. Indep. Sch. Dist.,*
2023 WL 2192234 (W.D. Mo. Feb. 23, 2023) ......................... 15

*McDonnell v. United States,*
79 U.S. 550 (2016) ...................................................................... 22

*Mech v. Sch. Bd. of Palm Beach Cnty., Fla.,*
806 F.3d 1070 (11th Cir. 2015) ................................................. 16

*Mediacom Comms. Corp. v. Sinclair Broad. Group, Inc.,*
460 F. Supp. 2d 1012 (S.D. Iowa 2006) ..................................... 7

*Nat'l Endowment for Arts v. Finley,*
524 U.S. 569 (1998) ................................................................ 8, 11

*New Motor Vehicle Bd. v. Orrin W. Fox Co.,*
34 U.S. 1345 (1977) .................................................................... 24

*Ng v. Bd. of Regents of Univ. of Minnesota,*
4 F.4th 992 (8th Cir. 2023)......................................................... 24

*People for the Ethical Treatment of Animals, Inc. v. Gittens,*
414 F.3d 23 (D.C. Cir. 2005) .............................................. 8, 9, 16

*Persons for Free Speech at SAC v. U.S. Air Force,*
675 F.2d 1010 (8th Cir. 1982) ..................................................... 8

*Planned Parenthood Minn., N.D., S.D. v. Rounds,*
530 F.3d 724 (8th Cir. 2008) ........................................... 7, 23, 25

*Pleasant Grove City, Utah v. Summum,*
555 U.S. 460 (2009) ........................................................ 8, 10, 14

*Rosenberger v. Rector and Visitors of Univ. of Va.,*
515 U.S. 819 (1995) ......................................................... 8, 9, 14, 16

*Sanborn Mfg. Co., v. Campbell Hausfeld/Scott Fetzer Co.,*
997 F.2d 484 (8th Cir. 1993) ....................................................... 7

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
393 U.S. 503 (1969) .............................................................. 12, 17

*U.S. American Library Ass'n, Inc.,*
539 U.S. 194 (2003) ...................................................... 9, 10, 11, 16

*U.S. v. Cook,*
782 F.3d 983 (8th Cir. 2015) ..................................................... 14

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
576 U.S. 200 (2015) ....................................................... 8, 12, 16

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ......................................................................... 7

*Wreal, LLC v. Amazon.com, Inc.,*
40 F.3d 1244 (11th Cir. 2016) ................................................... 24

## Statutes

Iowa Code § 256.1(19) ..................................................................................... 5

Iowa Code § 256.11 ....................................................................... 4, 5, 6, 15, 19, 23

Iowa Code § 256F.4 ......................................................................................... 20

Iowa Code § 279.50 ..................................................................................... 5, 20

Iowa Code § 279.80 ..................................................................... 5, 18, 19, 20, 21, 22, 23

Iowa Code § 4.4 ............................................................................................... 23

Iowa Code § 702.17 ......................................................................................... 14

Iowa Code § 728.2 ........................................................................................... 13

Iowa Code section 256.11(3) ....................................................................... 19, 23

Iowa Code sections 256E.7(2) and 256F.4 ........................................................ 19

owa Code §§ 232D.306 ..................................................................................... 21

## INTRODUCTION

Senate File 496 is a solution to an all-too-real problem. *Cf.* Dkt. 29-1 at 4; *see* Exhibits A, B, C, D, G, H, I, L. It responds to graphic sexual depictions in books in Iowa's Schools. *Id.* The system for flagging and removing books created an educational system inconsistent with the Iowan parents' values. So the Legislature passed, and the Governor signed, SF496 to ensure curricula and library books remained age appropriate. This Court should defer to the elected branches of Iowa's government and respect their policy decision to keep library books and school curricula "age appropriate" in Iowa schools.

## BACKGROUND

Plaintiffs challenge two sections of SF496. They first challenge the exemption of "descriptions or visual depictions of a sex acts" from the definition of "age appropriate" in the educational standards section of the Iowa Code. Iowa Code § 256.11(19)(a)(1). They challenge SF496's effect on new standards for school library programs. Under the new standards, SF496 requires schools to adopt a kindergarten through twelfth grade library program that includes only age-appropriate materials in school libraries ("Library Program"). They next challenge a section that forbids school districts from providing instruction about sexual orientation and gender identity until after sixth grade ("Instruction Section"). Neither offends the Constitution.

SF496 requires school curricula and educational programs to provide "age appropriate and research-based information." SF496 §§ 1–3 (Iowa Code § 256.11) "'Age-appropriate' means topics, messages, and teaching methods suitable to particular ages or age groups of children and adolescents, based on developing cognitive, emotional, and behavioral capacity typical for the age or age group." SF496

§ 4 (Iowa Code § 256.1(19)); *see also* SF496 § 9 (Iowa Code § 279.50). The law also requires schools to adopt a Library Program that "contains only age-appropriate materials, and supports the student achievement goals of the total school curriculum." SF496 § 3 (Iowa Code § 256.11(9)(a)(1)). But "Age-appropriate" does not include "descriptions or visual depictions of a sex act." *Id.*

The definition of "sex act" here is specific: it includes "penetration of the penis into the vagina or anus;" "[c]ontact between the mouth and genitalia or mouth and anus or by contact between the genitalia of one person and the genitalia or anus of another person;" "[c]ontact between the finger, hand, or other body part of one person and the genitalia or anus of another person, except in the course of examination or treatment by" specified licensed professionals; "[e]jaculation onto the person of another;" the "use of artificial sexual organs or substitutes therefore in contact with the genitalia or anus;" and "[t]he touching of a person's own genitals or anus with a finger, hand, or artificial sexual organ or other similar device at the direction of another person." SF496 § 3 (Iowa Code § 256.11(19)(a)(1)).

The Instruction Section prohibits a school district from providing "any program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six." SF496 § 16 (Iowa Code § 279.80). "Gender Identity" here means "a gender-related identity of a person, regardless of the person's assigned sex at birth." SF496 § 16 (Iowa Code § 279.80(1)(a)). And "[s]exual orientation" means "actual or perceived heterosexuality, homosexuality, or bisexuality." SF496 § 16.

The Iowa Senate introduced SF496 on March 2, 2023. *See* Bill History for SF496 https://perma.cc/WU74-P3A9 (accessed Dec. 11, 2023). SF496 passed both chambers in late April. *Id.* Governor Reynolds signed SF496 into law on May 26—when SF496's anti-bullying sections went into immediate effect. *See* SF496 § 22. The age-

appropriate standards went into effect on July 1, 2023, for the current school year. It has been in effect for over 5 months.

Plaintiffs did not challenge the law until November 30, 2023. Only one part of SF496 will go into effect on January 1, 2024. That enforcement provision applies only to school districts and their employees. *See* SF496 § 2 (Iowa Code § 256.11(9(a)(2)). Under that section, a school district or employee could face discipline if it knowingly allowed age-inappropriate material in a school library. SF496 § 2 (Iowa Code § 256.11(9)). But first, the Department of Education must investigate to determine whether a violation occurred. *Id.* And if it did, a first violation results in a written warning. *Id.* For a second or subsequent violation, disciplinary action "may result," but only for a "knowing violation," and only when determined by a required hearing conducted by the board of educational examiners. *Id.* As to employees, an employee "who holds a license, certificate, authorization, or statement of recognition issued by the board of educational examiners" can be subject to a hearing and potential discipline. *Id.* And only then if he is a knowing repeat offender after investigation, warning, and hearing. *Id.*

No Defendant can enforce SF496 against the publisher, authors, or minor student. Vague, generalized fears drawn from mischaracterizations of SF496 cannot establish standing for the minor's stigmatic injury claim. The Education Association's vicarious fear it asserts on behalf of teachers not before the Court cannot establish standing. And Iowa Educators are not injured by a law that forbids them from providing books to school kids that depict sex acts. Their challenge concerns not the facial validity of SF496 or its proper enforcement but a misinterpretation of the law. No Plaintiff asserts a cognizable Article III injury, and all claims fail on the merits.

## LEGAL STANDARD FOR PRELIMINARY INJUNCTION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The power to grant a preliminary injunction is "an awesome power" that "necessarily requires the Court to analyze the record carefully to determine whether Plaintiff has shown that it will be irreparably harmed absent the issuance of the requested relief." *Mediacom Comms. Corp. v. Sinclair Broad. Group, Inc.*, 460 F. Supp. 2d 1012, 1017 (S.D. Iowa 2006).

When determining whether to grant a preliminary injunction, Courts consider, "(1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the public interest." *Sanborn Mfg. Co., v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485–86 (8th Cir. 1993).

But when a plaintiff seeks to "enjoin the implementation of a duly enacted state statute," a district court must "make a threshold finding that a party is likely to prevail on the merits." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc). Only after that threshold showing may a court "then proceed to weigh the" other factors. *Id.* at 732. This "more rigorous standard" is intended to ensure that "a state's presumptively reasonable democratic processes" aren't thwarted without "an appropriately deferential analysis." *Id.* at 733.

## ARGUMENT

### I. Plaintiffs claims cannot succeed on the merits.

#### A. The Library Program is constitutionally permissible under the government speech doctrine.

##### 1. The government-speech doctrine protects the government's role as a communicator.

Under the government speech doctrine, "[a] government entity has the right to 'speak for itself.'" *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (quoting *Board of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 229 (2000)). And "it is entitled to say what it wishes." *Id.* (citing *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)). Indeed "it is the very business of government to favor and disfavor points of view." *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J. concurring in judgment). "When the State is the speaker, it may make content-based choices." *Rosenberger*, 515 U.S. at 833. "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Summum*, 555 U.S. at 467.

Here, SF496 does not regulate private speech. It sets school curricula and library inventory—both of which are government speech that does not violate First Amendment protections. *See Rosenberger*, 515 U.S. at 833 (The government can "regulate the content of what is or is not expressed" in its educational offerings); *see also Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."). And the Government can decide what government speech it allows. *See Persons for Free Speech at SAC v. U.S. Air Force*, 675 F.2d 1010, 1022 (8th Cir. 1982).

## 2. A public library may select what expressive content it shows to the public, and this is government speech.

The State communicating its own message impairs no one's First Amendment Rights. "The government may . . . run museums, libraries, television and radio stations, primary and secondary schools, and universities." *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 29 (D.C. Cir. 2005). When producing speech itself, "the government engages in the type of viewpoint discrimination that would be unconstitutional if it were acting as a regulator of private speech." *Id.* Yet "[t]he First Amendment Free Speech Clause does not limit the government as speaker." *Id.* (citing *Rosenberger*, 515 U.S. at 833).

When the government "compil[es] the speech of third parties," that is a "communicative act." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998). That includes "editorial discretion in the selection and presentation of" third-party speech that the government presents to the public. *Gittens*, 414 F.3d at 30 (quoting *Forbes*, 523 U.S. at 674). In public libraries, "the government speaks through its selection of which books to put on the shelves and which books to exclude." *Gittens*, 414 F.3d at 29.

No library can hold all books published, so a State must have authority to curate its public library collections. *U.S. American Library Ass'n, Inc.*, 539 U.S. 194, 204 (2003) (libraries cannot give "universal coverage" of books on their shelves). "To fulfill their traditional missions, public libraries must have broad discretion to decide what material to provide their patrons." *Id.* So, libraries select only materials "that would be of the greatest direct benefit or interest to the community." *Id.* They compile materials with "requisite and appropriate quality." *Id.* Refusing States' ability to ensure libraries curate their collections raises serious federalism concerns.

### 3. The First Amendment does not allow activists to speak for the government.

Plaintiffs cannot compel the content of Government speech. *See Dean v. Warren*, 12 F.4th 1248, 1264 (11th Cir. 2021). Plaintiffs base their challenge on the "right to receive information." But a "listener's right to receive information is reciprocal to the speaker's right to speak." *Doe ex rel. Doe v. Governor of N.J.*, 783 F.3d 150, 155 (3d Cir. 2015). And that right does not attach to government speech—when the State speaks, it has plenary authority over its own message. *See Summum*, 555 U.S. at 467.

Plaintiffs cannot assert a reciprocal right under the Free-Speech Clause to compel the content of the government's message. *See Warren*, 12 F.4th 1248, 1264 (11th Cir. 2021); *see also Keeton v. Anderson Wiley*, 644 F.3d 865, 877 (11th Cir. 2011). Because a government's compilation of third-party content in a library is government speech, *Forbes*, 523 U.S. at 674, Plaintiffs have no constitutional right to control a school library's content. "The First Amendment works as a shield to protect *private* persons from encroachments by the government on their right to speak freely, not as a sword to compel the government to speak for them." *Gundy v. City of Jacksonville Fla.*, 50 F.4th 60, 71 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 790 (2023)

### 4. Applying a First Amendment forum analysis is a category error.

Applying a First Amendment forum analysis is "incompatible with the discretion that public libraries must have to fulfill their traditional missions." *Am. Libr. Ass'n,*, 539 U.S. at 205. First Amendment forum principles do not "apply to a public library's exercise of judgment in selecting the material it provides to its patrons." *Id.* at 205. Public library staff "necessarily consider content in making collection decisions and the broad discretion in making them" *Id.* Other courts in this circuit recognize that forum analysis "and heightened judicial scrutiny are incompatible . . . with the discretion that public libraries must have to fulfill their traditional missions." *Gember*

*v. City of Lincoln, Neb.*, 2007 WL 2904091, at *2 (D. Neb. Sept. 26, 2007) (quoting *Am. Lib. Ass'n*, 539 U.S. at 205).

Government speech is not assessed under a First Amendment forum analysis. Nor do courts use a forum analysis when a government entity exercises discretion over content-based judgments. In an analogous context, the Supreme Court held that public forum principles seldom apply to a public television station's discretion to make content-based judgments about what it presents to the public. *Forbes*, 523 U.S. at 672. That Court recognized that "broad rights of access for outside speakers would be antithetical . . . to the discretion that" public stations and their public employee staff "must exercise to fulfill their journalistic purpose and statutory obligations." *Id.* at 673.

So too a National Endowment of the Arts funding program that had content-based criteria for funding decisions did not violate the First Amendment. *Accord Finley*, 524 U.S. 569. Forum analysis was unnecessary because of the "inherently content-based 'excellence' threshold" required for the funding. *Id.* at 586.

Then in *American Library Association*, the United States Supreme Court extended the rationale of *Forbes* and *Finley* to public libraries and their "exercise of judgment in selecting material [they] provide to [their] patrons." 539 U.S. at 205 (plurality op.) (cleaned up). That makes sense, because "[j]ust as forum analysis and heightened judicial scrutiny are incompatible with the role of public television stations and the role of the NEA, they are also incompatible with the discretion that public libraries must have to fulfill their traditional missions." *Id.*

In rejecting a First-Amendment challenge, *American Library Association*, upheld the "Child Internet Protection Act," which addressed "problems associated with the availability of internet pornography in public libraries." *Id.* at 198–99. Its analysis found that a forum analysis would be "out of place." *Id.* at 205. In rejecting heightened scrutiny, the Court explained that a "library does not acquire Internet terminals in

order to create a public forum for Web publishers to express themselves, any more than it collects books in order to provide a public forum for the authors of books to speak." *Id.* at 206. Because the library's internet access was "no more than a technological extension of the book stack," the challenged statute did not need to survive heightened scrutiny. *Id.* at 207. If the Supreme Court was extending principles from books to the internet, then this Court should be comfortable assuming that the State's role as compiler of school libraries is similarly appropriate.

In *Knights of Ku Klux Klan v. Curators of the Univ. of Missouri*, a not-for-profit public radio station rejected a financial gift from the KKK, because it operated under an "enhanced underwriting program" that required stations to broadcast acknowledgments of their donors. 203 F.3d 1085, 1088 (8th Cir. 2000). The Court applied *Forbes*, and it upheld the station's donor rejection. *Id.* at 1093, 1096.

The court explained that "forum requirements are for the most part inapplicable" when "substantial discretion is accorded to broadcasters with respect to the daily operation of their stations." *Id.* at 1093. Another basis for upholding the act was that "[f]irst and foremost, [the station's] underwriting acknowledgements constitute governmental speech." *Id.*

And the Supreme Court has since reiterated that a forum analysis does not apply to government speech. *See Walker*, 576 U.S. at 215 (Texas's specialty license plates are "meant to convey and have the effect of conveying a government message").

> ## 5. These principles apply with greater force to school libraries.

Although students in a school environment do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), the "First Amendment rights of students in the public schools 'are not automatically coextensive with the rights of adults in other settings,'" *Hazelwood Sch. Dist. v. Kulmeier*, 484 U.S. 260, 266 (1988)

(quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986)). First-amendment rights "must be applied in light of the special characteristics of the school environment." *Id.* (quoting *Tinker*, 393 U.S. 511).

States can protect children from "offensive expression" to better support "parents' claim to authority in their own household." *FCC v. Pacifica Found.*, 438 U.S. 726, 749 (1978). That recognizes "limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit, and the audience may include children." *Fraser*, 478 U.S. at 684. Parents share with the State "the obvious concern . . . to protect children—especially in a captive audience—from exposure to sexually explicit, indecent, or lewd speech." *Id.*

SF496 fits within the allowed framework of the State protecting children and delegating to parents the role of deciding when their children should be exposed to explicit materials. The Library Program shields school-age children from exposure to sex acts in the school environment. And it reflects other Iowa law that has long forbade "dissemination and exhibition of obscene materials to minors." Iowa Code § 728.2. "Obscene materials" includes the same definition of "sex acts" used in SF496. Plaintiffs admit "Iowa has an interest in protecting minors from materials that are obscene." Dkt 29-1 at 30. SF496 keeps State's Exhibits A, B, C, D, G, H, I, and L out of Iowa school libraries—but without infringing any parent's right to buy the book for his child nor does it preclude the same parent from taking his child to the local public library and checking it out.

The Library Program is constitutionally valid. It allows "only age-appropriate materials" in public school libraries—a decision that is the State's prerogative. As library composition is government speech, the State may set standards for how schools stock their libraries. State funded schools must be able to decide whether and how to stock sexually explicit material. The Free Speech clause is not "a sword [for

Plaintiffs] to compel the government to speak for them." *Gundy*, 50 F.4th at 71 (11th Cir. 2022). There is no heightened scrutiny that applies here.

### 6. Plaintiffs' First-Amendment free speech claims are off target.

Plaintiffs' misplaced approach to the First Amendment undermines their request for relief. SF496 does not trigger the Free Speech clause because it regulates government speech not private speech. *See Summum*, 555 U.S. at 467. ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."). Citizens cannot control government speech through their right to receive information—if Plaintiffs want to be responsible for government speech their recourse is found in the political process. The State may also "make content-based choices," *Rosenberger*, 515 U.S. at 833, so Plaintiffs' content-based claim fails too. And the overbreadth and vagueness claims are improper challenges to government speech. The State is not regulating private speech when it requires only age-appropriate library materials in school libraries.

Plaintiffs argue the word "description" is not clear enough to satisfy Due Process. But that's false. Plaintiffs cannot read "description" in isolation from "sex acts" to manufacture a constitutional defect. *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) (explaining that words cannot be construed in isolation). When read in context and in conjunction with the definition of "sex act," SF496 is clear on the detail a description must have to violate the Library Program. A "person of ordinary intelligence" has "fair notice of what is prohibited" by a law that forbids a "description" of, for example, "[c]ontact between the mouth and genitalia or mouth and anus or by contact between the genitalia of one person and the genitalia or anus of another person." *U.S. v. Cook*, 782 F.3d 983, 987 (8th Cir. 2015); Iowa Code § 702.17; SF496 § 4. That is circulating in Iowa Schools. *See* Exhibits A, B, C, D, G, H, I, L. This is not "'so standardless that it authorizes or encourages serious

discriminatory enforcement.'" *Cook*, 782 F.3d at 987. The standard is clearer under the proposed rules— "A reference or mention of a sex act in a way that does not describe or visually depict a sex act" does not offend the age-appropriate standard. Dkt. 1-2, p. 3. Feigned confusion is not unconstitutional vagueness. School administrators and board members do not struggle to understand SF496. *See* Exhibits D, E, F, J, K. Even if Plaintiffs could identify a legitimate question of statutory interpretation, "that in itself does not give rise to a finding of unconstitutional vagueness." *Farkas v. Miller*, 151 F.3d 900, 906 (8th Cir. 1998). SF496 is also not a criminal statute. And the enforcement mechanism is not draconian. A first offense results in only a warning. SF496 § 2 (Iowa Code § 256.11(9)(a)(2)). And discipline "may" occur only after repeat knowing violations. *Id.*

Next, Plaintiffs attempts to bring SF496 under free-speech scrutiny fail. SF496 is neutral—it takes no partisan or viewpoint stances. It does not "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982) (plurality op.). And the Legislature's role in setting these curricular standards is appropriate. Indeed, "the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Kulmeier*, 484 U.S. at 273. Moreover, other courts in this circuit recognize that decisions about removing books from school libraries is entitled to "substantial deference." *C.K.-W. ex rel. T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 917 (E.D. Mo. 2022), *appeal dismissed*, 2023 WL 2180065 (8th Cir. Jan. 17, 2023); *see L. H. v. Indep. Sch. Dist.*, 2023 WL 2192234, at *5 (W.D. Mo. Feb. 23, 2023) (same).

Plaintiffs' reliance on the fractured plurality in *Board of Education v. Pico*—a case that predates the Supreme Court's fuller exploration of the government speech doctrine—is unavailing. *See* Dkt. 29-1 at 16 (quoting 457 U.S. at 872). *Pico*'s plurality held school library materials may not be removed "in a narrowly partisan or political

manner." 457 U.S. at 870. But removing sex acts from school libraries is not a partisan restriction. *Pico* feared a "Democratic school board, motivated by party affiliation, order[ing] the removal of all books by or in favor of Republicans." *Id.* at 871. That is categorically different from SF496 which ensures school libraries contain age-appropriate books. Even if Plaintiffs are right that SF496 must survive *Pico*, the result is the same.

But *Pico* was "a badly fractured decision" that has "no precedential value as to the application of the First Amendment to these issues." *ACLU of Fl., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1199—1200 (11th Cir. 2009). As important, Pico "establishes no standard" for future courts. *Id.* ("*Pico* is a non-decision so far as precedent is concerned") (quotations omitted). After *Pico*, Courts recognized that libraries are not public forums and "the government speaks through its selection of what books to put on the shelves and which books to exclude." *See Gittens*, 414 F.3d at 28.

The First Amendment does not prohibit a State selecting materials based on content and viewpoint. *See Gittens*, 414 F.3d at 29. And those decisions do not trigger the heightened scrutiny courts use to assess content- or viewpoint-restrictive decisions affecting private speech. *Walker*, 576 U.S. at 215 ("When the government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."). That is even truer for school libraries where the materials target a young audience and "supports the student achievement goals of the total school curriculum." SF496 § 2.

Courts are wary about extending *Pico* because it predates the modern government-speech doctrine. *See, e.g., Rosenberger*, 515 U.S. at 819. That expansion led to the Supreme Court recognizing that public libraries' stocking decisions are government speech not subject to First Amendment forum analysis. 539 U.S. at 204– 05, 213 n.7. So courts have held that "the government speaks through its selection of

16

which books to put on the shelves and which books to exclude." *Gittens*, 414 F.3d at 28–29. Courts have also extended government speech to include the freedom "not to speak" and to "'speak through the removal' of speech that the government disapproves." *Mech v. Sch. Bd. of Palm Beach Cnty., Fla.*, 806 F.3d 1070, 1074 (11th Cir. 2015) (quoting *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1012 (9th Cir. 2000)). When *Pico*'s plurality strays from later jurisprudential developments, it should be narrowly construed.

Even if this Court disagrees with the other courts finding that school library composition is protected by heightened scrutiny under the First Amendment, the result is the same. Plaintiffs concede that a nonpublic forum analysis is the proper framework. (Dkt. 29-1 at 27.) But in nonpublic forums, content-based restrictions must be reasonable given the purpose of the forum and viewpoint neutral. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).

Keeping sex acts out of school libraries is reasonable. *Fraser*, 478 U.S. at 684 (recognizing "limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit, and the audience may include children"). That is especially true in school libraries hoping to educate youth. *Kulmeier*, 484 U.S. at 266 ("appl[ying scrutiny] in light of the special characteristics of the school environment) (quoting *Tinker*, 393 U.S. at 511). And nothing in SF496 requires removing any library books because of viewpoint. Books including sex acts are removed regardless of the author's viewpoint or the ideas expressed. So SF496 survives the content neutrality required in a nonpublic forum.

Plaintiffs' First Amendment challenges to the Library Program have no likelihood of success on the merits.

**B.      The Instruction Section does not create constitutional concerns.**

Plaintiffs' challenge to SF496's Instruction Section fails to state a constitutional claim. Plaintiffs question whether the Instruction Section's ban on a "program" relating to gender identity or sexual orientation works in conjunction with the Library Program to require schools to remove library books that relate in some way to gender identity or sexual orientation. But this Court should assess SF496 under one of two possible scenarios. First a school library's inventory could be government speech, either as instruction or curriculum, or as selection or compilation of third-party speech, so book removal is constitutionally permissible. Or second, library books are outside the scope of the Instruction Section's compulsory instructional focus, in which case school library books "relating to sexual orientation and gender identity" need not be removed from school libraries. Plaintiffs concede this second option resolves their constitutional challenge. Dkt. 29-1 at 42 ("The State of Iowa could easily clarify whether it believes the Prohibition applies to library books."). Either way, Plaintiffs' challenge fails.

The Instruction Section does not apply to the Library Program because it does not apply to noncurricular books on library shelves. The Instruction Section concerns "prohibited instruction" in the compulsory school environment. So the Instruction Section would not allow "a school district" to choose a book "relating to gender identity or sexual orientation" as part of its "curriculum" or "instruction" for "students in kindergarten through grade six." SF496 § 16 (Iowa Code § 279.80). Those kids range in age from 5 to 12 years old. But a noncurricular book may remain in the school library under the Library Program, so long as it does not describe a "sex act," and it is age appropriate. Because Plaintiffs agree their challenge depends on the theory that the Instruction Section controls library inventory, State Defendants' clarification that it does not resolves their claim.

Plaintiffs' constitutional challenge follows from their sky-is-falling attempt to misread SF496 as expansively as they can. The Instruction Section forbids any "program . . . relating to gender identity or sexual orientation to students in kindergarten through grade six." SF496 § 16 (Iowa Code § 279.80). Plaintiffs contend that the Library Program falls within the Instruction Section's prohibition. So Plaintiffs' overexpansive reading of SF496 excludes any book that, should the book be subject of a school lesson, would violate the Instruction Section. But the Instruction Section prohibits instruction on age-inappropriate relationships—regardless of whether that relationship is same-sex. Many books include families, relationships, or other details that Plaintiffs contend require a book's removal. But that absurd reading of SF496 misreads its text.

SF496 did not incorporate the Instruction Section into the Library Program. Plaintiffs' fears about the Instruction Section's effect on school libraries are misplaced. So the Court need not reach Plaintiffs' constitutional challenge. But even under Plaintiffs' too-broad reading of the Instruction Section, decisions about library inventory are government speech not subject to heightened scrutiny.

### 1. SF496 does not support Plaintiffs' reading of the Instruction Section.

The Instruction Section incorporates the existing Iowa Code section 279.80 into several other sections of the Iowa Code that govern instructional or curricular materials from kindergarten to sixth grade. Chapter 279 concerns the powers and duties of boards of directors of school corporations. The new section 279.80's focus is "prohibited instruction." SF496 incorporates section 279.80 requirements in these ways:

- SF496 section 2 amends Iowa Code section 256.11 subsection 2 to ensure the "kindergarten program" provides "experiences relating to the development of life skills" and human growth and development that is "subject to section

279.80, age-appropriate and research-based." SF 496 § 2 (Iowa Code § 256.11). It also explains that "section 279.80 shall not apply to a nonpublic school." SF496 § 2 (Iowa Code § 256.11).

- SF496 section 2 amends Iowa Code section 256.11(3) to ensure that grades one through six teach human growth and development in a way that is "age-appropriate and research-based." SF 496 § 2 (Iowa Code § 256.11).

- SF496 sections 6 and 8 create Iowa Code sections 256E.7(2) and 256F.4 which creates rules and regulations for charter schools. Those requirements require such schools to comply with State laws to ensure age-appropriate instruction consistent with other public schools. SF 496 §§ 6, 8 (Iowa Code § 256F.4).

- SF496 section 9 amends Iowa Code section 279.50 to address human growth and development instruction. SF496 § 9 (Iowa Code § 279.50).

- SF496 section 10 also amends Iowa Code section 279.50 to ensure "each school board shall provide age-appropriate and research-based instruction in human growth and development including instruction regarding self-esteem, stress management, interpersonal relationships, and domestic abuse in grades one through six." SF496 § 10 (Iowa Code § 279.50).

SF496 was clear when incorporating section 279.80's requirements into other code sections. But the Library Program section did not incorporate section 279.80. It instead required the Library Program to be "consistent with section 280.6"— an already-existing statutory requirement that held "[r]eligious books such as the Bible, the Torah, and the Koran" can be neither excluded from public school nor made required reading. If SF496 intended to require section 279.80 apply to the Library Program, it would have referenced it like it did in the many other sections.

## 2. The Instruction Section consistently applies only to grades kindergarten through sixth.

SF496 never incorporates section 279.80's requirements after grade six. The Legislature considered where it believed materials covered by section 279.80 were categorically inappropriate and set the line well before high school. That reveals intentionality: the references are repeated, specific, and always targeted at protecting students in school between kindergarten and grade six. So the Legislature did not intend to incorporate section 279.80 into Library Program, which applies from kindergarten through twelfth grade.

But in Iowa SF496 delays children's exposure to that material to children until they are more mature. That decision fits within the Legislature's purview. The delayed exposure includes all sex education. If parents want their young child to be exposed to more adult lessons, then they can take on that responsibility.

Why do some people want children to learn about sexual education and observe sexually explicit material at a young age while others do not? Sex education is a controversial topic with different policy, political, and religious perspectives. The who, what, when, where, and why matter when teaching kids about adult subjects. Not all parents will view age-appropriate in the same way. *See* Exhibits A, B, C, D, G, H, I, L. Reasonable minds may differ—and that is okay in democratic republic.

But the idea and application of age-appropriate is not new. The Iowa Legislature has made some decisions while leaving others for school boards and educators. And they are in good company. Courts routinely decide when a child is age-appropriate for certain things. *See*, *e.g.*, Iowa Code §§ 232D.306 (a minor who is the subject of a guardianship petition shall attend the hearing if the minor is of an age appropriate with a presumption of being age appropriate at fourteen), 598.15(6) (the court may require age-appropriate counseling for children involved in a dissolution of marriage action). In the context of a minor being able to attend a guardianship hearing–related

21

to their own care, custody, and well-being–they are presumed age-appropriate at fourteen. In school terms, that is eighth or ninth grade, which is later than the delay the Legislature imposed on when SF496 contemplates starting sex education.

### 3. The proposed rules and enforcement mechanism support this plain reading of SF496.

On November 15, 2023, the Iowa State Board of Education released proposed rules that give guidance on SF496's enforcement. As to the Instruction Section, the rules explain that "the department will not conclude that a neutral statement regarding sexual orientation or gender identity violates section 279.80 or this subrule." Dkt. 1-2. That neutrality fits in SF496's approach. Section 279.80 concerns prohibited instruction, and its scope is limited to a school district's learning environment. Although the section reserves teaching on gender identity and sexual orientation until after grade six, noncurricular neutral references are outside the rule's scope.

The proposed rules do not extend the Instruction Section's requirements to the Library Program. Proposed rule 281—12.3(15) addresses that section. Nothing there extends it to the Library Program. Proposed rule 281—12.3(12)(d) addresses the Library Program. Nothing there incorporates the Instruction Section either. Neither SF496 nor the proposed rule applies the Instruction Section to the Library Program.

The Library Program's enforcement fits within SF496's framework. Violations happen when districts or employees knowingly allow in age-inappropriate materials. While "age appropriate" includes "sex acts," neither statute nor rules incorporate section 279.80's criteria into the Instruction Section. And SF496 does not incorporate them into the enforcement mechanism of the Library Program. Section 279.80 criteria are outside the Library Program's enforcement scope. SF496's text defeats Plaintiffs' vagueness claims under the First and Fourteenth Amendments. And their First Amendment challenge based on overbreadth and content-restriction also fails.

### 4. Plaintiffs' subjective interpretation cannot create a vagueness claim.

Each time SF496 incorporates section 279.80, the incorporation refers to instruction and curriculum. Several examples reference "instruction" explicitly while others describe the curriculum. That is a clue that "program" in the Instruction Section does not extend into the non-instructional school library.

A familiar interpretive canon is that "a word is known by the company it keeps." *Dubin v. United States*, 599 U.S. 110, 124 (2023) (*noscitur a sociis*, which is "wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to" legislative acts) (quoting *McDonnell v. United States*, 579 U.S. 550, 568–596 (2016)). The Instruction Section prohibits a school district from providing any "program, curriculum, test, survey, questionnaire, promotion, or instruction." SF496 § 16 (Iowa Code § 279.80). When the bill is read as a whole, SF496's Instruction Section refers to the compulsory instructional function of the school district. *Dolan*, 546 U.S. at 486 (discussing the need to interpret statutes as a whole and not construe words out of context or in isolation). That does not affect a school library—the books there are not required reading. And any required reading books in the school library are not required by being in the school library.

Plaintiffs challenge to the Instruction Section requires this Court to apply an overly broad construction. Instead, this Court should assume that the Legislature does not "intend an absurd result." *Behlmann v. Century Sur. Co.*, 794 F.3d 960, 965 (8th Cir. 2015) (cleaned up); *see* Iowa Code § 4.4(4) ("In enacting a statute, it is presumed that . . . a just and reasonable result is intended.").

Statutes are also presumed constitutional. *See* Iowa Code § 4.4(1). Even if Plaintiffs could identify a legitimate question of statutory interpretation, "that in itself does not give rise to a finding of unconstitutional vagueness." *Farkas v. Miller*, 151 F.3d 900, 906 (8th Cir. 1998). Plaintiffs claim that the penalty for failure to

remove inappropriate books contributes to the vagueness. Dkt. 29-1 at 27. But a passing reference to characters that "had sexual intercourse" does not violate SF496. *Cf. id.* And even if it did—the violation would have to be knowing, and a *second* violation, before any discipline followed. SF 496 § 2 (Iowa Code § 256.11(9)).

Indeed, it is always "true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of [disputed] terms will be in nice question.'" *Id.* (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). That is not enough to defeat a statute. Plaintiffs cannot succeed on their Instruction Section challenge.

## II.    The other injunction factors weigh against an injunction.

Plaintiffs' failure to show likelihood of success is fatal. *See Rounds*, 530 F.3d at 732. So this Court need not "proceed to weigh the other" factors. *Id.* at 732. But those factors also weigh against an injunction.

Plaintiffs have not shown irreparable harm. SF496 invades no first amendment rights. Shielding school children from sex acts in school does not create an irreparable harm. *See* Exhibits A, B, C, D, G, H, I, L. School administrators and school board members are not struggling to understand and follow SF496. *See* Exhibits D, E, F, J, K. The authors are not chilled from publishing their books, which are readily available in libraries and bookstores. And the educators' subjective fear of punishment is not a cognizable harm. It is incommensurate with the enforcement mechanism in the Library Program, which requires repeated knowing violations.

Plaintiffs' request for immediate relief contrasts with their delay in seeking a preliminary injunction. Governor Reynolds signed SF496 law on May 26, after a lengthy and highly publicized committee, amendment, and debate process. But Plaintiffs did not file a complaint until nearly five months later. "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal— militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016); *see also Ng v. Bd. of Regents of Univ. of Minnesota*,

64 F.4th 992, 997 (8th Cir. 2023) ("[A]n unreasonable delay in moving for the injunction can undermine a showing of irreparable harm and is a sufficient ground to deny a preliminary injunction.") (internal quotation omitted).

Plaintiffs' claims do not allege that the November proposed rules cause their harm but that SF496 causes it. Litigants often challenge laws before rulemaking. Plaintiffs give no reasonable explanation of delay. Now, the status quo is SF496 remaining in effect. Plaintiffs' request for a preliminary injunction action is untimely.

As to the balance of harms, a preliminary injunction will create uncertainty and cause greater harm to the State, its students, and parents who enjoy SF496's protections. An injunction is also not in in the public interest. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers); *see also Rounds*, 530 F.3d at 732–33 (stressing the "more rigorous standard for demonstrating a likelihood of success on the merits" when plaintiffs seek to "thwart a state's presumptively reasonable democratic processes"). Statutes are "presumed constitutional and all doubts are resolved in favor of constitutionality." *Arkansas Times LP v. Waldrip as Tr. of Univ. of Arkansas Bd. of Trustees*, 37 F.4th 1386, 1393 (8th Cir. 2022), *cert. denied*, 143 S. Ct. 774 (2023).

Plaintiffs failed to meet their heavy burden to show a likelihood of success on the merits, irreparable harm, or that the balance of equities or public interest are aided by their suit. They lack standing. And their claims fail on the merits. An injunction departs from the status quo, where age-inappropriate materials are excluded from Iowa's schools and major health decisions about children are communicated to their parents.

**CONCLUSION**

State Defendants ask the Court to deny Plaintiffs' request for a preliminary injunction and grant such further relief the court deems equitable and just. This Court should deny the injunction.

Respectfully submitted,

BRENNA BIRD
Attorney General of Iowa

/s/ *Eric Wessan*
Eric Wessan
Solicitor General
/s/ *Daniel Johnston*
Daniel Johnston
Assistant Attorney General
/s/ *Alexa Den Herder*
Alexa Den Herder
Assistant Solicitor General
Iowa Department of Justice
Hoover State Office Building
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-5191
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
daniel.johnston@ag.iowa.gov
alexa.denherder@ag.iowa.gov

ATTORNEYS FOR STATE DEFENDANTS

*Original filed electronically.*
*Copy electronically served on all parties of record.*

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served on counsel for all parties of record by delivery in the following manner on December 19, 2023:

☐ U.S. Mail      ☐ FAX
☐ Hand Delivery      ☐ Overnight Courier
☐ Federal Express      ☐ Other
☒ CM/ECF

Signature: /s/ *Daniel Johnston*

Exhibit A

Affidavit of Jackie Abram

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF IOWA

|  |  |
|---|---|
| PENGUIN RANDOM HOUSE LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN ROBBINS in his official capacity as President of the Iowa State Board of Education, et al.,<br><br>Defendants. | Case No. 4:23-cv-00478-SHL-SBJ<br><br><br>**DECLARATION OF<br>JACKIE ABRAM** |

COMES NOW, Jackie Abram, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Jackie Abram. I am a former resident of Urbandale

2. , Iowa and previously lived within the Waukee Community School District. All three of my children have attended Waukee schools or currently do.

3. When my two older children were in 6th grade, they were each required to fill out a survey in class that asked what name they would like the teacher to use to refer to them, whether to use that name, but not in front of or to their family, and what pronouns they would like their teacher to use.

4. I can remember my oldest child sharing with me about this survey and that it made him feel uncomfortable. I remember telling my son that if he was uncomfortable filling out any of the questions in the survey, that he should submit the survey without answering specific questions. He told me that

these surveys sometimes will not let him submit them without answering each question. A screenshot of a survey that is substantially similar to the one my two oldest children filled out can be seen below.



5. I believe that requiring a child, especially a 6th grader, to answer these questions, especially without notification or consent from the parents, is inappropriate.

6. Two years later, when my oldest son was in 8th grade, he referred to a female student with female pronouns. Upon learning of this interaction, his teacher removed him from the classroom and admonished him because the other student believed herself to be male and wanted to use male pronouns. This made my son feel uncomfortable and I believe it was inappropriate.

7.  In March of 2021, my youngest child, B.A., was a 5th grader at Shuler

    Elementary. One day in March, my son came home to me crying. I remember

    the conversation we had occurred similar to the exchange described below.

    > **B.A.:** I'm really confused about why you guys decided to make me a boy.

    > **Mother:** What do you mean?

    > **B.A.:** Our teacher read us a book in class and told us that our parents might have made a mistake on our birth certificates.

8.  The book my son was referring to was *Call Me Max*. It's the story of a female,

    similar in age to my son, who believes she is a male and it was read aloud by

    his teacher, Michael Noble, to the entire class of 5th graders. An excerpt from

    the book is below.

    > "Transgender" is a long word but it means something simple. Trans means going across. Like how transportation means going from here to there. Gender means being a boy or a girl. Or a little of both. Or not feeling like a boy or a girl. When a baby is born, a grown-up says, "It's a boy!" or "It's a girl!" If a brand-new baby could talk, sometimes that baby might say, "No, I'm not!" When a baby grows up to be transgender, it means that the grown-up who said they were a boy or a girl made a mistake.

    > When I was born, my mom and dad said, "It's a girl!" When I looked in the mirror, I saw a girl. Kind of. But because I'm transgender, I wanted to see a boy.

9.  After this upsetting interaction with my son, I wrote to Mr. Noble for an

    explanation as to why this book was read to him and his classmates followed

    by a discussion on gender identity. I asked him why he made a comment to

the class suggesting that it wasn't their fault that their parents assumed their gender when they were born and called them the wrong pronoun. I shared with him my dismay that he would suggest I "misgendered" my son when he was born.

10. Later that evening, Mr. Noble responded to my email. He did not acknowledge whether he made these comments to the class. Instead, he said the book was read to conform to the District's equity statement. There's nothing equitable about teaching a 5th grader that his parents might have misgendered him at all, let alone on the day of his birth.

11. He also informed me that this book was read as part of a reaction to recent bullying incidents. I responded that the incidences of bullying should be responded to specifically and individually. The District has an anti-bullying policy, and it states:

> Harassment and bullying of students and employees are against federal, state and local policy, and are not tolerated by the District. The District is committed to providing all students and staff with a safe and civil school and work environment in which all members of the school community are treated with dignity and respect.

12. Suggesting to my son that his parents may have misgendered him does not treat him or me with dignity or respect.

13. Eventually, I met with Mr. Noble virtually and he apologized that B.A. was made to feel uncomfortable but did not apologize for reading the book in the first place.

Executed on <u>December 19, 2023.</u>        */s/ Jackie Abram*
                                              Jackie Abram

Exhibit B

Affidavit of David Alexander

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| PENGUIN RANDOM HOUSE LLC, et al., | Case No. 4:23-cv-00478-SHL-SBJ |
| Plaintiffs, | |
| v. | **DECLARATION OF DAVID ALEXANDER** |
| JOHN ROBBINS in his official capacity as President of the Iowa State Board of Education, et al., | |
| Defendants. | |

COMES NOW, David Alexander, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is David Alexander, and I reside in Indianola, Iowa. My wife and I live within the Indianola Community School District.

2. In Fall 2022, my seventeen-year-old son, S.A., enrolled in an English language course entitled "Survey of Literature" offered at Indianola High School.

3. The curriculum included the book "The Kite Runner" by Khaled Hosseini. This work includes many graphically depicted adult themes including child exploitation, child rape, rape, and suicide.

4. Parents were not notified this book would be required. My wife and I did not find out until we requested the information.

5. My wife and I requested an alternative literary selection be offered for our son and we were informed that it would not be. The only accommodation which the school offered to us was to have S.A. sit in the hallway during discussions and not read the book.

6. Not wanting our son to be ostracized among his peers, my wife and I acquiesced to the school's "requirement" and read the book with our son.

7. The graphic depictions of child rape and gun-inflicted suicide were age-inappropriate, jarring, and traumatic for our son. For example,

> Hassan lay with his chest pinned to the ground. Kamal and Wali each gripped an arm, twisted and bent at the elbow so that Hassan's hands were pressed to his back. Assef was standing over them, the heel of his snow boots crushing the back of Hassan's neck. ..."All I want you weaklings to do is hold him down. Can you manage that?" Wali and Kamal nodded. They looked relieved. Assef knelt behind Hassan, put his hands on Hassan's hips and lifted his bare buttocks. He kept one hand on Hassan's back and undid his own belt buckle with his free hand unzipped his jeans. Dropped his underwear. He positioned himself behind Hassan. Hassan didn't struggle. Didn't even whimper. He moved his head slightly and I caught a glimpse of his face. Saw the resignation in it. It was a look I had seen before. It was the look of the lamb....I stopped watching, turning away from the ally. Something warm was running down my wrist. I blinked, saw I was still biting down on my fist, hard enough to draw blood from the knuckles. I realized something else. I was weeping. From just around the corner, I could hear Assef's quick, rhythmic grunts…"

See Khaled Hosseini, The Kite Runner 75-77 (2007).

8. Following the passage of Senate File 496, this book was removed from the "Survey of Literature" curriculum.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 12/18/2023_____.    /s/ David Alexander
                                          David Alexander

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| PENGUIN RANDOM HOUSE LLC, et al., <br><br>     Plaintiffs, <br><br>     v. <br><br> JOHN ROBBINS in his official capacity as President of the Iowa State Board of Education, et al., <br><br>     Defendants. | Case No. 4:23-cv-00478-SHL-SBJ <br><br><br> **DECLARATION OF** <br> **DAVID ALEXANDER** |

COMES NOW, David Alexander, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is David Alexander, and I reside in Indianola, Iowa. My wife and I live within the Indianola Community School District.

2. In Fall 2022, my seventeen-year-old son, S.A., enrolled in an English language course entitled "Survey of Literature" offered at Indianola High School.

3. The curriculum included the book "The Kite Runner" by Khaled Hosseini. This work includes many graphically depicted adult themes including child exploitation, child rape, rape, and suicide.

4. Parents were not notified this book would be required. My wife and I did not find out until we requested the information.

5. My wife and I requested an alternative literary selection be offered for our son and we were informed that it would not be. The only accommodation which the school offered to us was to have S.A. sit in the hallway during discussions and not read the book.

6. Not wanting our son to be ostracized among his peers, my wife and I acquiesced to the school's "requirement" and read the book with our son.

7. The graphic depictions of child rape and gun-inflicted suicide were age-inappropriate, jarring, and traumatic for our son. For example,

> Hassan lay with his chest pinned to the ground. Kamal and Wali each gripped an arm, twisted and bent at the elbow so that Hassan's hands were pressed to his back. Assef was standing over them, the heel of his snow boots crushing the back of Hassan's neck. ..."All I want you weaklings to do is hold him down. Can you manage that?" Wali and Kamal nodded. They looked relieved. Assef knelt behind Hassan, put his hands on Hassan's hips and lifted his bare buttocks. He kept one hand on Hassan's back and undid his own belt buckle with his free hand unzipped his jeans. Dropped his underwear. He positioned himself behind Hassan. Hassan didn't struggle. Didn't even whimper. He moved his head slightly and I caught a glimpse of his face. Saw the resignation in it. It was a look I had seen before. It was the look of the lamb....I stopped watching, turning away from the ally. Something warm was running down my wrist. I blinked, saw I was still biting down on my fist, hard enough to draw blood from the knuckles. I realized something else. I was weeping. From just around the corner, I could hear Assef's quick, rhythmic grunts…"

See Khaled Hosseini, The Kite Runner 75-77 (2007).

8. Following the passage of Senate File 496, this book was removed from the "Survey of Literature" curriculum.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 12/18/2023_____.     /s/ David Alexander
                                          David Alexander

Exhibit C

Affidavit of Courtney Collier

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| PENGUIN RANDOM HOUSE LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN ROBBINS in his official capacity as President of the Iowa State Board of Education, et al.,<br><br>Defendants. | Case No. 4:23-cv-00478-SHL-SBJ<br><br><br>**DECLARATION OF COURTNEY COLLIER** |

COMES NOW, Courtney Collier, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Courtney Collier. I am a resident of Waukee, Iowa and live within the Waukee Community School District. I have three sons in the District. H.G. is currently in 7th grade while C.G. and S.G. are in 6th grade.

2. During the 2020-2021 school year, my children attended school virtually from our home. As a stay-at-home mother at the time, I was able to overhear what my students were learning from their online classes.

3. In this same class, students were assigned to fill out surveys supposedly to assess the children's mental health. These surveys were not disclosed to me or their father. When I learned that these surveys would be assigned, I asked the teacher to send me the content of future surveys. One survey, in a veiled

and suggestive manner, asked students to rate their comfortability with their sexual or gender identity on a scale of one to five. A student chooses a one if they believe the statement is "[n]ot at all true" and a student chooses a five if they believe the statement is "[c]ompletely true." Some of these statements include:

- It is hard for people like me to be accepted at my school.
- Sometimes I feel as if I don't belong in my school.
- Teachers here are not interested in people like me.
- I feel very different from most other students at my school.
- Other students at my school like me the way that I am.

Upon learning the content of this survey, I directed the teacher not to administer it to C.G. and S.G.

4. At the beginning of the 2021-2022 school year, I sent a note to each teacher who had any of my sons in their classrooms, including the principal, directing them to exempt my sons from any instruction, curriculum, or promotion of any content related to sex, sexual orientation, or gender identity.

5. During the 2021-2022 school year, C.G. and S.G. were in 4th grade. In their computer typing class, a popup advertisement appeared that asked them to take a test to know if they are gay. When C.G. and S.G. came home, they told me about the popup on their screens. I then reached out to the principal of their school, Matthew Robie, to express my concern and opposition to this content. Mr. Robie informed me that because of the typing program the school uses, they could not control whether popups exist or their content. Mr. Robie also indicated to me that the entire class was exposed to this advertisement.

6. During the same school year, H.G. was in 5th grade. He and his classmates went to the library as part of their class activity. The librarian, Jess Elliott, presented to his entire class suggesting for the class that they could read a book about a little boy close in age to the students who was struggling with his gender identity and sexual orientation. My son came home and complained to me because he was uncomfortable with the book Ms. Elliott suggested to him and his classmates. He asked, "why can't I just go to school and learn?" and "why do my teachers have to talk to us about this stuff?" I became upset because I wrote to H.G.'s teachers at the beginning of the year that I didn't want him to be taught this type of content. I was disappointed that my instruction as H.G.'s parent was violated.

7. During the 2022-2023 school year, H.G. was in 6th grade. I sent the same letter to all of his teachers as I did the previous year directing them to exempt my son from any instruction, curriculum, or promotion of any content related to sex, sexual orientation, or gender identity.

8. During the first week of school, H.G.'s social studies teacher, Lisa Reno, assigned work to H.G. and the entire class asking them to create a cartoon version of themselves which suggested a range of "traits" to consider, including preferred pronouns. The activity was named the "Little Ms/Mr/Mx Activity." A slide introducing the assignment can be seen below.



9. Another slide introducing the assignment normalizes Instagram for 6th graders and suggests the students' cartoon versions of themselves could be "gender neutral" and represent "the nonbinary community." The slide can be viewed below.



"WHAT STARTED OUT AS CHILDREN'S BOOKS SUCH AS MR. GRUMPY, LITTLE MISS BOSSY, AND LITTLE MISS STUBBORN HAVE NOW TURNED INTO A LEGITIMATE INSTAGRAM TAKEOVER, WITH GEN Z CREATING THEIR OWN LITTLE MISS, FOLLOWED BY A HYPER SPECIFIC QUALITY ABOUT THEMSELVES. THE "CREATE YOUR OWN" LITTLE MISS IS ESSENTIALLY A FILL IN THE BLANK SITUATION.

YES, THE WORDING IS A BIT OUTDATED — WOMEN BEING ASSOCIATED WITH "LITTLE" AND MEN BEING TIED TO "MR." FOR THAT REASON, THE GENDER NEUTRAL CHARACTER "MX" HAS COMMONLY REPLACED THE USE OF "MISS" AND "MR" IN ORDER TO REPRESENT THE NONBINARY COMMUNITY WITHIN THIS MEME. THE LITTLE MISS POSSIBILITIES ARE ENDLESS. TAKE "LITTLE MISS CRIES WHEN SHE'S MAD" FOR EXAMPLE, BECAUSE LIKE, SAME."

10. Another slide provides various choices for preferred pronouns. The slide can be seen below.



11. During the 2021-2022 school year, I submitted a request for reconsideration regarding three books circulating in libraries at both Waukee high schools. The books I challenged, in conjunction with other concerned parents, were *Gender Queer: A Memoir* (herein "*Gender Queer*"), *All Boys Aren't Blue*, and *Lawn Boy*. I knew these books were available to students because they were listed in circulation according to the District's online library database.

12. I checked out each of these books from the Waukee public library where they are freely available to anyone with a library card. I read each book in their entirety.

13. The following illustrations are found in *Gender Queer*:







14. The following passages are found in *All Boys Aren't Blue*. Those provided are only a sample of the many sexually explicit passages.

'Get your hand off my butt.' You giggled. 'That's not my hand.' 'You're lying,' I said. You then placed both hands on my hips, as we lay side by side. There was still something poking me. You were fully erect at this point. I was nervous. 'We gonna get in trouble.' 'You can't tell anybody, okay?' you said. 'You promise that you not gonna tell anyone?' I promised. You then grabbed my hand and made me touch it. It was the first time I had ever touched a penis that wasn't my own. I knew what was happening wasn't supposed to happen. Cousins weren't supposed to do these things with cousins. But my body didn't react that way. My body on the inside was doing something, too.

You told me to take off my pajama pants, which I did. You then took off your shorts, followed by your boxers. There you stood in front of me fully erect and said, 'Taste it.' At first, I laughed and refused. But then you said, 'Come on, Matt, taste it. This is what other boys like us do when we like each other.' I finally listened to you.

The whole time I knew it was wrong, not because I was having sexual intercourse with a guy, but that you were my family. I only did that for about forty-five seconds before you had me stop. Then you got down on your knees and told me to close my eyes. That's when you began oral sex on me as well. It was the strangest feeling in the world. Unfortunately, I didn't have a handbook to earn sexuality as a queer boy.

He reached his hand down and pulled out my dick. He quickly went to giving me head. I just sat back and enjoyed it as I could tell he was, too. He was also definitely experienced in what he was doing, because he went to work quite confidently. He then came up and asked me if I wanted to try on him. I said sure. I began and he said, 'Watch your teeth.' I didn't want to let him know I was inexperienced. So, I slowed down and took my time and luckily got into a good rhythm. He didn't know I was a virgin, and I did my best to act dominant like my favorite porn star. I was an actor, and this was my movie.

I remember the condom was blue and flavored like cotton candy. I put some lube on and got him up on his knees, and I began to slide into him from behind. I tried not to force it because I imagined that it would be painful; I didn't want this moment to be painful. So I eased in, slowly, until I heard him moan.

15. The following passages are found in *Lawn Boy*. Those provided are only a sample of the many sexually explicit passages.

But there's one thing I'd never tell Nick in a million years, not that it really matters: in fourth grade, at a church youth-group meeting, out in the bushes behind the parsonage, I touched Doug Goble's dick, and he touched mine. In fact, there were even some mouths involved.

'What if I told you I touched another guy's dick?' I said. 'Pfff.' Nick waved me off and turned his attention back to his beer. 'What if I told you I sucked it?' 'Will you please just shut up already?' 'I'm dead serious, Nick.' 'Well, I'd say you were a fag.' 'I was ten years old, but it's true. I put Doug Goble's dick in my mouth.'... 'I was in fourth grade. It was no big deal.' Cringing, Nick held his hands out in front of him in a yield gesture. 'Stop.' 'He sucked mine, too.'

16. After we submitted our reconsideration request, a meeting was arranged with both high school principals and both high school librarians. Together, they defended their decisions to include these books in their circulation.

17. Later, a meeting was scheduled with the reconsideration committee, which comprised administrators, librarians from other schools, parents, and students. When we showed up to the meeting, we were received by Lindsay Law, Director of Student Equity. She informed us that she would be facilitating the meeting with the reconsideration committee. She also informed us that we were not allowed to present as a group, instead we had to present separately and that we would be presenting virtually, as the committee was cloistered in a separate room. When we asked why we had to present separately, and virtually, and why we weren't notified of this fact ahead of time, Ms. Law informed us that the committee did not feel safe being in the same room as us. When we asked these questions, Ms. Law became upset and left to retrieve another administrator.

18. After Ms. Law and the other administrator conferred, they brought the committee into the same room as us. The committee imposed arbitrary rules for speaking time and presentation of arguments that were not communicated ahead of time. The committee also called their own witnesses that spoke in favor of these books. We were not notified ahead of time that we could call our own witnesses or that the committee planned to call their own.

At the conclusion of the hearing, the committee met privately and decided to keep the books available to students.

19. We appealed the committee's decision to Superintendent Brad Buck. After meeting with Mr. Buck, we received a letter from him informing us that while *All Boys Aren't Blue* and *Lawn Boy* would remain in circulation, he had decided to remove *Gender Queer*. On February 18, 2022, Superintendent Buck wrote:

> As it relates to *Gender Queer: A Memoir*, I believe the book needs to be removed from the shelves in our school libraries. Specifically, because the format of the book is a graphic novel, it contains pictures that are beyond the scope of what might be reasonably expected to be observed in a school library.
>
> More specifically, when reading a book that is words only, the images that come to mind are at the maturity level of the reader. In this book, there are pictures and they may be at a level that is beyond the maturity level of the reader. And, different from written words, any person could pick up this book and come across the pictures as opposed to flipping through a book that is all words.
>
> The copies are being removed from our libraries today.

20. The passage of Senate File 496 will benefit, and has already benefitted, my children and the education they receive from the Waukee Community School District. It has made them more comfortable knowing they can learn about core subjects and avoid age-inappropriate content.

Executed on <u>December 19, 2023.</u>          */s/ Courtney Collier*
                                              Courtney Collier

Exhibit D

Affidavit of Deb Davis

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| PENGUIN RANDOM HOUSE LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> JOHN ROBBINS in his official capacity as President of the Iowa State Board of Education, et al., <br><br> Defendants. | Case No. 4:23-cv-00478-SHL-SBJ <br><br><br> **DECLARATION OF** <br> **DEB DAVIS** |

COMES NOW, Deb Davis, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Deb Davis. I am a resident of Johnston, Iowa and a current elected Johnston School Board member.

2. I support curricula and library books in our kindergarten through 12th grade schools that contain only age-appropriate material. I also believe that our district should not provide any program, curriculum, test, survey, questionnaire, promotion or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six.

3. Our library collections are subject to a regular review of the materials they contain. Books are removed, for among other reasons, for low or non-existent check-out rates. One such book that was recently removed prior to the

enactment of Senate File 496 was *Lucky* by Alice Sebold. The author details her firsthand account of being violently raped. The book includes the following passages:

> He reached out and grabbed them- my breasts- in his two hands. He plied them and squeezed them, manipulating them right down to my ribs. Twisting. I hope that to say this hurt isn't necessary here. 'Please don't do this, please,' I said. 'Nice white titties,' he said. And the words made me give them up, lobbing off each part of my body as he claimed ownership- the mouth, the tongue, my breasts.

> 'Lie down.' I did. Shaking, I crawled over and lay face up against the cold ground. He pulled my underpants off me roughly and bundled them in his hand. He threw them away from me and into a corner where I lost sight of them. I watched him as he unzipped his pants and let them fall around his ankles. He lay down on top of me and started humping. He worked away on me, reaching down to work with his penis. . . He called me bitch. He told me I was dry.

> He began to knead his fist against the opening of my vagina. Inserted his fingers into it, three or four at a time. Something tore. I began to bleed there. I was wet now. It made him excited. He was intrigued. As he worked his whole fist up into my vagina and pumped it, I went into my brain.

> I thought it was over. I was trembling but I thought he'd had enough. Blood was everywhere and so I thought he'd done what he'd come for. 'Give me a blow job,' he said. He was standing now. I was on the ground, trying to search among the filth for my clothes. He kicked me and I curled into a ball. 'I want a blow job.' . . . He grabbed my head. 'Put it in your mouth and suck,' he said. 'Like a straw?' I said. 'Yeah, like a straw.' I took it in my hand. It was small. Hot, clammy. It throbbed involuntarily at my touch. He shoved my head forward and I put it in. It touched my tongue. The taste like dirty rubber or burnt hair. I sucked in hard... 'Bitch,' he said. His penis still limp, he held it with two fingers and peed on me. Just a little bit. Acrid, wet, on my nose and lips. The smell of him- the fruity, heady, nauseating smell- clung to my skin.

4. Upon learning that the man identified as the author's attacker was recently exonerated many years later, and that the West Des Moines School District

removed it from their collections, I asked former Johnston superintendent, Laura Kacer, to remove the book from the Johnston High School library. Ms. Kacer informed me that she removed the book from the library because library records showed it was rarely checked out. I am not aware of any teachers or faculty that objected to this circulation decision.

5. After Senate File 496 passed, Superintendent Nikki Roorda communicated to board members and faculty that the District would move forward and follow the law.

6. Johnston enforces an Internet Appropriate Use Regulation. This policy calls for schools to use a "technology protection measure that provides blocks to internet sites that are deemed inappropriate in content, graphic, message, or intent (i.e. sites that are obscene, child pornography, or harmful to minors)."

7. None of these policies have been affected by the enactment of Senate File 496.

8. Since the enactment of Senate File 496, there has been no negative impact on the quality of education that the District provides to students, nor have I witnessed any negative impact on education provided by District employees to their students.

9. I am not aware of any increase in harassment or bullying since Senate File 496 was enacted.

Executed on <u>December 19, 2023.</u>         <u>*/s/ Deb Davis*</u>
                                             Deb Davis

Exhibit E

Affidavit of Davis Eidahl

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| PENGUIN RANDOM HOUSE LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> JOHN ROBBINS in his official capacity as President of the Iowa State Board of Education, et al., <br><br> Defendants. | Case No. 4:23-cv-00478-SHL-SBJ <br><br><br> **DECLARATION OF DAVIS EIDAHL** |

COMES NOW, Davis Eidahl, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Davis Eidahl, and I am the Superintendent of the Solon Community School District ("District") in Solon, Iowa.

2. I have been in education for twenty-nine (29) years as a teacher, curriculum lead, principal, and superintendent.

3. I have been superintendent of the District since 2015. In my role as superintendent, I have the responsibility of the oversight of the District. Our District is comprised of four school buildings: (a) pre-school through third grade; (b) fourth and fifth grade; (c) sixth through eighth grade; and (d) ninth through twelfth grade. The District has a total of roughly 1500 students with 450 students at the pre-school through third grade level and an average of 125 students for every other grade.

4. My educational philosophy is, and has been, that the District does not replace parents. Decisions on whether a child is an appropriate age to review a specific type of material is for parents to make. Each of the families in the District may each have different values, but, my view is that those values are for them to instill – not the District.

5. Senate File 496 did not change our practice significantly regarding parental notification. Prior to the passage of the legislation, the District had an administrative practice that nothing be kept from parents: major or minor. Since that time, we have continued to adhere to that practice. For example, if a student reports to the nurse's office with a headache and would need medication, parents are notified.

6. After the passage of Senate File 496, myself, the assistant superintendent, and the District librarian review the content of books prior to placing them in the school buildings or library. If there are explicitly descriptive sexual passages—regardless of the nature of the relationship or the gender of the participants depicted—the materials are removed from the library. Depending upon concerns of age-appropriate content, sexual or otherwise, a book may then be moved to our Middle or High School buildings, if appropriate, or removed from the district library entirely.

7. In September 2023, the following books were moved from our elementary or middle school buildings to our high school building based upon age-appropriate content concerns:

   a. "The Fault in Our Stars" by Lois Green

      b. "Everything, Everything" by Nicola Yoon

      c. "The Hate U Give" by Angie Thomas

      d. "Drama" by Raina Telegmeier

8. In August-September 2023, several books were removed from our school district based upon age-appropriate content concerns, including:

      a. "Absolutely True Diary of a Part-Time Indian" by Sherman Alexie

      b. "Looking for Alaska" by John Green

      c. "Nineteen Minutes" by Jodi Picoult

      d. The "Court of Thorns and Roses" Series by Sarah J. Maas including:

            i. "A Court of Thorns and Roses"

            ii. "A Court of Wings and Ruin"

            iii.   "A Court of Frost and Starlight"

            iv.   "A Court of Mist and Fury"

9. If a parent or student wants to challenge the determination not to offer the book in the Library, there is a school board protected process for doing so. A hearing is heled before a committee ("Committee") comprised of educators, administrators, high school students, parents, and a community member. These individuals will then have the ability to determine whether the specific book be included in the Library.

10. No efforts are made by our educators or administrators to remove books or other materials from the Solon Public Library—which is not affiliated with the District. Further, no efforts are made by our educators or administrators to restrict District students' access to the Solon Public Library. Annually, the

children's librarian from the Solon Public Library visits the elementary school to provide students information about access to the public library.

11. I have worked to partner with our language arts faculty in reviewing materials to have robust discussion regarding what type of restrictions the law places on sexual content and what is age-appropriate for their particular students. These discussions are evolving and on-going.

12. Since the passage of Senate File 496, the Solon Community District High School's Gay-Straight Alliance ("GSA") has continued its nine-years as a club uninterrupted. The GSA continues to have a faculty advisor who, to my knowledge, has faced no retribution from any students or faculty members for being so-affiliated.

13. Since the passage of Senate File 496, to my knowledge, no students have faced bullying or harassment which has been reported to the District based on their gender identity or sexual preference.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _12 - 19 - 2023_ .

Davis Eidahl

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| PENGUIN RANDOM HOUSE LLC, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>JOHN ROBBINS in his official capacity as President of the Iowa State Board of Education, et al.,<br><br>    Defendants. | Case No. 4:23-cv-00478-SHL-SBJ<br><br><br>**DECLARATION OF DAVIS EIDAHL** |

COMES NOW, Davis Eidahl, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Davis Eidahl, and I am the Superintendent of the Solon Community School District ("District") in Solon, Iowa.

2. I have been in education for twenty-nine (29) years as a teacher, curriculum lead, principal, and superintendent.

3. I have been superintendent of the District since 2015. In my role as superintendent, I have the responsibility of the oversight of the District. Our District is comprised of four school buildings: (a) pre-school through third grade; (b) fourth and fifth grade; (c) sixth through eighth grade; and (d) ninth through twelfth grade. The District has a total of roughly 1500 students with 450 students at the pre-school through third grade level and an average of 125 students for every other grade.

4. My educational philosophy is, and has been, that the District does not replace parents. Decisions on whether a child is an appropriate age to review a specific type of material is for parents to make. Each of the families in the District may each have different values, but, my view is that those values are for them to instill – not the District.

5. Senate File 496 did not change our practice significantly regarding parental notification. Prior to the passage of the legislation, the District had an administrative practice that nothing be kept from parents: major or minor. Since that time, we have continued to adhere to that practice. For example, if a student reports to the nurse's office with a headache and would need medication, parents are notified.

6. After the passage of Senate File 496, myself, the assistant superintendent, and the District librarian review the content of books prior to placing them in the school buildings or library. If there are explicitly descriptive sexual passages—regardless of the nature of the relationship or the gender of the participants depicted—the materials are removed from the library. Depending upon concerns of age-appropriate content, sexual or otherwise, a book may then be moved to our Middle or High School buildings, if appropriate, or removed from the district library entirely.

7. In September 2023, the following books were moved from our elementary or middle school buildings to our high school building based upon age-appropriate content concerns:

   a. "The Fault in Our Stars" by Lois Green

b. "Everything, Everything" by Nicola Yoon

c. "The Hate U Give" by Angie Thomas

d. "Drama" by Raina Telegmeier

8. In August-September 2023, several books were removed from our school district based upon age-appropriate content concerns, including:

a. "Absolutely True Diary of a Part-Time Indian" by Sherman Alexie

b. "Looking for Alaska" by John Green

c. "Nineteen Minutes" by Jodi Picoult

d. The "Court of Thorns and Roses" Series by Sarah J. Maas including:

i. "A Court of Thorns and Roses"

ii. "A Court of Wings and Ruin"

iii. "A Court of Frost and Starlight"

iv. "A Court of Mist and Fury"

9. If a parent or student wants to challenge the determination not to offer the book in the Library, there is a school board protected process for doing so. A hearing is heled before a committee ("Committee") comprised of educators, administrators, high school students, parents, and a community member. These individuals will then have the ability to determine whether the specific book be included in the Library.

10. No efforts are made by our educators or administrators to remove books or other materials from the Solon Public Library—which is not affiliated with the District. Further, no efforts are made by our educators or administrators to restrict District students' access to the Solon Public Library. Annually, the

children's librarian from the Solon Public Library visits the elementary school to provide students information about access to the public library.

11. I have worked to partner with our language arts faculty in reviewing materials to have robust discussion regarding what type of restrictions the law places on sexual content and what is age-appropriate for their particular students. These discussions are evolving and on-going.

12. Since the passage of Senate File 496, the Solon Community District High School's Gay-Straight Alliance ("GSA") has continued its nine-years as a club uninterrupted. The GSA continues to have a faculty advisor who, to my knowledge, has faced no retribution from any students or faculty members for being so-affiliated.

13. Since the passage of Senate File 496, to my knowledge, no students have faced bullying or harassment which has been reported to the District based on their gender identity or sexual preference.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _12 - 19 - 2023_ .

_____
Davis Eidahl

Exhibit F

Affidavit of Clint Evans

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| PENGUIN RANDOM HOUSE LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> JOHN ROBBINS in his official capacity as President of the Iowa State Board of Education, et al., <br><br> Defendants. | Case No. 4:23-cv-00478-SHL-SBJ <br><br><br> **DECLARATION OF CLINT EVANS** |

COMES NOW, Clint Evans, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Clint Evans. I am a resident of Urbandale, Iowa and a current elected Johnston School Board member.

2. I support curricula and library books in our kindergarten through 12th grade schools that contain only age-appropriate material. I also believe that our district should not provide any program, curriculum, test, survey, questionnaire, promotion or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six.

3. After Senate File 496 was signed by the Governor, Superintendent Nikki Roorda informed myself and other that the District would follow the law. In

my experience, I have not heard or witnessed faculty or administrators struggling to understand or implement the law.

4. The Johnston Community School District abides by Iowa Code section 280.28 which prohibits harassment and bullying, which among other things, states that "school employees, volunteers, and students in Iowa schools shall not engage in harassing or bullying behavior."

5. The District has created, and abides by, its own anti-bullying policies at each of its schools. The Board's policy for all students and faculty requires that "school employees, volunteers, and student shall not engage in bullying or harassing behavior…"

6. The Anti-Bullying/Anti-Harassment Policy also requires that "[w]ithin 24 hours of receiving a report that a student may have been the victim of conduct that constitutes bullying and/or harassment, the district will notify the parent or guardian of the student."

7. The District also enforces a policy regarding the formation and content of after-school clubs. It is broadly applicable and not particular to a single group.

8. None of these policies have been affected by the enactment of Senate File 496.

9. Since the enactment of Senate File 496, there has been no negative impact on the quality of education that the District provides to students, nor have I

witnessed any negative impact on education provided by District employees to their students.

10. I am not aware of any increase in harassment or bullying since Senate File 496 was enacted.

Executed on <u>December 19, 2023.</u>

*/s/ Clint Evans*
Clint Evans

Exhibit G

Affidavit of Mandy Gilbert

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| PENGUIN RANDOM HOUSE LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> JOHN ROBBINS in his official capacity as President of the Iowa State Board of Education, et al., <br><br> Defendants. | Case No. 4:23-cv-00478-SHL-SBJ <br><br><br> **DECLARATION OF MANDY GILBERT** |

COMES NOW, Mandy Gilbert, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Mandy Gilbert. I am a resident of Johnston, Iowa and live within the Johnston Community School District. I am the mother of three children who attended Johnston community schools until 2021-2022 school year.

2. My oldest child, A.G., was a sophomore at Johnston High School in the Fall of 2021.

3. Because of months of online school due to the COVID-19 pandemic, my daughter became very depressed. She was spending hours a day alone in her room without in-person human interactions and her grades began to suffer. Although Johnston schools eventually began bringing students back to the classroom on a part-time basis, this hybrid model did not provide the needed

stability and normalcy for my daughter to reach her academic potential. She disengaged from her family and was temperamental. She would make borderline suicidal comments. Only when classes returned full-time and student activities resumed did my daughter experience a relief from her stress. That is, until the school faculty introduced her and her classmates to sexually inappropriate books.

4. During the 2021 Fall semester, my child was enrolled in Advanced Placement (A.P.) English. During the first week of school in August, A.G.'s teacher, Kristi Miller, sent home a curriculum notification that requested a parent to sign and acknowledge the class activities and books assigned. Nowhere in this notification was a description of the content of these books or information that a student could opt out and how to do so. Among those books was *The Absolutely True Diary of a Part-Time Indian* (herein "*True Diary*") and *The Hate U Give.*

5. Upon reading in the notification and the titles of the books available in the class, I researched the content of *True Diary* and *The Hate U Give*, which included renting the books from the public library and reading their entirety.

6. Upon reading *True Diary*, I learned it contains the following passages:

> And the thing is, Miss Warren was hugging me so tight that I was pretty sure she could feel my, er, physical reaction. I was kind of proud, you know?
>
> Yep, that's right, I admit that I masturbate. I'm proud of it. I'm good at it. I'm ambidextrous. If there were a Professional Masturbators League, I'd get drafted number one and make millions of dollars. And maybe you're thinking, 'Well, you really shouldn't be talking about

masturbation in public.' Well, tough, I'm going to talk about it because EVERYBODY does it. And EVERYBODY likes it. And if God hadn't wanted us to masturbate, then God wouldn't have given us thumbs. So I thank God for my thumbs. But, the thing is, no matter how much time my thumbs and I spend with the curves of imaginary women.

7. Upon reading *The Hate U Give*, I learned it contains the following passage:

   Let me clarify, my butt against his crotch, my back against his chest, I'm bumping up against him trying to figure out how to get the ball back in the hole. It sounds way dirtier than it actually is especially in this position.

8. Once I discovered the sexually explicit content in these books, I shared with A.G. that this book contained inappropriate, sexually explicit content and that I would not sign the curriculum acknowledgment.

9. A.G. then asked me, "Why would a teacher want me to read that?"

10. I reached out to Ms. Miller and Principal Ryan Woods and met with them and Teaching and Learning Coordinator, Mary Cooksley, along with my husband. We expressed our opposition to A.G. reading such sexually explicit content. I brought printed excerpts from *True Diary* and asked Mr. Woods to read them aloud, to which he obliged. When he reached portions about how a young character masturbates and how his teacher in the book can feel his erect penis as they hugged, Mr. Woods fell silent and stopped reading aloud. I was never given a response as why it was appropriate for students to read this content. Ms. Miller and Mr. Woods suggested that another book could be added to the list of titles. I then asked Ms. Miller and Mr. Woods, that although *True Diary* was one of several books available to the A.P. English class, why it was required reading for the entire sophomore class not enrolled

in the A.P. English track. They informed me that if I was challenging the 10th grade curriculum, that I would have to work through the reconsideration process.

11. Ms. Miller and Mr. Woods never followed back up with me after the meeting about proposed alternative books or how they would prevent A.G. from being singled out or ostracized as potentially being the only one in the class reading an alternative book.

12. A.G. and her friends discussed amongst themselves that they thought it was ridiculous that they had to read *True Diary* because of the graphic sexual content and because it normalized harmful male and female relationships and the objectification of women. They didn't understand why it was acceptable to read these books when it seemed to contradict the #MeToo movement.

13. When I informed school administrators that I wanted to pursue a curriculum challenge to *True Diary*, I was informed that the hearing wouldn't take place until after the school board elections in November, approximately two months later after my initial complaint. During the second of two reconsideration hearings, I was heckled and harassed by parents and students, and even a then-current school board member, who want this book available to every child. At the conclusion of this hearing, and in front of a hostile and angry crowd of people in support of this book, the reconsideration

committee made zero alterations to the availability of this book both in the A.P. English class and as part of the entire 10th grade curriculum.

14. At the end of the 2021-2022 school year, Johnston Middle School, which educates the eighth and ninth graders in the District, and where my son would be attending during the next school year, allowed a student to publish in the annual yearbook an editorial bullying me and my family by extension for raising the issue that students should not be subjected to books that include descriptions of masturbation and student-on-teacher sexual touching. I was called a nazi, racist, and homophobic. When I asked why the school allowed a student to publish such an article, administrators could only express regret for how it made my family and me feel.

15. After my children and I experienced these indignities, I no longer send my children to the Johnston Community School District.


Executed on <u>December 19, 2023.</u>    */s/ Mandy Gilbert*
                                        Mandy Gilbert

Exhibit H

Affidavit of Pamela Gronau

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| PENGUIN RANDOM HOUSE LLC, et al., | Case No. 4:23-cv-00478-SHL-SBJ |
| Plaintiffs, | |
| v. | **DECLARATION OF PAMELA GRONAU** |
| JOHN ROBBINS in his official capacity as President of the Iowa State Board of Education, et al., | |
| Defendants. | |

COMES NOW, Pamela Gronau, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Pamela Gronau, and I am a resident of Urbandale, Iowa. I live within the Urbandale Community School District. My son, C.G., currently attends Urbandale High School.

2. The Urbandale High School Library contained the following books: *Lawn Boy*, *All Boys Aren't Blue: A Memoir-Manifesto* (herein *All Boys Aren't Blue*), and *Gender Queer: A Memoir*.

3. Myself, along with seven other parents, requested the books be removed from the Urbandale High School Library or that parent permission be required for checkout.

4. A hearing was held before a book-review committee ("Committee") formed by the Urbandale School District.

5. During the hearing, the book *All Boys Aren't Blue* by George M. Johnson was evaluated.

6. The following passages are found in *All Boys Aren't Blue*. Those provided are only a sample of the many sexually explicit passages.

'Get your hand off my butt.' You giggled. 'That's not my hand.' 'You're lying,' I said. You then placed both hands on my hips, as we lay side by side. There was still something poking me. You were fully erect at this point. I was nervous. 'We gonna get in trouble.' 'You can't tell anybody, okay?' you said. 'You promise that you not gonna tell anyone?' I promised. You then grabbed my hand and made me touch it. It was the first time I had ever touched a penis that wasn't my own. I knew what was happening wasn't supposed to happen. Cousins weren't supposed to do these things with cousins. But my body didn't react that way. My body on the inside was doing something, too.

You told me to take off my pajama pants, which I did. You then took off your shorts, followed by your boxers. There you stood in front of me fully erect and said, 'Taste it.' At first, I laughed and refused. But then you said, 'Come on, Matt, taste it. This is what other boys like us do when we like each other.' I finally listened to you.

The whole time I knew it was wrong, not because I was having sexual intercourse with a guy, but that you were my family. I only did that for about forty-five seconds before you had me stop. Then you got down on your knees and told me to close my eyes. That's when you began oral sex on me as well. It was the strangest feeling in the world. Unfortunately, I didn't have a handbook to earn sexuality as a queer boy.

He reached his hand down and pulled out my dick. He quickly went to giving me head. I just sat back and enjoyed it as I could tell he was, too. He was also definitely experienced in what he was doing, because he went to work quite confidently. He then came up and asked me if I wanted to try on him. I said sure. I began and he said, 'Watch your teeth.' I didn't want to let him know I was inexperienced. So, I slowed down and took my time and luckily got into a good rhythm. He didn't know I was a virgin, and I did my best to act dominant like my favorite porn star. I was an actor, and this was my movie.

I remember the condom was blue and flavored like cotton candy. I put some lube on and got him up on his knees, and I began to slide into him from behind. I tried not to force it because I imagined that it would be painful; I didn't want this moment to be painful. So I eased in, slowly, until I heard him moan.

7. Despite findings from the Committee that "students who have been sexually abused might find this triggering" and "graphic depiction of sexual acts" that "if students were not prepared, they could be harmed" the Committee determined the book should remain in the library. A picture from the committee meeting weighing the obscenity harms against the instructional value is attached to show what we saw:



8. Also, during the course of the hearing, the Committee reviewed the book *Gender Queer* by Maia Kobabe. *Gender Queer* contains the following illustrations.

  




9. In spite of Committee findings that "casual examination of the content (i.e. flipping through) might expose images they are not prepared to see" and the content being "very mature" the Committee determined the book should remain in the library.





10. The Committee also reviewed the book, *Lawn Boy* by Jonathan Evison. The following passages are found in *Lawn Boy*. Those provided are only a sample of the many sexually explicit passages.

> But there's one thing I'd never tell Nick in a million years, not that it really matters: in fourth grade, at a church youth-group meeting, out in the bushes behind the parsonage, I touched Doug Goble's dick, and he touched mine. In fact, there were even some mouths involved.

> 'What if I told you I touched another guy's dick?' I said. 'Pfff.' Nick waved me off and turned his attention back to his beer. 'What if I told you I sucked it?' 'Will you please just shut up already?' 'I'm dead serious, Nick.' 'Well, I'd say you were a fag.' 'I was ten years old, but it's true. I put Doug Goble's dick in my mouth.'… 'I was in fourth grade. It was no big deal.' Cringing, Nick held his hands out in front of him in a yield gesture. 'Stop.' 'He sucked mine, too.'

11. Despite Committee findings that "sexual interaction that was depicted was presented early on in the book without context or preparation – felt 'traumatic'" and "language (cursing offensive names) present from the first page on with no indication of this in reading the jacket cover" the Committee determined the book should remain in the library.



12. Myself, and seven other parents, supported the appeal of the Committee's determination to the Principal of Urbandale High School pursuant to school policy. The Principal determined the books should remain in the library.

13. Myself, and seven other parents, supported the appeal of the Principal's determination to the superintendent. The superintendent determined the books should remain in the library.

14. After passage of Senate File 496, these books were ultimately removed from the library.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _12/18/2023_____.     /s/ Pamela Gronau
                                          Pamela Gronau

| | |
|---|---|
| PENGUIN RANDOM HOUSE LLC, et al., | Case No. 4:23-cv-00478-SHL-SBJ |
| Plaintiffs, | |
| v. | **DECLARATION OF PAMELA GRONAU** |
| JOHN ROBBINS in his official capacity as President of the Iowa State Board of Education, et al., | |
| Defendants. | |

COMES NOW, Pamela Gronau, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Pamela Gronau, and I am a resident of Urbandale, Iowa.  I live within the Urbandale Community School District.  My son, C.G., currently attends Urbandale High School.

2. The Urbandale High School Library contained the following books: *Lawn Boy*, *All Boys Aren't Blue: A Memoir-Manifesto* (herein *All Boys Aren't Blue*), and *Gender Queer: A Memoir*.

3. Myself, along with seven other parents, requested the books be removed from the Urbandale High School Library or that parent permission be required for checkout.

4. A hearing was held before a book-review committee ("Committee") formed by the Urbandale School District.

5. During the hearing, the book *All Boys Aren't Blue* by George M. Johnson was evaluated.

6. The following passages are found in *All Boys Aren't Blue*. Those provided are only a sample of the many sexually explicit passages.

'Get your hand off my butt.' You giggled. 'That's not my hand.' 'You're lying,' I said. You then placed both hands on my hips, as we lay side by side. There was still something poking me. You were fully erect at this point. I was nervous. 'We gonna get in trouble.' 'You can't tell anybody, okay?' you said. 'You promise that you not gonna tell anyone?' I promised. You then grabbed my hand and made me touch it. It was the first time I had ever touched a penis that wasn't my own. I knew what was happening wasn't supposed to happen. Cousins weren't supposed to do these things with cousins. But my body didn't react that way. My body on the inside was doing something, too.

You told me to take off my pajama pants, which I did. You then took off your shorts, followed by your boxers. There you stood in front of me fully erect and said, 'Taste it.' At first, I laughed and refused. But then you said, 'Come on, Matt, taste it. This is what other boys like us do when we like each other.' I finally listened to you.

The whole time I knew it was wrong, not because I was having sexual intercourse with a guy, but that you were my family. I only did that for about forty-five seconds before you had me stop. Then you got down on your knees and told me to close my eyes. That's when you began oral sex on me as well. It was the strangest feeling in the world. Unfortunately, I didn't have a handbook to earn sexuality as a queer boy.

He reached his hand down and pulled out my dick. He quickly went to giving me head. I just sat back and enjoyed it as I could tell he was, too. He was also definitely experienced in what he was doing, because he went to work quite confidently. He then came up and asked me if I wanted to try on him. I said sure. I began and he said, 'Watch your teeth.' I didn't want to let him know I was inexperienced. So, I slowed down and took my time and luckily got into a good rhythm. He didn't know I was a virgin, and I did my best to act dominant like my favorite porn star. I was an actor, and this was my movie.

I remember the condom was blue and flavored like cotton candy. I put some lube on and got him up on his knees, and I began to slide into him from behind. I tried not to force it because I imagined that it would be painful; I didn't want this moment to be painful. So I eased in, slowly, until I heard him moan.

7. Despite findings from the Committee that "students who have been sexually abused might find this triggering" and "graphic depiction of sexual acts" that "if students were not prepared, they could be harmed" the Committee determined the book should remain in the library. A picture from the committee meeting weighing the obscenity harms against the instructional value is attached to show what we saw:



8. Also, during the course of the hearing, the Committee reviewed the book

    *Gender Queer* by Maia Kobabe. *Gender Queer* contains the following

    illustrations.









9. In spite of Committee findings that "casual examination of the content (i.e. flipping through) might expose images they are not prepared to see" and the content being "very mature" the Committee determined the book should remain in the library.




10. The Committee also reviewed the book, *Lawn Boy* by Jonathan Evison. The following passages are found in *Lawn Boy*. Those provided are only a sample of the many sexually explicit passages.

> But there's one thing I'd never tell Nick in a million years, not that it really matters: in fourth grade, at a church youth-group meeting, out in the bushes behind the parsonage, I touched Doug Goble's dick, and he touched mine. In fact, there were even some mouths involved.

> 'What if I told you I touched another guy's dick?' I said. 'Pfff.' Nick waved me off and turned his attention back to his beer. 'What if I told you I sucked it?' 'Will you please just shut up already?' 'I'm dead serious, Nick.' 'Well, I'd say you were a fag.' 'I was ten years old, but it's true. I put Doug Goble's dick in my mouth.'… 'I was in fourth grade. It was no big deal.' Cringing, Nick held his hands out in front of him in a yield gesture. 'Stop.' 'He sucked mine, too.'

11. Despite Committee findings that "sexual interaction that was depicted was presented early on in the book without context or preparation – felt 'traumatic'" and "language (cursing offensive names) present from the first page on with no indication of this in reading the jacket cover" the Committee determined the book should remain in the library.



12. Myself, and seven other parents, supported the appeal of the Committee's determination to the Principal of Urbandale High School pursuant to school policy. The Principal determined the books should remain in the library.

13. Myself, and seven other parents, supported the appeal of the Principal's determination to the superintendent. The superintendent determined the books should remain in the library.

14. After passage of Senate File 496, these books were ultimately removed from the library.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _12/18/2023_____.    /s/ Pamela Gronau
                                                                    Pamela Gronau

Exhibit I

Affidavit of Teri Patrick

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| PENGUIN RANDOM HOUSE LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN ROBBINS in his official capacity as President of the Iowa State Board of Education, et al.,<br><br>Defendants. | Case No. 4:23-cv-00478-SHL-SBJ<br><br><br>**DECLARATION OF<br>TERI PATRICK** |

COMES NOW, Teri Patrick, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Teri Patrick. I am a resident of Clive, Iowa and live within the West Des Moines Community School District. In the Fall of 2021, my son attended Valley High School.

2. That year, I had heard rumors that there were books that contained sexually explicit content in schools across Iowa. In order to see if this information was true, I searched the online library catalog for West Des Moines schools. I learned that Valley Southwoods, the school that educates ninth graders in the District, circulated, *Gender Queer: A Memoir* (herein "*Gender Queer*").

3. *Gender Queer* contains the following illustrations:











4. The book also informs the reader that a landmark previously "housed the filming studios of kink.com," an actual pornographic website that markets its content as "Authentic Bondage & Real BDSM Porn Videos" and that it "[D]emystify[ies] and celebrat[es] alternative sexuality by providing the most authentic kinky videos. Experience the other side of porn."

5. In October 2021, I emailed West Des Moines school board member, Jeff Hicks, alerting him of the sexually explicit and inappropriate content in this book and that it was available at Valley Southwoods. He directed me to the reconsideration policy found in the West Des Moines Community Schools Board Policy 605.05.

6. In November 2021, I submitted a reconsideration request to the Principal of Valley Southwoods, Mitchell Kuhnert, related to *Gender Queer*. I objected to the pornographic illustrations and sexual content of the text citing many examples throughout the over-200-page book. Mr. Kuhnert responded saying that a reconsideration committee had been selected and that I would receive the decision in a few weeks. I was never notified who was appointed to the committee other than each member's status in relation to the district (e.g., teacher, student, administrator, etc.). I requested to present in front of the committee if there was the potential the book would not be removed, but my requests were ignored.

7. In December 2021, Mr. Kuhnert informed me that the reconsideration committee voted unanimously to keep the book available in the library. The

committee decided the primary purpose of the book was autobiographical. The committee also stated that the book had received two literary awards. One of the awards was an Alex Award, which is given to "ten books *written for adults* that have special appeal to young adults, ages 12-18" (emphasis my own). The fact that this book won an award is irrelevant in addressing the obscene material contained in the book, which was the basis of the reconsideration request. In addition, the very requirement of the Alex Award is that the book is written for adults, not teens or younger.

8. I appealed the committee's decision for the following reasons: age appropriateness for minors, sexually graphic content, crude language, justification provided for keeping it, and committee selection process. The initial committee review was not impartial, nor did it have any chance to be, because membership of the committee was determined solely by Principal Kuhnert. Further, minors were asked to sit on the committee. By appointing students, if the material was deemed to be obscene and not educational, it would be a violation of Iowa code section 728.2. If the book was found to contain obscene content lacking educational value, the school would have in effect disseminated obscene content, in violation of the law, to students on the committee and in the school library.

9. My appeal was reviewed by the Teaching and Learning Services Advisory Committee, which affirmed the original decision. I then appealed the decision to the full West Des Moines School Board. I read a statement to the school

board at the beginning of the hearing. After I had sat down following my statement to the board, I was called to the microphone where board members questioned me for approximately 20 minutes about my values as a person, and very little about *Gender Queer* itself. They affirmed the original decision 6-1. One board member, Anadelia Morgan, stated that a picture of a bearded naked man on his knees reaching to fondle the penis of a smaller naked male couldn't be assumed to be pedophilia as it might just be a smaller man that had shaved, so it might be consenting adults.

10. I appealed the decision again. This time to the Iowa Board of Education. A hearing in June of 2022 was convened, and my attorney questioned West Des Moines Community School District Superintendent Dr. Lisa Remy. ==Here== is a transcript of their exchange:

> **Lawyer:** Categorically would you consider a book that had photographs of naked adults in sexual situations be inappropriate in any school library?
>
> **Superintendent:** So I believe that if we had a book that someone had a concern about, we would follow policy 605.05 and determine if that book should be allowed in the library.
>
> **Lawyer:** So the answer to my question is no, it's not categorically inappropriate, you would have to look at the book and make a decision through your process, is that right?
>
> **Superintendent:** We would use the policy and follow the policy to make the decision, yes.

11. The Board of Education eventually dismissed the challenge on procedural standing grounds, stating that because my son was not a current student at

Valley Southwoods, I was not able to bring a challenge. Standing doctrine was only raised relatively late in the process, in a request for supplemental briefing issued in July.

12. After the Board of Education made its ruling, and at the beginning of the new school year that started later that month, I learned that *Gender Queer* was not only in Valley High School, where my son was a student, but that it was displayed at the front of a classroom where students could view it and check it out from the teacher. A picture of that classroom display can be seen below.



13. I asked the Board of Education to reconsider its decision that I did not have proper standing (and which I don't believe I need) but it never responded to my request.

14. I enrolled my son at a private school for language arts classes his junior year of high school because we had heard of a language arts teacher displaying *Gender Queer* in her classroom. He attended all other classes through Valley

High School. In the spring semester of that same school year, I met with the Principal, the Curriculum Coordinator, and his counselor and they told me that they would not accept his credit for language arts and if he did not take the four remaining language classes, he would not be allowed to graduate from Valley High School. I did not want him to have to redo those classes at Valley and so I opted then to have him open enroll during his senior year. He will not graduate with a diploma from Valley High School. Because I felt the content in the language arts classrooms was obscene, and because I had challenged books in the District and didn't want him to face repercussions, I enrolled my son in alternative language arts programming. Because of that, my son will not receive a diploma from Valley High School, something he has worked for his whole life.

15. In September of 2022, I submitted another request for reconsideration. This time for seven books at Valley High School, three of which that were also circulating at Valley Southwoods. This reconsideration was much slower than the reconsideration process for *Gender Queer*. I did not hear back from the reconsideration committee for more than six months regarding the books at Valley High School and I never heard back from the books challenged at Valley Southwoods. It was never communicated to me why West Des Moines Community Schools Board Policy 605.05 was not followed.

16. I believe the obscene content of *Gender Queer* and the other books I challenged outweighs any literary value that might be found in them.

17. *Gender Queer* is available at the West Des Moines and Urbandale public libraries and it can be purchased at bookstores and online retailers.

Executed on <u>December 19, 2023.</u>      */s/ Teri Patrick*

                                                   Teri Patrick

Exhibit J

Affidavit of Matt Rollinger

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| PENGUIN RANDOM HOUSE LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> JOHN ROBBINS in his official capacity as President of the Iowa State Board of Education, et al., <br><br> Defendants. | Case No. 4:23-cv-00478-SHL-SBJ <br><br><br> **DECLARATION OF MATT ROLLINGER** |

COMES NOW, Matt Rollinger, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Matt Rollinger. I am a resident of Marion, Iowa and a current elected Linn-Mar School Board member.

2. I support curricula and library books in our kindergarten through 12th grade schools that contain only age-appropriate material. I also believe that our district should not provide any program, curriculum, test, survey, questionnaire, promotion or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six.

3. In this district, faculty are mandatory reporters of suspected abuse or neglect of their children. This District notifies parents when their child is injured on school grounds or during school activities. Parents of disabled children may

request notification on a variety of topics related to their child, including issues related to medication, behaviors in the classroom, and bullying incidents.

4. I believe that any confusion on how to interpret or implement Senate File 496 is illegitimate and purposefully obtuse. As an example, the new law requires parental notification if a student requests a gender-identity affirming accommodation, including a request to be addressed by a name or pronoun different than assigned in the school's registration forms or records. The Alburnett Community School District notifies every parent at the beginning of the school year informing them that if they want their child to use a preferred name, that the parent should let the school know. It's a simple implementation of a simple policy. Conversely, Linn-Mar schools requires teachers to refer to students by their legal name until the parents reach out to the school first. One of these school districts took a commonsense approach; the other did not.

5. Linn-Mar has standards for appropriate internet usage by students. Students are prohibited from using District devices or networks to access or share inappropriate content. Inappropriate use includes, but is not limited to, "accessing . . . or distributing pornographic, obscene, profane, abusive, threatening, sexually explicit or otherwise inappropriate material, or material encouraging or promoting discrimination towards individuals or groups of individuals based upon a legal protected trait or characteristic." I

am also aware that Linn-Mar schools engage filters to prevent students from accessing inappropriate content on the internet.

6. The Linn-Mar Community School District abides by Iowa Code section 280.28 which prohibits harassment and bullying, which among other things, states that "school employees, volunteers, and students in Iowa schools shall not engage in harassing or bullying behavior."

7. Linn-Mar has standards for appropriate student conduct. Linn-Mar requires students to "conduct themselves in a manner fitting to their age level and maturity and with respect and consideration for the rights of others while" in or on school property or at school-related events.

8. In addition to generally applicable policies against bullying, Linn-Mar has a policy that specifically addresses transgender students, Policy 504.13. This policy states: "The Linn-Mar Community School District is committed to serving the educational needs of the [transgender] community and underscores its commitment by supporting all students in a safe learning environment." Linn-Mar does not have a specific policy addressing any other protected class of people. This policy was adopted prior to the enactment of Senate File 496 and has not been modified since.

9. The District's anti-bullying and internet use policies remain unaffected after the enactment of Senate File 496.

10. Since the enactment of Senate File 496, there has been no negative impact on the quality of education that the District provides to students, nor have I

witnessed any negative impact on education provided by my colleagues to their students.

11. I am not aware of any increase in harassment or bullying since Senate File 496 was enacted.

Executed on <u>December 18, 2023.</u>      */s/ Matt Rollinger*
                                          Matt Rollinger

Exhibit K

Affidavit of Whitney Smith McIntosh

| | |
|---|---|
| IOWA SAFE SCHOOLS, et al., | Case No. 4:23-cv-474-SHL-SBJ |
| Plaintiffs, | |
| v. | **DECLARATION OF** |
| KIM REYNOLDS, in her official capacity as Governor of the State of Iowa, et al., | **WHITNEY SMITH MCINTOSH** |
| Defendants. | |

COMES NOW, Whitney Smith McIntosh, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Whitney Smith McIntosh. I am a resident of Altoona, Iowa and a current elected Southeast Polk School Board member.

2. I support curricula and library books in our kindergarten through 12th grade schools that contain only age-appropriate material. I also believe that our district should not provide any program, curriculum, test, survey, questionnaire, promotion or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six.

3. I believe that the Senate File 496 uses language that educators are capable of understanding. Many faculty and administrators have diplomas in advanced degrees. I believe if any confusion exists on what the law covers or how it is to be implemented, it is feigned and overblown. If the law is confusing to

teachers and administrators, then they aren't in the best position to be educating students.

4. Earlier during the COVID-19 pandemic, Southeast Polk Schools received federal money to help mitigate the effects of COVID-19. Some federal funds went to replacing library books that were lost because they were never returned, whether due to the chaos imposed by the pandemic, or other reasons. Librarians and administrators responsible for purchasing new books did not replace the lost books with new copies. Instead, new titles were purchased. These new books contained sexual themes.

5. The Southeast Polk Community School District abides by Iowa Code section 280.28 which prohibits harassment and bullying, which among other things, states that "school employees, volunteers, and students in Iowa schools shall not engage in harassing or bullying behavior."

6. The District has created, and abides by, its own anti-bullying policies at each of its schools. As an example, the 2023-2024 Southeast Polk Junior High Student Handbook declares that students "will not bully others" and "will help students who are bullied." The Handbook outlines procedures for what students and faculty should do if they experience or witness bullying.

7. The District also maintains a policy that governs internet and technology usage. "Sending or displaying offensive messages or pictures" or "[u]sing obscene language" is not permitted. Further, "[a]ccess to district networks and electronic information resources is a privilege and not a right, and will be

provided for the student as is appropriate to the school building and grade level."

8. The District's anti-bullying and technology policies remain unaffected after the enactment of Senate File 496.

9. Since the enactment of Senate File 496, there has been no negative impact on the quality of education that the District provides to students, nor have I witnessed any negative impact on education provided by my colleagues to their students.

10. I am not aware of any increase in harassment or bullying since Senate File 496 was enacted.


Executed on <u>December 19, 2023.</u>          */s/ Whitney Smith McIntosh*
                                          Whitney Smith McIntosh

Exhibit L

Affidavit of Joshua Briggs

| | |
|---|---|
| PENGUIN RANDOM HOUSE LLC, et al.,<br><br>     Plaintiffs,<br><br>     v.<br><br>JOHN ROBBINS in his official capacity as President of the Iowa State Board of Education, et al.,<br><br>     Defendants. | Case No. 4:23-cv-00478-SHL-SBJ<br><br><br>**DECLARATION OF<br>JOSHUA BRIGGS** |

COMES NOW, Joshua Briggs, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Joshua Briggs, and I reside in Urbandale, Iowa. I live within the Waukee Community School District.

2. I grew up in Waukee, Iowa, and relocated my family to the area for the academic reputation of the Waukee Community School District.

3. In the Fall of 2021, my daughters M.B. and B.B. attended elementary school in the Waukee Community School District.

4. As my children matriculated into Waukee schools, I became very concerned regarding the books available at the Waukee High School Library.

5. It came to my attention that several age-inappropriate books were available to Waukee High School students in the Waukee High School Library.

6. Included among these titles was the book "Gender Queer" by Maia Kobabe. This graphic novel included sexual content with depictions of sex acts and anatomy as shown below:











7. My wife and I formally requested "Gender Queer" be pulled from the high

school library. Our request was denied by the librarians, principals, and a

committee of teachers at both Waukee high schools. Eventually, this book was removed by the superintendent of Waukee schools.

8. During the reconsideration process for this book, I was disappointed in the Waukee school district's failure to create healthy boundaries for children when it comes to sexual content.

9. After these events, my wife and I removed our children from the Waukee School District based upon our concerns about the content they had access to.

10. After our oldest two children were enrolled in private school, we continued to have concerns about the Waukee schools prior to our youngest children becoming school age.

11. We formally requested the removal of the book graphic novel *Let's Talk About It: The Teen's Guide to Sex, Relationships, and Being a Human* a book published by Penguin Random House which, among other sexual content advises students how to send nude photos to one another without being detected.

12. As shown below, the book also includes explicit discussions of sexual behavior with visual depictions of anatomy:

Copyrighted Material

What is . . . this book? – – – – – – – 1

What is . . . first? – – – – – – – 9

What is . . . a relationship? – – – – – 25

What are . . . gender and sexuality? – – – 41

What is . . . body image? – – – – – 57

What is . . . your body? – – – – – 71

Where do you . . . start? – – – – – 93

What is . . . masturbation? – – – – – 107

What is . . . safe sex? – – – – – – 125

What is . . . climax? – – – – – – 137

What is . . . sexting? – – – – – – 147

What are . . . kinks, fantasies, and porn? – – 155

What is . . . aftercare? – – – – – – 169

Where are . . . friends in all this? – – – 177

What is . . . jealousy? – – – – – – 185

What is . . . rejection? – – – – – – 197

What is . . . next? – – – – – – 219

Furthur reading – – – – – – – 228

Authors' note – – – – – – – 230

Index – – – – – – – – 231

Copyrighted Material

Copyrighted Material

Copyrighted Material

Copyrighted Material



But...but... If that's right, then... I'm probably NOT a virgin?!

Ha! I don't know what sort of sexy stuff you might have done, but yeah, chances are you're not the "perfect virgin."

See, "virginity" is this silly label people came up with to describe a person who hasn't done a *specific sexual act*, traditionally, a cisgender man or woman who hasn't yet had penis-in-vagina intercourse.





But since there are SO many ways to have sex between SO many different kinds of people and body parts, you can be a virgin in one kind of sex act and totally NOT a virgin in others. "Virginity" just doesn't work anymore in today's world.

Don't get me wrong, it's okay to avoid sexy activities if they don't interest you or if they have a special importance for you. It's okay to never have sex if you know it's not for you; that's often called abstinence. What's important is that you do what feels right.



Copyrighted Material

Copyrighted Material



Copyrighted Material

A great place to research fantasies and kinks safely is on the internet!

There are tons of people and communities out there who share your interests and have all kinds of advice.





The online world is also chockablock full of pornography: professionals and amateurs alike sharing their sexy adventures online.

When consumed right, porn can help you discover new aspects of your sexuality, and help you safely explore kinks and fantasies.

Buuuut, depending on your age and where you found it, porn can also be unethical or illegal to watch. So do your research! Look up interviews with your fave porn performers, go to the sites they recommend, and pay for your porn.

But here's a heads-up: pornography is a performance. It's not a blueprint on how to have sex in real life, just like an action movie isn't a guide on how to drive a car.



Watching porn uncritically can leave you with unrealistic expectations about what to do in the bedroom, so do yourself a favor and consume it with a hefty pinch of salt. At the same time, remember that the people you see on camera are real human beings who deserve your respect.

Ha, sometimes I worry I watch too much porn, you know?



Yeahhh, I know that worry! But there's nothing wrong with enjoying some porn; it's a fun sugary treat! Though if the amount of porn you're watching feels like it's impacting your life, then it's probably time to pull back and give it some thought.



And don't forget—everybody's got a butt!

After the train has left the station (so to speak) and you've had a chance to wash up or douche back there, you can have an assload of fun with a healthy heaping of lube.

Apply broad pressure to the outside of the entrance.

Circle your butthole with your finger, pausing any time a spot feels extra good.

Dip just the tip of your finger inside. Let your anus pull it in when it's ready, instead of forcing it.

Dive deeper with your finger or a butt plug! Just make sure any objects you put up there have a flared base; otherwise, your hungry heinie can gobble it up and the only way to get it back out is a trip to the hospital. Make sure to wash your hands before touching any of your other body parts, especially the vulva! Or wear latex gloves and toss 'em when you're done.



## Things to Try!

Stroke the shaft of your penis with different pressures and speeds. Try mixing up your grip or switch hands.

Whack it against your palm or give it some gentle bending pressure.

FWAP!

Tug or squeeze on your balls.

If you have a foreskin, play with it! Slip a wet finger between it and the glans.

Switch things up and avoid constantly masturbating with a tight hard grip, as it can make it harder to climax in the future.

Try a sex toy for bonus fun. Vibes and strokers are awesome!

118

But here's a heads-up: *pornography is a performance.* It's not a blueprint on how to have sex in real life, just like an action movie isn't a guide on how to drive a car.



Watching porn uncritically can leave you with unrealistic expectations about what to do in the bedroom, so do yourself a favor and consume it with a hefty pinch of salt. At the same time, remember that *the people you see on camera are real human beings who deserve your respect.*

Ha, sometimes I worry I watch too much porn, you know?

Yeahhh, I know that worry! But there's nothing wrong with enjoying some porn; it's a fun *sugary treat!* Though if the amount of porn you're watching feels like it's impacting your life, then it's probably time to pull back and give it some thought.



...hen it comes to ...g, the penis and the vagina can fit together to form the ultimate baby-making machine. Let's take a peek right now and see how—

WHOA, that's NOT safe for work!

Shloop!

Reproduction aside, *your genitals exist to let you feel pleasure* with yourself or others (no matter which genitals they may have). Sexual intimacy is a powerful way to *feel good and bond with another person*, whether it's for a night or a lifetime.

*Ahhhh.* I can't handle any more.

Our bodies are so incredible!!

...Makes me wanna have some alone time with my bits. Get outta here, Suri!

Shoo!



Whether you're having a one-night fling or you're in a long-term relationship, you want to be on the same page with your partner, so make sure to talk about sex ahead of time.

It can be a long chat way in advance, or something shorter right before you hook up. It all counts as long as you're talking!





111





If you ARE feeling ready, one of the best first steps you can take is connecting with your body by learning to masturbate.

When you're safe and alone, give yourself permission to touch and explore your bod.

Relax, let your mind wander, and let your hands roam. There's no perfect way to touch yourself.



Try running the palms of your hands up and down your body. Touch ALL the different parts of you and not just the "naughty bits."

Your hands can do so many different things; they can press, massage, squeeze, pat, stroke, lightly pinch, and flick.

What kind of touch does your thigh like? Does your butt like being squeezed? What happens when you gently pat yourself? Does your nipple like to be pinched? Start light and apply more pressure. Discover what makes you feel good.



13. I requested this book be removed from the library, and the librarian denied our request. Eventually, the principal removed this book from the library.

14. My wife and I currently pay $21,000.00 for school tuition a year so our children are not exposed to the environment of hyper-sexualization in the Waukee School District.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 12/19/2023__.

/s/ Josh Briggs

Joshua Briggs