# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

PENGUIN RANDOM HOUSE LLC; )
HACHETTE BOOK GROUP, INC.; )
HARPERCOLLINS PUBLISHERS LLC; )
MACMILLAN PUBLISHING GROUP, LLC; )
SIMON & SCHUSTER, LLC; THE AUTHORS )  Case No. 4:23-cv-00478-SHL-SBJ
GUILD; LAURIE HALSE ANDERSON; JOHN )
GREEN; MALINDA LO; JODI PICOULT; )  **SECOND AMENDED**
MEGGAN VAN GUNDY, as parent and next )  **COMPLAINT FOR**
friend of G.V.G.; IOWA STATE EDUCATION )  **DECLARATORY AND**
ASSOCIATION; LISA PETRIE; and EMILY )  **INJUNCTIVE RELIEF**
HOUSE, )
                     )
           Plaintiffs, )
                     )
           v. )
                     )
JOHN ROBBINS, in his official capacity as )
President of the Iowa State Board of Education; )
MCKENZIE SNOW, in her official capacity as )
Director of the Iowa Department of Education; )
CHAD JANZEN, in his official capacity as Chair )
of the Iowa Board of Educational Examiners; )
JASON MENKE, RACHEL KENT, )
KATHERINE HOWSARE, JENNY MEADE, )
JOSH VANRYSWYK, CARISSA WILLIAMS, )
and MARGARET YOUNG, in their official )
capacities as Members of the Urbandale )
Community School District Board of Education; )
ROSALIE DACA, in her official capacity as )
Urbandale Community School District )
Superintendent; JUSTIN FLETCHER, BRIAN )
RAUSCH, DANIEL DOERFLER, KATE )
BALDWIN, and MICHELLE KELLY, in their )
official capacities as Members of the Norwalk )
Community School District School Board of )
Directors; and SHAWN HOLLOWAY in his )
official capacity as Norwalk Community School )
District Superintendent, )
                     )
           Defendants. )
                     )

Plaintiffs Penguin Random House LLC; Hachette Book Group, Inc.; HarperCollins Publishers LLC; Macmillan Publishing Group, LLC; Simon & Schuster, LLC; the Authors Guild; Laurie Halse Anderson; John Green; Malinda Lo; Jodi Picoult; Meggan Van Gundy as parent and next friend of G.V.G.; Iowa State Education Association; Lisa Petrie; and Emily House, by their attorneys, for their Complaint against Defendants John Robbins, in his official capacity as President of the Iowa State Board of Education; McKenzie Snow, in her official capacity as Director of the Iowa Department of Education; Chad Janzen, in his official capacity as Chair of the Iowa Board of Educational Examiners; Jason Menke, in his official capacity as President of the Urbandale Community School District Board of Education; Rachel Kent, in her official capacity as Vice President of the Urbandale Community School District Board of Education; Katherine Howsare, Jenny Meade, Josh VanRyswyk, Carissa Williams, and Margaret Young, in their official capacities as Members of the Urbandale Community School District Board of Education; Rosalie Daca, in her official capacity as Urbandale Community School District Superintendent; Justin Fletcher, in his official capacity as President At-Large of the Norwalk Community School District School Board of Directors; Brian Rausch, in his official capacity as Vice President At-Large of the Norwalk Community School District School Board of Directors; Daniel Doerfler, Kate Baldwin, and Michelle Kelly, in their official capacities as Members At-Large of the Norwalk Community School District School Board of Directors; and Shawn Holloway in his official capacity as Norwalk Community School District Superintendent, state as follows:

## **INTRODUCTION**

1.     Maya Angelou's *I Know Why the Caged Bird Sings*, Ralph Ellison's *Invisible Man*, Zora Neale Hurston's *Their Eyes Were Watching God*, Aldous Huxley's *Brave New World*, Toni

Morrison's *The Bluest Eye*, George Orwell's *1984*, Richard Wright's *Native Son*, Kurt Vonnegut's *Slaughterhouse-Five*, and Alice Walker's *The Color Purple* are some of the many books that the State of Iowa has required be removed from school libraries. These books are timeless classics, renowned for their literary value. Many of them have won awards or are bestsellers. They have been on the shelves of school libraries for years. But Iowa has required these books and others to be removed from school libraries under its broad, across-the-board, content-based mandate that forbids consideration of the books' value.

2.      The First Amendment ensures that authors can communicate their ideas to students without undue interference by the government. "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them. In most circumstances, the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975).

3.      The right to speak and the right to read are inextricably intertwined. Just as authors have the right to communicate their ideas to students without undue interference from the government, students have a corresponding right to receive those ideas. Publishers and educators connect authors to students. If the government dislikes an author's idea, it can offer a competing message. It cannot suppress the disfavored message.

4.      This action concerns solely the portion of Senate File 496 that requires the removal of books from school libraries that are not remotely obscene, in violation of the First and Fourteenth Amendments to the United States Constitution. Senate File 496 forces teachers and school librarians to remove books, some of which have been on shelves for decades, or face

3

penalties, including termination of their employment. This lawsuit does not challenge any of the numerous other provisions of Senate File 496. The text of Senate File 496 is attached as Exhibit A.

5. Senate File 496 requires the removal of fiction and nonfiction books alike, depriving Iowa students from encountering literature that portrays and describes critical aspects of the human experience.

6. Rather than defer to trained professionals, such as teachers or librarians, to determine which books are appropriate for school libraries, Senate File 496 automatically prohibits books in school libraries that contain any description of a "sex act." This restriction applies to all grades, kindergarten through twelfth grade, without consideration of the book as a whole, excepting only religious books. By so broadly regulating the display and availability of books that are constitutionally protected as to at least a significant number of students, this restriction violates the First and Fourteenth Amendments because it is an impermissible content-based restriction, prohibits access to constitutionally protected books, and is unconstitutionally vague.

7. Plaintiffs bring this action to safeguard their fundamental rights and the rights of their members and other persons under the First and Fourteenth Amendments to the U.S. Constitution (a) to disseminate and have others read constitutionally protected books, (b) to receive and read constitutionally protected books, and (c) to avoid being required to choose between removing constitutionally protected books from school libraries or losing their jobs as a teacher or school librarian.

8. Plaintiffs ask this Court to declare unconstitutional and void the portions of Sections 1, 2, and 4 of Senate File 496 that apply to school libraries as violations of their rights

under the First and Fourteenth Amendments and to preliminarily and permanently enjoin the State Defendants' enforcement of those portions of Senate File 496.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because this action is brought under 42 U.S.C. § 1983 and seeks to vindicate civil rights protected by the First and Fourteenth Amendments to the U.S. Constitution.

10.     Venue is proper under 28 U.S.C. § 1391(b) because multiple Defendants reside in this district, all Defendants are residents of the State in which this district is located, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and are occurring in this district.

## PARTIES

11.     Plaintiffs Penguin Random House LLC; Hachette Book Group, Inc.; HarperCollins Publishers LLC; Macmillan Publishing Group, LLC; and Simon & Schuster, LLC (collectively the "Publisher Plaintiffs") are publishers whose books have been targeted for removal or removed from school libraries throughout Iowa as a result of Senate File 496's prohibition on books that contain a description of a "sex act."  References to books published by a Publisher Plaintiff include books originally published by that Publisher Plaintiff's predecessors.

12.     Plaintiff Penguin Random House LLC ("PRH"), a Delaware Limited Liability Company headquartered in New York, is the U.S. arm of Penguin Random House, the world's largest trade publisher, which comprises more than 300 editorially and creatively independent publishing imprints globally.  PRH's mission is to ignite a universal passion for reading by creating books for everyone and creating a world where independent thinking, free expression, and creativity flourish.  PRH aims to publish books that provide children with a gateway to the whole world, promoting literacy, fostering empathy, and inspiring free and open debate.  Continued

5

inclusion of its books in public school libraries is critical to PRH's mission, especially for books intended for elementary and young-adult readers.

13. Plaintiff Hachette Book Group, Inc. ("Hachette") is a U.S. general-interest book publisher headquartered in New York City. Hachette's publishing groups include prominent imprints such as Little, Brown and Company, Little, Brown Books for Young Readers, Grand Central Publishing, Basic Books, Orbit Books, Running Press, Algonquin Books, and Workman Publishing. Hachette is part of Hachette Livre, the world's third-largest trade and educational publisher. Hachette's books and authors have garnered major awards, including the Pulitzer Prize, National Book Award, Caldecott Medal, Newbery Medal, Booker Prize, and Nobel Peace Prize. Hachette's publishing programs aim to reflect the broad range of backgrounds, experiences, and viewpoints that shape our society. Its mission is to make it easy for everyone to discover new worlds of ideas, learning, entertainment, and opportunity, and it is fundamental to Hachette's mission that its books remain accessible to students in public school libraries.

14. Plaintiff HarperCollins Publishers LLC ("HarperCollins"), a subsidiary of News Corp, is the second-largest consumer book publisher in the world, with operations in fifteen countries. With 200 years of history and more than 120 branded imprints around the world, HarperCollins publishes approximately 10,000 new books every year in sixteen languages and has a print and digital catalog of more than 250,000 titles. HarperCollins seeks to deliver content that presents a diversity of voices and speaks to the global community. Writing across dozens of genres, its authors include winners of the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize.

15. Plaintiff Macmillan Publishing Group, LLC ("Macmillan") is a New York-based group of U.S. publishers that includes Celadon Books, Farrar, Straus and Giroux, Flatiron Books,

Henry Holt & Company, Macmillan Audio, Macmillan Children's Publishing Group, St. Martin's Publishing Group, and Tor Publishing Group. The U.S. publishing group is part of Macmillan Publishers, a global trade book publishing company with prominent imprints around the world. Macmillan publishes a broad range of award-winning books for children and adults in all categories and formats. Macmillan strongly advocates for the right to read, uniting a broad community of authors, educators, librarians, and readers. Macmillan strives to ensure access to diverse literary works, highlighting the critical role of literacy in democracy, championing the transformative power of books in fostering understanding, and working to build an inclusive future.

16. Plaintiff Simon & Schuster, LLC ("S&S"), a global leader in general interest publishing, is dedicated to providing the best in fiction and nonfiction for readers of all ages, and in all printed, digital, and audio formats. Its distinguished roster of authors includes many of the world's most popular and widely recognized writers, and winners of the most prestigious literary honors and awards. It is home to numerous well-known imprints and divisions such as Simon & Schuster, Scribner, Atria Books, Gallery Books, Adams Media, Avid Reader Press, Simon & Schuster Children's Publishing, and Simon & Schuster Audio, and international companies in Australia, Canada, India, and the United Kingdom, and VBK in the Netherlands and Belgium. It proudly brings the works of its authors to readers in more than 200 countries and territories. S&S is a New York limited liability company that is headquartered in New York.

17. Plaintiff The Authors Guild (the "Guild") was founded in 1912 and is a national non-profit association of more than 15,000 professional, published writers of all genres. The Guild counts historians, biographers, academicians, journalists, and other writers of nonfiction and fiction as members. The Guild works to promote the rights and professional interest of authors in

7

various areas, including copyright, freedom of expression, and taxation. Many Guild members earn their livelihoods through their writing. Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field. The ability to write on topics of their choosing and to have their work available through bookstores and libraries, including school libraries, is vital to their ability to make a living in their chosen profession. Books written by the Guild's members, including Plaintiffs John Green, Malinda Lo, and Jodi Picoult, have been targeted for removal or removed from school libraries throughout Iowa as a result of Senate File 496.

18. Plaintiffs Laurie Halse Anderson, John Green, Malinda Lo, and Jodi Picoult are authors whose books have been targeted for removal or removed from school libraries throughout Iowa as a result of Senate File 496. Halse Anderson, Green, Lo, Picoult, and the Guild are collectively referred to herein as the "Author Plaintiffs."

19. Plaintiff Laurie Halse Anderson resides in Pennsylvania. She has authored ten novels. Her novels have been selected for many best-of lists, including in the *New York Times*, in *Publishers Weekly*, and on the American Library Association's ("ALA") Amelia Bloomer List. Her novels have also been recognized by the International Reading Association, the New York Public Library, the Young Adult Library Services Association ("YALSA"), and the Junior Library Guild. She has won the ALA Margaret A. Edwards Award, the Anne V. Zarrow Award, the Scott O'Dell Award for Historical Fiction, and the Astrid Lindgren Memorial Award during her distinguished career.

20. Anderson's book *Speak*, published by Macmillan, is a young adult fiction novel based on Anderson's personal experience of having been sexually assaulted as a teenager and the

resulting trauma. *Speak* explores themes of identity, finding one's voice, trauma, and healing by reclaiming the narrative. *Speak* won the Golden Kite Award and a Michael Printz Honor and was named as a finalist for the Edgar Allen Poe Award, the *Los Angeles Times* Book Prize, and the National Book Award for Young People's Literature. *Speak* was also named an ALA Best Book for Young Adults and listed in the ALA's Top Ten Best Books for Young Adults. At least fourteen Iowa school districts have determined that Senate File 496 requires that *Speak* be removed from school libraries.

21. Plaintiff John Green resides in Indiana. He is the author of seven novels. His novels have sold more than fifty million copies in print worldwide, and his novel *The Fault in Our Stars* is one of the best-selling books of all time. Green has won the Edgar Alan Poe Award, the Corine Literature Prize, the Children's Choice Book Awards, the Guardian's Children's Fiction Prize, the Uruguayan Premio Bartolomé Hidalgo for "Best children's Youth [Book] by a foreign Author," and the Young Reader's Choice Award, among others, during his illustrious career.

22. Green's book *Looking for Alaska*, published by PRH, is a coming-of-age school story and teen romance about a boarding school student who is bullied. The *New York Times* bestselling novel won the ALA's Michael L. Printz Award and was a finalist for the *Los Angeles Times* Book Prize. *Looking for Alaska* was featured on the ALA's Top Ten Best Book for Young Adults, the YALSA's Teen's Top Ten Award, and the ALA's Quick Pick for Reluctant Young Adult Readers. It has been named a New York Public Library Book for the Teen Age, a Booklist Editor's Choice Pick, and a Borders Original Voices Selection. At least eighteen Iowa school districts have determined that Senate File 496 requires that *Looking for Alaska* be removed from school libraries, including Urbandale Community School District.

23.     Plaintiff Malinda Lo resides in Massachusetts.  She is a *New York Times* bestselling author of seven novels, all of which are about queer girls.  Lo's novels have been selected for many best-of lists, including the ALA's Best Fiction for Young Adults, the ALA's Rainbow List, Bank Street College's Best Children's Books, the Locus Recommended Reading List, and the James Tiptree Jr. Longlist.  Lo has been honored by the Carnegie Corporation as a Great Immigrant.

24.     Lo's novel *Last Night at the Telegraph Club*, published by PRH, is a historical coming-of-age novel set in 1950s San Francisco about a Chinese American girl named Lily Hu who discovers her identity as a lesbian.  *Last Night at the Telegraph Club* won the National Book Award, the Stonewall Book Award, the Asian/Pacific American Award for Literature, and a Michael L. Printz Honor, and it was an *LA Times* Book Prize finalist.  At least seven Iowa school districts have determined that Senate File 496 requires that *Last Night at the Telegraph Club* be removed from school libraries, including Urbandale Community School District.

25.     Plaintiff Jodi Picoult is a resident of New Hampshire.  She has authored 28 novels that have been translated into 34 languages and sold approximately forty million print copies worldwide.  Picoult's novels have been selected for many best-of lists, including by the *New York Times*, *Publishers Weekly*, and YALSA.  She has won the New England Bookseller Award for Fiction, YALSA's "Alex Award," the Vermont Department of Libraries' "Green Mountain Book Award," the Maryland Association of School Librarians' "Black-Eyed Susan Award," Romance Writers of America's "Lifetime Achievement Award" for mainstream fiction, and the Sarah Josepha Hale Award Medal during her venerable career.

26.     Picoult's book *Nineteen Minutes*, published by S&S, centers on a school shooting, demonstrating the devastating ramifications of failing a child who has been "othered."  Through characters Peter Houghton, who has been mercilessly bullied for most of his life, and Josie

Cormier, who is being physically and sexually abused by her boyfriend, *Nineteen Minutes* shows that marginalization can take many different forms. *Nineteen Minutes* debuted at #1 on the *New York Times* bestseller list. At least 24 Iowa school districts have determined that Senate File 496 requires that *Nineteen Minutes* be removed from school libraries, including Urbandale Community School District.

27.     For each Author Plaintiff, school libraries are a critical means of reaching their intended audiences and securing the broadest possible readership. The Author Plaintiffs' books, including the books identified herein, are vehicles for their personal messages and ideas. The removal of their books from school, including the associated stigma, causes them personal and professional harm.

28.     Plaintiff Meggan Van Gundy is an Iowa resident. She is the mother, next of friend, and general guardian of G.V.G., a senior at Urbandale High School. During the current school year, G.V.G. wanted and intended to check out specific books from her school library or her teachers' classroom libraries that have been removed due to Senate File 496, including *Looking for Alaska* by John Green, *The Last Night at the Telegraph Club* by Malinda Lo, and *Nineteen Minutes* by Jodi Picoult. Meggan Van Gundy wants G.V.G. to have access to these books, and others like them, among other reasons, so that she is presented with different viewpoints and experiences and, thus, better prepared to engage with a wide range of people. G.V.G. wants to have access to these books, and others like them, for the same reasons.

29.     Plaintiff Iowa State Education Association ("ISEA") is a professional organization of educators dedicated to the mission of supporting and protecting quality public education "by placing our students at the center of everything we do while advocating for education professionals." ISEA's goals include promoting learner-centered curricula for the development of

11

the whole person and protecting the professional integrity of the educator. ISEA represents teachers, librarians, and other education professionals who work in public school districts and schools throughout Iowa, including Urbandale Community School District and Norwalk Community School District. Virtually all of ISEA's members are subject to Senate File 496. ISEA members overwhelmingly support the preservation of academic freedom and oppose the provisions of Senate File 496 that have resulted in the removal of books from district libraries. As a result of Senate File 496, many of ISEA's members, including teachers and school counselors, are being forced to remove books from their classroom libraries or face penalties and expose their districts to penalties. As a result of Senate File 496, many of ISEA's librarian-members are being forced to remove books from school libraries or face penalties themselves and expose their districts and administrators to penalties.

30. Plaintiffs Emily House and Lisa Petrie are Iowa educators and members of ISEA who, as a result of Senate File 496, are being forced to choose between removing constitutionally protected books from their school libraries and classroom collections or exposing their districts, administrators, and themselves to penalties, including termination of their employment and loss of licensure. Each is licensed by the Iowa Board of Educational Examiners. Together with ISEA, House and Petrie are referred to as the "Educator Plaintiffs."

31. Defendant John Robbins is the President of the Iowa State Board of Education. He is sued in his official capacity, as chief executive of a state government body responsible for enforcing the provisions of Senate File 496. Under the statute, the "rules of the state board shall require that an age-appropriate, multicultural, and gender-fair approach is used by schools and school districts." Iowa Code § 256.11 (as amended by Senate File 496 § 1). The state board is also responsible for establishing "a definition of and standards for an articulated sequential

12

kindergarten through grade twelve media program." Iowa Code § 256.11(9)(b) (as amended by Senate File 496 § 2).

32.     Defendant McKenzie Snow is the Director of the Iowa Department of Education. She is sued in her official capacity, as chief executive of a state government body responsible for enforcing the provisions of Senate File 496. Senate File 496 gives the Department of Education authority to investigate and enforce certain violations of the statute, including violations related to library programs. Iowa Code § 256.11(9)(a)(2) (as amended by Senate File 496 § 2); Iowa Code § 279.78(4) (as amended by Senate File 496 § 14).

33.     Defendant Chad Janzen is the Chair of the Iowa Board of Educational Examiners. He is sued in his official capacity, as a chief executive of a state government body responsible for enforcing the provisions of Senate File 496. The Iowa Board of Educational Examiners has the authority to conduct hearings related to violations of the statute, including violations related to library programs, and to take subsequent disciplinary action. *Id.*

34.     Defendants Robbins, Snow, and Janzen are all officers of the State of Iowa (collectively the "State Defendants").

35.     Defendant Jason Menke is President of the Urbandale Community School District Board Of Education.

36.     Defendant Rachel Kent is Vice President of the Urbandale Community School District Board Of Education.

37.     Defendants Katherine Howsare, Jenny Meade, Josh VanRyswyk, Carissa Williams, and Margaret Young are Members of the Urbandale Community School District Board Of Education.

4870-1269-5529, v. 1

38. The Urbandale Community School District Board Of Education is the seven-member governing body of Urbandale Community School District ("Urbandale"). The Urbandale Community School District Board Of Education delegates authority to the Superintendent of the Urbandale Community School District, school principals, and other executives to enforce the provisions of Senate File 496.

39. Defendant Rosalie Daca is the Superintendent of the Urbandale Community School District. As Superintendent, Daca is the executive officer of the Board of Directors of the Urbandale Community School District and is directly responsible "for the enforcement of all provisions of law relating to the operation of the schools." Urbandale Community School Board Policy 0311. She is "delegate[d] . . . the authority and responsibility to administer the District and to implement decisions made by the Board." *Id.* Daca therefore is tasked with implementing Senate File 496. Together, Menke, Kent, Howsare, Meade, VanRyswyk, Williams, Young, and Daca are referred to as the "Urbandale Defendants." The Urbandale Defendants are responsible for implementing and enforcing the provisions of Senate File 496 concerning school and classroom libraries. The Urbandale Defendants are sued in their official capacity.

40. Defendant Justin Fletcher is President At-Large of the Norwalk Community School District School Board Of Directors.

41. Defendant Brian Rausch is Vice President At-Large of the Norwalk Community School District School Board Of Directors.

42. Defendants Daniel Doerfler, Kate Baldwin, and Michelle Kelly are Members At-Large of the Norwalk Community School District School Board Of Directors.

43. The Norwalk Community School District Board Of Directors is the five-member governing body of Norwalk Community School District ("Norwalk"). The Norwalk Community

14

School District Board Of Directors delegates authority to the Superintendent of the Norwalk Community School District, school principals, and other executives to enforce the provisions of Senate File 496.

44.     Defendant Shawn Holloway is the Superintendent of the Norwalk Community School District.  As Superintendent, Holloway is "the chief executive officer" of the Norwalk Community School District Board Of Directors and has the power to "decide all matters of administrative and supervisory detail in connection with the operation and maintenance of the schools."  Norwalk Community School District Board Policy BP-302.04.  Holloway therefore is tasked with implementing Senate File 496.  Together, Fletcher, Rausch, Doerfler, Baldwin, Kelly, and Holloway are referred to as the "Norwalk Defendants."  The Norwalk Defendants are responsible for implementing and enforcing the provisions of Senate File 496 concerning school and classroom libraries.  The Norwalk Defendants are sued in their official capacity.

45.     Under Senate File 496, Iowa school districts must establish kindergarten through twelfth grade library programs that contain "only age-appropriate materials."  Iowa Code § 256.11(9)(a)(1) (as amended by Senate File 496 § 2).  "Age-appropriate" materials exclude "material with descriptions or visual depictions of a sex act."  Iowa Code § 256.11(19) (as amended by Senate File 496 § 4).  This prohibition applies to books made available in school libraries (the "Library Restriction").  *Id.*

46.     Iowa school districts, including the Urbandale Defendants and the Norwalk Defendants, are responsible for implementing and enforcing the Library Restriction.  *See* Iowa Code § 256.11(9)(a)(1) (as amended by Senate File 496 § 2).  Iowa school districts are also subject to penalties for violating the Library Restriction.  Iowa Code § 256.11(9)(a)(1) (as amended by Senate File 496 § 2); Iowa Code §§ 272.2(4), 279.27(1-2).

47.     All Defendants are state actors operating under the color of state law with respect to all allegations in this complaint.  According to Urbandale and Norwalk, the Urbandale Defendants and the Norwalk Defendants have no discretion under the Library Restriction, which is a state mandate.

48.     The Fourteenth Amendment to the U.S. Constitution incorporates the protections of the First Amendment, which apply to and bind all Defendants.

## FACTUAL ALLEGATIONS

### *School Libraries*

49.     School libraries are and have always been places of self-directed learning.

50.     School libraries are also central to a student's First Amendment right to access new ideas and information.

51.     Matching students to books is an inherently individual exercise.  Not every book is for every student at every point in their life.  For that reason, each student has the right to choose whether to read any particular book from a school library.

52.     As the Supreme Court has recognized, the school library "is the principal locus" of a student's freedom "to inquire, to study and to evaluate, to gain new maturity and understanding" – where a student can "explore the unknown" and "discover areas of interest and thought not covered by the prescribed curriculum."  *Bd. Of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 868-69 (1982) (plurality opinion).

53.     The fact that schools are "educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes."  *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943).

4870-1269-5529, v. 1

54.     The State of Iowa mandates that each school district establish a "library program" at the direction of a qualified teacher librarian, who shall have "special expertise in identifying resources and technologies to support teaching and learning." Iowa Admin. Code r. 281-12.3(9)(a).

55.     The State of Iowa has a proud history of supporting libraries and opposing censorship. In the 1930s, Des Moines Public Library Director Forrest Spaulding drafted an anti-censorship document that evolved into the American Library Association's "Library Bill of Rights." The introduction to Spaulding's document stated as follows: "Now, when indications in many parts of the world point to growing intolerance, suppression of free speech and censorship, affecting the rights of minorities and individuals, the Board of Trustees of the Des Moines Public Library reaffirms these basic policies governing a free public library to serve the best interests of Des Moines and its citizens."

56.     In addition to separate school libraries, many Iowa teachers have a collection of books in their classrooms that are available for students to borrow and read. Classroom libraries serve a similar purpose and function to school libraries.

57.     Senate File 496 does not expressly provide whether the Library Restriction applies to classroom collections, but many Iowa school districts—including Norwalk and Urbandale—have proceeded as if they do. References to "school libraries" or "school library books" in this complaint also refer to "classroom libraries," "classroom collections" or "books in classroom libraries or classroom collections."

### *Iowa Senate File 496*

58.     Following enactment by the Iowa legislature, Iowa Governor Kim Reynolds signed Senate File 496 into law on May 26, 2023.

4870-1269-5529, v. 1

59.     Senate File 496 altered several provisions of Iowa law related to school district library programs and the educational programs provided to students enrolled in Iowa school districts.

60.     This lawsuit solely concerns the Library Restriction.

***The Library Restriction***

61.     Under Senate File 496's Library Restriction, a school district's "library program" must contain "only age-appropriate materials."  For all grades, age-appropriate materials exclude "any material with descriptions or visual depictions of a sex act."  Iowa Code §§ 256.11(9)(a)(1), (19)(a) (as amended by Senate File 496 §§ 2, 4).  The term "sex act" is defined in Iowa Code § 702.17.

62.     The Library Restriction does not account for the value of a book as a whole or its literary, scientific, medical, artistic, or political value.

63.     The Library Restriction requires the removal of numerous award-winning books and other literary classics from school libraries solely because the book contains only a single description of a sex act.  This serves no legitimate pedagogical purpose.

64.     The Library Restriction's prohibition on material with any description of a sex act applies to all students in kindergarten through twelfth grade, regardless of age.  Consequently, a 16-year-old high school sophomore in Iowa can legally consent to a sex act but cannot read a school library book about a sex act.

65.     Although the Library Restriction generally prohibits books that describe a sex act, the law exempts "Religious books such as the Bible, the Torah, and the Koran," which "shall not be excluded from any public school or institution in the state," in apparent recognition of their value when considered as a whole.  Iowa Code § 256.11(9)(a)(1) (as amended by Senate File 496 § 2); Iowa Code § 280.6.

18

66.     Iowa State Representative Skyler Wheeler, Chair of the House Education Committee, has claimed that the Library Restriction requires only that "sexually explicit material" that is akin to pornography be removed from school libraries: "This is quite simple to me. Porn doesn't belong in school libraries. Books that don't contain porn can remain on the shelves."

67.     Governor Reynolds similarly has stated that Senate File 496 merely prohibits books in school libraries that are "pornography."

68.     However, the books being removed from schools under the Library Restriction are not pornography, nor are they remotely obscene, which is the applicable legal standard. The Supreme Court has defined obscene material as "limited to works" (a) "which, taken as a whole, appeal to the prurient interest in sex," (b) "which portray sexual conduct in a patently offensive way, and" (c) "which, taken as a whole, do not have serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. 15, 24 (1973).

69.     When applied to students, the obscenity standard must account for the age of the reader. A book is not obscene as to minors if it has serious value for a legitimate minority of minors, such as older minors. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 488 U.S. 905 (1988); *Am. Booksellers Ass'n, Inc. v. Virginia*, 882 F.2d 125 (4th Cir. 1989), *cert. denied*, 494 U.S. 1056 (1990). The First Amendment prohibits suppression of

> Speech that is neither obscene as to youths nor subject to some other legitimate proscription . . . solely to protect the young from ideas or images that a legislative body thinks unsuitable for them. In most circumstances, the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors.

*Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975).

70.     The Library Restriction goes far beyond prohibiting books that are obscene as to minors because it prohibits books with even a brief description of a sex act for students of all ages without any evaluation of the book as a whole or its literary, artistic, political, or scientific value.

19

Under the Library Restriction, highly-regarded books—even ones that have been on shelves for many decades—must be removed from school libraries in Iowa if they contain a description of a sex act, even if the books taken as a whole are not obscene.

71.     A law that regulates or prohibits speech must sufficiently define terms so that ordinary people can understand what conduct is prohibited and enforcers of the regulation are able to enforce the law in a non-arbitrary, non-discriminatory manner.  *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."  *Id.*

72.     The Library Restriction is vague and ambiguous.  In particular, the term "description" in relation to a "sex act" provides no easily understood line as to which types of statements constitute a description of a sex act.  Iowa Code § 256.11(19)(a)(1) (as amended by Senate File 496 § 4).  The term "description . . . of a sex act" is so broad that it would appear to require removal of the Oxford English Dictionary—which defines "sex" as "physical activity between two people in which they touch each other's sexual organs, and which may include sexual intercourse"—from school libraries.  The Oxford English Dictionary, however, is not obscene.

73.     This vagueness and ambiguity results in overbroad interpretations of the Library Restriction and has a chilling effect on protected speech.

74.     On June 20, 2024, the Iowa State Board of Education adopted rules concerning Senate File 496.  *See*, *e.g.*, Iowa Admin. Code r. 281-12.2.  These rules provide that a "reference or mention of a sex act in a way that does not describe or visually depict a sex act" does not constitute a description or visual depiction of a sex act.  *Id*.  The text of Iowa Administrative Code Rule 281-12.2 is attached as Exhibit B.  This attempt to clarify the meaning of the Library Restriction is inadequate because it offers no reasonable guidance on what the term "description"

means in relation to a "sex act" and because it does not incorporate the *Miller* obscenity standard as applied to minors.

### *Penalties And Procedures*

75. Teachers, librarians, and other educators licensed by the Iowa Board of Educational Examiners face license sanctions and adverse employment actions for violation of Senate File 496, including termination of their employment.

76. Senate File 496 establishes penalties for violations of the Library Restriction and provides for enforcement of these penalties beginning January 1, 2024.

> If, after investigation, the [Iowa State Department of Education] determines that a school district or an employee of a school district has violated the [Library Restriction] related to library programs containing only age-appropriate materials, beginning January 1, 2024, the school district or employee of the school district, as applicable, shall be subject to the following:
>
>   (a)  For the first violation .  .  . , the [Iowa State Department of Education] shall issue a written warning to the board of directors of the school district or the employee, as applicable.
>
>   (b)  (i)  For a second or subsequent violation .  .  . , if the [Iowa State Department of Education] finds that a school district knowingly violated [the Library Restriction], the superintendent of the school district shall be subject to a hearing conducted by the board of educational examiners .  .  .  which may result in disciplinary action.
>
>   (ii)  For a second or subsequent violation .  .  . , if the [Iowa State Department of Education] finds that an employee of the school district who holds a license, certificate, authorization, or statement of recognition issued by the board of educational examiners knowingly violated [the Library Restriction], the employee shall be subject to a hearing conducted by the board of educational examiners .  .  .  which may result in disciplinary action.

Iowa Code § 256.11(9)(a)(2) (as amended by Senate File 496 § 2).

77. Standard IV of the Standards of Professional Conduct and Ethics promulgated by the Iowa Board of Educational Examiners prohibits a licensee from "[f]ailing to comply with federal, state, and local laws applicable to the fulfillment of professional obligations." Violation of such standards may result in the revocation or suspension of an educator's license under Iowa

Code section 256.146(4). Iowa Code section 279.27(1) provides that a teacher's employment may be terminated for "just cause," upon recommendation by a superintendent and after a hearing and determination by a school board, and that a superintendent may suspend the teacher pending that hearing and determination by the school board. Just cause "includes but is not limited to a violation of the code of professional conduct and ethics of the board of educational examiners if the board has taken disciplinary action" against the teacher, which includes violations of state law. Iowa Code § 279.27(2).

78. Senate File 496 requires school districts to publish explanations of the procedures or policies in effect for the parent or guardian of a student enrolled in the school district to request the removal of a library book and of the procedures or policies in effect to request the review of decisions made by the board of directors of the school district on their website. Iowa Code § 279.77(1) (as amended by Senate File 496 § 13).

79. Senate File 496 establishes that the identity of a parent or guardian who requests the removal of a library book "shall be confidential and shall not be a public record." Iowa Code § 279.77(4) (as amended by Senate File 496 § 13). This confidentiality provision does not apply to the identity of a parent or guardian who requests the review of a decision to remove a library book.

### *Previous Attempts To Remove Books In Urbandale*

80. Prior to the passage of Senate File 496, Urbandale had a policy in place to evaluate whether books should be removed from school libraries. Under Urbandale's policies, a member of the greater Urbandale community could object to books made available in the school library by complaining to a teacher or librarian. The teacher or librarian was supposed to try to resolve the issue by explaining to the complainant "the district's selection procedure, criteria to be met by the instructional materials, . . . qualifications of those persons selecting the material, . . . the role of

22

the objected material in the education program and/or the library collection, its intended educational purpose, and additional information regarding its use."

81. If the issue was not resolved, the complainant could complete a Request for Reconsideration of Instructional and Library Materials Form to formally challenge a book and file the form with the school's principal. The principal would then file the objection with the Superintendent for re-evaluation, who would convene a re-evaluation committee. The committee would evaluate the book and make a recommendation to the Superintendent, who would issue a decision. The decision could be appealed to the School Board, and the School Board's decision would be final if it elected to hear the appeal. Urbandale Board Policy Manual Regulation 0631C-R(1)-R(1).

82. The reconsideration committee, in determining whether a book was appropriate for its designated audience at the time, was supposed to "remember that the school system must be responsive to the needs, tastes, and opinions of the community it serves" and required to "distinguish between broad community sentiment and attempts to impose personal standards." *Id.* at Exhibit 0631C-E(3)-E(1).

### *The Effects Of The Library Restriction*

83. Iowa school districts have created lists of books that they determined must be removed from school libraries under the Library Restriction. A selection of books that school districts determined must be removed from school libraries as a result of the Library Restriction is as follows:

| TITLE | AUTHOR | PUBLISHER |
|---|---|---|
| *1984* | George Orwell | PRH |
| *A Thousand Splendid Suns* | Khaled Hosseini | PRH |
| *As I Lay Dying* | William Faulkner | PRH |
| *Beloved* | Toni Morrison | PRH |
| *Brave New World* | Aldous Huxley | HarperCollins |

| | | |
|---|---|---|
| *Catch-22* | Joseph Heller | S&S |
| *Concrete Rose* | Angie Thomas | HarperCollins |
| *Extremely Loud and Incredibly Close* | Jonathan Safran Foer | HarperCollins |
| *Friday Night Lights* | Buzz Bissinger | Hachette |
| *I Know Why The Caged Bird Sings* | Maya Angelou | PRH |
| *Invisible Man* | Ralph Ellison | PRH |
| *Kaffir Boy* | Mark Mathabane | S&S |
| *Last Night at the Telegraph Club* | Malinda Lo | PRH |
| *Native Son* | Richard Wright | HarperCollins |
| *Night* | Elie Wiesel | Macmillan |
| *Nineteen Minutes* | Jodi Picoult | S&S |
| *Shout* | Laurie Halse Anderson | PRH |
| *Slaughterhouse-Five* | Kurt Vonnegut | PRH |
| *Song of Solomon* | Toni Morrison | PRH |
| *Speak* | Laurie Halse Anderson | Macmillan |
| *The Absolutely True Diary of a Part-Time Indian* | Sherman Alexie | Hachette |
| *The Bluest Eye* | Toni Morrison | PRH |
| *The Catcher in the Rye* | J.D. Salinger | Hachette |
| *The Color Purple* | Alice Walker | PRH |
| *The Fault in Our Stars* | John Green | PRH |
| *The Female of the Species* | Mindy McGinnis | HarperCollins |
| *The Handmaid's Tale* | Margaret Atwood | PRH |
| *The Hate U Give* | Angie Thomas | HarperCollins |
| *The Kite Runner* | Khaled Hosseini | PRH |
| *The Nowhere Girls* | Amy Reed | S&S |
| *The Rape of Nanking* | Iris Chang | Hachette |
| *Their Eyes Were Watching God* | Zora Neale Hurston | HarperCollins |
| *Ulysses* | James Joyce | PRH |

84.     The Library Restriction requires the removal from school libraries of award-winning books, classic books that have been on school library shelves for decades, and books that are commonly included on Advanced Placement (AP) exams, such as *Brave New World*, *1984*, *As I Lay Dying*, *The Kite Runner*, *Beloved*, *The Color Purple*, *Native Son*, and *The Handmaid's Tale*. A law that requires the removal of books from school libraries that are covered in Advanced Placement exams disadvantages Iowa students and serves no legitimate pedagogical purpose.

85.     *Brave New World*, written by Aldous Huxley and published by HarperCollins, is a dystopian novel that offers a chilling depiction of a future society driven by technological advancements and extreme social engineering.  *Brave New World* explores the consequences of sacrificing individuality and freedom for the sake of stability and order and themes such as the loss of individuality, the dehumanizing effects of technology, and the dangers of an all-powerful state. Huxley's sharp and thought-provoking narrative raises critical questions about the price of progress and the true meaning of happiness, making it a cornerstone of dystopian literature.  *Brave New World* has won the Prometheus Hall of Fame Award, which recognizes classic works of science fiction and fantasy that explore themes of personal freedom and societal control, and is ranked fifth on Modern Library's 100 Best English-Language Novels of the 20th Century.  At least ten school districts in Iowa have determined that the Library Restriction requires the removal of *Brave New World*.

86.     *1984*, written by George Orwell and published by PRH, is a dystopian novel that explores a totalitarian state ruled by the "Party" in which history is rewritten to align with the Party's ever-changing narrative.  The Party exercises complete control over every aspect of life, including thought, through constant surveillance, propaganda, and the manipulation of language via "Newspeak."  *1984* explores themes such as totalitarianism, censorship, individualism vs. collectivism, the manipulation of truth, and the dangers of state surveillance.  It remains a powerful warning against the dangers of unchecked political power and has introduced terms such as "Big Brother," "doublethink," and "thoughtcrime" into the modern lexicon.  *1984* is one of TIME Magazine's Best 100 English-Language Novels, one of Modern Library's 100 Best Novels, and a winner of the Prometheus Hall of Fame Award.  At least five school districts in Iowa have determined that the Library Restriction requires the removal of *1984*.

87.     *As I Lay Dying*, written by William Faulkner and published by PRH, is a saga narrated by fifteen different characters centered around the death of Addie Bundren and her poor, rural family's quest to honor her wish to be buried in her hometown of Jefferson, Mississippi. Written in stream of consciousness, the novel reflects on themes of existentialism, mortality, the fight between self-interest and duty, the tension between language and action, and the relationship between childbearing and death.  It is consistently ranked among the best novels of the twentieth century.  Faulkner was awarded the Nobel Prize in Literature in 1949.  At least three school districts in Iowa have determined that the Library Restriction requires the removal of *As I Lay Dying*.

88.     *The Kite Runner*, written by Khaled Hosseini and published by PRH, tells the story of Amir, a young boy from Kabul, in the backdrop of turbulent events, from the fall of Afghanistan's monarchy through the Soviet invasion, the exodus of refugees to Pakistan and the United States, and the rise of the Taliban regime.  This *New York Times* bestseller explores themes of friendship, betrayal, guilt, redemption, and father-son relationships.  The novel won the South African Boeke Prize, was twice voted Reading Group Book of the Year, and has been adapted into a motion picture and play.  At least one school district in Iowa determined that the Library Restriction requires the removal of *The Kite Runner*.

89.     *Beloved*, written by Toni Morrison and published by PRH, is set in the period after the American Civil War, telling the story of a family of formerly enslaved people whose Cincinnati home is haunted by a malevolent spirit.  The novel explores themes of mother-daughter relationships, the psychological effects of slavery, the effect of slavery on African American families, manhood and masculinity, pain and generational trauma, and heroism.  *Beloved* won the Pulitzer Prize for Fiction and the Anisfield-Wolf Book Award and was a National Book Award

Finalist. The novel has been adapted into a motion picture and was ranked by the *New York Times* as the best work of American fiction from 1981 to 2006. Toni Morrison was awarded the Nobel Prize in Literature in 1993. At least eleven school districts in Iowa, including Urbandale, have determined that the Library Restriction requires the removal of *Beloved*.

90.    *The Color Purple*, written by Alice Walker and published by PRH, is a critically acclaimed novel that tells the story of a poor, young, uneducated African-American girl named Celie who lives in rural Georgia in the early 1900s. The novel details Celie's encounters with racism, sexism, abuse, and challenges to her own sexuality. *The Color Purple* won the 1983 Pulitzer Prize for Fiction and the National Book Award for Fiction. At least seventeen school districts in Iowa, including Urbandale and Norwalk, have determined that the Library Restriction requires the removal of *The Color Purple*.

91.    *Native Son*, written by Richard Wright and published by PRH, is a powerful, award-winning novel that was first published in 1940. Set in Chicago in the 1930s, *Native Son* is the story of Bigger Thomas, a young Black man whose life spirals downward after he kills a young white woman in a moment of panic. This novel both condemns social and racial injustice and paints an unsparing portrait of the Black experience in America, revealing the tragic effects of poverty, racism, and hopelessness on the human spirit. At least three school districts in Iowa, including Urbandale, have determined that the Library Restriction requires the removal of *Native Son*.

92.    *The Handmaid's Tale*, written by Margaret Atwood, is an award-winning dystopian novel that explores the author's criticisms of elements of contemporary American society by imagining a future in which the U.S. government is overthrown by a patriarchal cult. *The Handmaid's Tale* won the 1985 Governor General's Award and the first Arthur C. Clarke Award

in 1987.  The novel was also nominated for the 1986 Nebula Award, the 1986 Booker Prize, and the 1987 Prometheus Award.  At least seventeen school districts in Iowa, including Urbandale and Norwalk, have determined that the Library Restriction requires the removal of *The Handmaid's Tale*.

93.     Iowa school districts have included nonfiction books on their lists of books that they determined must be removed from school libraries as a result of the Library Restriction, including *Shout* by Laurie Halse Anderson, *I Know Why the Caged Bird Sings* by Maya Angelou, *Kaffir Boy* by Mark Mathabane, and *The Rape of Nanking* by Iris Chang.

94.     *Shout*, written by Laurie Halse Anderson and published by PRH, is a nonfiction poetry memoir recounting Anderson's personal experience with sexual assault and perspective on sexual violence.  *Shout* was awarded a Blue Ribbon by the Center for Children's Books, named in the Top Ten by "Rise: A Feminist Book Project," and longlisted for the National Book Award for Young People's Literature.  At least two school districts in Iowa have determined that the Library Restriction requires the removal of *Shout*.

95.     *I Know Why the Caged Bird Sings*, written by Maya Angelou and published by PRH, is a nonfiction autobiographical coming-of-age story about the writer and poet's early years that illustrates how strength of character and love of literature helped her overcome racism and trauma.  It recounts Angelou's experience with sexual assault.  *I Know Why the Caged Bird Sings* was a National Book Award Finalist, and Angelou was a Pulitzer Prize nominee, a National Medal of Arts awardee, and a Presidential Medal of Freedom recipient.  At least five school districts in Iowa have determined that the Library Restriction requires the removal of *I Know Why the Caged Bird Sings*.

28

96.     *Kaffir Boy: The True Story of a Black Youth's Coming of Age in Apartheid South Africa*, written by Mark Mathabane and published by S&S, is a memoir that chronicles the author's childhood and adolescence under apartheid in South Africa.  Born in 1960 in the impoverished township of Alexandra, Mathabane recounts the brutal realities of living in a system designed to oppress and dehumanize black South Africans.  The memoir vividly depicts the daily struggles his family faced, including extreme poverty, violence, and systemic racism.  Despite the oppressive environment, Mathabane's determination to escape the cycle of poverty and discrimination drives him to pursue education against all odds and leads him to excel academically, eventually earning a scholarship to an American university.  *Kaffir Boy* is both an educational resource and an inspiring testament to the resilience of the human spirit, highlighting the transformative power of education and the enduring fight for justice and equality.  *Kaffir Boy* has earned the Christopher Award for media that affirms the highest value of the human spirit and been recognized as one of the American Library Association's Best Books for Young Adults, which recognizes powerful storytelling and impact on young adult readers.  *Kaffir Boy* is also a *New York Times Bestseller* and is frequently included on AP exams.  At least one school district in Iowa has determined that the Library Restriction requires the removal of *Kaffir Boy*.

97.     *The Rape of Nanking: The Forgotten Holocaust of World War II*, written by Iris Chang and published by Hachette, is a meticulously researched account of one of the most brutal atrocities of World War II: the massacre and systematic sexual violence committed by Japanese soldiers in the Chinese city of Nanking (now Nanjing) in 1937-1938.  Chang's book weaves together survivors' testimonies, diaries of Western missionaries who remained in the city, and official reports to vividly detail the horrors inflicted on the people of Nanking.  By shedding light on this often-overlooked chapter of history, *The Rape of Nanking* preserves the memory of the

victims, underscores the importance of historical accountability, and addresses the lingering tensions between China and Japan over Japan's failure to fully acknowledge or atone for these war crimes. It has played a pivotal role in bringing international attention to the atrocities committed in Nanking, making it one of the most significant accounts of wartime atrocities in modern history. *The Rape of Nanking* won the Asian American Literary Award for Nonfiction and the Christopher Award. It is also a Kiriyama Prize Notable Book, a National Book Critics Circle Award Finalist, and a *New York Times* Bestseller. At least two school districts in Iowa have determined that the Library Restriction requires the removal of *The Rape of Nanking*.

98.     Some Iowa school districts have not created lists of books to remove as a result of the Library Restriction in order to avoid public scrutiny, but they have still required that school libraries and classroom collections remove books under the Library Restriction. In this way, the Library Restriction has led to covert censorship.

99.     After the passage of Senate File 496 and before the Library Restriction was preliminarily enjoined, Urbandale developed a list of books that it determined violate the Library Restriction (the "Urbandale Removal List").

100.    The Urbandale Removal List includes books such as the following:

| TITLE | AUTHOR | PUBLISHER |
|-------|--------|-----------|
| *The Handmaid's Tale* | Margaret Atwood | PRH |
| *Forever* | Judy Blume | S&S |
| *The Perks of Being a Wallflower* | Stephen Chbosky | S&S |
| *A Stolen Life* | Jaycee Dugard | S&S |
| *Looking for Alaska* | John Green | PRH |
| *Water for Elephants* | Sara Gruen | Hachette |
| *Ulysses* | James Joyce | PRH |
| *The Last Night at the Telegraph Club* | Malinda Lo | PRH |
| *Wicked* | Gregory Maguire | HarperCollins |
| *Sold* | Patricia McCormick | Hachette |
| *Beloved* | Toni Morrison | PRH |

4870-1269-5529, v. 1

| | | |
|---|---|---|
| *Song of Solomon* | Toni Morrison | PRH |
| *The Bluest Eye* | Toni Morrison | PRH |
| *Nineteen Minutes* | Jodi Picoult | S&S |
| *The Nowhere Girls* | Amy Reed | S&S |
| *The Color Purple* | Alice Walker | PRH |
| *Native Son* | Richard Wright | PRH |

101.    After the passage of Senate File 496 and before the Library Restriction was preliminarily enjoined, Norwalk developed a list of books that it determined violate the Library Restriction (the "Norwalk Removal List").

102.    The Norwalk Removal List includes books such as the following:

| TITLE | AUTHOR | PUBLISHER |
|---|---|---|
| *The Handmaid's Tale* | Margaret Atwood | PRH |
| *Forever* | Judy Blume | S&S |
| *A Stolen Life* | Jaycee Dugard | S&S |
| *Memoirs of a Geisha* | Arthur Golden | PRH |
| *Forrest Gump* | Winston Groom | PRH |
| *Water for Elephants* | Sara Gruen | Hachette |
| *The Kite Runner* | Khaled Hosseini | PRH |
| *Wicked* | Gregory Maguire | HarperCollins |
| *Sold* | Patricia McCormick | Hachette |
| *The Bluest Eye* | Toni Morrison | PRH |
| *Where the Crawdads Sing* | Delia Owens | PRH |
| *The Color Purple* | Alice Walker | PRH |

103.    The Urbandale Removal List and the Norwalk Removal List stigmatize the books on those lists, as well as the authors and publishers of those books, falsely branding them as inappropriate and pornographic.

104.    The Urbandale Removal List and the Norwalk Removal List also stigmatize students who have read or discussed, or seek to read or discuss, the books on those lists. Urbandale informed its high school students that they may bring a copy of a book on the Urbandale Removal List to school (if they are able to obtain a copy), but that they may not discuss or share the book with other students. Some students who attend Urbandale or Norwalk schools will not bring to

31

school a copy of a book on the Urbandale Removal List or the Norwalk Removal List because they fear how they will be perceived by certain teachers or peers.

105. Urbandale's polices recognize that "[l]ibrary materials should encourage students to utilize higher order thinking skills and to become informed decision-makers, to exercise freedom of thought and to make independent judgements through examination and evaluation of relevant information, evidence and differing viewpoints." Urbandale Board Policy Manual Regulation 0631A-R(1)-R(1).

106. Nonetheless, as evidenced by the books on the Urbandale Removal List and the Norwalk Removal List, the Library Restriction precludes school librarians from considering the value of school library books as a whole or their literary, scientific, medical, artistic, or political value.

107. The removal of books from the Urbandale Removal List and the Norwalk Removal List would impair students from being exposed to diverse experiences and viewpoints that are integral to a student's well-rounded education.

108. During the current school year, G.V.G. intended to check out and read *Looking for Alaska* by John Green, *The Last Night at the Telegraph Club* by Malinda Lo, and *Nineteen Minutes* by Jodi Picoult from her school library, but she could not do so because those titles had been removed as a result of Senate File 496.

### *Confusion And Overbreadth In Application Of The Library Restriction*

109. The Library Restriction is vague, and it is being construed and applied broadly.

110. Teachers, librarians, district officials, and State Board members have pleaded for guidance on Senate File 496, complaining that the law is vague. The vagueness of the Library Restriction has resulted in conflicting and overbroad interpretations in school districts throughout the State.

111.     Iowa State Board of Education President John Robbins stated during a State Board meeting that, in talking with educators about Senate File 496, "there's a lot of confusion" about the scope of the prohibitions.  Robbins said he has talked to people "in the field" who hope the State Board or somebody else "provides direction because right now, we're kind of either guessing what is right or wrong, and not being in violation of the law."

112.     The Iowa Association of School Librarians and the Iowa Library Association requested guidance from the State Department of Education in May of 2023, including the following questions:

a.  "What resources and standards will the Department of Education apply to identify and classify the age-appropriateness of school library materials?  When will teacher librarians and library workers be trained in these resources?"

b.  "Will classic literature that is part of the Advanced Placement curriculum for AP Literature and Composition now be illegal due to age-appropriateness?  How will the College Board be made aware that Iowa's Advanced Placement courses in Literature and Composition can no longer provide required classic literature due to the age-appropriateness definition?"

c.  "Will the presence of materials that may be age-appropriate for some students but not deemed age-appropriate for all students be considered a violation of this law?"

113.     The Iowa Department of Education and Iowa State Board of Education have not provided meaningful guidance.

114.     The Library Restriction is having a chilling effect on protected First Amendment activity.  As a result of the Library Restriction, school districts throughout Iowa are erring on the side of censorship to avoid the substantial penalties that librarians and teachers may face if the "wrong" books are made available to students in violation of the Library Restriction.

115.     Urbandale has stated that it "had to take a fairly broad interpretation of the law knowing that if our interpretation was too finite, our teachers and administrators could be faced with disciplinary actions" under the law.

33

116.     Urbandale Superintendent Rosalie Daca made clear that Urbandale is erring on the side of censorship to protect district staff from punishment under Senate File 496.  "As someone who is tasked with the livelihood of 450 teachers and administrators, I owe it to every staff member and their family to be careful, mindful, and intentional about the guidance we provide knowing that if our guidance is wrong, we could jeopardize their professional and personal lives," Daca stated.  "This has weighed heavily on my mind and heart."

117.     The law is also infringing upon adults' First Amendment rights.  Some libraries are shared among a school and the community, accessible to both students and town residents.  In order to keep books that are prohibited under Senate File 496 from students, some shared libraries are inhibiting adults' access to those materials.

118.     For example, the town of Alta shares a library with the town elementary school.  In Alta, the district and the library have explored the possibility of ending the partnership, according to the former Alta Community Library director, who has stated that the law is "very vague."

119.     Alta-Aurelia Superintendent Denny Olhausen said his district would "probably err[] on the side of caution, making sure that if we think there's anything that has sexual content, that it needs to be removed."

120.     Iowa State Senator Ken Rozenboom said that Senate File 496 is intended to apply to shared libraries:  "We didn't make an exception very intentionally because we don't want an exception with this law."

121.     Notwithstanding the vagueness of the Library Restriction, district school board members, superintendents, librarians, and other educators must comply with it.  Urbandale and Norwalk have stated that they have no discretion regarding the Library Restriction:  it is a state mandate, not a district policy.

34

122.     Iowa State Representative Jeff Shipley has acknowledged the breadth of the Library Restriction, stating that classic books with literary value are likely being removed because they contain details of a sex act, since the Library Restriction does not permit educators to consider the merits of a book.  Shipley suggested that a more appropriate way to evaluate school library books would be to use the *Miller* test for obscenity.

123.     The State Defendants have stated that "every book" removed from school libraries under the Library Restriction was properly removed.

## CAUSES OF ACTION

**COUNT I – AUTHOR PLAINTIFFS, PUBLISHER PLAINTIFFS, and
PLAINTIFF MEGGAN VAN GUNDY as parent and next friend of G.V.G. AGAINST
THE STATE DEFENDANTS
First Amendment, Unreasonable Overbroad Content-Based Restriction
(Library Restriction)**

124.     Paragraphs 1-124 are incorporated by reference as if fully set forth herein.

125.     School libraries and classroom collections within Iowa school districts are, at a minimum, nonpublic forums.  In nonpublic forums, states cannot impose restrictions on speech that are unreasonable in light of the forum's purpose.  *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 12, 16 (2018).

126.     The Library Restriction is a content-based restriction because it regulates the availability of books in school libraries and classroom collections based on "the topic discussed, or the idea or message expressed"—namely, whether the book describes or visually depicts a sex act.  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  *See also Reno v. Am. Civ. L. Union*, 521 U.S. 844, 849, 868 (1997) (holding that statutory provisions restricting "indecent" and "patently offensive" communications on the Internet were "content-based blanket restriction[s] on speech").

35

127.     The Library Restriction violates the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because it is not reasonable in light of the purpose of school libraries and classroom collections.

128.     The Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, prohibits state statutes that restrict a substantial amount of protected speech in the course of regulating unprotected speech.  Such statutes are unconstitutionally overbroad.  *Moody v. NetChoice, LLC.*, 144 S. Ct. 2383, 2397 (2024) (citing *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)).  In assessing an overbreadth claim, a court "must evaluate the full scope of the law's coverage[,] . . . decide which of the law's applications are constitutionally permissible and which are not, and finally weigh the one against the other." *Id.* at 2409.  Under this test, statutes are overbroad when they are categorically untailored to any legitimate State interest. *See Bonta*, 594 U.S. at 615.

129.     A statute, such as the Library Restriction, that requires the content-based removal of school library books without regard to the value of the books as a whole is not constitutionally permissible.

130.     The Library Restriction is overbroad because it prohibits a substantially broad swath of constitutionally protected material in comparison to any limited constitutional applications.

131.     The Library Restriction is overbroad in that it covers any book with any description of a sex act for students of all age groups without regard to (a) whether the book when "taken as a whole, appeal[s] to the prurient interest in sex," (b) whether the book "portray[s] sexual conduct in a patently offensive way," or (c) whether the book when "taken as a whole, [has] serious literary, artistic, political, or scientific value," as that standard applies to minors. *Miller*, 413 U.S. at 24.

36

132.    The Library Restriction requires that all books with any description of a sex act be removed from school libraries, which prevents all students (including students who have reached the age of majority) from checking out those books at school, rather than requiring parents who seek to prevent their children from accessing those books to inform a school district that their children should not be allowed to access such books.

133.    Rather than deferring to school districts and their trained professionals to determine which books to make available to students in their districts based on community standards and the value of a book as a whole, the Library Restriction imposes a one-size-fits-all content-based restriction on all schools throughout Iowa.

134.    Further, the term "description" in relation to "sex act" is vague and confusing because it provides no guidance as to what types of statements contain sufficient descriptions of sexual conduct or what level of detail is necessary to implicate the Library Restriction.  Because the State Defendants threaten to penalize Iowa educators who do not comply with the law, those educators must decide whether to remove books that purportedly contain content that describes sexual conduct in violation of the First Amendment rights of publishers, authors, students, and others, or to risk loss of licensure for refusing to do so.

135.    The Library Restriction exempts religious books, including the Bible, presumably in recognition that, when taken as a whole, religious books do not "appeal to the prurient interest in sex" or "portray sexual conduct in a patently offensive way" and have serious literary value. *Miller*, 413 U.S. at 24.

136.    The Library Restriction violates the First and Fourteenth Amendments to the U.S. Constitution as to the Author Plaintiffs and the Publisher Plaintiffs because it interferes with their ability to make their books available to whom they desire and to distribute constitutionally

protected books, and it unconstitutionally chills the Author Plaintiffs, the Publisher Plaintiffs, and others from engaging in protected activity.

137.    The Library Restriction also violates the rights of G.V.G. under the Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, because it interferes with G.V.G.'s right to receive information in her school libraries and it chills her from engaging in protected activity.  The Library Restriction violates the rights of other Iowa students under the Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, because it interferes with their right to receive information in their school libraries and it chills them from engaging in protected activity.

138.    In the setting of a public school library, the First Amendment "protects the right to receive information and ideas."  *Bd. Of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion).  This right is violated when a state or school district removes or restricts access to library books "in a narrowly partisan or political manner," and for the purpose of "deny[ing] [students] access to ideas with which" the state or school district disagrees.  *Id*. at 870-71.  This right is likewise violated by state laws such as the Library Restriction that prohibit school libraries from containing categories of books based on the book's content without regard for the value of the book as a whole.  As explained above, that is what has occurred, and will continue to occur, in Urbandale and other Iowa school districts as a result of the Library Restriction.

139.    Meggan Van Gundy wants her child G.V.G., a student in Urbandale, to be able to check out and read from G.V.G.'s school library books that have been targeted for removal or removed due to Senate File 496, including *Looking for Alaska* by John Green, *The Last Night at the Telegraph Club* by Malinda Lo, and *Nineteen Minutes* by Jodi Picoult.  Meggan also wants

G.V.G. to be able to possess, read, and discuss such books in school without incurring the stigma associated with having, reading, or discussing books that have been falsely branded as "pornographic" or otherwise inappropriate due to the Library Restriction.

140.  G.V.G. likewise wants to be able to check out and read from her school library books that have been targeted for removal or removed due to the Library Restriction, including *Looking for Alaska* by John Green, *The Last Night at the Telegraph Club* by Malinda Lo, and *Nineteen Minutes* by Jodi Picoult.  G.V.G. also wants to be able to possess, read, and discuss such books in school without incurring the stigma associated with having, reading, or discussing books that have been falsely branded as "pornographic" or otherwise inappropriate due to the Library Restriction.

141.  G.V.G. intended to check out these books from her school library this school year, but she has been unable to do so as a result of the Library Restriction.

142.  The unlawful conduct of the State Defendants injured the rights of G.V.G. and is injuring other students attending school in Iowa school districts to access information and ideas within school and classroom libraries.  It has also stigmatized other students as it stigmatized G.V.G.

143.  An actual and substantial controversy as to the constitutionality of the Library Restriction exists between the Author Plaintiffs, the Publisher Plaintiffs, and G.V.G. on the one hand and the State Defendants on the other hand.

144.  Because the Library Restriction infringes on the First Amendment rights of publishers, authors, parents, and students—including the Author Plaintiffs, the Publisher Plaintiffs, and G.V.G.—there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that the Library Restriction is unconstitutional.

39

145.     Declaratory relief as to the constitutionality of the Library Restriction would clarify and settle the legal relations in issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

**COUNT II – AUTHOR PLAINTIFFS, PUBLISHER PLAINTIFFS, and PLAINTIFF MEGGAN VAN GUNDY as parent and next friend of G.V.G. AGAINST THE URBANDALE DEFENDANTS**
**First Amendment, Unreasonable Overbroad Content-Based Restriction**
**(Library Restriction)**

146.     Paragraphs 1-124 are incorporated by reference as if fully set forth herein.

147.     School libraries within Iowa school districts are, at a minimum, nonpublic forums. In nonpublic forums, states cannot impose restrictions on speech that are unreasonable in light of the forum's purpose. *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 12, 16 (2018).

148.     The Library Restriction is a content-based restriction because it regulates the availability of books in school libraries based on "the topic discussed, or the idea or message expressed"—namely, whether the book describes or visually depicts a sex act. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). *See also Reno v. Am. Civ. L. Union*, 521 U.S. 844, 849, 868 (1997) (holding that statutory provisions restricting "indecent" and "patently offensive" communications on the Internet were "content-based blanket restriction[s] on speech").

149.     The Library Restriction violates the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because it is not reasonable in light of the purpose of school libraries.

150.     The Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, prohibits state statutes that restrict a substantial amount of protected speech in the course of regulating unprotected speech. Such statutes are unconstitutionally overbroad. *Moody v. NetChoice, LLC.*, 144 S. Ct. 2383, 2397 (2024) (citing *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)). In assessing an overbreadth claim, a court "must evaluate the

40

full scope of the law's coverage[,] . . . decide which of the law's applications are constitutionally permissible and which are not, and finally weigh the one against the other." *Id.* at 2409. Under this test, statutes are overbroad when they are categorically untailored to any legitimate State interest. *See Bonta*, 594 U.S. at 615.

151. A statute, such as the Library Restriction, that requires the content-based removal of school library books without regard to the value of the books as a whole is not constitutionally permissible.

152. The Library Restriction is overbroad because it prohibits a substantially broad swath of constitutionally protected material in comparison to any limited constitutional applications.

153. The Library Restriction is overbroad in that it covers any book with any description of a sex act for students of all age groups without regard to (a) whether the book when "taken as a whole, appeal[s] to the prurient interest in sex," (b) whether the book "portray[s] sexual conduct in a patently offensive way," or (c) whether the book when "taken as a whole, [has] serious literary, artistic, political, or scientific value," as that standard applies to minors. *Miller*, 413 U.S. at 24.

154. The Library Restriction requires that all books with any description of a sex act be removed from school libraries, which prevents all students (including students who have reached the age of majority) from checking out those books at school, rather than requiring parents who seek to prevent their children from accessing those books to inform a school district that their children should not be allowed to access such books.

155. The Library Restriction imposes a one-size-fits-all content-based restriction on school library books without regard to community standards and the value of the book as a whole.

4870-1269-5529, v. 1

156.     Further, the term "description" in relation to "sex act" is vague and confusing because it provides no guidance as to what types of statements contain sufficient descriptions of sexual conduct or what level of detail is necessary to implicate the Library Restriction.  Because the State Defendants threaten to penalize Iowa educators who do not comply with the law, those educators must decide whether to remove books that purportedly contain content that describes sexual conduct in violation of the First Amendment rights of publishers, authors, students, and others, or to risk loss of licensure for refusing to do so.

157.     The Library Restriction exempts religious books, including the Bible, presumably in recognition that, when taken as a whole, religious books do not "appeal to the prurient interest in sex" or "portray sexual conduct in a patently offensive way" and have serious literary value. *Miller*, 413 U.S. at 24.

158.     The Library Restriction violates the First and Fourteenth Amendments to the U.S. Constitution as to the Author Plaintiffs and the Publisher Plaintiffs because it interferes with their ability to make their books available to whom they desire and to distribute constitutionally protected books, and it unconstitutionally chills the Author Plaintiffs, the Publisher Plaintiffs, and others from engaging in protected activity.

159.     The Library Restriction also violates the rights of G.V.G. under the Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, because it interferes with G.V.G.'s right to receive information in her school libraries and it chills her from engaging in protected activity.  The Library Restriction violates the rights of other Iowa students under the Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, because it interferes with their right to receive information in their school libraries and it chills them from engaging in protected activity.

160.     In the setting of a public school library, the First Amendment "protects the right to receive information and ideas." *Bd. Of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion). This right is violated when a state or school district removes or restricts access to library books "in a narrowly partisan or political manner," and for the purpose of "deny[ing] students access to ideas with which" the state or school district disagrees. *Id*. at 870-71. This right is likewise violated by state laws such as the Library Restriction that prohibit school libraries from containing categories of books based on the book's content without regard for the value of the book as a whole. As explained above, that is what has occurred, and will continue to occur, in Urbandale, Norwalk, and other Iowa school districts as a result of the Library Restriction.

161.     Meggan Van Gundy wants her child G.V.G., a student in Urbandale, to be able to check out and read from G.V.G.'s school library books that have been targeted for removal or removed due to Senate File 496, including *Looking for Alaska* by John Green, *The Last Night at the Telegraph Club* by Malinda Lo, and *Nineteen Minutes* by Jodi Picoult. Meggan also wants G.V.G. to be able to possess, read, and discuss such books in school without incurring the stigma associated with having, reading, or discussing books that have been falsely branded as "pornographic" or otherwise inappropriate due to the Library Restriction.

162.     G.V.G. likewise wants to be able to check out and read from her school library books that have been targeted for removal or removed due to the Library Restriction, including *Looking for Alaska* by John Green, *The Last Night at the Telegraph Club* by Malinda Lo, and *Nineteen Minutes* by Jodi Picoult. G.V.G. also wants to be able to possess, read, and discuss such books in school without incurring the stigma associated with having, reading, or discussing books

4870-1269-5529, v. 1

that have been falsely branded as "pornographic" or otherwise inappropriate due to the Library Restriction.

163.   G.V.G. intended to check out these books from her school library this school year, but she has been unable to do so as a result of Senate File 496.

164.   The Urbandale Defendants are responsible for enforcing the Library Restriction as agents of the State.

165.   The unlawful conduct of the Urbandale Defendants injured the rights of G.V.G and is injuring other students attending school in Iowa school districts to access information and ideas within school and classroom libraries.  It has also stigmatized other students as it stigmatized G.V.G.

166.   An actual and substantial controversy as to the constitutionality of the Library Restriction exists between the Author Plaintiffs, the Publisher Plaintiffs, and G.V.G. on the one hand and the Urbandale Defendants on the other hand.

167.   Because the Library Restriction infringes on the First Amendment rights of publishers, authors, parents, and students—including the Author Plaintiffs, the Publisher Plaintiffs, and G.V.G.—there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that the Library Restriction is unconstitutional.

168.   Declaratory relief as to the constitutionality of the Library Restriction would clarify and settle the legal relations in issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

### COUNT III – AUTHOR PLAINTIFFS and PUBLISHER PLAINTIFFS AGAINST THE NORWALK DEFENDANTS
### First Amendment, Unreasonable Overbroad Content-Based Restriction (Library Restriction)

169.   Paragraphs 1-124 are incorporated by reference as if fully set forth herein.

170.    School libraries within Iowa school districts are, at a minimum, nonpublic forums. In nonpublic forums, states cannot impose restrictions on speech that are unreasonable in light of the forum's purpose. *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 12, 16 (2018).

171.    The Library Restriction is a content-based restriction because it regulates the availability of books in school libraries based on "the topic discussed, or the idea or message expressed"—namely, whether the book describes or visually depicts a sex act. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). *See also Reno v. Am. Civ. L. Union*, 521 U.S. 844, 849, 868 (1997) (holding that statutory provisions restricting "indecent" and "patently offensive" communications on the Internet were "content-based blanket restriction[s] on speech").

172.    The Library Restriction violates the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because it is not reasonable in light of the purpose of school libraries.

173.    The Free Speech Clause of the First Amendment, as incorporated by the Fourteenth Amendment, prohibits state statutes that restrict a substantial amount of protected speech in the course of regulating unprotected speech. Such statutes are unconstitutionally overbroad. *Moody v. NetChoice, LLC.*, 144 S. Ct. 2383, 2397 (2024) (citing *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)). In assessing an overbreadth claim, a court "must evaluate the full scope of the law's coverage[,] . . . decide which of the law's applications are constitutionally permissible and which are not, and finally weigh the one against the other." *Id.* at 2409. Under this test, statutes are overbroad when they are categorically untailored to any legitimate State interest. *See Bonta*, 594 U.S. at 615.

4870-1269-5529, v. 1

174.     A statute, such as the Library Restriction, that requires the content-based removal of school library books without regard to the value of the books as a whole is not constitutionally permissible.

175.     The Library Restriction is overbroad because it prohibits a substantially broad swath of constitutionally protected material in comparison to any limited constitutional applications.

176.     The Library Restriction is overbroad in that it covers any book with any description of a sex act for students of all age groups without regard to (a) whether the book when "taken as a whole, appeal[s] to the prurient interest in sex," (b) whether the book "portray[s] sexual conduct in a patently offensive way," or (c) whether the book when "taken as a whole, [has] serious literary, artistic, political, or scientific value," as that standard applies to minors. *Miller*, 413 U.S. at 24.

177.     The Library Restriction requires that all books with any description of a sex act be removed from school libraries, which prevents all students (including students who have reached the age of majority) from checking out those books at school, rather than requiring parents who seek to prevent their children from accessing those books to inform a school district that their children should not be allowed to access such books.

178.     The Library Restriction imposes a one-size-fits-all content-based restriction on school library books without regard to community standards and the value of the book as a whole.

179.     Further, the term "description" in relation to "sex act" is vague and confusing because it provides no guidance as to what types of statements contain sufficient descriptions of sexual conduct or what level of detail is necessary to implicate the Library Restriction.  Because the State Defendants threaten to penalize Iowa educators who do not comply with the law, those educators must decide whether to remove books that purportedly contain content that describes

4870-1269-5529, v. 1

sexual conduct in violation of the First Amendment rights of publishers, authors, students, and others, or to risk loss of licensure for refusing to do so.

180.    The Library Restriction exempts religious books, including the Bible, presumably in recognition that, when taken as a whole, religious books do not "appeal to the prurient interest in sex" or "portray sexual conduct in a patently offensive way" and have serious literary value. *Miller*, 413 U.S. at 24.

181.    The Library Restriction violates the First and Fourteenth Amendments to the U.S. Constitution as to the Author Plaintiffs and the Publisher Plaintiffs because it interferes with their ability to make their books available to whom they desire and to distribute constitutionally protected books, and it unconstitutionally chills the Author Plaintiffs, the Publisher Plaintiffs, and others from engaging in protected activity.

182.    The Norwalk Defendants are responsible for enforcing the Library Restriction as agents of the State.

183.    An actual and substantial controversy as to the constitutionality of the Library Restriction exists between the Author Plaintiffs and the Publisher Plaintiffs on the one hand and the Norwalk Defendants on the other hand.

184.    Because the Library Restriction infringes on the First Amendment rights of publishers and authors—including the Author Plaintiffs and the Publisher Plaintiffs—there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that the Library Restriction is unconstitutional.

185.    Declaratory relief as to the constitutionality of the Library Restriction would clarify and settle the legal relations in issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

4870-1269-5529, v. 1

**COUNT IV – EDUCATOR PLAINTIFFS AGAINST THE STATE DEFENDANTS**
**First And Fourteenth Amendments, Void For Vagueness**
**(Library Restriction)**

186.     Paragraphs 1-124 are incorporated by reference as if fully set forth herein.

187.     The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution prohibits statutes that are so impermissibly vague that an ordinary person would not understand what conduct the statute regulates or that are so standardless as to invite arbitrary enforcement. *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  This prohibition is vigorously enforced when protected First Amendment conduct is involved.  *Id.*

188.     The Library Restriction includes terms that are vague, indefinite, arbitrary, and subject to different meanings such that they fail to provide educators with adequate notice of their obligations in violation of the First and Fourteenth Amendments to the U.S. Constitution.

189.     The term "description" in relation to "sex act" is vague and confusing because it provides no guidance as to what types of statements contain sufficient descriptions of sexual conduct or what level of detail is necessary to implicate the prohibition on content that describes sexual conduct.  *See Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 669 (8th Cir. 2023) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)).

190.     The vagueness of the Library Restriction has resulted in conflicting and overbroad interpretations in school districts throughout the State.  Many books have been removed from some school district libraries but not others.

191.     The Educator Plaintiffs, as well as other Iowa educators, must decide whether to remove books that may violate the Library Restriction, including books that have been identified for removal by other school districts, or to subject themselves and their districts to penalties for refusing to do so.

48

192.     As a result of this vagueness, constitutionally protected materials are and will be suppressed and chilled, injuring Plaintiffs and others.

## IRREPARABLE HARM

193.     There is no adequate remedy at law for these violations of Plaintiffs' constitutional rights.  Unless the requested injunctive relief is granted, Plaintiffs, their members, and others will suffer immediate and irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

A.     Setting this matter for hearing on the requested preliminary injunctive relief at the earliest practical date;

B.     Entering a preliminary and permanent injunction enjoining the State Defendants and each of their agents, attorneys, servants, employees, and other representatives, from enforcing the Library Restriction in any manner whatsoever;

C.     Entering a declaratory judgment that the Library Restriction is unconstitutional, void, and of no effect;

D.     Awarding Plaintiffs the costs of this action;

E.     Awarding Plaintiffs their reasonable attorneys' fees and other expenses pursuant to 42 U.S.C. § 1988; and

F.     Granting such other relief as the Court deems just and proper.

4870-1269-5529, v. 1

Dated: September 26, 2024

THE WEINHARDT LAW FIRM

By: /s/ Mark E. Weinhardt
    Mark E. Weinhardt     AT0008280
    Todd M. Lantz       AT0010162
    Jason R. Smith       AT0014862
    2600 Grand Avenue, Suite 450
    Des Moines, Iowa 50312
    Telephone: (515) 244-3100
    mweinhardt@weinhardtlaw.com
    tlantz@weinhardtlaw.com
    jsmith@weinhardtlaw.com

    Frederick J. Sperling
    Adam J. Diederich
    Kirstie Brenson
    Meera Gorjala
    ArentFox Schiff LLP
    233 South Wacker Drive, Suite 7100
    Chicago, Illinois 60606
    Telephone: (312) 258-5500
    frederick.sperling@afslaw.com
    adam.diederich@afslaw.com
    kirstie.brenson@afslaw.com
    meera.gorjala@afslaw.com
    (admitted *pro hac vice*)

    *Attorneys for Plaintiffs*

    Christy A.A. Hickman   AT0000518
    Becky S. Knutson     AT0004225
    Katherine E. Schoolen  AT0010031
    Iowa State Education Association
    777 Third Street
    Des Moines, Iowa 50309
    Telephone: (515) 471-8004
    Christy.Hickman@isea.org
    Becky.Knutson@isea.org
    Katie.Schoolen@isea.org

    *Attorneys for the Educator Plaintiffs*

# EXHIBIT A



May 26, 2023

The Honorable Paul Pate
Secretary of State of Iowa
State Capitol
Des Moines, Iowa 50319

Dear Mr. Secretary,

I hereby transmit:

> Senate File 496, an Act relating to children and students, including establishing a parent's or guardian's right to make decisions affecting the parent's or guardian's child, authorizing the parent or guardian of a student enrolled in a school district to enroll the student in another attendance center within the same school district in certain specified circumstances, prohibiting instruction related to gender identity and sexual orientation in school districts, charter schools, and innovation zone schools in kindergarten through grade six, and modifying provisions related to student health screenings, school district library programs, the educational program provided to students enrolled in school districts, accredited nonpublic schools, and charter schools, other duties of school districts, accredited nonpublic schools, the department of education, the board of educational examiners, and the governing boards of charter schools and innovation zone schools, competent private instruction, and special education, and including effective date provisions.

The above Senate File is hereby approved on this date.

Sincerely,

Kim Reynolds
Governor of Iowa

cc:     Secretary of the Senate
        Clerk of the House



AN ACT

RELATING TO CHILDREN AND STUDENTS, INCLUDING ESTABLISHING A
PARENT'S OR GUARDIAN'S RIGHT TO MAKE DECISIONS AFFECTING
THE PARENT'S OR GUARDIAN'S CHILD, AUTHORIZING THE PARENT
OR GUARDIAN OF A STUDENT ENROLLED IN A SCHOOL DISTRICT TO
ENROLL THE STUDENT IN ANOTHER ATTENDANCE CENTER WITHIN THE
SAME SCHOOL DISTRICT IN CERTAIN SPECIFIED CIRCUMSTANCES,
PROHIBITING INSTRUCTION RELATED TO GENDER IDENTITY AND
SEXUAL ORIENTATION IN SCHOOL DISTRICTS, CHARTER SCHOOLS,
AND INNOVATION ZONE SCHOOLS IN KINDERGARTEN THROUGH
GRADE SIX, AND MODIFYING PROVISIONS RELATED TO STUDENT
HEALTH SCREENINGS, SCHOOL DISTRICT LIBRARY PROGRAMS,
THE EDUCATIONAL PROGRAM PROVIDED TO STUDENTS ENROLLED IN
SCHOOL DISTRICTS, ACCREDITED NONPUBLIC SCHOOLS, AND CHARTER
SCHOOLS, OTHER DUTIES OF SCHOOL DISTRICTS, ACCREDITED
NONPUBLIC SCHOOLS, THE DEPARTMENT OF EDUCATION, THE BOARD OF
EDUCATIONAL EXAMINERS, AND THE GOVERNING BOARDS OF CHARTER
SCHOOLS AND INNOVATION ZONE SCHOOLS, COMPETENT PRIVATE
INSTRUCTION, AND SPECIAL EDUCATION, AND INCLUDING EFFECTIVE
DATE PROVISIONS.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF IOWA:

DIVISION I
EDUCATIONAL PROGRAM
    Section 1.  Section 256.11, unnumbered paragraph 1, Code
2023, is amended to read as follows:

The state board shall adopt rules under chapter 17A and a procedure for accrediting all public and nonpublic schools in Iowa offering instruction at any or all levels from the prekindergarten level through grade twelve. The rules of the state board shall require that ~~a~~ an age-appropriate, multicultural, and gender-fair approach is used by schools and school districts. The educational program shall be taught from ~~a~~ an age-appropriate, multicultural, and gender-fair approach. Global perspectives shall be incorporated into all levels of the educational program. The rules adopted by the state board pursuant to section 256.17, Code Supplement 1987, to establish new standards shall satisfy the requirements of this section to adopt rules to implement the educational program contained in this section. The educational program shall be as follows:

Sec. 2. Section 256.11, subsections 2, 3, 4, and 9, Code 2023, are amended to read as follows:

2. The kindergarten program shall include experiences designed to develop healthy emotional and social habits and growth in the language arts and communication skills, as well as a capacity for the completion of individual tasks, and protect and increase physical well-being with attention given to experiences relating to the development of life skills and, subject to section 279.80, age-appropriate and research-based human growth and development. A kindergarten teacher shall be licensed to teach in kindergarten. An accredited nonpublic school must meet the requirements of this subsection only if the nonpublic school offers a kindergarten program; provided, however, that section 279.80 shall not apply to a nonpublic school.

3. The following areas shall be taught in grades one through six: English-language arts, social studies, mathematics, science, health, ~~age-appropriate and research-based human growth and development,~~ physical education, traffic safety, music, ~~and~~ visual art, and, subject to section 279.80, age-appropriate and research-based human growth and development. Computer science instruction incorporating the standards established under section 256.7, subsection 26, paragraph ``a``, subparagraph (4), shall be offered in at least one grade level commencing with the school year

beginning July 1, 2023. The health curriculum shall include
the characteristics of communicable diseases ~~including acquired
immune deficiency syndrome~~. The state board as part of
accreditation standards shall adopt curriculum definitions for
implementing the elementary program.

4. The following shall be taught in grades seven and
eight: English-language arts; social studies; mathematics;
science; health; age-appropriate and research-based human
growth and development; career exploration and development;
physical education; music; and visual art. Computer science
instruction incorporating the standards established under
section 256.7, subsection 26, paragraph ``a``, subparagraph (4),
shall be offered in at least one grade level commencing with
the school year beginning July 1, 2023. Career exploration
and development shall be designed so that students are
appropriately prepared to create an individual career
and academic plan pursuant to section 279.61, incorporate
foundational career and technical education concepts aligned
with the six career and technical education service areas
as defined in subsection 5, paragraph ``h``, and incorporate
relevant twenty-first century skills. The health curriculum
shall include age-appropriate and research-based information
regarding the characteristics of sexually transmitted diseases~~,
including HPV and the availability of a vaccine to prevent
HPV, and acquired immune deficiency syndrome~~. The state board
as part of accreditation standards shall adopt curriculum
definitions for implementing the program in grades seven
and eight. However, this subsection shall not apply to the
teaching of career exploration and development in nonpublic
schools. ~~For purposes of this section, "age-appropriate",
"HPV", and "research-based" mean the same as defined in section
279.50.~~

9. _a._ (1) Beginning July 1, 2006, each school district
shall have a qualified teacher librarian who shall be licensed
by the board of educational examiners ~~under chapter 272~~. <u>Each
school district shall establish a kindergarten through grade
twelve library program that is consistent with section 280.6
and with the educational standards established in this section,
contains only age-appropriate materials, and supports the</u>

student achievement goals of the total school curriculum.

(2) If, after investigation, the department determines that a school district or an employee of a school district has violated the provisions of subparagraph (1) related to library programs containing only age-appropriate materials, beginning January 1, 2024, the school district or employee of the school district, as applicable, shall be subject to the following:

(a) For the first violation of subparagraph (1), the department shall issue a written warning to the board of directors of the school district or the employee, as applicable.

(b) (i) For a second or subsequent violation of subparagraph (1), if the department finds that a school district knowingly violated subparagraph (1), the superintendent of the school district shall be subject to a hearing conducted by the board of educational examiners pursuant to section 272.2, subsection 14, which may result in disciplinary action.

(ii) For a second or subsequent violation of subparagraph (1), if the department finds that an employee of the school district who holds a license, certificate, authorization, or statement of recognition issued by the board of educational examiners knowingly violated subparagraph (1), the employee shall be subject to a hearing conducted by the board of educational examiners pursuant to section 272.2, subsection 14, which may result in disciplinary action.

*b.* The state board shall establish in rule a definition of and standards for an articulated sequential kindergarten through grade twelve media program.

*c.* A school district that entered into a contract with an individual for employment as a media specialist or librarian prior to June 1, 2006, shall be considered to be in compliance with this subsection until June 30, 2011, if the individual is making annual progress toward meeting the requirements for a teacher librarian endorsement issued by the board of educational examiners ~~under chapter 272~~. A school district that entered into a contract with an individual for employment as a media specialist or librarian who holds at least a master's degree in library and information studies shall be

considered to be in compliance with this subsection until the individual leaves the employ of the school district.

Sec. 3.  Section 256.11, subsection 5, paragraph j, subparagraph (1), Code 2023, is amended to read as follows:

(1)  One unit of health education which shall include personal health; food and nutrition; environmental health; safety and survival skills; consumer health; family life; age-appropriate and research-based human growth and development; substance abuse and nonuse; emotional and social health; health resources; and prevention and control of disease, including age-appropriate and research-based information regarding sexually transmitted diseases~~, including HPV and the availability of a vaccine to prevent HPV, and acquired immune deficiency syndrome~~.

Sec. 4.  Section 256.11, Code 2023, is amended by adding the following new subsection:

NEW SUBSECTION.  19.  For purposes of this section:

a.  (1)  *Age-appropriate* means topics, messages, and teaching methods suitable to particular ages or age groups of children and adolescents, based on developing cognitive, emotional, and behavioral capacity typical for the age or age group.  *Age-appropriate* does not include any material with descriptions or visual depictions of a sex act as defined in section 702.17.

(2)  Notwithstanding subparagraph (1), for purposes of the human growth and development curriculum, *age-appropriate* means the same as defined in section 279.50.

b.  *Research-based* means the same as defined in section 279.50.

### DIVISION II
### SCHOOL RESPONSIBILITIES

Sec. 5.  Section 256E.7, subsection 2, paragraph i, Code 2023, is amended to read as follows:

i.  Be subject to and comply with section 279.76 relating to physical examinations, ~~and~~ health screenings, and formal examinations or surveys designed to assess a student's mental, emotional, or physical health in the same manner as a school district.

Sec. 6.  Section 256E.7, subsection 2, Code 2023, is amended

by adding the following new paragraphs:

NEW PARAGRAPH. *0j.* Be subject to and comply with the requirements of section 279.78 relating to prohibitions and requirements related to the gender identity of students in the same manner as a school district.

NEW PARAGRAPH. *00j.* Be subject to and comply with the requirements of section 279.79 relating to student, employee, and contractor participation in surveys, analyses, activities, or evaluations in the same manner as a school district.

NEW PARAGRAPH. *000j.* Be subject to and comply with the requirements of section 279.80 relating to sexual orientation and gender identity instruction in kindergarten through grade six in the same manner as a school district.

NEW PARAGRAPH. *0000j.* Be subject to and comply with the requirements of section 279.81 relating to prohibiting students from serving on any committees that determine, or provide recommendations related to, whether a material in a school library should be removed.

Sec. 7. Section 256F.4, subsection 2, paragraph k, Code 2023, is amended to read as follows:

*k.* Be subject to and comply with section 279.76 relating to physical examinations, ~~and~~ health screenings, and formal examinations or surveys designed to assess a student's mental, emotional, or physical health in the same manner as a school district.

Sec. 8. Section 256F.4, subsection 2, Code 2023, is amended by adding the following new paragraphs:

NEW PARAGRAPH. *l.* Be subject to and comply with the requirements of section 279.78 relating to prohibitions and requirements related to the gender identity of students in the same manner as a school district.

NEW PARAGRAPH. *m.* Be subject to and comply with the requirements of section 279.79 relating to student, employee, and contractor participation in surveys, analyses, activities, or evaluations in the same manner as a school district.

NEW PARAGRAPH. *n.* Be subject to and comply with the requirements of section 279.80 relating to sexual orientation and gender identity instruction in kindergarten through grade six in the same manner as a school district.

NEW PARAGRAPH. *o.* Be subject to and comply with the requirements of section 279.81 relating to prohibiting students from serving on any committees that determine, or provide recommendations related to, whether a material in a school library should be removed.

Sec. 9. Section 279.50, subsections 1 and 2, Code 2023, are amended to read as follows:

1. ~~Each~~ Subject to section 279.80, each school board shall provide instruction in kindergarten which gives attention to experiences relating to life skills and human growth and development as required in section 256.11. School districts shall use research provided in section 256.9, subsection 46, paragraph ˜*b*˜, to evaluate and upgrade their instructional materials and teaching strategies for human growth and development.

2. Each school board shall provide age-appropriate and research-based instruction in human growth and development including instruction regarding human sexuality, self-esteem, stress management, interpersonal relationships, domestic abuse, ~~HPV and the availability of a vaccine to prevent HPV, and acquired immune deficiency syndrome~~ and the prevention and control of disease, including sexually transmitted diseases as required in section 256.11, in grades ~~one~~ seven through twelve.

Sec. 10. Section 279.50, Code 2023, is amended by adding the following new subsection:

NEW SUBSECTION. 1A. Subject to section 279.80, each school board shall provide age-appropriate and research-based instruction in human growth and development including instruction regarding self-esteem, stress management, interpersonal relationships, and domestic abuse in grades one through six.

Sec. 11. Section 279.50, subsection 9, paragraphs b and c, Code 2023, are amended by striking the paragraphs.

Sec. 12. Section 279.76, subsections 1 and 2, Code 2023, are amended to read as follows:

1. *a.* Each school district is prohibited from administering or conducting an invasive physical examination of a student, ~~or~~ a student health screening that is not required by state or federal law, or a formal examination or survey of a student

that is designed to assess the student's mental, emotional, or physical health that is not required by state or federal law, without first acquiring the written consent of the student's parent or guardian. This section applies only to a minor child in the direct care of a parent or guardian, and does not apply to an emancipated minor or a minor who is not residing with the parent or guardian.

*b.* Each school district shall give written notice to a student's parent or guardian of an examination or survey of the student required by state or federal law that is designed to assess the student's mental, emotional, or physical health not less than seven days prior to the examination or survey. The notice shall include a copy of the examination or survey or a link to an internet site where the parent or guardian may access the examination or survey.

*c.* This subsection shall not apply to a hearing or vision examination.

2. This section shall not be construed to prohibit a school district from conducting health screenings or invasive physical examinations in emergent care situations or from cooperating in a child abuse assessment commenced in accordance with section 232.71B.

Sec. 13. NEW SECTION. 279.77 Transparency — publication of school district information.

1. Each school district shall publish all of the following information related to the current school year on the school district's internet site:

*a.* A detailed explanation of the procedures or policies in effect for the parent or guardian of a student enrolled in the school district to request the removal of a book, article, outline, handout, video, or other educational material that is available to students in the classroom or in a library operated by the school district. Each school district shall prominently display the detailed explanation on the school district's internet site.

*b.* A detailed explanation of the procedures or policies in effect to request the review of decisions made by the board of directors of the school district, including the petition process established pursuant to section 279.8B.

2. The board of directors of each school district shall adopt a policy describing the procedures for the parent or guardian of a student enrolled in the school district or a resident of the school district to review the instructional materials used in classrooms in the school district. The policy shall include a process for a student's parent or guardian to request that the student not be provided with certain instructional materials. The policy shall be prominently displayed on the school district's internet site and the board of directors of the school district shall, at least annually, provide a written or electronic copy of the policy to the parent or guardian of each student enrolled in the school district. For purposes of this section, *instructional materials* means either printed or electronic textbooks and related core materials that are written and published primarily for use in elementary school and secondary school instruction and are required by a state educational agency or local educational agency for use by students in the student's classes by the teacher of record. *Instructional materials* does not include lesson plans.

3. Each school district shall make available on the school district's internet site a comprehensive list of all books available to students in libraries operated by the school district. However, for school years beginning prior to July 1, 2025, if the school district does not use an electronic catalog, the school district may request a waiver from this requirement from the department of education.

4. The identity of a parent or guardian who requests the removal of a book, article, outline, handout, video, or other educational material that is available to students in the classroom or in a library operated by the school district pursuant to subsection 1, paragraph *a*, shall be confidential and shall not be a public record subject to disclosure under chapter 22.

5. This section shall not be construed to require a school district to do any of the following:

*a.* Reproduce educational materials that were not created by a person employed by the board of directors.

*b.* Distribute any educational materials in a manner that

would infringe on the intellectual property rights of any person.

Sec. 14. <u>NEW SECTION</u>. **279.78 Parental rights in education.**

1. As used in this section:

a. *"Gender identity"* means the same as defined in section 216.2.

b. *"License"* means the same as defined in section 272.1.

c. *"Practitioner"* means the same as defined in section 272.1.

2. A school district shall not knowingly give false or misleading information to the parent or guardian of a student regarding the student's gender identity or intention to transition to a gender that is different than the sex listed on a student's official birth certificate or certificate issued upon adoption if the certificate was issued at or near the time of the student's birth.

3. If a student enrolled in a school district requests an accommodation that is intended to affirm the student's gender identity from a licensed practitioner employed by the school district, including a request that the licensed practitioner address the student using a name or pronoun that is different than the name or pronoun assigned to the student in the school district's registration forms or records, the licensed practitioner shall report the student's request to an administrator employed by the school district, and the administrator shall report the student's request to the student's parent or guardian.

4. If, after investigation, the department of education determines that a school district or an employee of a school district has violated this section, the school district or employee of the school district, as applicable, shall be subject to the following:

a. For the first violation of this section, the department of education shall issue a written warning to the board of directors of the school district or the employee, as applicable.

b. (1) For a second or subsequent violation of this section, if the department of education finds that a school district knowingly violated this section, the superintendent of

the school district shall be subject to a hearing conducted by the board of educational examiners pursuant to section 272.2, subsection 14, which may result in disciplinary action.

(2) For a second or subsequent violation of this section, if the department of education finds that an employee of the school district who holds a license, certificate, authorization, or statement of recognition issued by the board of educational examiners knowingly violated this section, the employee shall be subject to a hearing conducted by the board of educational examiners pursuant to section 272.2, subsection 14, which may result in disciplinary action.

5. The state board of education shall adopt rules pursuant to chapter 17A to administer this section.

Sec. 15. NEW SECTION. 279.79 Surveys — required parent or guardian consent.

1. The board of directors of a school district must receive the prior written consent of a student's parent or guardian before requiring a student to take part in any survey, analysis, activity, or evaluation that reveals information concerning any of the following about the student or the student's family, whether the information is personally identifiable or not:

a. The political affiliations or beliefs of the student or the student's parent or guardian.

b. Mental or psychological problems of the student or the student's family.

c. Sexual behavior, orientation, or attitudes.

d. Illegal, antisocial, self-incriminating, or demeaning behavior.

e. Critical appraisals of other individuals with whom the student has close familial relationships.

f. Legally recognized privileged or analogous relationships, such as those of attorneys, physicians, or ministers.

g. Religious practices, affiliations, or beliefs of the student or the student's parent or guardian.

h. Income, except when required by law to determine eligibility for participation in a program or for receiving financial assistance under such a program.

2. An employee of a school district, or a contractor engaged

by a school district, shall not answer any question pertaining
to any particular student enrolled in the school district
in any survey related to the social or emotional abilities,
competencies, or characteristics of the student, unless the
board of directors of the school district satisfies all of the
following requirements:

*a.* The board of directors of the school district provides to
the parent or guardian of each student enrolled in the school
district detailed information related to the survey, including
the person who created the survey, the person who sponsors the
survey, how information generated by the survey is used, and
how information generated by the survey is stored.

*b.* The board of directors of the school district receives
the written consent from a student's parent or guardian
authorizing the employee or contractor to answer questions in
the survey pertaining to the student.

3. Subsection 2 shall not be construed to prohibit an
employee of a school district, or a contractor engaged by a
school district, from answering questions pertaining to any
particular student enrolled in the school district as part of
the process of developing or implementing an individualized
education program for such student.

Sec. 16. NEW SECTION. **279.80 Sexual orientation and gender
identity — prohibited instruction.**

1. As used in this section:

*a.* "Gender identity" means the same as defined in section
216.2.

*b.* "Sexual orientation" means the same as defined in section
216.2.

2. A school district shall not provide any program,
curriculum, test, survey, questionnaire, promotion, or
instruction relating to gender identity or sexual orientation
to students in kindergarten through grade six.

Sec. 17. NEW SECTION. **279.81 Library materials review
committee.**

The board of directors of a school district shall not allow a
student to serve on any committee that determines, or provides
recommendations related to, whether a material in a library
operated by the school district should be removed.

Sec. 18.  NEW SECTION.  279.82  Intra-district enrollment.

1.  A parent or guardian of a student enrolled in a school district may enroll the student in another attendance center within the same school district that offers classes at the student's grade level in the manner provided in this section if, as a result of viewing a recording created by a video surveillance system or a report from a school district employee, and consistent with the requirements of the federal Family Educational Rights and Privacy Act, 20 U.S.C. §1232g, and any regulations promulgated pursuant to that Act, the school district determines that any student enrolled in the school district has harassed or bullied the student.  For purposes of this subsection, "*harassment*" and "*bullying*" mean the same as defined in section 280.28.

2.  *a.*  A parent or guardian shall send notification to the school district, on forms prescribed by the department of education, that the parent or guardian intends to enroll the student in another attendance center within the same school district that offers classes at the student's grade level.

*b.*  The school district shall enroll the student in another attendance center within the same school district unless the attendance center has insufficient classroom space for the student.  If the request is granted, the school district shall transmit a copy of the form to the parent or guardian within five days after the school district's action.  The parent or guardian may withdraw the request at any time prior to the school district's action on the request.  A denial of a request by the school district may be appealed to the board of directors of the school district.

*c.*  The board of directors of each school district shall adopt a policy that defines the term "*insufficient classroom space*" for that district.

3.  A request under this section is for a period of not less than one year.  A student who attends school in another attendance center pursuant to this section may return to the original attendance center and enroll at any time, once the parent or guardian has notified the school district in writing of the decision to enroll the student in the original attendance center.

4. If a request filed under this section is for a student requiring special education under chapter 256B, the request to transfer to another attendance center shall only be granted if all of the following conditions are met:

*a.* The attendance center maintains a special education instructional program that is appropriate to meet the student's educational needs and the enrollment of the student in the attendance center would not cause the size of the class or caseload in that special education instructional program in the attendance center to exceed the maximum class size or caseload established pursuant to rules adopted by the state board of education.

*b.* If the student would be assigned to a general education class, there is sufficient classroom space for the general education class to which the student would be assigned.

5. If a student, for whom a request to transfer has been filed with the school district, has been suspended or expelled in the school district, the student shall not be permitted to transfer until the student has been reinstated. Once the student has been reinstated, however, the student shall be permitted to transfer in the same manner as if the student had not been suspended or expelled. If a student, for whom a request to transfer has been filed with a school district, is expelled in the school district, the student shall be permitted to transfer under this section if the student applies for and is reinstated. However, if the student applies for reinstatement but is not reinstated in the school district, the school district may deny the request to transfer. The decision of the school district may be appealed to the board of directors of the school district.

6. A student who is enrolled in another attendance center within the same school district pursuant to this section is eligible to participate immediately in varsity interscholastic athletic contests and athletic competitions as a member of a team from the receiving attendance center.

7. This section shall not be construed to prohibit a school district from allowing the parent or guardian of a student enrolled in the school district to enroll the student in another attendance center within the same school district

that offers classes at the student's grade level pursuant to a policy adopted by the board of directors of the school district that allows for transfers for reasons in addition to those allowed pursuant to this section.

8.  The state board of education shall adopt rules pursuant to chapter 17A to administer this section.

Sec. 19.  NEW SECTION.  **279.83 Notice to parents or guardians related to physical injuries, harassment, or bullying.**

After following the policy adopted by the school district pursuant to section 280.28, subsection 3, an employee of a school district may notify the parents or guardians of a student enrolled in the school district in writing or by electronic mail within twenty-four hours after the employee witnesses, either directly or indirectly by viewing a recording created by a video surveillance system, any student enrolled in the school district harassing or bullying the student.  For purposes of this section, *"harassment"* and *"bullying"* mean the same as defined in section 280.28.

Sec. 20.  Section 280.28, subsection 3, Code 2023, is amended by adding the following new paragraph:

NEW PARAGRAPH.  *0f.*  A procedure for reporting an allegation of an act of harassment or bullying, including the identification by job title of the school official responsible for ensuring that the policy is implemented, and the identification of the person or persons responsible for receiving reports of allegations of harassment or bullying. The procedure shall require a school official to notify the parents or guardians of a student enrolled in the school district within twenty-four hours after the school official receives a report that the student may have been the victim of conduct that constitutes harassment or bullying.

Sec. 21.  EFFECTIVE DATE.  The following, being deemed of immediate importance, take effect upon enactment:

1.  The section of this division of this Act enacting section 279.82.

2.  The section of this division of this Act enacting section 279.83.

3.  The section of this division of this Act amending section 280.28, subsection 3.

DIVISION III
PRIVATE INSTRUCTION AND SPECIAL EDUCATION

Sec. 22. Section 299A.9, subsection 1, Code 2023, is amended to read as follows:

1. A child of compulsory attendance age who is identified as requiring special education under chapter 256B is eligible for placement under competent private instruction ~~with prior approval of the placement by the director of special education of the area education agency of the child's district of residence~~.

Sec. 23. Section 299A.9, Code 2023, is amended by adding the following new subsection:

NEW SUBSECTION. 3. The parent, guardian, or legal custodian of a child who is identified as requiring special education may request dual enrollment pursuant to section 299A.8. The appropriate special education services for the child shall be determined pursuant to chapter 256B and rules adopted pursuant to chapter 256B.

DIVISION IV
PARENTS AND GUARDIANS RIGHTS

Sec. 24. NEW SECTION. 601.1 Parents and guardians — rights.

1. For purposes of this section:

a. *Emergent care situation* means a sudden or unforeseen occurrence or onset of a medical or behavioral condition that could result in serious injury or harm to a minor child in the event immediate medical attention is not provided.

b. *Medical care* means any care, treatment, service, or procedure to prevent, diagnose, alleviate, treat, or cure a minor child's physical or mental condition.

c. *Minor child* means an unmarried and unemancipated person under the age of eighteen years.

2. Subject to section 147.164, as enacted by 2023 Iowa Acts, Senate File 538, a parent or guardian bears the ultimate responsibility, and has the fundamental, constitutionally protected right, to make decisions affecting the parent's or guardian's minor child, including decisions related to the minor child's medical care, moral upbringing, religious upbringing, residence, education, and extracurricular

activities.  Any and all restrictions of this right shall be
subject to strict scrutiny.

   3.  This section shall not be construed to prohibit any of
the following:

   *a.*  A minor child from receiving medical attention in an
emergent care situation.

   *b.*  A person from cooperating in a child abuse assessment
commenced in accordance with section 232.71B.

   *c.*  A court from issuing an order that is permitted by law.

   4.  This section shall not be construed to authorize a parent
or guardian to engage in conduct that is unlawful or to abuse
or neglect a minor child in violation of the laws of this
state.

   5.  The rights guaranteed to parents and guardians by this
section are not a comprehensive list of the rights reserved
to parents or guardians of a minor child.  The enumeration of
the rights contained in this section shall not be construed to
limit the rights reserved to parents or guardians of a minor
child.

DIVISION V

IMPLEMENTATION OF ACT

   Sec. 25.  IMPLEMENTATION OF ACT.  Section 25B.2, subsection
3, shall not apply to this Act.


_____
AMY SINCLAIR
President of the Senate


_____
PAT GRASSLEY
Speaker of the House


   I hereby certify that this bill originated in the Senate and
is known as Senate File 496, Ninetieth General Assembly.


_____
W. CHARLES SMITHSON
Secretary of the Senate


Approved _____, 2023


_____
KIM REYNOLDS
Governor

# EXHIBIT B

# Iowa State Board of Education

## Executive Summary

**June 20, 2024**



**Framework for Board Policy Development and Decision Making**

Issue Identification → Board Identifies Priorities → Board Analysis Study → Board Action → Board Follow-up

| | |
|---|---|
| **Agenda Item:** | Rules: 281 IAC Chapter 12 – "General Accreditation Standards" (Adopt) |
| **State Board Priority:** | Eliminating Achievement and Opportunity Gaps |
| **State Board Role/Authority:** | This rule making is adopted under the authority provided in Iowa Code sections 256.7(5) and 2023 Iowa Acts, Senate File 496. |
| **Presenter(s):** | Thomas A. Mayes, General Counsel |
| **Attachment(s):** | One |
| **Recommendation:** | It is recommended that the State Board amend Chapter 12. |
| **Background:** | This rulemaking addresses items required by Senate File 496. This rulemaking does not adopt any provision enjoined by the federal court. Such items are struck through in the attachment, and no discussion will be made of any public comment about the enjoined provisions. |
| | Concerning the provisions not enjoined, the Department considered public comment, as discussed in the preamble in the attachment. The commenters' proposed changes are not adopted because the changes are either beyond the State Board's statutory authority or the commenters' concerns are sufficiently addressed in the proposed rules' text. |

# EDUCATION DEPARTMENT[281]

## Adopted and Filed

The State Board of Education hereby amends Chapter 12, "General Accreditation Standards," Iowa Administrative Code.

### *Legal Authority for Rulemaking*

This rulemaking is adopted under the authority provided in Iowa Code section 256.7(5).

### *State or Federal Law Implemented*

This rulemaking implements, in whole or in part, 2023 Iowa Acts, Senate File 496.

### *Purpose and Summary*

This rulemaking implements portions of 2023 Iowa Acts, Senate File 496. A portion of that legislation is currently enjoined by a federal court. Consistent with that injunction, neither the Department nor the State Board will take any action in furtherance of those enjoined provisions.

The items from Senate File 496 that are not enjoined include age-appropriate instruction; a requirement for online availability of library catalogs; and provisions concerning parental rights for accurate information regarding their children's gender identity.

### *Public Comment and Changes to Rulemaking*

Notice of Intended Action for this rulemaking was published in the Iowa Administrative Bulletin on December 13, 2023, as **ARC 7169C**.

Two public hearings were held: one on January 3, 2024, at 2:30 p.m. in the State Board Room, Second Floor, Grimes State Office Building, Des Moines; and one on January 4, 2024, at 10:30 a.m., in the ICN Classroom (relocated from the State Board Room due to technical issues), Second Floor, Grimes State Office Building, Des Moines. A combined 30 people attended the

two public hearings, with 9 individuals making public comment. The Department received 83 written comments.

Consistent with the federal court's injunction, the Department will not analyze or discuss any comment concerning the currently enjoined provisions of Senate File 496.

Two organizations submitted comment asking for additional modifiers to be added to the definition of age-appropriate. The organizations proposed the following text: "*Age-appropriate* does not include any material with <u>vivid or pornographic</u> descriptions or <u>graphic</u> depictions of a sex act." The organizations assert that this is consistent with legislative intent, and would allow schools to use "classic pieces of literature and other books that mention a sex act, but do not vividly describe it" in instruction. The definition is established by statute, and the sentence following the quoted language in Item 4 addresses the organizations' concerns.

The two organizations also requested that the investigation process for violations of the parental rights provisions in Item 6 be modified by requiring complainants to "follow local processes first" and requiring "timely" notification of "licensed staff who are under investigation about the complaint, providing an opportunity to remedy voluntarily and permanently" any violations. Concerning local processes, the Department is unable to add a required step to the complaint process. Concerning notification of staff members whose alleged conduct is subject of an investigation, the rules need not include this requirement because it is an assumed part of any investigation and a required due process protection.

One organization objected to the requirement that online catalogues be updated a minimum of twice per year, asserting that this is inconsistent with the waiver process made available in Senate File 496. The governing statutory text is incorporated in Item 13 by reference, including the waiver provision. Item 4 is not inconsistent with Senate 496; rather, it provides clarity and

flexibility to districts. When a district, whether it received a waiver or not, is required to post its catalogue online, it must update its catalogue at least twice per year if it does not do so in real time.

*Adoption of Rulemaking*

This rulemaking was adopted by the State Board on June 20, 2024.

*Fiscal Impact*

There is an unknown fiscal impact to the Iowa Department of Education. The estimated fiscal impact for districts was set out in the Fiscal Note prepared for Senate File 496, available at www.legis.iowa.gov/docs/publications/FN/1370427.pdf.

*Jobs Impact*

After analysis and review of this rulemaking, no impact on jobs has been found.

*Waivers*

Any person who believes that the application of the discretionary provisions of this rulemaking would result in hardship or injustice to that person may petition the State Board for a waiver of the discretionary provisions, if any, pursuant to 281—Chapter 4.

*Review by Administrative Rules Review Committee*

The Administrative Rules Review Committee, a bipartisan legislative committee which oversees rulemaking by executive branch agencies, may, on its own motion or on written request by any individual or group, review this rulemaking at its regular monthly meeting or at a special meeting. The Committee's meetings are open to the public, and interested persons may be heard as provided in Iowa Code section 17A.8(6).

*Effective Date*

This rulemaking will become effective on August 28, 2024.

The following rulemaking action is adopted:

ITEM 1. Strike "multicultural and gender fair" wherever it appears in **281—Chapter 12** and

insert "age-appropriate, multicultural, and gender fair" in lieu thereof.

ITEM 2. Strike "Multicultural and gender fair" wherever it appears in **281—Chapter 12** and insert "Age-appropriate, multicultural, and gender fair" in lieu thereof:

ITEM 3. Strike "multicultural, gender fair" wherever it appears in **281—Chapter 12** and insert "age-appropriate, multicultural, and gender fair" in lieu thereof:

ITEM 4. Adopt the following **new** definitions of "Age-appropriate" and "Sex act" in rule **281—12.2(256)**:

*"Age-appropriate,"* with the exception of the human growth and development, means topics, messages, and teaching methods suitable to particular ages or age groups of children and adolescents, based on developing cognitive, emotional, and behavioral capacity typical for the age or age group. "Age-appropriate" does not include any material with descriptions or visual depictions of a sex act. A reference or mention of a sex act in a way that does not describe or visually depict a sex act as defined in these rules is not included in the previous sentence. For purposes of human growth and development instruction required by Iowa Code section 279.50, "age-appropriate" means topics, messages, and teaching methods suitable to particular ages or age groups of children and adolescents, based on developing cognitive, emotional, and behavioral capacity typical for the age or age group.

*"Sex act"* means any sexual contact between two or more persons by any of the following:

1.  Penetration of the penis into the vagina or anus.

2.  Contact between the mouth and genitalia or mouth and anus or by contact between the genitalia of one person and the genitalia or anus of another person.

3.  Contact between the finger, hand, or other body part of one person and the genitalia or anus of another person, except in the course of examination or treatment by a person licensed pursuant

to Iowa Code chapters 148, 148C, 151, or 152.

4. Ejaculation onto the person of another.

5. Use of artificial sexual organs or substitutes therefore in contact with the genitalia or anus.

6. The touching of a person's own genitals or anus with a finger, hand, or artificial sexual organ or other similar device at the direction of another person.

ITEM 5. Adopt the following **new** paragraph **12.3(12)"d"**:

*d.* General. Each school district shall establish a kindergarten through grade 12 library program that is consistent with Iowa Code section 280.6 and with the educational standards established in this chapter, ~~contains only age-appropriate materials,~~ and supports the student achievement goals of the total school curriculum.

~~(1) If, after investigation, the department determines that a school district or an employee of a school district has violated the provisions of this paragraph related to library programs containing only age-appropriate materials, beginning January 1, 2024, the school district or employee of the school district, as applicable, shall be subject to the following:~~

~~1. For the first violation of this paragraph, the department shall issue a written warning to the board of directors of the school district or the employee, as applicable.~~

~~2. For a second or subsequent violation of this paragraph, if the department finds that a school district knowingly violated this paragraph, the superintendent of the school district shall be subject to a hearing conducted by the board of educational examiners, which may result in disciplinary action.~~

~~3. For a second or subsequent violation of this paragraph, if the department finds that an employee of the school district who holds a license, certificate, authorization, or statement of recognition issued by the board of educational examiners knowingly violated this paragraph, the~~

5

employee shall be subject to a hearing conducted by the board of educational examiners, which may result in disciplinary action.

(2) This paragraph relates solely to library programs operated by the district, which means library programs over which the district exercises administrative control.

(3) Concerning enforcement provisions relating to library books containing only age-appropriate materials, the department may exercise enforcement discretion if any violation is voluntarily and permanently corrected prior to the department making a determination of a violation.

(4) For library collections that serve multiple grade ranges, the district will exercise reasonable physical, administrative, and technological controls to ensure that students have access to age-appropriate materials based on the students' age and grade.

(5) In complying with the requirements in Iowa Code section 279.77(3) as enacted by 2023 Iowa Acts, Senate File 496, section 13, the district, if it does not make available a comprehensive list of all books available to all students in libraries offered by the district on its website in real time, must post an updated list at least two times per calendar year.

ITEM 6. Adopt the following **new** subrules 12.3(15) and 12.3(16):

**12.3(15)** *Compliance with Iowa Code section 279.80.*

*a.* A school district shall not provide any program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six.

*b.* "Gender identity" and "sexual orientation" have the meanings given in Iowa Code section 216.2.

*c.* In monitoring and enforcing this subrule, the department will not conclude that a neutral

~~statement regarding sexual orientation or gender identity violates Iowa Code section 279.80 as~~ ~~enacted by 2023 Iowa Acts, Senate File 496, or this subrule.~~

~~**12.3(16)**~~ *Parental rights in education.*

*a.* A school district shall not knowingly give false or misleading information to the parent or guardian of a student regarding the student's gender identity or intention to transition to a gender that is different than the sex listed on a student's official birth certificate or certificate issued upon adoption if the certificate was issued at or near the time of the student's birth.

*b.* If a student enrolled in a school district requests an accommodation that is intended to affirm the student's gender identity from a licensed practitioner employed by the school district, including a request that the licensed practitioner address the student using a name or pronoun that is different than the name or pronoun assigned to the student in the school district's registration forms or records, the licensed practitioner shall report the student's request to an administrator employed by the school district, and the administrator shall report the student's request to the student's parent or guardian. Concerning a student's request to use a name that is different from the name on the student's registration forms or records, that request is governed by this subrule only if the request is an accommodation intended to affirm a student's gender identity.

*c.* If, after investigation, the department determines that a school district or an employee of a school district has violated this subrule, the school district or employee of the school district, as applicable, shall be subject to the following:

(1) For the first violation of this subrule, the department shall issue a written warning to the board of directors of the school district or the employee, as applicable.

(2) For a second or subsequent violation of this subrule, if the department finds that a school district knowingly violated this subrule, the superintendent of the school district shall be subject

to a hearing conducted by the board of educational examiners, which may result in disciplinary action.

(3) For a second or subsequent violation of this subrule, if the department finds that an employee of the school district who holds a license, certificate, authorization, or statement of recognition issued by the board of educational examiners knowingly violated this subrule, the employee shall be subject to a hearing conducted by the board of educational examiners, which may result in disciplinary action.

*d.* Concerning enforcement of this subrule, the department may exercise enforcement discretion if any violation is voluntarily and permanently corrected prior to the department making a determination of a violation.