**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

PENGUIN RANDOM HOUSE LLC;                      )
HACHETTE BOOK GROUP, INC.;                      )
HARPERCOLLINS PUBLISHERS LLC;                  )
MACMILLAN PUBLISHING GROUP, LLC;              )
SIMON & SCHUSTER, LLC; THE AUTHORS        )     Case No. 4:23-cv-00478-SHL-SBJ
GUILD; LAURIE HALSE ANDERSON; JOHN        )
GREEN; MALINDA LO; JODI PICOULT;             )     **PLAINTIFFS' BRIEF**
MEGGAN VAN GUNDY, as parent and next       )     **IN SUPPORT OF THEIR**
friend of GRACE VAN GUNDY; IOWA STATE      )     **RENEWED MOTION FOR**
EDUCATION ASSOCIATION; LISA PETRIE;         )     **PRELIMINARY**
and EMILY HOUSE,                                      )     **INJUNCTION**
                                                              )
                      Plaintiffs,                        )
                                                              )
               v.                                            )
                                                              )
JOHN ROBBINS, in his official capacity as      )
President of the Iowa State Board of Education; )
MCKENZIE SNOW, in her official capacity as   )
Director of the Iowa Department of Education;  )
CHAD JANZEN, in his official capacity as Chair )
of the Iowa Board of Educational Examiners;    )
JASON MENKE, RACHEL KENT,                     )
KATHERINE HOWSARE, JENNY MEADE,            )
JOSH VANRYSWYK, CARISSA WILLIAMS,         )
and MARGARET YOUNG, in their official         )
capacities as Members of the Urbandale          )
Community School District Board of Education;  )
ROSALIE DACA, in her official capacity as       )
Urbandale Community School District             )
Superintendent; JUSTIN FLETCHER, BRIAN      )
RAUSCH, DANIEL DOERFLER, KATE             )
BALDWIN, and MICHELLE KELLY, in their       )
official capacities as Members of the Norwalk   )
Community School District School Board of       )
Directors; and SHAWN HOLLOWAY in his        )
official capacity as Norwalk Community School  )
District Superintendent,                              )
                                                              )
                      Defendants.                      )

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................1

OVERVIEW ..............................................................................2

FACTUAL BACKGROUND ..........................................................4

   I.     The Library Restriction Violates First Amendment Rights. ...............4

   II.    SF496 Is A Solution In Search Of A Problem. ...................................7

   III.   Plaintiffs Have Suffered Or Imminently Will Suffer Harm Due To Senate File 496.................................................................10

       A.    The Publisher Plaintiffs And The Author Plaintiffs ................10

       B.    Parent And Student Plaintiffs.................................................12

       C.    Educators................................................................................12

   IV.   Procedural History..................................................................13

ARGUMENT .............................................................................14

   I.     The First Amendment Applies In School Libraries. ..........................15

   II.    School Libraries Are Not Compulsory. ............................................16

   III.   The Library Restriction Is An Unconstitutionally Overbroad Content-Based Restriction.......................................................17

       A.    The Library Restriction Violates Plaintiffs' First Amendment Rights. ...............................................................17

       B.    The Library Restriction Is Unconstitutionally Overbroad...............................................................................20

            1.    The Library Restriction Applies To School Library Books. ..............................................................21

**TABLE OF CONTENTS**

**Page**

2. The Library Restriction Has Limited Constitutional Applications. ...........................................22

3. The Library Restriction's Unconstitutional Applications Vastly Outweigh Its Constitutional Applications. ...........................................26

IV. The Remaining Factors Weigh In Favor Of A Preliminary Injunction ...........................................................31

CONCLUSION ....................................................................33

4890-3188-6321, v. 1

**TABLE OF AUTHORITIES**

**Page(s)**

## Cases

*Adams v. Matanuska-Susitna Borough School Dist.*, No. 3:23-cv-00265-SLG
(D. Alaska Aug. 6, 2024) ...................................................................................18

*Am. Booksellers Ass'n, Inc. v. Virginia*,
882 F.2d 125 (4th Cir. 1989) ............................................................................31

*Americans for Prosperity Foundation v. Bonta*,
594 U.S. 595 (2021) ............................................................................ 23, 24, 36

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002) ...........................................................................................24

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ..............................................................................................21

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982) ............................................................ 18, 19, 20, 26, 28, 30

*Book People, Inc. v. Wong*,
692 F. Supp. 3d 660 (W.D. Tex. 2023).............................................................29

*Burnham v. Ianni*,
119 F.3d 668 (8th Cir. 1997)..............................................................................27

*Campbell v. St. Tammany Parish Sch. Bd.*,
64 F.3d 184 (5th Cir. 1995)................................................................ 16, 19, 26

*Carson v. Simon*,
978 F.3d 1051 (8th Cir. 2020) ...........................................................................15

*Case v. Unified Sch. Dist. No. 233*,
908 F. Supp. 864 (D. Kan. 1995)........................................................................17

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985)............................................................................................27

*Counts v. Cedarville Sch. Dist.*,
295 F. Supp. 2d 996 (W.D. Ark. 2003)............................................ 17, 23, 26, 28

*Cuviello v. City of Vallejo*,
944 F.3d 816 (9th Cir. 2019)..............................................................................37

*D.M. by Bao Xiong v. Minnesota State High Sch. League*,
917 F.3d 994 (8th Cir. 2019).............................................................................37

**TABLE OF AUTHORITIES**

**Page(s)**

*Dakotans for Health v. Noem*,
52 F.4th 381 (8th Cir. 2022) .................................................................23

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
640 F.2d 109 (8th Cir. 1981)................................................................15

*Dream Defenders v. DeSantis*,
559 F. Supp. 3d 1238 (N.D. Fla. 2021)................................................37

*Elrod v. Burns*,
427 U.S. 347 (1976).............................................................................37

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) ................................................... 15, 21, 29, 31, 33

*Fayetteville Public Library v. Crawford County, Arkansas*,
684 F. Supp. 3d 879 (W.D. Ark. 2023)............................. 17, 19, 32, 37

*FW/PBS, Inc. v. City of Dallas*,
493 U.S. 215 (1990).............................................................................29

*GLBT Youth in Iowa Sch. Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) ..........................................................1, 16

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
709 F. Supp. 3d 664 (S.D. Iowa 2023) ............................... 3, 16, 26, 35

*Hazelwood School Dist. v. Kuhlmeier*,
484 U.S. 260 (1988).............................................................................20

*Interactive Digital Software Ass'n v. St. Louis Cnty. Mo.*,
329 F.3d 954 (8th Cir. 2003)................................................................32

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
385 U.S. 589 (1967).............................................................................28

*Little v. Llano Cnty.*,
103 F.4th 1140 (W.D. Tex. 2023).........................................................17

*Mailloux v. Kiley*,
436 F.2d 565 (1st Cir. 1971).................................................................30

*Matal v. Tam*,
582 U.S. 218 (2017).............................................................................16

*Miller v. California*,
413 U.S. 15 (1972) ......................................................................... 15, 28

**TABLE OF AUTHORITIES**

**Page(s)**

*Minarcini v. Strongsville City Sch. Dist.*,
    541 F.2d 577 (6th Cir. 1976) ........................................................ 16, 26

*Minn. Citizens Concerned for Life, Inc. v. Swanson*,
    692 F.3d 864 (8th Cir. 2012) ................................................................36

*Minnesota Voters All. v. Mansky*,
    585 U.S. 1 (2018) .................................................................................27

*Missourians for Fiscal Accountability v. Klahr*,
    892 F.3d 944 (8th Cir. 2018) ...............................................................24

*Moody v. NetChoice, LLC*,
    144 S. Ct. 2383 (2024) .......................................................................1, 2

*PEN American Center, Inc. v. Escambia County School Board*,
    711 F. Supp. 3d 1325 (N.D. Fla. 2024) ................................................17

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009) .............................................................................16

*Pope v. Illinois*,
    481 U.S. 497 (1987) .............................................................................28

*Powell v. Noble*,
    798 F.3d 690 (8th Cir. 2015) ...............................................................36

*Pratt v. Ind. Sch. Dist. No. 831, Forest Lake, Minn.*,
    670 F.2d 771 (8th Cir. 1982) ...............................................................27

*Prison Legal News v. Livingston*,
    683 F.3d 201 (5th Cir. 2012) ...............................................................21

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015) .............................................................................20

*Reno v. Am. C. L. Union*,
    521 U.S. 844 (1997) ........................................................................ 21, 22

*Right To Read Def. Comm. of Chelsea v. Sch. Comm. of City of Chelsea*,
    454 F. Supp. 703 (D. Mass. 1978) .......................................................18

*Roth v. United States*,
    354 U.S. 476 (1957) .............................................................................29

*Salvail v. Nashua Bd. of Ed.*,
    469 F. Supp. 1269 (D.N.H. 1979) ........................................................17

**TABLE OF AUTHORITIES**

**Page(s)**

*Sheck v. Baileyville Sch. Comm.*,
   530 F. Supp. 679 (D. Me. 1982) ..................................................... 17, 29

*Shipley Inc. v. Long*,
   454 F. Supp. 2d 819 (E.D. Ark. 2004) .................................................32

*Shurtleff v. Boston*,
   596 U.S. 243 (2022) ...........................................................................16

*Stanley v. Georgia*,
   394 U.S. 557 (1969) ...........................................................................21

*Stutzka v. McCarville*,
   420 F.3d 757 (8th Cir. 2005) ...............................................................8

*Sund v. City of Wichita Falls, Tex.*,
   121 F. Supp. 2d 530 (N.D. Tex. 2000) ...............................................17

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503 (1969) ...........................................................................20

*U.S. v. Stevens*,
   559 U.S. 460 (2010) ..................................................................... 24, 36

*United States v. Am. Library Ass'n, Inc.*,
   539 U.S. 194 (2003) ..................................................................... 19, 28

*Virginia v. Am. Booksellers Ass'n, Inc.*,
   488 U.S. 905 (1988) ...........................................................................31

*Virginia v. Hicks*,
   539 U.S. 113 (2003) ...........................................................................24

*Willson v. City of Bel-Nor, Mo.*,
   924 F.3d 995 (8th Cir. 2019) ........................................................ 15, 24

**Statutes**

Iowa Code § 256.11 ................................................... 3, 4, 5, 21, 29

Iowa Code § 272.2 ..................................................................5

Iowa Code § 279.27 ..................................................................5

Iowa Code § 280.6 ...............................................................5, 29

Iowa Code § 702.17 ..................................................................5

4890-3188-6321, v. 1

## TABLE OF AUTHORITIES

**Page(s)**

Iowa Code § 728.1 ..................................................................................8

## **Other Authorities**

Iowa Admin. Code r. 282—25.3(272) ......................................................5

S.S.B. 1145 § 16......................................................................................8

U.S. Const. amend. I ..............................................................................17

4890-3188-6321, v. 1

## INTRODUCTION

On August 30, 2024, the Eighth Circuit vacated the preliminary injunction that this Court entered against the provisions of Senate File 496 ("SF496") that Plaintiffs previously moved to enjoin. The Eighth Circuit did not fault this Court's substantive First Amendment analysis. It affirmed this Court's rejection of the government speech doctrine and agreed with this Court and every other court that the First Amendment applies in school libraries. It took issue, however, with this Court's application of the standard for facial overbreadth challenges and stated that, on remand, Plaintiffs "are free to pursue injunctive relief in the manner required" by the Supreme Court's recent decision in *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2409 (2024). *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 668, 671 (8th Cir. 2024).

Plaintiffs now bring a narrower motion to preliminarily enjoin the book removal provision of SF496 under *NetChoice*. First, Plaintiffs no longer challenge the "Identity And Orientation Prohibition" in SF496 due to the State Defendants' confirmation in their Eighth Circuit briefing that the Prohibition does not apply to school library books. Second, Plaintiffs seek to preliminarily enjoin only the portion of the book removal provision of SF496 that requires school library materials not to contain any "descriptions" of a sex act, not the provision that concerns "visual depictions" of a sex act (Count I of the Second Amended Complaint).

Under the *NetChoice* standard, SF496's book removal provision is facially overbroad. *NetChoice* requires the Court to determine the scope of the statute, identify its constitutional applications and unconstitutional applications, and weigh the constitutional applications against the unconstitutional applications. *NetChoice*, 144 S. Ct. at 2409. Much of this Court's prior analysis satisfies the *NetChoice* standard for facial overbreadth. But the Eighth Circuit appeared to take issue with this Court's prior focus on the particular books that the State Defendants

1

identified as potentially problematic as opposed to the constitutional applications of the book removal provision—obscene books that might have been selected by school librarians to be placed in school libraries. As explained in this brief, the *NetChoice* standard supports a finding of facial overbreadth even more strongly than the Court's prior analysis because (1) there are even more unconstitutional applications of the law than books that were actually removed under it and (2) there are few if any books subject to constitutional removal. A substantial number of the law's applications are unconstitutional compared to the few, if any, applications that are constitutional.

## OVERVIEW

SF496 is an unprecedented assault on school libraries that requires the removal of hundreds of books from school libraries across Iowa.[1] Before SF496, librarians and other educators curated school libraries based on educational objectives, community standards, their professional judgment and best practices, and the First Amendment. And before SF496, there were already procedures in place to permit parents to challenge library books and to regulate their own children's access to library books. (*See*, *e.g.*, Declaration of Lisa Petrie (Ex. A) ¶ 13; Declaration of Emily House (Ex. B) ¶ 14; Declaration of Skip Dye (Ex. C) ¶ 18.) Now, under the guise of protecting students from obscene materials, the State has mandated the removal of a wide range of literature that is not remotely obscene by proscribing an extremely broad and poorly defined category of books.

---

[1] As used herein, the term "school libraries" encompasses both traditional school libraries and classroom collections of books, which are essentially classroom libraries. As used herein, the term "books" refers to individual titles, not numbers of copies of books.

SF496 requires the removal of *any* book containing *any* "description" of a "sex act" for students in *every* grade (the "Library Restriction").[2]  Iowa Code §§ 256.11 (9)(a)(2), (19)(a)(1) (SF496 §§ 2, 4).  The statute purports to describe the Library Restriction as "age-appropriate," *see* Iowa Code §§ 256.11 (9)(a)(2), (19)(a)(1) (SF496 §§ 2, 4), but that is a misnomer: it is actually age-indifferent.  It requires school librarians, other educators, and school districts to apply exactly the same standard to books for high school seniors as it does to books for third graders, prohibits educators from considering the value of the book as a whole, and imposes harsh penalties on educators who do not comply.  As this Court recognized, the State's "underlying message is that there is no redeeming value to any such book even if it is a work of history, self-help guide, award-winning novel, or other piece of serious literature."  *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 709 F. Supp. 3d 664, 697 (S.D. Iowa 2023).

A small selection of the books that school districts concluded must be removed under the Library Restriction because those books contain a "description" of a "sex act" includes George Orwell's *1984*, Aldous Huxley's *Brave New World*, Toni Morrison's *Beloved*, William Faulkner's *As I Lay Dying*, Kurt Vonnegut's *Slaughterhouse-Five*, Alice Walker's *The Color Purple*, Richard Wright's *Native Son*, Maya Angelou's *I Know Why the Caged Bird Sings*, and James Joyce's *Ulysses*.  (Exs. C-2, C-3.)  According to the State Defendants, these books and hundreds of others have all been properly removed under the Library Restriction.  (*See* Defendants-Appellants'

---

[2] Plaintiffs seek to preliminarily enjoin the portion of Senate File 496 that requires that school library materials not contain any "descriptions" of a sex act—not the portion of the statute concerning "visual depictions" of a sex act.

Opening Brief at 59, *GLBT Youth in Iowa Schools Task Force v. Reynolds*, No. 24-1074 (8th Cir. Mar. 11, 2024).)

Provisions like the Library Restriction that require the removal of award-winning books without consideration of the book's value as a whole serve no valid educational purpose.  Instead, the law requires educators and their school districts either to interfere with the First Amendment rights of students, authors, and publishers or to face discipline for noncompliance, including termination and loss of licensure.  The Library Restriction harms students by undermining their right to receive information in school libraries.  It also harms publishers and authors by requiring the removal of their books from school libraries based on an impermissible, overbroad content-based restriction.

Publishers and authors disseminate information and ideas of interest and value to students.  Matching students to books is an inherently individual exercise.  Not every book is for every person at every point in their life.  For that reason, each student has the right to choose whether to read any particular book from a school library.  But the Library Restriction bars all consideration of context, prohibiting school librarians from exercising their professional judgment.  Neither the value of the book nor a student's readiness and desire to read it count for anything.  If the First Amendment has any force in public schools, the Library Restriction must be enjoined once again.

## FACTUAL BACKGROUND

## I.    The Library Restriction Violates First Amendment Rights.

The Library Restriction wholly ignores the age of students by excluding *any* book containing *any* "description" of a "sex act" for students in *every* grade.  Iowa Code §§ 256.11 (9)(a)(2), (19)(a)(1) (SF496 §§ 2, 4).  The Library Restriction incorporates the definition of "sex act" from Iowa's criminal code, which defines the term as "any sexual contact between two or

more persons" and includes examples.  *Id.*; *id.* § 702.17.  Because the Library Restriction does not define the word "description" in relation to the term "sex act," it is unclear what level of detail is necessary for a book to implicate the Library Restriction.  For example, a book that contains the phrase "spent the night together" may be sufficiently detailed for the Library Restriction to apply. It appears that some school districts actually removed books on that basis.  (*See*, *e.g.*, Declaration of Mari Butler Abry ¶¶ 13–14, ECF No. 34-10.)

SF496 elsewhere acknowledges the importance of considering the "developing cognitive, emotional, and behavioral capacity typical for the age or age group," but the Library Restriction prohibits consideration of students' different development levels with respect to their access to school library books:  the Library Restriction's mandate applies regardless of the age, grade, or maturity of the student.  Iowa Code §§ 256.11 (9)(a)(2), (19)(a)(1) (SF496 §§ 2, 4).  The Library Restriction also prohibits school librarians from considering the literary, artistic, political, or scientific value of books taken as a whole, with one exception:  certain religious books, such as the Bible, are exempt from removal.  Iowa Code §§ 256.11 (9)(a)(2) (SF496 § 2), 280.6.

SF496 empowers Defendants, school districts, and school superintendents to enforce its provisions against school districts, librarians, and teachers through a harsh system of penalties, including disciplinary action, loss of teaching licenses, and termination of employment.[3]  The penalty provisions were to take effect on January 1, 2024.  Iowa Code § 256.11 (9)(a)(3) (SF496 § 2).  Before that date, educators repeatedly requested guidance from the Iowa Department of Education regarding how to implement the Library Restriction, including on the following topics:

---

[3] *See* Iowa Code §§ 256.11 (9)(a)(3) (SF496 § 2), 272.2 (4), 279.27; Iowa Admin. Code r. 282—25.3(272).

a. What resources and standards will the Department of Education apply to identify and classify the age-appropriateness of school library materials?  When will teacher librarians and library workers be trained in these resources?

b. Will classic literature that is part of the Advanced Placement curriculum for AP Literature and Composition now be illegal due to age-appropriateness?  How will the College Board be made aware that Iowa's Advanced Placement courses in Literature and Composition can no longer provide required classic literature due to the age-appropriateness definition?

c. Will the presence of materials that may be age-appropriate for some students but not deemed age-appropriate for all students be considered a violation of this law?

(Ex. C-1.)  The State provided none, and it continues to provide none.

The lack of guidance is especially problematic because SF496 imposes harsh penalties for violations but does not identify any "metric or tool" that the State will use to assess districts' and educators' compliance efforts.  (House Decl. (Ex. B) ¶ 10.)  SF496 unleashed fear and chaos upon the Iowa education community, which has struggled to determine what the Library Restriction requires.  Educators, school districts, and even state administrators have expressed confusion. Defendant John Robbins, President of the Iowa State Board of Education, stated that "there's a lot of confusion" about the scope of the Library Restriction and that people "in the field" hope the Iowa Department of Education "provides direction because right now, we're kind of either guessing what is right or wrong, and not being in violation of the law." (Ex. C-4.  *See also* Petrie Decl. (Ex. A) ¶ 21.)  Robbins was right: before the Library Restriction was enjoined, everyone appeared to be guessing.

The vague Library Restriction has led to extensive First Amendment violations through the removal of protected literature.  Districts erred on the side of removing books to avoid penalties. (*See* House Decl. (Ex. B) ¶ 10.)  Many teachers "reduc[ed] book collections in their classrooms or eliminat[ed] them altogether out of fear of retaliation or discipline."  (*See*, *e.g.*, Declaration of Joshua Brown (Ex. D) ¶ 11.)  School districts across the State have removed or identified for

6

removal award-winning and classic books that have been in libraries for decades, including books that are commonly included on Advanced Placement exams.  (*See*, *e.g.*, Exs. C-2, C-3 (listing books that have been identified for removal under SF496).)  Nonetheless, the State Defendants have admitted that *every* book removed or identified for removal under the Library Restriction properly fell within the broad scope of the statute.  (*See* Defendants-Appellants' Opening Brief at 59, *GLBT Youth in Iowa Schools Task Force v. Reynolds*, No. 24-1074 (8th Cir. Mar. 11, 2024) ("Every book removed from library shelves because of the Library [Restriction] included at least some material that was [prohibited] under the law.").)  Further, while many school districts have not compiled removal lists, they have still required libraries to remove books.  (Brown Decl. (Ex. D) ¶¶ 9–13.)  Attached as Exhibit C-2 is a list of books that Iowa school districts determined must be removed prior to the Court's preliminary injunction barring enforcement of the Library Restriction and attached as Exhibit C-3 is a list of books that Iowa school districts have determined must be removed as of June 6, 2024, while the preliminary injunction was in effect.[4]

## II.   SF496 Is A Solution In Search Of A Problem.

The State Defendants have never meaningfully attempted to justify the unprecedented breadth of the Library Restriction.  Legislative history suggests that the Library Restriction was originally intended to restrict obscene content in schools.  Previous versions of the bill were based upon the definition of obscenity set forth by the Supreme Court and Iowa's existing obscenity

---

[4] These lists are taken directly from the Des Moines Register's database of those books, which it compiled from public school district records (https://databases.desmoinesregister.com/database-books-removed-from-libraries-in-iowa-school-districts/).  The lists of books also include any books that school districts erroneously removed under other provisions of SF496, including a provision that concerns gender identity and sexual orientation in the context of grades K-6.  The lists of books that Iowa school districts have identified for removal from school libraries are appropriate for judicial notice. *See Stutzka v. McCarville*, 420 F.3d 757, 760 n. 2 (8th Cir. 2005).

laws.  *See* Iowa Code § 728.1(5); S.S.B. 1145 § 16.  However, the enacted version of the Library Restriction ultimately ignored the obscenity standard and instead proscribed all books with any description of a "sex act," prohibiting librarians and school districts from considering community standards and the value of the book as a whole.

Iowa elected officials have publicly characterized the Library Restriction as protecting Iowa students from pornography.  For example, Iowa State Representative Skyler Wheeler, Chair of the House Education Committee, claimed that the Library Restriction regulates only "sexually explicit material" that is akin to pornography: "Porn doesn't belong in school libraries.  Books that don't contain porn can remain on the shelves."  (Ex. C-4.)  Governor Kim Reynolds stated that the Library Restriction prohibits school library books that are "pornographic" and described the prohibited books as "nasty," making clear her opposition to the content of the books targeted by the Library Restriction.  (Ex. C-5.)  By enacting the Library Restriction and characterizing its purpose as purging pornography from school libraries, Iowa lawmakers have stigmatized the many books that have been removed (and their authors), as well as the students who seek to read them.

Even before the Library Restriction, the State was not and has never been "powerless" to require the removal of obscene materials from school libraries.  Iowa school districts already had procedures for parents and community members to challenge library books.  Under those procedures, qualified educators would review challenged books at the school or district level, considering educational criteria, the value of each book as a whole, and community standards.  (*See*, *e.g.*, Abry Decl. ¶ 20, ECF No. 34-10; Petrie Decl. (Ex. A) ¶ 19.)  In addition, Iowa school districts have procedures that enable parents to regulate their own children's access to library books.  (*See*, *e.g.*, Petrie Decl. (Ex. A) ¶ 13; House Decl. (Ex. B) ¶ 14; Dye Decl. (Ex. C) ¶ 18.)

Teachers and librarians in Iowa are trained to understand the importance of exposing students to diverse authors, perspectives, and topics, and they look to professional review journals and standards and the Iowa Board of Educational Examiners Code of Rights and Responsibilities to help them to make those decisions. (Petrie Decl. (Ex. A) ¶¶ 9, 15.) When deciding which books to include in or exclude from their school libraries, teachers and librarians consider the particular populations who are likely to read the books, because no two families or communities in Iowa are identical. (*Id*. ¶ 13.) This focus on community standards results in a compilation of school library books that reflect the values and needs of that school's community. (*Id*.) In contrast, an across-the-board mandate like the Library Restriction—which forbids consideration of the values and needs of students, families, or communities—"strips [districts] of local control" by restricting educators' ability to use their professional judgment in making decisions about library books for the students in their schools. (*Id*.) In this way, the Library Restriction gives parents "*fewer* rights; not more." (*Id*. (emphasis in original).)

Student choice is particularly important given the focus in schools on increasing reading proficiency. (*See*, *e.g.*, *id*. ¶ 14.) Students develop fluency and confidence in reading skills when they are permitted to choose books in which they are particularly interested, with the opportunity to discuss those books with peers and adults. (*Id*. ¶ 13.) For many students, the school library is the only means of doing so. (*Id*. ¶ 15.) The Library Restriction prevents educators from fostering this love of learning and reading, especially as to students who have or might have created a connection with a particular book that the Library Restriction requires to be removed. (*Id*.) It also damages students' trust that their educators actually desire and are able to help students to grow as readers. (*Id*. ¶ 23.) Moreover, some of the books that the Library Restriction prohibits can actually save lives—in particular, books concerning sexual assault or abusive sexual experiences permit

9

students to process similar experiences in their own lives or learn about potentially life-altering experiences through the lives of others, all in a safe environment. (*Id*. ¶¶ 16, 18; Declaration of Jodi Picoult (Ex. E) ¶ 6.) The Library Restriction is therefore not only harmful but contrary to the purpose and professional training of librarians and other educators.

## III.    Plaintiffs Have Suffered Or Imminently Will Suffer Harm Due To Senate File 496.

### A.    The Publisher Plaintiffs And The Author Plaintiffs

Plaintiffs Penguin Random House ("PRH"); Hachette Book Group ("Hachette"); HarperCollins Publishers LLC ("HarperCollins"); Macmillan Publishing Group, LLC ("Macmillan"); and Simon & Schuster, LLC ("S&S") (collectively the "Publisher Plaintiffs") are the five largest trade publishers in the world. (Dye Decl. (Ex. C) ¶ 10.) Many books published by the Publisher Plaintiffs have been removed or identified for removal from school libraries in Iowa under the Library Restriction, which limits the audience for the Publisher Plaintiffs' books.[5] (*Id*. ¶ 9.)

Plaintiff The Authors Guild (the "Guild") is the nation's oldest and largest professional organization for published writers. It serves as a collective voice of American authors. Many books written by the Guild's members, including Plaintiffs John Green, Malinda Lo, and Jodi Picoult, have been removed or identified for removal in Iowa school libraries under the Library

---

[5] These books include *Beloved*, *Song of Solomon*, and *The Bluest Eye*, written by Toni Morrison and published by PRH; *Last Night at the Telegraph Club*, written by Malinda Lo and published by PRH; *Ulysses* by James Joyce; *As I Lay Dying* by William Faulkner; *The Fault in Our Stars* and *Looking for Alaska*, written by John Green and published by PRH; *I Know Why The Caged Bird Sings*, written by Maya Angelou and published by PRH; *Night*, written by Elie Wiesel and published by Macmillan; *Speak* and *Shout*, written by Laurie Halse Anderson and published by Macmillan; *The Rape of Nanking*, written by Iris Chang and published by Hachette; *Native Son*, written by Richard Wright and published by HarperCollins; *Nineteen Minutes*, written by Jodi Picoult and published by S&S; and *Catch-22*, written by Joseph Heller and published by S&S. (Dye Decl. (Ex. C) ¶ 13.)

Restriction.  Plaintiffs John Green, Laurie Halse Anderson, Malinda Lo, Jodi Picoult (collectively with the Guild, the "Author Plaintiffs") are authors of critically acclaimed novels aimed at young people that have been removed or identified for removal from school libraries in Iowa under the Library Restriction.  (Declaration of Laurie Halse Anderson  (Ex. F) ¶ 1; Declaration of John Green (Ex. G) ¶ 1; Declaration of Malinda Lo (Ex. H) ¶ 1; Picoult Decl. (Ex. E) ¶ 1.)  Their books "make young adults feel seen."  (Picoult Decl. (Ex. E) ¶ 5.)

The Library Restriction has removed a key forum through which the Publisher Plaintiffs and the Author Plaintiffs reach young readers.  School libraries are an important channel for publishers and authors to speak to students—the intended audiences for some of their books— through those books.  (*See*, *e.g.*, Anderson Decl. (Ex. F) ¶ 11; Picoult Decl. (Ex. E) ¶ 7; Lo Decl. (Ex. H) ¶ 9; Dye Decl. (Ex. C) ¶ 9; Declaration of Mary E. Rasenberger (Ex. I) ¶¶ 4–5.)  If students are not able to access in their school libraries the books that the Library Restriction requires to be removed, they will have to discover them elsewhere (or not at all), imposing a burden on access to publishers' (such as the Publisher Plaintiffs) and authors' (such as the Author Plaintiffs) speech. (Dye Decl. (Ex. C) ¶ 9.)  Particular books appeal to students at particular times in their lives, so the opportunity to speak to those students may be lost if the Publisher Plaintiffs' or the Author Plaintiffs' books cannot be found in school libraries.  *Id.*  Library censorship of books not only reduces readership for the specific books being removed; it also reduces readership of publishers' and authors' other works because a student who reads one of their books is more likely to then read another.  *Id.*

Further, by falsely labeling books that the Publisher Plaintiffs and Author Plaintiffs have made available to students as "pornography," Iowa has stigmatized those books.  (Picoult Decl. (Ex. E) ¶ 7.)  This stigmatization "travels . . . beyond the school setting" and further decreases the

11

likelihood that students will read the Publisher Plaintiffs' and the Author Plaintiffs' books both in school and elsewhere in the future. (Dye Decl. (Ex. C) ¶ 9; Rasenberger Decl. (Ex. I) ¶ 7.) Moreover, the stigma chills the creative process. (Dye Decl. (Ex. C) ¶ 5; Rasenberger Decl. (Ex. I) ¶ 8.) Authors who have been stigmatized by the Library Restriction may—consciously or subconsciously—self-censor their future works to avoid those works being wrongly labelled as "pornography." (*Id.*) That chill leads to "dimmer, less colorful dialogues in the marketplace of ideas." (Rasenberger Decl. (Ex. I) ¶ 8.)

### B.   Parent And Student Plaintiffs

Plaintiff Meggan Van Gundy is the parent of minor student Grace Van Gundy, a senior in high school in the Urbandale School District. Because of the Library Restriction, Grace has been unable to find books that she intended to read in the school library, including *Last Night at the Telegraph Club*, *Nineteen Minutes*, and *Looking For Alaska*. (Declaration of Gracelyn Van Gundy ("Grace") (Ex. J) ¶ 7; Declaration of Meggan Van Gundy (Ex. K) ¶ 5.) Grace and her classmates have also been unable to read or discuss in school the books that Urbandale has targeted for removal without risking stigma and judgment from her teachers and fellow students. (Grace Decl. ¶¶ 11–12.)

### C.   Educators

The Iowa State Education Association ("ISEA") represents teachers, librarians, and other education professionals who work in Iowa school districts and schools. ISEA has communicated with educators throughout the state who fear being disciplined for violating the Library Restriction, who are confused by and afraid of its vague language and the inconsistency among district removal lists, and who are frustrated by the lack of state guidance. (Brown Decl. (Ex. D) ¶¶ 10–11, 16.) Many of these educators are afraid to speak up about the law, and others have left or may leave

the profession in Iowa due to SF496.  (*Id.* ¶ 12.)  Many of ISEA's members have been forced to remove books from their classroom to attempt to avoid the risk of future penalization.  (*Id.* ¶ 9.)

Plaintiffs Lisa Petrie and Emily House are Iowa educators and ISEA members who provide quality, relevant, readily accessible, and inclusive reading material for their students.  (Petrie Decl. (Ex. A) ¶ 5; House Decl. (Ex. B) ¶ 12; Brown Decl. (Ex. D) ¶ 13.)  As a result of the Library Restriction, they have been or will be forced to remove broad swaths of non-obscene books from their school libraries, which had previously been deemed appropriate by education professionals, or expose themselves and their school districts to penalties.  (Petrie Decl. (Ex. A) ¶ 12; House Decl. (Ex. B) ¶ 8.)

## IV.    Procedural History.

Plaintiffs filed their original Complaint against the State Defendants (and school districts and superintendents, who decided not to defend the constitutionality of SF496 in the district court or on appeal) on November 30, 2023, approximately two weeks after the Iowa State Board of Education issued proposed rules that purported to clarify SF496's provisions.  (ECF No. 1.)

On December 8, Plaintiffs moved for a preliminary injunction to enjoin the Library Restriction before SF496's penalty provisions became effective.  (ECF No. 28.)  This Court granted the motion on December 29, holding that the Library Restriction violated the First Amendment.  (ECF No. 56.)   On August 30, 2024, the Eighth Circuit vacated the preliminary injunction.  (ECF No. 84.)

Since the preliminary injunction was lifted, some schools, such as Urbandale, have started to remove books from school library shelves again.  (Grace Decl. (Ex. J) ¶ 4.) Other schools appear not to have decided how to apply the Library Restriction in the absence of the preliminary

injunction.  The chaos that existed in schools as a result of the Library Restriction prior to this Court's order enjoining that provision has ensued once again.

## LEGAL STANDARD

In determining whether to issue a preliminary injunction, the Court considers the movant's probability of success on the merits, which is the "most significant" factor, as well as the threat of irreparable harm to the movant, the balance between that harm and any injury to the other parties of granting the injunction, and the public interest.  *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020).  When a plaintiff has shown "a likely violation of his or her First Amendment rights, the other [considerations] are generally deemed to have been satisfied."  *Willson v. City of Bel-Nor, Mo.*, 924 F.3d 995, 999 (8th Cir. 2019).

## ARGUMENT

The Court should enjoin the Library Restriction as unconstitutionally overbroad.  First, the First Amendment applies in school libraries.  Second, the First Amendment applies with more force in school libraries than in curricular activities because school libraries, unlike curricular activities, are not compulsory.  Third, a substantial number of the Library Restriction's applications are unconstitutional compared to the few, if any, applications that are constitutional. At a minimum, a school library is a nonpublic forum, which requires that any First Amendment restrictions be reasonable in light of the purpose of school libraries.  There are few, if any, constitutional applications of the Library Restriction because there are few, if any, books on school library shelves that are obscene as to minors.  Rather, the Library Restriction prohibits a vast number of books without regard to the value of the book as a whole or the age of the reader, contrary to the Supreme Court's decisions in *Miller v. California*, 413 U.S. 15 (1972), and

14

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975).   The remaining preliminary injunction factors also weigh in favor of enjoining enforcement of the Library Restriction.

## I.       The First Amendment Applies In School Libraries.

As this Court held and the Eighth Circuit affirmed, the First Amendment applies to school library books.  *See GLBT Youth in Iowa Schools Task Force v. Reynolds*, 709 F. Supp. 3d 664, 695–97 (S.D. Iowa 2023) (rejecting the State Defendants' government speech argument); *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 667–68 (8th Cir. 2024) (affirming this Court's rejection of the government speech doctrine) (citing *Shurtleff v. Boston*, 596 U.S. 243 (2022); *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009); *Matal v. Tam*, 582 U.S. 218 (2017)).

Every other court to consider this issue agrees:  the First Amendment right to freedom of speech exists in public libraries, including public school libraries.  *See, e.g.*, *Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d 184, 188–190 (5th Cir. 1995); *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582–83 (6th Cir. 1976); *PEN American Center, Inc. v. Escambia County School Board*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024); *Little v. Llano Cnty.*, 103 F.4th 1140, 1151–52 (5th Cir.), *reh'g granted en banc*, 106 F.4th 426 (5th Cir. 2024); *Fayetteville Public Library v. Crawford County, Arkansas*, 684 F. Supp. 3d 879, 909–910 (W.D. Ark. 2023); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1004 (W.D. Ark. 2003); *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 547–48 (N.D. Tex. 2000); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 874–76 (D. Kan. 1995); *Sheck v. Baileyville Sch. Comm.*, 530 F. Supp. 679, 686–89 (D. Me. 1982); *Salvail v. Nashua Bd. of Ed.*, 469 F. Supp. 1269, 1272–73 (D.N.H. 1979); *Right To Read Def. Comm. of Chelsea v. Sch. Comm. of City of Chelsea*, 454 F. Supp. 703, 710–11 (D. Mass. 1978); Order On Motion For Preliminary Injunction at 14, *Adams v. Matanuska-Susitna Borough School Dist.*, No. 3:23-cv-00265-SLG (D. Alaska Aug. 6, 2024).

4890-3188-6321, v. 1

## II.      School Libraries Are Not Compulsory.

While the State has substantial discretion in certain compulsory functions of public schools, school libraries are different.  School libraries are places of voluntary learning in which student participation is self-driven and optional.  In contrast, other aspects of the educational experience such as curriculum and instruction are compulsory and require participation.

School libraries serve an important purpose.  As the Supreme Court has recognized, a school library is a place where students "can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 868–69 (1982) (plurality) (explaining that "students must always remain free to inquire" and the "school library is the principal locus of such freedom").  A school library is meant to be a "regime of voluntary inquiry," affording students "an opportunity at self-education and individual enrichment that is wholly optional." *Id.* at 869. Libraries "pursue the worthy missions of facilitating learning and cultural enrichment" and are necessary for a "well-functioning democracy." *Fayetteville*, 684 F. Supp. 3d at 889, 891 (quoting *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 203 (2003) ("*ALA*")).

The discretion afforded to librarians in overseeing their library collections is crucial to well-functioning libraries.  Librarians are tasked with "curat[ing] the collections of public libraries to serve diverse viewpoints" and must be "commit[ted] to freedom of speech." *Id*.  Because that task requires librarians to have "broad discretion to decide what material to provide to their patrons," librarians are "afforded significant professional responsibility and deference with respect to their area of expertise." *Id*. at 890–91. Authors, publishers, students, and parents rely on trained librarians to facilitate voluntary book discovery through individualized consideration of a student's

16

maturity, reading level, interests, and life experiences.  The Library Restriction replaces librarians' discretion with the dictates of Iowa legislators that impose a statewide standard.

School libraries are not compulsory educational environments, and the removal of a book from a school library is not a curricular decision.  Because students are voluntary participants in school libraries, they are not compelled to read any particular book or any book at all, including the books that the Library Restriction now mandates be removed from every school library.  The State's mandate to remove books from school libraries "must withstand greater scrutiny within the context of the First Amendment than would a decision involving a curricular matter."  *See Campbell*, 64 F.3d at 189 (citing *Pico*, 457 U.S. at 868–870 (contrasting the "compulsory environment of the classroom" with "the school library and the regime of voluntary inquiry that there holds sway")).  The Supreme Court has recognized this distinction between voluntary aspects of a school environment and the compulsory curricular environment.  *See Pico*, 457 U.S. at 868–870 (comparing the "compulsory environment of the classroom" to "the school library and the regime of voluntary inquiry that there holds sway"); *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 269 (1988) (concerning a school newspaper that was part of the school's "curriculum" and over which "school officials retained ultimate control").

## III.   The Library Restriction Is An Unconstitutionally Overbroad Content-Based Restriction.

### A.   The Library Restriction Violates Plaintiffs' First Amendment Rights.

The First Amendment prohibits laws that abridge the freedom of speech.  U.S. Const. amend. I.  Laws that restrict speech based on its content are disfavored and subject to heightened scrutiny.  *See, e.g.*, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).  In addition, the First Amendment limits government restrictions on speech in public schools to "reasonable regulation

17

of speech-connected activities in carefully restricted circumstances." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511, 513 (1969) (explaining that speech restrictions must be "necessary to avoid material and substantial interference with schoolwork or discipline").

The Publisher Plaintiffs, the Author Plaintiffs, and the Student Plaintiff each have rights under the Free Speech Clause of the First Amendment that the Library Restriction violates. The Publisher Plaintiffs and the Author Plaintiffs have the First Amendment right to communicate their messages through their books in school libraries free from unreasonable, overbroad content-based restrictions such as the Library Restriction. The First Amendment "embraces the circulation of books as well as their publication." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n. 6 (1963). *See also Prison Legal News v. Livingston*, 683 F.3d 201, 212 (5th Cir. 2012) (holding that an "interest in distributing books" is "precisely the type of interest at the core of First Amendment protections").

Iowa students have a First Amendment right to receive information that is commensurate with publishers' and authors' rights to communicate their messages through their books. *See Reno v. Am. C. L. Union*, 521 U.S. 844, 874 (1997) (recognizing the "constitutional right to receive" information); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (holding that the "right to receive information and ideas, regardless of their social worth, is fundamental to our free society"). *See also Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975) ("Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.").

The Publisher Plaintiffs, the Author Plaintiffs, the Student Plaintiffs, and others who are similarly situated have suffered First Amendment injuries due to the Library Restriction. Books written by the Publisher Plaintiffs and the Author Plaintiffs have been identified for removal or

removed by Iowa schools under the Library Restriction.  (Dye Decl. (Ex. C) ¶ 13; Exs. C-2, C-3.)

Further, laws like the Library Restriction may result in authors—consciously or subconsciously—

self-censoring their future works to avoid those works being wrongly labelled as "pornography."

(Dye Decl. (Ex. C) ¶ 5; Rasenberger Decl. (Ex. I) ¶ 8.)  In addition, the Library Restriction has

already caused Iowa students to lose access to countless library books, and it will continue to do

so.  For example, Plaintiff Grace Van Gundy sought to check out three award-winning school

library books this school year, but she was unable to do so because those books had been removed

due to the Library Restriction.  (Grace Decl. (Ex. J) ¶ 7.)  As a result of the Library Restriction,

students are deprived of the opportunity to have "challenging conversations in safe environments"

sparked by the works of great authors.  (*Id*. ¶ 6.)  It takes away students' access to "an environment

of growth and independence" that would broaden students' horizons and expose them to different

perspectives.  (*Id*.)

Students risk incurring reputational and other harm because of the Library Restriction.

Students may seek to read many of the books that SF496 mandates be removed from libraries.  But

the State has labeled those books "pornography" and "smut," creating a fear that students'

reputations may suffer if they seek to read those books.  (*Id*. ¶ 12.)  The fact that the books

identified for removal under the Library Restriction may be available elsewhere does not mitigate

students' First Amendment injury.  *See Reno*, 521 U.S. at 880 ("[O]ne is not to have the exercise

of his liberty of expression in appropriate places abridged on the plea that it may be exercised in

some other place.").  And while some students may be able to obtain those books from places other

than their school libraries, they may be less likely to do so because of the stigma that arises from

the books being labeled "pornography."  (Grace Decl. (Ex. J) ¶ 11.)  *See also Counts*, 295 F. Supp.

2d at 999 (holding that stigma associated with reading certain books, access to which had been limited, violated a student's First Amendment right to receive information).

### B.     The Library Restriction Is Unconstitutionally Overbroad.

The Library Restriction is unconstitutionally overbroad.  The Library Restriction bars minors from accessing books that contain any description of a "sex act" without regard to the value of the books as a whole and even where those books are not remotely obscene under the Supreme Court's obscenity standard.  The Library Restriction also makes no attempt to differentiate, as it constitutionally must, between books that may be obscene as to all minors versus books that may be obscene only for younger minors.

A statute that burdens otherwise-protected speech is invalid as overbroad if a "substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *NetChoice*, 144 S. Ct. at 2397  (citing *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615 (2021) (finding provision facially unconstitutional)).  In assessing an overbreadth claim, a court "must evaluate the full scope of the law's coverage[,] decide which of the law's applications are constitutionally permissible and which are not, and finally weigh the one against the other." *Id*. at 2409.

The Eighth Circuit has repeatedly applied the overbreadth standard to invalidate state statutes that restrict speech.  *See*, *e.g.*, *Dakotans for Health v. Noem*, 52 F.4th 381, 388 (8th Cir. 2022) (affirming preliminary injunction on facial challenge to statute restricting speech because such statutes "may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep" (citations and quotations omitted)); *Willson v. City of Bel-Nor, Missouri*, 924 F.3d 995, 1002–1003 (8th Cir. 2019) (reversing denial of motion for preliminary injunction because plaintiff was likely to succeed on

20

the merits of his First Amendment facial challenge because "the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep"); *Missourians for Fiscal Accountability v. Klahr*, 892 F.3d 944, 948 (8th Cir. 2018) (affirming grant of summary judgment on First Amendment facial challenge based on the standard set forth in *U.S. v. Stevens*, 559 U.S. 460, 481–82 (2010)).

The Supreme Court has held that facial overbreadth challenges are particularly appropriate and important where, as here, the "pertinent facts . . . are the same across the board." *Bonta*, 594 U.S. at 618.  Facial challenges are an important tool to protect First Amendment rights when a law restricts and chills a substantial amount of protected speech.  *See*, *e.g.*, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002) ("The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere."); *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (explaining that facial challenges are important because "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech[,] harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas").  The Library Restriction, which in every situation requires the removal of books with no consideration of the book's value as a whole (as is constitutionally required), is the epitome of a statute for which a facial challenge is appropriate.  Plaintiffs are likely to succeed on the merits of their First Amendment overbreadth claim because the Library Restriction's unconstitutional applications vastly outweigh any constitutional applications.

### 1.    The Library Restriction Applies To School Library Books.

Senate File 496 requires the removal of school library materials that contain any "descriptions or visual depictions of a sex act."  Iowa Code §§ 256.11 (9)(a)(2), (19)(a)(1) (SF496

21

§§ 2, 4).  Plaintiffs seek to preliminarily enjoin only the portion of the statute that requires the removal of library materials with any *description* of a sex act (the Library Restriction)—not the portion of the statute concerning *visual depictions* of a sex act.  The scope of the Library Restriction, therefore, is materials in Iowa school libraries that contain a description of a sex act. Those materials primarily consist of books, but may also include magazines, newspapers, and audiobooks.[6]  (Petrie Decl. (Ex. A) ¶ 11.)

These are books—both fiction and nonfiction—that were specifically selected for school library shelves by trained professionals who regularly consider educational appropriateness, community standards, and literary value in making library curation decisions.  (*See*, *e.g.*, *id*. ¶ 19; Brief Of Amici Curiae Freedom To Read Foundation, Iowa Library Association, And American Association of School Librarians In Support Of Appellees And Affirmance at 28, No. 24-1082 (8th Cir. Apr. 19, 2024) (explaining that librarians "make decisions about which developmentally-appropriate books should or should not be included based upon the needs of the students and the communities they serve").)  The scope of the Library Restriction includes award-winning and other educationally valuable books, classics, books that have been on school library shelves for years, and even books that are commonly tested on Advanced Placement exams.  The Library Restriction sweeps far too broadly.

## 2.    The Library Restriction Has Limited Constitutional Applications.

The Library Restriction's constitutional applications are few, if any, because it mandates the content-based removal of library books without regard for the value of books as a whole or the

---

[6] References in this brief to "books" also include magazines, newspapers, and audiobooks.  The same overbreadth analysis that applies to books also applies to magazines, newspapers, and audiobooks.

22

discretion of librarians and other trained professionals in Iowa schools. No exigency of the educational environment justifies the Library Restriction, which is inconsistent with the purpose of school libraries.

As this Court previously explained, courts agree that the government cannot require the content-based removal of library books to impose a "puritanical 'pall of orthodoxy'" or to rid libraries of messages with which they disagree. *GLBT Youth*, 709 F. Supp. 3d at 697. *See also Pico*, 457 U.S. at 877; *Minarcini*, 541 F.2d at 580; *Campbell*, 64 F.3d at 188–89 (quoting *Pico*); *Counts*, 295 F. Supp. 2d at 1004–1005 (quoting *Pico*). *See also Pratt v. Ind. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 777 (8th Cir. 1982) (holding that the government "must establish that a substantial and reasonable governmental interest exists for interfering with the students' right to receive information").

When the government restricts speech on government property, courts assess those restrictions based on the nature of the forum and the type of speech that is restricted. *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). At a minimum, a school library is a nonpublic forum. The standards that courts apply to assess statutes requiring the removal of library books are consistent with the standard used to assess speech restrictions in nonpublic forums.

Within nonpublic forums, content-based restrictions must be (1) reasonable in light of the purpose of the forum and (2) viewpoint-neutral. *Cornelius*, 473 U.S. at 806. *Accord Minnesota Voters All. v. Mansky*, 585 U.S. 1, 12, 16 (2018) (holding that the state must "articulate some sensible basis for distinguishing what [speech is allowed] from what [speech is not allowed]" inside a polling place); *Burnham v. Ianni*, 119 F.3d 668, 676 (8th Cir. 1997) (holding that "the suppression of exactly [the] type of information" the forum was created for "was simply not

23

reasonable"). Therefore, an application of the Library Restriction is constitutional only if it is reasonable in light of the purpose of a school library. *See also Counts*, 295 F. Supp. 2d at 1002 (requiring the State to show that book-removal decisions were "justified by some exigency").

The purpose of school libraries is inconsistent with broad content-based restrictions that do not account for the value of the book as a whole. Libraries are places of voluntary inquiry that provide students with the opportunity for exploration, discovery, and growth. *See Pico*, 457 U.S. at 868–889. Libraries provide students with access to "areas of interest and thought not covered by the prescribed curriculum." *Id*. Critical to the success of libraries is the lack of "any kind of authoritative selection" of ideas by the State. *See Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603–04 (1967); *ALA*, 539 U.S. at 204 ("To fulfill their traditional missions, public libraries must have broad discretion to decide what material to provide to their patrons.").

In light of these purposes, the reasonable and therefore constitutional applications of the Library Restriction are minimal. Because the Library Restriction is a statewide mandate with the purported purpose of keeping sexually explicit content out of school libraries, its reasonableness must be evaluated using the Supreme Court's standard that governs speech concerning sexual content—the obscenity standard. The Supreme Court has defined obscenity as "limited to works" that (a) "taken as a whole, appeal to the prurient interest in sex"; (b) "portray sexual conduct in a patently offensive way"; and (c) "taken as a whole, do not have serious literary, artistic, political, or scientific value." *See Miller v. California*, 413 U.S. 15, 24 (1972). The first and second parts of the *Miller* obscenity test are to be determined "applying contemporary community standards." *Pope v. Illinois*, 481 U.S. 497, 500 (1987). When applied to minors, the *Miller* obscenity standard accounts for the age of the reader. *See Erznoznik*, 422 U.S. at 213–14.

24

While the State has a legitimate interest in prohibiting students from accessing books that are obscene for minors in school libraries, a book is not obscene merely because it contains a description of a sex act. As Justice Scalia explained, the Supreme Court has "rejected the approach previously adopted by some courts, which would permit the banning of an entire literary work on the basis of one or several passages that in isolation could be considered obscene." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 250 (1990) (concurrence) (explaining that "the standards for judging obscenity safeguard the protection of freedom of speech and press for material which does not treat sex in a manner appealing to prurient interest" (quoting *Roth v. United States*, 354 U.S. 476, 488 (1957))).

Application of the *Miller* test to minors—what this Court called the "'obscenity-light' standard"—is not novel. Courts have applied the "obscenity-light" standard to evaluate First Amendment restrictions in schools. *See*, *e.g.*, *Sheck*, 530 F. Supp. at 686–87, 691 (applying *Miller*, with consideration of students' "age or maturity," to the removal of a school library book); *Book People, Inc. v. Wong*, 692 F. Supp. 3d 660, 695–97 (W.D. Tex. 2023), *aff'd in relevant part and remanded*, 91 F.4th 318 (5th Cir. 2024) (applying *Miller* in the context of school libraries and considering the "wide range of grades and ages of potential readers"). *Accord Mailloux v. Kiley*, 436 F.2d 565, 566 (1st Cir. 1971) (holding that restrictions on student access to "offensive" language in schools must account for "the age and sophistication of students," as well as the "context and manner of presentation").

*Miller*'s contextual approach does not mean that schools are powerless to remove inappropriate books from school libraries or that parents are powerless to regulate which books their children can access in school libraries. *Pico* suggested that school districts may be able to remove library books that are "pervasively vulgar" or not "educational[ly] suitab[le]." *See Pico*,

25

475 U.S. at 871. Books that are pervasively vulgar or not educationally suitable may also be obscene as to minors under the *Miller* test, which requires consideration of both the book's appeal to prurient interests and its value as a whole. *Miller* also requires consideration of community standards, which may differ among school districts and across the state. Even as to books that are not obscene under the *Miller* standard, school librarians may also consider vulgarity and educational suitability when considering which books should be on school library shelves. Finally, parents have long had the ability under school district policies to limit their own children's access to school library books. (*See*, *e.g.*, Petrie Decl. (Ex. A) ¶ 13; House Decl. (Ex. B) ¶ 14; Dye Decl. (Ex. C) ¶ 18.)

The constitutional applications of the Library Restriction are therefore any school library books that are obscene under the *Miller* standard accounting for the age of the minor. That population is necessarily extremely limited because library collections are curated by trained professional librarians who take into account community standards. (*See*, *e.g.*, Petrie Decl. (Ex. A) ¶¶ 13, 15, 19.) As a result, it would be the rare exception that a school library would contain a book that would be obscene. (*Id*. ¶ 19 (explaining that educators' "professional training requires [that] books that are appropriate and valuable for high school students but that may be too mature for elementary school students not be made available to elementary school students").) Therefore, the constitutional applications of the Library Restriction are very few, if any.

### 3.      The Library Restriction's Unconstitutional Applications Vastly Outweigh Its Constitutional Applications.

In contrast, the unconstitutional applications of the Library Restriction are vast and substantially outweigh any potential constitutional applications. The Library Restriction prohibits school librarians from considering the literary, political, or scientific value of the books when taken

26

as a whole, resulting in a blanket prohibition that ignores differing community standards throughout the State.

The Library Restriction also makes no attempt to differentiate, as it constitutionally must, between books that may be obscene as to all minors versus books that may be obscene only for younger minors.  Under the Library Restriction, the State treats high school seniors the same as third graders and prohibits all students regardless of age, maturity, or reading level from accessing certain books in their school libraries.  The First Amendment requires that books be considered in relation to the age and maturity of the students who may access them.  *See Erznoznik*, 422 U.S. at 214 n.11 ("[T]he age of a minor is a significant factor.").  A book is not obscene as to all minors if it has serious value for a legitimate minority of minors, such as older minors.  *See Virginia v. Am. Booksellers Ass'n, Inc.*, 488 U.S. 905 (1988); *Am. Booksellers Ass'n, Inc. v. Virginia*, 882 F.2d 125, 127–28 (4th Cir. 1989), *cert. denied*, 494 U.S. 1056 (1990).  *See also Shipley Inc. v. Long*, 454 F. Supp. 2d 819, 829–830 (E.D. Ark. 2004) (holding that the State cannot "effectively stifle[] the access" of "older minors to communications and material they are entitled to receive and view" just because such material may be "harmful to the youngest of the minors"); *Fayetteville*, 684 F. Supp. 3d at 904–905 (finding obscenity restriction on library books to be overbroad, even where the statutory language was consistent with *Miller*, because the restriction burdened older minor and adult access to books).  Nevertheless, the Library Restriction applies to all school libraries and all students without differentiating based on the age of the prospective reader—even if the reader is an adult under Iowa law—and therefore prevents older minors from accessing school library

27

books that contain any description of a sex act, even where those books are not obscene as to those older minors, in violation of the First Amendment.[7]

Although the State has an interest in protecting minors from obscene materials, that interest is not "an unbridled license to governments to regulate what minors read and view." *Interactive Digital Software Ass'n v. St. Louis Cnty. Mo.*, 329 F.3d 954, 959–960 (8th Cir. 2003). Moreover, the State cannot suppress "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription" solely "to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213–14 (striking ordinance as overbroad).

The unconstitutional applications of the Library Restriction are many. The Library Restriction requires the removal of numerous categories of non-obscene books, many of which have been in school libraries in Iowa and throughout the nation for decades:

- Historical classics (*e.g.*, *As I Lay Dying* by William Faulkner, *Ulysses* by James Joyce, *Brave New World* by Aldous Huxley, *1984* by George Orwell, *Native Son* by Richard Wright; *Slaughterhouse-Five* by Kurt Vonnegut);

- Modern award-winners or highly acclaimed books (*e.g.*, *I Know Why the Caged Bird Sings* by Maya Angelou; *Song of Solomon, Beloved*, and *The Bluest Eye* by Toni Morrison; *The Kite Runner* by Khaled Hosseini; *Nineteen Minutes* by Jodi Picoult; *Speak* and *Shout* by Laurie Halse Anderson; *Looking for Alaska* and *The Fault in Our Stars* by John Green; *Last Night at the Telegraph Club* by Malinda Lo);

- Books on AP exams or that serve important educational purposes (*e.g.*, *The Color Purple* by Alice Walker, *Native Son* by Richard Wright, *The Handmaid's Tale* by Margaret Atwood, *As I Lay Dying* by William Faulkner, *Beloved* by Toni Morrison, *1984* by George Orwell, *Brave New World* by Aldous Huxley);

- Non-fiction history books about important historical events (*e.g.*, *Night* by Elie Wiesel, *Kaffir Boy: The True Story of a Black Youth's Coming of Age in Apartheid South Africa* by Mark Mathabane, *The Rape of Nanking: The Forgotten Holocaust of World War II*

---

[7] Students who are at least sixteen years old can legally consent to a "sex act" under Iowa law but cannot, under the Library Restriction, access a library book that contains a single sentence describing a sex act.

by Iris Chang, *The Freedom Writers Diary: How a Teacher and 50 Teens Used Writing to Change Themselves and the World Around Them* by Erin Gruwell);

- Non-fiction books to help minors avoid being victimized by sexual assault (*e.g.*, *Sexual Predators* edited by Laurie Willis, *The Truth About Rape* edited by Robert Golden);

- Non-fiction books about health and anatomy (*e.g.*, *Urinary Tract Infections* by Krista West, *Endometriosis* by Stephanie Watson);

- Books that address bullying, racism, and sexual assault (*e.g.*, *The Bluest Eye* and *Song of Solomon* by Toni Morrison; *Last Night at the Telegraph Club* by Malinda Lo; *Looking for Alaska* by John Green, *Nineteen Minutes* by Jodi Picoult, *I Know Why the Caged Bird Sings* by Maya Angelou, *Speak* and *Shout* by Laurie Halse Anderson, *The Truth About Rape* edited by Robert Golden, *Rape and Sexual Assault* by Rebecca T. Klein);

- Books that address trauma and grief (*e.g.*, *The Fault in Our Stars* by John Green, *Speak* and *Shout* by Laurie Halse Anderson);

- Books that address injustice (*e.g.*, *Native Son* by Richard Wright, *The Freedom Writers Diary: How a Teacher and 50 Teens Used Writing to Change Themselves and the World Around Them* by Erin Gruwell); and

- Works of fiction geared toward the emotional and intellectual challenges of being a teenager or young adult (*e.g.*, *Looking for Alaska* and *The Fault in Our Stars* by John Green).

(*See*, *e.g.*, Exs. C-2, C-3 (listing books that school districts have determined must be removed under the Library Restriction.)  The Library Restriction requires the removal of books that contain only one sentence describing a sex act—even if the described sex act was an impetus for legislation concerning sexual assault; was historically significant, such as in an impeachment, presidential campaign, or international events; or was central to character development in an award-winning work of fiction.

The Library Restriction is indifferent to the educational and literary qualities in the hundreds of books that it requires be removed from Iowa schools.  It requires schools to remove a book regardless of its value if it contains only a single, brief description of a sexual encounter— unless the book is a religious text.  In an implicit admission that books that contain a description

of a sex act may have value for Iowa students, the Library Restriction expressly exempts "[r]eligious books such as the Bible, the Torah, and the Koran," which "shall not be excluded from any public school or institution in the state." Iowa Code §§ 256.11 (9)(a)(2) (SF496 § 2), 280.6.

The breadth of the Library Restriction is even more expansive because it is vague. The Library Restriction requires Iowa educators to remove library books but does not explain what constitutes a description in relation to a sex act or what level of detail is necessary for the Library Restriction to apply. If Iowa educators fail to divine what the Library Restriction requires, they risk "facing potential discipline, up to and including termination." *GLBT Youth*, 709 F. Supp. 3d at 702. In that way, the Library Restriction incentivizes educators and school districts to err on the side of caution and to remove books liberally. The vagueness concern is real. It is unclear, for example, whether a book that contains the phrase "spent the night together" (or other phrases that might imply a sexual interaction) is descriptive enough to offend the Library Restriction. (*See*, *e.g.*, Declaration of Mari Butler Abry ¶¶ 13–14, ECF No. 34-10; Petrie Decl. ¶ 21.) Nor is it clear whether a book that states that two characters "made passionate love" or "had sexual intercourse" must be removed. Given the draconian penalties that follow from noncompliance, however, those sorts of books might be fairly implicated by the Library Restriction.

It is not necessary to hypothesize about the broad reach of the Library Restriction. Prior to this Court's order preliminarily enjoining enforcement of that provision, Iowa school districts removed large numbers of books that are not remotely obscene from school library shelves under the Library Restriction—books that fall within the categories mentioned above. (*See*, *e.g.*, Ex. C-2.) And since the Eighth Circuit's order vacating the preliminary injunction, Iowa school districts have started removing non-obscene books once again. (*See*, *e.g.*, Grace Decl. (Ex. J) ¶ 4.) The State Defendants admitted that *every book* removed by Iowa school districts under the Library

30

Restriction was properly removed. (*See* Defendants-Appellants' Opening Brief at 59, *GLBT Youth in Iowa Schools Task Force v. Reynolds*, No. 24-1074 (Mar. 11, 2024).) The books that Iowa schools have actually removed or have identified for removal from school libraries under the Library Restriction exemplify and confirm the Library Restriction's substantial unconstitutional applications.

Those substantial unconstitutional applications vastly outweigh the few, if any, constitutional applications of the Library Restriction. There are only few, if any, books on school library shelves that are obscene for minors under the *Miller* test that therefore could be permissibly removed pursuant to the State's mandate. In contrast, the Library Restriction reaches far beyond obscenity to prohibit *any* book with *any* description of a sex act for *any* age. Because any permissible applications of the Library Restriction are "dwarfed" by its "presumptively impermissible applications," the Library Restriction is "substantially overbroad, and therefore invalid under the First Amendment. *See Stevens*, 559 U.S. at 481–82. The "pertinent facts in these cases are the same across the board"—the Library Restriction disregards the value of the book as a whole, in violation of the First Amendment. *See Bonta*, 594 U.S. at 618. It should be enjoined once again.

**IV.    The Remaining Factors Weigh In Favor Of A Preliminary Injunction.**

The remaining preliminary injunction factors also favor injunctive relief. Where, as here, a plaintiff shows the "likely violation" of "First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012). Even so, the remaining factors favor Plaintiffs.

Plaintiffs will suffer irreparable harm without a preliminary injunction because the Library Restriction violates their First Amendment rights.  *See Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) ("It is well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Plaintiffs' renewed motion for preliminary injunction is timely.  Since the Eighth Circuit vacated the preliminary injunction,  Plaintiffs have been diligently assessing what actions school districts have been taking to comply with the Library Restriction following the Eighth Circuit's mandate vacating the injunction.  Further, courts have counseled that delay is less probative in the context of continuing constitutional injuries. *See*, *e.g.*, *Dream Defenders v. DeSantis*, 559 F. Supp. 3d 1238, 1285 (N.D. Fla. 2021) (citing *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019)).

The balance of the equities and the public interest also decidedly favor injunctive relief. *See Fayetteville*, 684 F. Supp. 3d at 911 (explaining that those factors "merge" "when the government opposes the issuance of a preliminary injunction").  It is "always in the public interest to prevent the violation of a party's constitutional rights." *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) (citation omitted).  In contrast, injunctive relief does not harm the State Defendants.  Existing Iowa school district procedures protect minors from accessing obscene materials in school libraries, while permitting evaluation of the book's value as a whole and avoiding the sweeping removal of non-obscene books.  The State Defendants have no legitimate interest in enforcing the Library Restriction because it violates the First Amendment.

32

## CONCLUSION

Senate File 496's Library Restriction violates Plaintiffs' First Amendment rights.  For the

reasons set forth above, the Court should enjoin enforcement of that provision once again.

Dated:  October 18, 2024

THE WEINHARDT LAW FIRM

By: /s/ Mark E. Weinhardt
     Mark E. Weinhardt    AT0008280
     Todd M. Lantz       AT0010162
     Jason R. Smith       AT0014862
     2600 Grand Avenue, Suite 450
     Des Moines, Iowa  50312
     Telephone: (515) 244-3100
     mweinhardt@weinhardtlaw.com
     tlantz@weinhardtlaw.com
     jsmith@weinhardtlaw.com

     Frederick J. Sperling
     Adam J. Diederich
     Kirstie Brenson
     Meera Gorjala
     ArentFox Schiff LLP
     233 South Wacker Drive, Suite 7100
     Chicago, Illinois 60606
     Telephone: (312) 258-5500
     frederick.sperling@afslaw.com
     adam.diederich@afslaw.com
     kirstie.brenson@afslaw.com
     meera.gorjala@afslaw.com
     (admitted *pro hac vice*)

     *Attorneys for Plaintiffs*

     Christy A.A. Hickman   AT0000518
     Becky S. Knutson        AT0004225
     Katherine E. Schoolen  AT0010031
     Iowa State Education Association
     777 Third Street
     Des Moines, Iowa 50309
     Telephone: (515) 471-8004
     Christy.Hickman@isea.org

Becky.Knutson@isea.org
Katie.Schoolen@isea.org

*Attorneys for the Educator Plaintiffs*

PROOF OF SERVICE

The undersigned certifies that the foregoing instrument was served upon the parties
to this action by serving a copy all attorneys of record on October 18, 2024 via ECF.

By:   /s/  Maura McNally-Cavanagh