## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

PENGUIN RANDOM HOUSE LLC;
HACHETTE BOOK GROUP, LLC;
HARPERCOLLINS PUBLISHING GROUP,
LLC; MACMILLAN PUBLISHING GROUP,
LLC; SIMON & SCHUSTER, LLC; THE
AUTHORS GUILD; LAURIE HALSE
ANDERSON; JOHN GREEN; MALINDA LO,
JODI PICOULT; MEGGAN VAN GUNDY as
parent and next friend of GRACE VAN
GUNDY; IOWA STATE EDUCATION
ASSOCIATION; LISA PETRIE; and EMILY
HOUSE,

      Plaintiffs,

vs.

JOHN ROBBINS, in his official capacity as
President of the Iowa State Board of Education;
MCKENZIE SNOW, in her official capacity as
Director of the Iowa Department of Education;
CHAD JANZEN, in his official capacity as
Chair of the Iowa Board of Educational
Examiners; JASON MENKE, RACHEL
KENT, KATHERINE HOWSARE, JENNY
MEADE, JOSH VANRYSWYK, CARISSA
WILLIAMS, and MARGARET YOUNG, in
their official capacities as Members of the
Urbandale Community School District Board of
Education; ROSALIE DACA, in her official
capacity as Urbandale Community School
District Superintendent; JUSTIN FLETCHER,
BRIAN RAUSCH, DANIEL DOERFLER,
KATE BALDWIN, and MICHELLE KELLY,
in their official capacities as Members of the
Norwalk Community School District School
Board of Directors; and SHAWN
HOLLOWAY in his official capacity as
Norwalk Community School District
Superintendent,

      Defendants.

Case No. 4:23-cv-00478

**ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTION**

1

## I.    INTRODUCTION.

In December 2023, the Court preliminarily enjoined State of Iowa officials from, among other things, enforcing the portion of a new Iowa law ("Senate File 496") that requires the removal of books from public school libraries if those books contain a "description" of a "sex act." *See GLBT Youth in Iowa Schools Task Force v. Reynolds*, 709 F. Supp. 3d 664 (S.D. Iowa 2023).[1] In August 2024, the United States Court of Appeals for the Eighth Circuit vacated the injunction and remanded with instructions to the Court to apply the test set forth in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), for facial challenges under the First Amendment. *NetChoice* requires the Court to "determine a law's full set of applications, evaluate which are constitutional and which are not, and compare the one to the other." 603 U.S. at 718. "The question is whether 'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* at 723 (quoting *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615 (2021)).

The result of the *NetChoice* analysis hinges on determining the correct legal standard. This is hard to do, however, because the Court is unable to locate a single case evaluating the constitutionality of a statewide law setting categorical, content-based rules on books in school libraries. Prior cases have instead involved either: (i) statewide book restrictions in *non*-school settings like bookstores or public libraries; (ii) decisions by *local* school boards on a one-off basis to remove specific books from school libraries; and (iii) restrictions on *student* speech in public schools. None of those cases perfectly captures the situation here. Nonetheless, for reasons explained in full below, the Court believes the first and second categories of cases are the closest to being on point and therefore will perform the *NetChoice* analysis under the governing standards established by those cases. (For ease of appellate review, the Court also will perform the *NetChoice* analysis under the third category—cases involving student speech—although this is not the standard the Court ultimately will apply.)

Under the legal standard applicable to cases involving statewide restrictions on books in bookstores or public libraries, the results of the *NetChoice* analysis are clear and unequivocal: the book restrictions in Senate File 496 are facially unconstitutional. Senate File 496 makes no attempt to evaluate a book's literary, political, artistic, or scientific value before requiring the book's

---

[1] This ruling will focus solely on the book restrictions in Senate File 496. The constitutionality of other aspects of the law will be addressed in the future in a separate ruling in a separate case, Case No. 4:23-cv-00474.

removal from a school library and thus comes nowhere close to applying the "obscenity" standard that is typically used to determine the constitutionality of statewide book restrictions. The result is the forced removal of books from school libraries that are not pornographic or obscene. Accordingly—and even if one interprets the language of Senate File 496 as narrowly as reasonably possible and focuses only on a representative sample of school districts—the law has been unconstitutionally applied in dozens (if not hundreds) of situations and constitutionally applied in one. Meaning: "a substantial number of [Senate File 496's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.*

Under the legal standard applicable to one-off book removal decisions by local school boards, Senate File 496 is again facially unconstitutional under *NetChoice*. The record shows that the law requires school districts to remove dozens (if not hundreds) of books that have tremendous pedagogical value. Defendants have not shown a "substantial and reasonable governmental interest" for the removal of those books except, at most, in a few instances. Thus, again, under the *NetChoice* balancing analysis, the unconstitutional applications of the law far outweigh the constitutional ones.

The result flips if, as Defendants allege, Senate File 496 is evaluated under the governing standard for student speech. Supreme Court and Eighth Circuit precedent establish that school districts (or, in this case, the Iowa Legislature) may impose categorical prohibitions on sexual content in student speech. Accordingly, Senate File 496 would be constitutional under this standard, regardless of how misguided the law might be when it comes to preparing students for college and adulthood. The Court does not, however, believe the standard for student speech should be applied to what is unmistakably *not* student speech.

The bottom line is that the unconstitutional applications of the book restrictions in Senate File 496 far exceed the constitutional applications of those restrictions under both legal standards the Court believes are applicable. The Court further concludes that Plaintiffs have established a risk of irreparable harm if the book restrictions in Senate File 496 are not enjoined; indeed, the record is unrebutted in showing that hundreds of books already have been removed from school libraries across the state. The Court therefore GRANTS Plaintiffs' Motion for Preliminary Injunction and ENJOINS Defendants from enforcing the portions of Senate File 496 requiring the removal of books that contain a "description" of a "sex act" and that impose penalties on educators for failing to adhere to the law.

## II.   FACTUAL AND PROCEDURAL BACKGROUND.

### A.  Senate File 496.

In late April 2023, the Iowa Legislature passed Senate File 496, which, as relevant here, amended Iowa Code § 256.11 to require each Iowa school district to establish a "kindergarten through grade twelve library program that is consistent with section 280.6 and with the educational standards established in this section, contains only age-appropriate materials, and supports the student achievement goals of the total school curriculum." According to section 256.11(19):

> '*Age-appropriate*' means topics, messages, and teaching methods suitable to particular ages or age groups of children and adolescents, based on developing cognitive, emotional, and behavioral capacity typical for the age or age group. '*Age-appropriate*' does not include any material with descriptions or visual depictions of a sex act as defined in section 702.17.

In turn, Iowa Code § 702.17 defines "sex act" to mean:

> any sexual contact between two or more persons by any of the following:
>
> 1. Penetration of the penis into the vagina or anus.
>
> 2. Contact between the mouth and genitalia or mouth and anus or by contact between the genitalia of one person and the genitalia or anus of another person.
>
> 3. Contact between the finger, hand, or other body part of one person and the genitalia or anus of another person, except in the course of examination or treatment by a [licensed professional].
>
> 4. Ejaculation onto the person of another.
>
> 5. By use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus.
>
> 6. The touching of a person's own genitals or anus with a finger, hand, or artificial sexual organ or other similar device at the direction of another person.

Senate File 496, on its face, does not permit school officials to take context into account when determining whether a book is "age-appropriate" or contains a "sex act." Meaning: the law prohibits such books even if the "sex act" was, say, an impetus for legislation (e.g., books describing the history of laws geared toward preventing sexual assault), important for historical reasons (such as "sex acts" that played a central role in political campaigns or served as the basis for impeaching a sitting president), or played an important role in an award-winning work of fiction like explaining a character's emotional development (as in the case of books written by some Plaintiffs here). The law also prohibits students from being involved in deciding whether a book

should be removed or not. *See* Iowa Code § 279.81 ("[A] school district shall not allow a student to serve on any committee that determines, or provides recommendations related to, whether a material in a library operated by the school district should be removed.").

School districts and school employees are subject to graduated penalties for failing to remove non-age-appropriate materials from school library programs. *See* Iowa Code § 256.11(9)(a)(3). For the first offense, the Iowa Department of Education "shall issue a written warning to the board of directors of the school district or the employee, as applicable." *Id.* For a second or subsequent violation, if committed "knowingly," the school district superintendent and/or employee "shall be subject to a hearing conducted by the board of educational examiners pursuant to [Iowa Code §] 256.146, subsection 13, which may result in disciplinary action." *Id.* The penalty provisions were scheduled to go into effect on January 1, 2024, until this Court enjoined them. *See id.* The Eighth Circuit vacated the injunction, however, in August 2024. *See GLBT Youth II*, 114 F.4th 660.

Local school officials had concerns about the new law and sought guidance from the Iowa Department of Education about how to apply the "age-appropriate" requirement. (ECF 104-10, ¶¶ 11–12; ECF 104-4.) School officials asked, for example, whether "classic literature that is part of the Advanced Placement curriculum for AP Literature and Composition [will] now be illegal due to age-appropriateness." (ECF 104-4.) They also asked the Department of Education to provide resources and standards to help apply the "age-appropriate" standard. (ECF 104-4.) Many educators have removed books out of caution. (ECF 104-10, ¶ 12.)

Effective August 28, 2024, the Iowa State Board of Education promulgated a rule that goes slightly further than the statute in providing guidance on the "age-appropriate" standard. Iowa Admin. Code r. 281—12.2(256). The rule defines "age-appropriate" in the same way as Senate File 496 but adds one sentence (in **bold** typeface, with the immediately-preceding language also included for context): " . . . 'Age-appropriate' does not include any material with descriptions or visual depictions of a sex act. **A reference or mention of a sex act in a way that does not describe or visually depict a sex act as defined in these rules is not included in the previous sentence** . . . ." *Id.*

According to Declarations submitted by Plaintiffs, the enactment of Senate File 496 has led to many problems. <u>First</u>, there is uncertainty among school districts and school officials regarding which books must be removed to comply with the law. (ECF 104-1, ¶ 21; ECF 104-2, ¶

10; ECF 104-3, ¶ 14; ECF 104-5; ECF 104-10, ¶¶ 12, 15.) In the Iowa City Community School District, for example, officials "spent an inordinate amount of time in the District trying to determine whether or not suggestive poems in Walt Whitman's famous poetry collection, *Leaves of Grass*, violate the law. I'm still not certain we made the right call." (ECF 104-1, ¶ 21.)

Second, due to either the same uncertainty or the law's actual breadth (or both), school districts have removed hundreds of books across a variety of genres from school libraries. In total, at least 629 books have been removed from the shelves of at least one Iowa school district. (ECF 104-6.) For example, school districts have removed well-known works of classic fiction and non-fiction by authors such as James Joyce (*Ulysses*), Maya Angelou (*I Know Why the Caged Bird Sings*), William Faulkner (*As I Lay Dying*), Kurt Vonnegut (*Slaughterhouse Five*), Toni Morrison (*Beloved*, *Song of Solomon*, *The Bluest Eye*), Aldous Huxley (*Brave New World*), George Orwell (*1984*), Joseph Heller (*Catch-22*), Alice Walker (*The Color Purple*), and Richard Wright (*Native Son*). (Id.; ECF 104-2, ¶ 8; ECF 104-3, ¶¶ 6, 13.) They also have removed award-winning books by contemporary authors like Malinda Lo (*Last Night at the Telegraph Club*), Sapphire (*Push: A Novel*), John Green (*The Fault in Our Stars*, *Looking for Alaska*), Margaret Atwood (*The Handmaid's Tale*), Jodi Picoult (*Nineteen Minutes*), Laurie Halse Anderson (*Speak*, *Shout*), Jennifer Niven (*Breathless*) and Maya Angelou (*I Know Why the Caged Bird Sings*), among many others. (ECF 104-5; ECF 104-3, ¶¶ 6, 13.) Non-fiction books have been removed, too, including historical books about the Holocaust (*Night*, by Elie Wiesel) and other atrocities (*The Rape of Nanking*, by Iris Chang) and educational texts like *101 Questions about Sex and Sexuality* (by Faith Hickman Brynie), *Sexual Predators* (by Laura Willis), and *The Truth About Rape* (by Robert Golden). (ECF 104-5.)

Some of the authors whose books have been removed are Plaintiffs. They allege that Senate File 496 has taken away an important channel for them to speak to students—their intended audience—through their books. (ECF 104-11, ¶ 7; ECF 104-12, ¶ 11; ECF 104-13, ¶ 7; ECF 104-14, ¶ 9.) These authors also allege that Senate File 496 has stigmatized their books by falsely labeling them as "pornography." (ECF 104-11, ¶ 7; ECF 104-12, ¶ 11; ECF 104-15, ¶ 8.) High school student Gracelyn Van Gundy (who sues through her parent and next friend Meggan Van Gundy) similarly alleges that Senate File 496 has prevented her from checking out books from the school library that she otherwise would have read, including *Looking for Alaska*, *Last Night at the Telegraph Club*, and *Nineteen Minutes*. (ECF 104-16, ¶ 7.) She asserts that Senate File 496 "is

stunting my academic development and personal growth" and "blocks my access to new ideas and viewpoints, as well as information about history, politics, and science." (Id., ¶ 9.) "By restricting the scope of books that I have access to, including non-fiction books and classic literature, the State has left me at a deficit compared to my peers across the country—some of whom will be my classmates in college—who have access to books that contain facts and histories that are critical to our participation in society." (Id.)

The Court will provide additional facts, below, in the context of the legal arguments to which those facts are relevant.

### B. Procedural History.

Plaintiffs filed their Complaint on November 30, 2023, and original Motion for Preliminary Injunction on December 8, 2023. (ECF 1; ECF 28.) The State Defendants resisted. (ECF 45.) In a ruling dated December 29, 2023, the Court granted Plaintiffs' Motion for Preliminary Injunction. *See GLBT Youth I*, 709 F. Supp. 3d 664. The Court's ruling was consolidated and also addressed a partially overlapping motion for preliminary injunction in Case No. 4:23-cv-00474.[2] On August 12, 2024, the United States Court of Appeals for the Eighth Circuit vacated the injunction and remanded for further consideration. *See GLBT Youth II*, 114 F.4th 660. The parties disagree on how to interpret *GLBT Youth II*. The Court will discuss these disagreements below in the context of the issues to which they are relevant.

## III. PRELIMINARY INJUNCTION STANDARDS.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "[T]he burden of establishing the propriety of an injunction is on the movant." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021) (citation omitted). The Court must consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (alteration in

---

[2] In retrospect, the Court may have inadvertently created confusion by deciding the two cases together. This time around, it is issuing this single ruling in this case only. It will issue a separate ruling in the future in Case No. 4:23-cv-00474.

original) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).

"While no single factor is determinative, the probability of success factor is the most significant." *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (cleaned up). For actions that seek to enjoin the enforcement of a duly enacted state statute, the moving parties must show they are likely to prevail on their claims. *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1000 (8th Cir. 2019). This is a higher standard than applies in other preliminary injunction cases. *See id.* "We apply a heightened standard in such instances because the duly enacted state statute constitutes government action based on presumptively reasoned democratic processes, and such action is entitled to a higher degree of deference and should not be enjoined lightly." *Id.* (internal punctuation and citation omitted).

With respect to the remaining three factors, a plaintiff "is not required to prove with certainty the threat of irreparable harm, but it must prove that irreparable injury is likely in the absence of an injunction." *Sleep No. Corp.*, 33 F.4th at 1018 (citations omitted). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *General Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "In balancing the equities, we weigh 'the threat of irreparable harm' shown by the movant against 'the injury that granting the injunction will inflict on other parties litigant.'" *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (quoting *Dataphase Sys.*, 640 F.2d at 113.) This "requires a court to distinguish between weak or illusory injuries and very real threats of injuries." *Rodriguez v. Molina*, No. 4:22-cv-00183-SMR-HCA, 2022 WL 2287805, at *3 (S.D. Iowa June 24, 2022) (cleaned up). It considers harm to both the litigants and other interested parties, like the public. *Wachovia Sec., L.L.C. v. Stanton*, 571 F. Supp. 2d 1014, 1047 (N.D. Iowa 2008). The last factor, the public interest, "invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious." *Id.* at 1048.

When a party seeks preliminary injunctive relief based on a facial constitutional challenge under the First Amendment, district courts must "determine [the] law's full set of applications, evaluate which are constitutional and which are not, and compare the one to the other." *NetChoice*, 603 U.S. at 718. "The question is whether 'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* at 723 (quoting

*Bonta*, 594 U.S. at 615). "So in this singular context, even a law with 'a plainly legitimate sweep' may be struck down in its entirety. But that is so only if the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 723–24. Facial challenges are "hard to win." *Id.* at 723.

## IV.    LEGAL ANALYSIS: STANDING.

### A.  *Legal Standards.*

As in any constitutional challenge, a threshold question is whether Plaintiffs have standing. To establish standing, "a plaintiff must present a 'case' or 'controversy' within the meaning of Article III of the Constitution." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009). "This 'irreducible constitutional minimum of standing' requires a showing of 'injury in fact' to the plaintiff that is 'fairly traceable to the challenged action of the defendant,' and 'likely [to] be redressed by a favorable decision.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "Whether a plaintiff has shown such an injury 'often turns on the nature and source of the claim asserted.'" *Id.* at 591 (quoting *Warth v. Seldin*, 422 U.S. 490, 500, (1975)). "[T]he question whether he has a cognizable injury sufficient to confer standing is closely bound up with the question of whether and how the law will grant him relief." *Id*.

The challenge to the book restrictions in Senate File 496 revolves around the First Amendment, in conjunction with the Fourteenth Amendment. "A plaintiff claiming an abridgment of the [First Amendment] right to free speech has standing to seek pre-enforcement review of a policy 'under circumstances that render the threatened enforcement sufficiently imminent.'" *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 666 (8th Cir. 2023) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). "A plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id*. (quoting *Driehaus*, 573 U.S. at 159 (internal quotation omitted)).

### B.  *Plaintiffs Have Standing to Challenge the Book Restrictions.*

In its December 2023 ruling, the Court concluded that four categories of Plaintiffs had standing to challenge Senate File 496's book restrictions: (i) "Educator Plaintiffs" who work in school libraries or as teachers and face potential discipline for violating Senate File 496; (ii) the Iowa State Education Association ("ISEA"), whose members include the individual Educator Plaintiffs and other librarians and teachers across the State; (iii) "Publisher/Author Plaintiffs"

whose books have been removed from one or more school libraries as a result of Senate File 496; and (iv) one "Student Plaintiff" whose access to books was impacted by Senate File 496. *See generally GLBT Youth I*, 709 F. Supp. 3d at 682–85. The Eighth Circuit affirmed this Court's conclusion that standing existed. *See GLBT Youth II*, 114 F.4th at 668 ("Plaintiffs have standing to pursue their First Amendment claim as to the Library Program.").

On remand, there has been some turnover among Plaintiffs, but not in a way that materially affects the original standing analysis. The Educator Plaintiffs now consist of Lisa Petrie, a Teacher Librarian in the Iowa City Community School District, and Emily House, a Language Arts Teacher in the Southeast Polk Community School District. (ECF 104-1, ¶ 1; ECF 104-2, ¶ 1.) They both have standing because they have been required to remove books from their respective libraries and are subject to sanctions in the form of termination and/or revocation of licensure if they are deemed to have violated Senate File 496. (ECF 104-1, ¶ 12; ECF 104-2, ¶¶ 10–11.) Similarly, the ISEA has organizational standing to challenge the book restrictions because Petrie and House are both ISEA members, along with thousands of other teachers and librarians in Iowa public schools. (ECF 104-10, ¶¶ 5, 13.) *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) (recognizing that "organizations can assert the standing of their members"); *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 986–88 (8th Cir. 2011) (holding that organizations had standing because, *inter alia*, individual members were at imminent risk of concrete injury).

The Publisher/Author Plaintiffs include the same authors and publishers who had standing the first time around, as well as additional publishers and an organization, The Authors Guild, Inc., whose membership includes over 15,000 authors, some of whom have had books removed from school libraries due to Senate File 496. (ECF 104-15.) The Publisher/Author Plaintiffs are situated differently than the Educator Plaintiffs because none of them are licensed by the State of Iowa or employed by an Iowa school district. They therefore cannot "violate" Senate File 496 at all, much less in a way that would result in formal discipline. Even so, the Publisher/Author Plaintiffs have standing to challenge the book restrictions in Senate File 496 due to the alleged impact on their First Amendment rights. The Supreme Court has recognized that authors and publishers have standing to challenge regulations that prohibit them from reaching their intended audience or impose financial disincentives on their work. *See Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) (holding that publishers could challenge prison regulations limiting access to written materials); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)

(explaining that publishers and authors are interchangeable with respect to making First Amendment challenge to laws that impose content-based restrictions). Both are present here.

The Publisher/Author Plaintiffs also have standing because they are "stigmatized" by the removal of their books from public school libraries in Iowa. Elected officials in Iowa have characterized Senate File 496 as being designed, in relevant part, to remove "pornography" from schools. The Publisher/Author Plaintiffs insist, however, that their books are not pornographic and that any discussion of sex acts instead serves an important literary purpose like helping explain a character's social or emotional development or sending a message about sexual assault, bullying, or other topics of pedagogical importance to students. Under Eighth Circuit precedent, the stigma associated with these works being banned from schools is a standalone basis for standing. *See Turkish Coal. of Am., Inc. v. Bruininks*, 678 F.3d 617, 622–23 (8th Cir. 2012) (holding that organization had standing due to stigma associated with its website being labeled "unreliable" and included on the same list as websites denying the Holocaust); *see also Meese v. Keene*, 481 U.S. 465, 473 (1987) (holding that state senator had standing to raise First Amendment claim due to potential impact of law on his "personal, political, and professional reputation").

Finally, Student Plaintiff Gracelyn Van Gundy (who sues through her parent and next friend Meggan Van Gundy) has standing because Senate File 496 directly limits the books and materials she can obtain from the school library. (ECF 104-16, ¶ 7.) This "blocks [her] access to new ideas and viewpoints, as well as information about history, politics, and science." (Id., ¶ 9.) This is enough to create an imminent risk of harm to her First Amendment rights.

## V.   LEGAL ANALYSIS: THE CONSTITUTIONALITY OF THE BOOK RESTRICTIONS IN SENATE FILE 496.

In its December 2023 ruling, the Court devoted considerable attention to determining the constitutional rights implicated by the challenges to the book restrictions in Senate File 496 and the governing standard(s) for evaluating the law's constitutionality. *See GLBT Youth I*, 709 F. Supp. 3d at 688–701. For the most part, the Eighth Circuit did not address that analysis except to conclude that the Court "did not perform the necessary inquiry set forth in *NetChoice*" when a plaintiff makes a facial First Amendment challenge to a law. *GLBT Youth II*, 114 F.4th at 670.[3] The Court will of course try to do a better job this time around. It still must start, however, by: (i)

---

[3] The Eighth Circuit also noted that this Court did not address as-applied challenges to the book restrictions. On remand, Plaintiffs have chosen not to pursue injunctive relief on an as-applied basis, and thus the Court will address only the facial constitutional challenge.

identifying the constitutional rights at issue and determining the governing standard(s) for evaluating the law's constitutionality; and (ii) determining the proper interpretation of the book restrictions. Only after those two steps are completed can the Court measure the unconstitutional applications of the law against the constitutional applications. *Id.*

A. *The Constitutional Rights at Issue and Governing Legal Standards: Background.*

1. <u>The Court's Original Analysis.</u>

In its December 2023 ruling, the Court devoted considerable time to trying to decipher whose constitutional rights are at issue, what those rights are, and what standard should be applied to determine whether the book restrictions in Senate File 496 violate them. The Court explained that "existing Supreme Court and Eighth Circuit precedent provide helpful guidance in some ways but very little clarity in others. The most enduring lesson appears to be that there is no single standard of scrutiny that applies to restrictions on First Amendment rights in the school setting; instead, there is a sliding scale that varies according to context." 709 F. Supp. 3d at 688. In summary form, the Court concluded:

> <u>First</u>, the Student Plaintiffs have the First Amendment right to receive information in school libraries free from suppression based on viewpoint, ideology, or other reasons amounting to the suppression of ideas. The constitutionality of the book restrictions in Senate File 496 depends on whether the State Defendants have shown a "substantial and reasonable governmental interest" for those restrictions. <u>Second</u>, the Publisher/Author Plaintiffs and Student Plaintiffs have affirmative First Amendment free speech rights that require the Court to decide whether Senate File 496 is overbroad. The applicable standard of scrutiny is unclear but somewhat higher than the "substantial and reasonable governmental interest" test and must take into account the extent to which the "age-appropriate" standard in Senate File 496 deviates from the definition of "obscenity" for adults, as reasonably adjusted for minors. <u>Third</u>, the Educator Plaintiffs have the Fourteenth Amendment due process right to be free from laws that are so vague that a person of ordinary intelligence does not have fair notice of what is prohibited.[4]

*Id.* at 688–89. The Court rejected the State Defendants' argument that the placement of books in the school library is "government speech" for which no First Amendment rights are implicated. *Id.* at 695–96.

---

[4] Other than stray references to "vagueness" (ECF 104, p. 38), Plaintiffs no longer appear to be seeking preliminary injunctive relief on the basis that Senate File 496 is void for vagueness under the due process clause. Accordingly, the Court will not apply the void-for-vagueness standard.

2. The Eighth Circuit's Opinion.

Although the Eighth Circuit vacated the preliminary injunction, it did not directly address this Court's analysis of the governing First Amendment standards except in two ways. First, the Eighth Circuit agreed that the selection of books in the school library is not "government speech." *See GLBT Youth II*, 114 F.4th at 667–68. Second, the Eighth Circuit stated:

> We note that the district court concluded that the Library Provision is a viewpoint-neutral, content-based, age-appropriate restriction on the content of public school libraries, and we agree. The purpose of public school libraries is to advance the school curriculum—that is, to facilitate the pedagogical mission of the school, which may involve some limitation of expression. *See Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.*, 200 F.3d 1128, 1133-36 (8th Cir. 1999) (holding that a school district could restrict a student's campaign speech for class president as it was a school-sponsored activity that was part of the curriculum and the district need not allow speech that was inconsistent with [] its legitimate pedagogical concerns); and *See* Iowa Code § 256.11(9)(a)(2); Iowa Admin. Code 281-12.2(256). The pedagogical mission of the school allows for tailoring to provide for "the teaching of basic skills and ideas." *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 915, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (Rehnquist, C.J., dissenting); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272-73, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) ("[T]he standard ... for determining when a school may [limit] expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of ... expression."). Given the pedagogical mission and the policy making authority possessed by Iowa, it is important in conducting a review and analysis to bear in mind that Iowa is not required to tolerate speech that undermines or is inconsistent with its central mission of educating Iowa children.

*Id.* at 670.

The parties disagree about what the Eighth Circuit meant with this paragraph. Plaintiffs argue that it was largely dicta and did nothing to undermine this Court's original analysis regarding the applicable First Amendment rights and governing standards. The State Defendants, by contrast, argue that the Eighth Circuit was directing the Court to treat the selection of books in the school library as "school-sponsored speech" for which lesser First Amendment protection applies. The State Defendants point out, correctly, that in *Henerey ex rel. Henerey v. City of St. Charles School*

*District*, the Eighth Circuit recognized that "[a] school may exercise greater control over student speech uttered during participation in a school-sponsored activity than that expressed during an independent activity because 'students, parents, and members of the public might reasonably perceive [the school-sponsored speech] to bear the imprimatur of the school.'" 200 F.3d at 1133 (quoting *Hazelwood*, 484 U.S. at 271).

3.  Applying the Eighth Circuit's Opinion.

Whether dicta or not, it goes without saying that the Court will not ignore the paragraph in which the Eighth Circuit cited *Hazelwood* and *Henerey*. The State Defendants urge the Court to place particular emphasis on the Eighth Circuit's statement that the "purpose of public school libraries is to advance the school curriculum." *Id.* The State Defendants interpret this sentence, in conjunction with the citations to *Hazelwood* and *Henerey*, to mean the Eighth Circuit was directing the Court to evaluate Senate File 496 by asking whether the book restrictions are "reasonably related to legitimate pedagogical concerns." (ECF 102, p. 17 (quoting *Hazelwood*, 474 U.S. at 273)). This is a more deferential standard than the Court applied in its December 2023 ruling.

The Court cannot agree with the State Defendants' position. In essence, the State Defendants are arguing that the paragraph in question overruled the Court's determination of the governing legal standards. But the Eighth Circuit never said this directly, nor did it ever use the words "reasonably related to legitimate pedagogical concerns." To the contrary, the Eighth Circuit started the relevant paragraph by stating that it "agree[d]" with this Court's discussion of the book restrictions. 114 F.4th at 670. The Court cannot conclude, as the State Defendants contend, that the Eighth Circuit would overrule this Court on an important issue in such a covert way.

To that end, it is important to note that the Eighth Circuit framed the question later in the same paragraph as whether and to what degree schools must "tolerate" certain forms of speech. This language emanates from *Tinker v. Des Moines Independent Community School District*, which held that schools may not restrict student speech unless it would "materially and substantially disrupt the work and discipline of the school." 393 U.S. 503, 509 (1969). As *Hazelwood* later explained, "[t]he question whether the First Amendment requires a school to tolerate particular student speech—the question that we addressed in *Tinker*—is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech." 484 U.S. at 270–71. If one adopts the State Defendants' approach of looking for clues about the governing legal standard in this paragraph of *GLBT Youth II*, the framing of the

issue as what a school must "tolerate" suggests the Eighth Circuit wants the Court to apply the *Tinker* standard. This standard is far less favorable to the State Defendants than the standards the Court applied in December 2023.

Just as the Court will not interpret the relevant paragraph as a directive to apply the *Hazelwood* standard, it will not interpret it as a directive to apply the *Tinker* standard, either. Instead, the better interpretation is that the Eighth Circuit simply cited *Hazelwood* and *Henerey* for the generic proposition that schools have greater latitude to limit First Amendment protections than would exist in non-school settings. *See* 114 F.4th at 670. This Court said the same thing in its December 2023 ruling. *See GLBT Youth I*, 709 F. Supp. 3d at 694 (citing *Hazelwood* and recognizing that "school districts have greater freedom to remove books from school libraries and curricula than just those that meet the adult obscenity standard"). Accordingly, the Court will not interpret the relevant paragraph of *GLBT Youth II* as overruling the Court's original analysis as to the governing legal standards.

There are important reasons not to go further—and especially not to apply the *Hazelwood/Henerey* standard of evaluating whether the restrictions are "reasonably related to legitimate pedagogical concerns." *Hazelwood* and *Henerey* involved true student speech in the form of student-written articles in the school newspaper and student campaign activity in school hallways. In fact, *Hazelwood* identified the relevant question as whether educators could "exercis[e] editorial control over the style and content of **student speech** in school-sponsored activities…" 484 U.S. at 273 (emphasis added). Here, the "speakers" are not students, but rather the authors and publishers of the books that are subject to removal under Senate File 496. Accordingly, the First Amendment analysis revolves around the rights of those authors to have their books reach their intended audiences and of students to receive the information set forth in those books. Neither of those issues was present in *Hazelwood* or *Henerey*.

Moreover, *Hazelwood* and *Henerey* involved student speech that necessarily was (or would have been) disseminated to other students in captive settings. The same was true in *Bethel School District No. 403 v. Fraser*—another case on which the State Defendants rely—which involved a student's speech advocating illegal drug use at an assembly attended by approximately 600 students. 478 U.S. 675, 677 (1986); *see also Lacks v. Ferguson Reorg. Sch. Dist. R-2*, 147 F.3d 718, 724 (8th Cir. 1998) (rejecting First Amendment challenge by teacher who was disciplined for allowing students to read aloud poems describing sexual encounters in graphic detail). Here, by

contrast, there is nothing in the record to suggest students have been forced to read or listen to books with "descriptions" of a "sex act" except in two narrow instances described below. In all other circumstances, the books remain harmlessly on the shelves except with respect to students who want to read them. In this respect, the books are closer to the black armbands in *Tinker* that schools must "tolerate" unless they would "materially and substantially disrupt the work and discipline of the school." 393 U.S. at 509. (Which is not to say the Court is applying the *Tinker* standard.)

In determining the governing standard, the Court also must keep in mind the Eighth Circuit's rejection of the State Defendants' argument that school library books are "government speech." 114 F.4th at 668. In the Eighth Circuit's words:

> [I]t is doubtful that the public would view the placement and removal of books in public school libraries as the government speaking. Take routine examples of historic tomes on political science. A well-appointed school library could include copies of Plato's *The Republic*, Machiavelli's *The Prince*, Thomas Hobbes' *Leviathan*, Karl Marx and Freidrich Engels' *Das Kapital*, Adolph Hitler's *Mein Kampf*, and Alexis de Tocqueville's *Democracy in America*. As Plaintiffs noted, if placing these books on the shelf of public school libraries constitutes government speech, the State "is babbling prodigiously and incoherently."

*Id.* (quoting *Matal v. Tam*, 582 U.S. 218, 236 (2017)). This discussion is important for determining the governing legal standard because "*Hazelwood*'s permissive 'legitimate pedagogical concern' test governs only when a student's school-sponsored speech could reasonably be viewed as speech of the school itself." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 213–14 (3d Cir. 2001) (Alito, J.); *accord, e.g. Morgan v. Swanson*, 659 F.3d 359, 376 (5th Cir. 2011) ("The critical inquiry in deciding whether speech is 'school-sponsored' under *Hazelwood* is whether it could reasonably be understood to bear the school's imprimatur, which is synonymous with 'sanction,' or 'approval.'"). Here, the Eighth Circuit concluded—for good reason—that the placement of a book in a school library would *not* reasonably be viewed as the school speaking. 114 F.4th at 668. It would undermine this aspect of the Eighth Circuit's ruling for the Court to apply a standard of review that is premised upon school library books being viewed as government speech after all.

Granted, the Tenth Circuit has held that "school-sponsored speech" is different than "government speech." *See Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 923 (10th Cir. 2002). Under the Tenth Circuit's approach, "school-sponsored speech" is at the midpoint of a continuum in which "student speech that happens to occur on the school premises" is at one end

and "government speech" is at the other. *See id.* The Eighth Circuit appears not to have adopted this approach, however, and instead has treated "government speech" and "school-sponsored speech" as more-or-less synonymous. *See, e.g., Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1003 (8th Cir. 2012) (using "government" and "school-sponsored" speech interchangeably). The Eighth Circuit's approach is consistent with other authority, including now-Justice Alito's opinion in *Saxe*, 240 F.3d at 213–14, and the Supreme Court's opinion in *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 834 (1995), both of which limit application of the *Hazelwood* standard to what is truly the school's own speech. Justice Alito, in particular, has recognized the danger of allowing schools to go further, lest school officials force "the inculcation of whatever political and social views are held by [elected and appointed officials]." *Morse v. Frederick*, 551 U.S. 393, 423 (2007) (Alito, J., concurring). The Court will follow these cases and principles over arguably inconsistent precedent from the Tenth Circuit.

In sum, the Court does not interpret the paragraph of *GLBT Youth II* in which *Hazelwood* and *Henerey* are cited as undermining or overruling this Court's prior analysis on the governing legal standards. Instead, if anything, that paragraph simply reinforces the challenge of determining the appropriate constitutional standard in the context of a law like Senate File 496 that does not regulate student speech or constitute "government speech" but instead tries to impose statewide restrictions on what has traditionally been the prerogative of local officials regarding the contents of school libraries. Simply put, Senate File 496 does not fall neatly within any of the legal doctrines the Supreme Court and Eighth Circuit have developed in prior First Amendment cases in the school setting. For this reason—and in the absence of clearer guidance from the Eighth Circuit that this Court got it wrong the first time around—the Court will continue to apply the legal standards set forth in its December 2023 ruling. For ease of appellate review, the Court will restate below its reasoning for doing so. In an abundance of caution—and also for ease of appellate review—the Court also will apply the *Hazelwood* standard so that the Eighth Circuit has the most fulsome possible record if this ruling is appealed.

B.  *The Constitutional Rights at Issue and Governing Legal Standards: Analysis.*

   1.  <u>Students Have the First Amendment Right to Receive Information in School
       Libraries That May Be Limited Only When There Is a "Substantial and Reasonable
       Governmental Interest."</u>

The Supreme Court and Eighth Circuit have each addressed the constitutionality of
restrictions on access to books and other materials in school libraries: the former in *Pico*, 457 U.S.
853, and the latter in *Pratt v. Independent School District No. 831, Forest Lake, Minnesota*, 670
F.2d 771 (8th Cir. 1982). In *Pico*, a local school board ordered the removal of nine books from
school libraries based on the board's belief that the content of the books did not match their
"conservative educational philosophy" and were "irrelevant, vulgar, immoral, and in bad taste."
457 U.S. at 859 (plurality opinion). The Supreme Court was asked to decide whether the school
board's actions violated the students' First Amendment rights.

The Supreme Court's decision was fractured, with a three-justice plurality opinion
concluding the board's actions would violate the First Amendment if the board members removed
the books "simply because they dislike the ideas contained in those books and seek by their
removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of
opinion.'" *Id.* at 872 (plurality opinion) (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624,
642 (1943)). A fourth justice mostly agreed with the plurality opinion but offered a "somewhat
different perspective on the nature of the First Amendment right involved," namely, that "the State
may not suppress exposure to ideas—for the sole *purpose* of suppressing exposure to those ideas—
absent sufficiently compelling reasons." *Id.* at 877 (Blackmun, J., concurring). In dissent, four
justices concluded that the First Amendment does not encompass "a right to have particular books
retained on the school library shelf." *Id.* at 888 (Burger, C.J., dissenting). Three of those same
dissenting justices also recognized, however, that school boards may not exercise their discretion
to "determine the content of their school libraries . . . in a narrowly partisan or political manner."
*Id.* at 907 (Rehnquist, J., dissenting). Finally, one justice—the deciding vote—concluded the Court
should not decide the constitutional question at all and instead should simply remand for trial. *Id.*
at 883 (White, J., concurring in the judgment). Despite not having the support of any of his
colleagues, Justice White's concurring opinion carried the day and resulted in remand.

Notwithstanding the splintered nature of the decision, *Pico* provides some guidance that
remains applicable today. Almost all justices agreed that school boards can violate the First
Amendment in *some* circumstances when making decisions about the removal of books from the

school library. Indeed, then-Justice Rehnquist, in an otherwise forceful dissent, "cheerfully concede[d]" that school boards would violate the Constitution if they removed all books "written by or in favor of Republicans" or "an all-white school board, motivated by racial animus, decided to remove all books authored by blacks or advocating racial equality and integration. Our Constitution does not permit the official suppression of *ideas*." *Id.* at 907 (Rehnquist, J., concurring) (quoting *id.* at 871 (plurality opinion)). In addition, "all Members of the Court, otherwise sharply divided, acknowledged that the school board has the authority to remove books that are vulgar." *Fraser*, 478 U.S. at 684 (discussing *Pico*). Beyond these areas of agreement, however, it would be difficult to apply *Pico* without additional guidance.

Fortunately, *Pico* does not stand alone in the universe of precedential cases involving the removal of books from school libraries. In *Pratt*, the Eighth Circuit addressed the same issue, stating:

> There has been a flurry of cases recently in which the federal courts have considered First Amendment challenges to the removal of books from school libraries. Those courts have generally concluded that a cognizable First Amendment claim exists if the book was excluded to suppress an ideological or religious viewpoint with which the local authorities disagreed . . . We believe that this focus provides the proper framework for analysis here.

670 F.2d at 776. *Pratt* held that "to avoid a finding that it acted unconstitutionally, the board must establish that a substantial and reasonable governmental interest exists for interfering with the students' right to receive information." *Id.* at 777. "At the very least, the First Amendment precludes local authorities from imposing a 'pall of orthodoxy' on classroom instruction which implicates the state in the propagation of a particular religious or ideological viewpoint." *Id.* at 776. Based on *Pico* and *Pratt*, the Court concludes that: (a) Plaintiff Van Gundy and other students have a First Amendment right not to have books and materials removed from the school library based on ideological, religious, or other grounds designed to suppress ideas or impose a "pall of orthodoxy" over the classroom; and (b) the State must establish a "substantial and reasonable governmental interest" that justifies the school library restrictions. *See Pratt*, 670 F.2d at 776–77; *see also Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 188–89 (5th Cir. 1995).

   2. The Publisher/Author Plaintiffs and Student Plaintiff Have First Amendment Free Speech Rights Against Overbroad Restrictions.

Although the *Pico*/*Pratt* standard makes sense for Plaintiff Van Gundy, it does not fit for the Publisher/Author Plaintiffs, whose First Amendment rights revolve not around their ability to

*receive* information, but rather their ability (or lack thereof) to communicate with their intended audience. *See Thornburgh*, 490 U.S. at 408. In other words, their constitutional challenge emanates from the fact that Senate File 496 imposes content-based restrictions on their *affirmative* free speech rights. *See GLBT Youth II*, 114 F.4th at 670 (agreeing that Senate File 496 imposes "content-based" restrictions).

Ordinarily, "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). It is well established, however, that the First Amendment does not apply the same way in the school setting as it does elsewhere. *See, e.g.*, *Morse*, 551 U.S. at 404–05 ("[T]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." (quoting *Fraser*, 478 U.S. at 682). The Court therefore will not presume the unconstitutionality of Senate File 496 or apply strict scrutiny.

The question turns, then, to what standard the Court *should* apply. The answer is unclear because the Supreme Court has never settled on a single, governing standard for First Amendment challenges in school settings. In *Tinker*, the Supreme Court held that schools could not restrict student speech unless the speech would "materially and substantially disrupt the work and discipline of the school." 393 U.S. at 509. Later cases emphasize, however, that the "mode of analysis set forth in *Tinker* is not absolute." *Morse*, 551 U.S. at 405. In two of the most recent school First Amendment cases, the Supreme Court conspicuously declined to endorse any particular standard of scrutiny. *See id.* at 404 ("We need not resolve this debate [about the appropriate level of scrutiny] to decide this case."); *see also Mahanoy Area Sch. Dist. v. B.L. by & through Levy*, 594 U.S. 180, 189 (2021). As relevant here, the main takeaway from these cases is that there is no one-size-fits-all standard for school-related First Amendment challenges.

Senate File 496 is a perfect illustration for why the Supreme Court has been unable to settle on a single standard of scrutiny in the school setting. On the surface—and as discussed in the preceding section—Senate File 496 resembles cases like *Pico* and *Pratt* because it involves restrictions on the contents of school libraries. Hence the Court's conclusion above that it should apply the "substantial and reasonable governmental interest" test from *Pratt*. Closer review, however, shows two large differences between the *Pico/Pratt* line of cases and the book

20

restrictions in Senate File 496, both of which weigh in favor of applying a more exacting level of scrutiny.

First, *Pico* and *Pratt* each involved one school board's decision to remove a small number of materials—nine books in *Pico*, 457 U.S. at 858, and a single film (plus a trailer for the same film) in *Pratt*, 670 F.2d at 773. Other reported cases emanating from *Pico* similarly involve the removal of a small number of books or materials by a local school board. *See, e.g.*, *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 1995) (one book); *Campbell*, 64 F.3d at 185 (one book); *Bicknell v. Vergennes Union High Sch. Bd. of Directors*, 638 F.2d 438 (2d Cir. 1980) (two books); *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1308 (7th Cir. 1980) (one book); *Cary v. Bd. of Ed. of Adams-Arapahoe Sch. Dist. 28-J, Aurora, Colo.*, 598 F.2d 535 (10th Cir. 1979) (ten books); *C.K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 910 (E.D. Mo. 2022) (eight books); *Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 677 F. Supp. 1547 (M.D. Fla. 1988) (one textbook); *Salvail v. Nashua Bd. of Ed.*, 469 F. Supp. 1269 (D.N.H. 1979) (one magazine). One of the recurring tensions in these cases is whether and to what extent federal judges should get into the business of reviewing *ad hoc* decisions by local school boards regarding the removal of individual books from school libraries. *See, e.g.*, *Pico*, 457 U.S. at 890–91 (Burger, C.J., dissenting) ("Discretion must be used, and the appropriate body to exercise that discretion is the local elected school board, not judges . . . [L]ocal control of education involves democracy in a microcosm. In most public schools in the United States the *parents* have a large voice in running the school.").

Here, by contrast, the evidence shows that the Iowa Legislature enacted Senate File 496 because local school boards would *not* remove books from school libraries. In other words, the Legislature was dissatisfied with local decision-making by local officials and decided an across-the-board solution was necessary for a problem that local school boards apparently did not believe existed in the first place. The result is a statewide law that has thus far been interpreted as requiring the removal of hundreds of books, including classic words of fiction, award-winning novels by contemporary authors, and historical and educational texts. (ECF 104-5; ECF 104-2, ¶ 8; ECF 104-3, ¶¶ 6, 13.) The State Defendants have not identified, nor has the Court been able to locate, a single case upholding school library restrictions as broad as those found in Senate File 496.

Second, and relatedly, the statewide nature of the restrictions in Senate File 496 imposes a far greater burden on the First Amendment rights of the Publisher/Author Plaintiffs than the

isolated and *ad hoc* decisions in cases like *Pico* and *Pratt*. Books like *Nineteen Minutes* are not merely being removed from one bookshelf in one school district, but rather from school libraries in dozens of school districts across the state. Meaning: the authors are being cut off from reaching tens of thousands of potential readers. It is appropriate in this context not merely to apply First Amendment cases involving *students'* rights, but also First Amendment cases involving *authors'* rights.

Against this backdrop, it is difficult to conclude that the mode of analysis in the *Pico* line of cases is the exclusive—or even most appropriate—method for evaluating the constitutionality of Senate File 496. Instead, the Court agrees with Plaintiffs that the analysis must take into account Supreme Court precedent from related First Amendment areas, including, especially, the obscenity doctrine. This doctrine starts with *Miller v. California*, where the Supreme Court defined "obscenity" as "works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." 413 U.S. 15, 24 (1973). As Plaintiffs correctly admit, school districts have greater freedom to remove books from school libraries and curricula than just those that meet the adult obscenity standard. *See Hazelwood*, 484 U.S. at 266 ("[T]he First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings . . . and must be applied in light of the special characteristics of the school environment." (internal punctuation and citations omitted)). Accordingly, the Iowa Legislature was not constitutionally required to adopt the adult obscenity standard in Senate File 496, nor will the Court apply that standard.

The Court will, however, follow later Supreme Court precedent recognizing that laws imposing statewide, content-based restrictions on the availability of materials for minors should be tethered to the adult obscenity standard, as adjusted for minors. This modified *Miller* standard emanates from *Ginsberg v. State of New York*, in which the Supreme Court upheld a New York law prohibiting bookstores from selling certain books to minors. 390 U.S. 629 (1968). The law used a watered-down version of the then-prevailing adult definition of "obscenity," with the restrictions limited to books with "nudity, sexual conduct, sexual excitement, or sadomasochistic abuse [that] (i) predominantly appeals to the prurient, shameful or morbid interest of minors, and (ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and (iii) is utterly without redeeming social importance for

minors." *Id.* at 646. *Ginsberg* held that it was permissible for a state to "adjust[] the definition of obscenity 'to social realities by permitting the appeal of this type of material to be assessed in terms of the sexual interests . . . of such minors.'" *Id.* at 638 (quoting *Mishkin v. State of N.Y.*, 383 U.S. 502, 509 (1966)).

Later Supreme Court cases have affirmed the *Ginsberg* standard. In *Erznoznik v. City of Jacksonville*, for example, the Supreme Court struck down a city ordinance prohibiting films with nudity from being shown in drive-in theaters. 422 U.S. 205 (1975). *Erznoznik* rejected the city's argument that the ordinance was designed to protect against the possibility of minors viewing the films, holding that "[c]learly all nudity cannot be deemed obscene even as to minors." *See id.* at 213. *Erznoznik* suggested the *Ginsberg* standard—which it characterized as a "variation of the adult obscenity standards"—would have been a more appropriate mechanism for protecting against First Amendment concerns than an across-the-board prohibition with no room for nuance. *See id.* at 213 n.10. Similarly, in *Reno v. American Civil Liberties Union*, the Supreme Court struck down portions of the Communications Decency Act on First Amendment grounds in part because the law did not adopt the *Ginsberg* standard or otherwise allow for consideration of whether the restricted materials had serious literary, artistic, political, or scientific value. 521 U.S. 844, 865 (1997). Five years later, in *Ashcroft v. American Civil Liberties Union*, the Supreme Court attached paramount significance to Congress's decision to regulate content "in a manner analogous to *Miller*'s definition of obscenity" in analyzing the constitutionality of Child Online Protection Act under the First Amendment. 535 U.S. 564, 584–85 (2002). Finally, in *Brown v. Entertainment Merchants Association*, the Supreme Court reiterated the importance of "adjust[ing] the definition of obscenity" as it relates to minors as opposed to dispensing with the definition altogether. 564 U.S. 786, 794 (2011). *Brown* reiterated that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795 (quoting *Erznoznik*, 422 U.S. at 213–14).

As illustrated by these cases, the *Ginsberg* standard is a sort of "obscenity-light" standard for minors that must be applied when a First Amendment challenge is made to a law with sweeping implications on the ability of minors to access books or other materials. Senate File 496 is just such a law, as it imposes across-the-board, statewide restrictions on publishers, authors, teachers, and students alike. The Court therefore will apply, in the alternative, both the *Ginsberg* and

*Pico/Pratt* standards to determine whether the book restrictions in Senate File 496 comply with the First Amendment.

 *C. The Proper Interpretation of the Book Restrictions in Senate File 496.*

  The next step in the *NetChoice* analysis is to determine the proper interpretation of Iowa Code § 256.11, which requires each Iowa school district to establish a "kindergarten through grade twelve library program that is consistent with section 280.6 and with the educational standards established in this section, contains only age-appropriate materials, and supports the student achievement goals of the total school curriculum." The phrase "age-appropriate" means:

> topics, messages, and teaching methods suitable to particular ages or age groups of children and adolescents, based on developing cognitive, emotional, and behavioral capacity typical for the age or age group. '*Age-appropriate*' does not include any material with descriptions or visual depictions of a sex act as defined in section 702.17.

In turn, Iowa Code § 702.17 defines "sex act" to mean:

> any sexual contact between two or more persons by any of the following:
>
> 1. Penetration of the penis into the vagina or anus.
>
> 2. Contact between the mouth and genitalia or mouth and anus or by contact between the genitalia of one person and the genitalia or anus of another person.
>
> 3. Contact between the finger, hand, or other body part of one person and the genitalia or anus of another person, except in the course of examination or treatment by a [licensed professional].
>
> 4. Ejaculation onto the person of another.
>
> 5. By use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus.
>
> 6. The touching of a person's own genitals or anus with a finger, hand, or artificial sexual organ or other similar device at the direction of another person.

In simple terms, Senate File 496 forbids a book from being in the school library if it contains a "description[]" of any of these "sex acts."

  The next question is what "description" means. The State Defendants provide guidance, asserting that the statement, "I put Doug Goble's dick in my mouth," is an example of a "description" of a "sex act." (ECF 102, p. 13.) Accordingly, the State Defendants assert that the book in which the sentence is found—*Lawn Boy*—is not permitted in a school library under Iowa Code § 256.11. (ECF 102, p. 13.) The State Defendants argue, however, that a mere "reference or

mention of a sex act in a way that does not describe or visually depict a sex act" is not enough to require a book to be removed. (ECF 102, p. 8.) In other words, in the State Defendants' view, a statement that two people "made love" or "had sex" is not enough to require a book to be removed. (ECF 102, p. 13.)

The Court has reservations about adopting the State Defendants' position. By their logic, *Lawn Boy* would not have been subject to removal if it said, "I had oral sex with Doug Goble" instead of "I put Doug Goble's dick in my mouth." It is difficult to imagine reasonable teachers or school librarians, with their employment and licensure on the line, feeling comfortable drawing such a distinction. Nonetheless, the Court must honor the canon of constitutional avoidance, which "suggests the proper course in the construction of a statute may be to steer clear of 'constitutional shoals' when possible." *State v. Iowa Dist. Ct. ex rel. Story Cnty.*, 843 N.W.2d 76, 85 (Iowa 2014). Accordingly, the Court will agree with the State Defendants and conclude that a mere reference or mention of a sex act is not enough to require a book's removal under section 256.11.

Even so, Senate File 496 remains broad in the sense that it requires the removal of a book from the school library if even a single sentence contains a description of a sex act, irrespective of the book's larger literary, artistic, political, or scientific value. The law therefore makes no attempt to tether book removal requirements to the *Ginsberg* standard. Indeed, Iowa already had a law prohibiting the dissemination of obscene material to children before Senate File 496 was enacted, and thus it is self-evident that the Iowa Legislature was trying to go further.

>   D.  *Comparing the Constitutional and Unconstitutional Applications of the Law.*

The next step under *NetChoice* is to "determine [the] law's full set of applications, evaluate which are constitutional and which are not, and compare the one to the other." 603 U.S. at 718. "The question is whether 'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* at 723 (quoting *Bonta*, 594 U.S. at 615). "So in this singular context, even a law with 'a plainly legitimate sweep' may be struck down in its entirety. But that is so only if the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 723–24.

>   1.  The Record Contains Sufficient Information About How School Districts Are Applying Senate File 496 to Allow the Court to Compare the Law's Constitutional and Unconstitutional Applications.

The parties sharply dispute how *NetChoice* applies to Senate File 496. The State Defendants argue, as a starting point, that Plaintiffs have not done enough to analyze whether

school districts are even applying the law correctly; instead, in the School Defendants' view, Plaintiffs have simply provided a list of books that have been removed by at least one school district without establishing except in a handful of instances that those books include a "description" of a "sex act." According to the State Defendants, if a school district improperly removes a book, this is an interpretation problem, not a constitutional problem. Or, to use the language of *NetChoice*, the balancing of constitutional and unconstitutional "applications" of a law should not include *mis*applications. The State Defendants argue that until Plaintiffs do a better job of differentiating between proper and improper book removals, they will not have met their burden under *NetChoice*.

There are several problems with the State Defendants' argument. <u>First</u>, Senate File 496 places the burden on local school districts and school officials to determine in the first instance whether a book is permitted in the school library. Indeed, this is the whole point of the law's penalty provisions: local officials and districts are subject to punishment if they get it wrong. It follows that a school district's removal of a book—whether right or wrong—is literally an "application" of the law and therefore should be part of the *NetChoice* balancing. The State Defendants essentially conceded as much in briefing to the Eighth Circuit, asserting that "[e]very book removed from library shelves because of the Library Program included at least some material that was not 'age-appropriate' under the law." Opening Brief, *GLBT Youth in Iowa Schools Task Force v. Reynolds*, No. 24-1074, 2024 WL 1200292, at * 58–59 (8th Cir. Mar. 11, 2024).

<u>Second</u>, the State Defendants' position, if accepted, would essentially require the parties (and Court) to read hundreds—if not thousands—of books to determine whether there is a "description" of a "sex act" and, if so, how that "description" fits into the larger work. In prior facial challenges under the First Amendment, courts have not followed such an arduous process. Instead, they have essentially taken judicial notice of the contents of artistic works. In *Ashcroft*, for example, Justice Thomas's majority opinion stated that *I Know Why the Caged Bird Sings*, *Are You There God? It's Me, Margaret*, *Brave New World*, and *Catcher in the Rye* (among other artistic works) "are likely unaffected" by a statute limiting children from accessing certain materials over the Internet even though the record did not appear to contain any information about the contents of those works. 535 U.S. at 584 n.16. Similarly, in a concurring opinion in *FW/PBS, Inc. v. City of Dallas*, Justice Scalia listed *An American Tragedy*, *Lady Chatterley's Lover*, *Tropic of Cancer*, *Tropic of Capricorn*, and *Ulysses* as works that "contain some sexually explicit or even erotic

material" despite the apparent absence of any factual record about the contents of those books. 493 U.S. 215, 251 (1990) (Scalia, J., concurring).

Lower courts have followed suit. In *Couch v. Jabe*, the court "list[ed] dozens of the highly regarded works of literature which include an explicit description of a sexual act or intercourse," including *Ulysses*, *Lady Chatterley's Lover*, *Candide*, *Brave New World*, *All the Pretty Horses*, *Droll Stories*, *Howl and Other Poems*, *[The] Naked Lunch*, *Tropic of Cancer*, *Slaughterhouse Five*, *Sophie's Choice*, *Myra Breckenridge*, *One Hundred Years of Solitude*, *For Whom the Bell Tolls*, *A Farewell to Arms*, *Women in Love*, *As I Lay Dying*, *The Handmaid's Tale*, *Leaves of Grass*, *Song of Myself*, *I Know Why the Caged Bird Sings*, *Go Tell It On The Mountain*, *Their Eyes Were Watching God*, *Lolita*, *To Kill a Mockingbird*, *Oedipus Rex*, *Mourning Becomes Electra*, *The Scarlet Letter*, *The World According to Garp*, *Anna Karenina*, *The Postman Always Rings Twice*, *Stranger in a Strange Land*, *The Color Purple*, *Moll Flanders*, *Tristessa*, *Nana*, and the Bible. 737 F. Supp. 2d 561, 567–69 & n.4–14 (W.D. Va. 2010). With the possible exception of the first two, no factual record was made about the contents of those books. *See id.* Similarly, in *Cline v. Fox*, the court recognized that *1984*, *The Canterbury Tales*, *Ulysses*, and the Bible contain sexually explicit passages despite the absence of any factual record. 319 F. Supp. 2d 685, 692–93 (N.D. W.Va. 2004). This Court is comfortable following the approach of these cases by taking judicial notice of the contents of the dozens of books that are identified in Plaintiffs' filings as having been removed by at least one school library and with which the Court is familiar.

To the extent the Court is not permitted to take judicial notice in this way, the factual record nonetheless contains enough information to perform the *NetChoice* balancing. This record starts with the Declaration of Lisa Petrie, a Teacher Librarian in the Iowa City Community School District. (ECF 104-1.) It is apparent from Petrie's Declaration that she is attempting in good faith to interpret and apply the book restrictions in Senate File 496. *See, e.g.*, Petrie Declaration, ¶ 21 (stating that educators in Iowa City have spent "hundreds of hours reading and reviewing books" and recognizing the challenge in determining whether a passage is a "description of a sex act"). Her Declaration, when combined with Exhibit C-2 (ECF 104-5), establishes that sixty-four books were removed from the Iowa City Community School District due to Senate File 496. Her Declaration further establishes that these books are not pornographic or obscene despite containing descriptions of sex acts. (ECF 104-1, ¶ 18.) Instead, the books "are a lifeline for kids" by helping them deal with sexual abuse by family members, make healthy sexual choices, and avoid abusive

27

relationships (among other important pedagogical purposes). (Id., ¶¶ 10, 17, 18.) Petrie's Declaration, standing alone, establishes a representative sample of books that have been removed from school libraries under Senate File 496 despite not containing obscene or pornographic material. This is enough to allow the Court to proceed to the next stages of the *NetChoice* analysis.

To the extent more of a factual record is needed, it's there. Plaintiffs have submitted Declarations from authors (ECF 104-11; ECF 104-12; ECF 104-13), a High School Language Arts Teacher (ECF 104-2), a publishing executive (ECF 104-3), a high school student (ECF 104-16), and a parent (ECF 104-17). These Declarations specifically establish that some of the books that have been removed from school libraries contain a "description" of a "sex act." *See, e.g.*, Declaration of Jodi Picoult, ¶ 4 (ECF 104-11) (describing sex scene in *Nineteen Minutes* and explaining why it is not pornographic or titillating, but rather "endemic to the message of the book; it encapsulates the realization that being bullied takes a lot of different forms"); Declaration of John Green, ¶ 5 (ECF 104-13) ("To the extent there is sexuality depicted in *Looking for Alaska*, it is there because I wanted to draw a contrast between physical intimacy and emotional intimacy. I believe it is important for young people to learn not to conflate the two."); Declaration of Laurie Halse Anderson, ¶ 8 (ECF 104-12) (acknowledging sex scenes in *Speak* and *Shout* and explaining that they show how survivors of sexual assault can "find[] the courage to reclaim the narrative" and serve as a "call[] to action against sexual assault"). These Declarations also reinforce that these and other books containing descriptions of sex acts are not obscene or pornographic. *See id.*; *see also, e.g.*, Declaration of Emily House, ¶ 13 (ECF 104-2) ("I have never witnessed pornography or obscene materials in a public school, including in the [Southeast Polk Community School] District."); Declaration of Skip Dye, ¶ 8 (ECF 104-3) ("Penguin Random House does not publish pornography. The titles populating district removal lists include the most enduring classics in the history of literature, including the works of Toni Morrison, George Orwell, and William Faulkner. These are works whose literary acclaim and commercial appeal are without equal. They are not books about sex; they are books about the entire range of human experience. Reducing them to one passage or one topic ignores the value of these works. There is no book we carry for which we do not stand behind the literary, scientific, artistic, or political value."). When combined with Petrie's Declaration, these materials give the Court enough of a factual record to move to the next step of the *NetChoice* analysis.

      <u>Third</u>, and in any event, the Court's weighing of constitutional versus unconstitutional "applications" of the law would not materially change under at least one of the relevant legal standards (the *Ginsberg* standard) even if: (a) some school districts have indeed unnecessarily removed books from library shelves; and (b) the Court was wrong in concluding above that a *mis*application of a law is still an "application" for *NetChoice* purposes. The Court will explain this further in the next section.

      2.  <u>The Unconstitutional Applications of Senate File 496 Substantially Outweigh the Constitution Applications Under the *Ginsberg* Standard.</u>

      The final step in the *NetChoice* analysis is to determine "if the law's unconstitutional applications substantially outweigh its constitutional ones." 603 U.S. at 724. In *GLBT Youth II*, the Eighth Circuit stated: "the district court, in analyzing the facial challenge to the Library Program, weighed the number of books justifying the restrictions against the number of books identified by the [Plaintiffs] that have been swept up in the restrictions. But for facial challenges, 'the question … is whether a law's unconstitutional applications are substantial compared to its constitutional ones." 114 F.4th at 670 (quoting *NetChoice*, 144 S. Ct. at 2394). The Court will undertake this analysis for each of the various standards that may apply, starting with the "obscenity-light" standard established by *Ginsberg* and reiterated in *Erznoznik*, *Reno*, *Ashcroft* and *Brown*.

      Before Senate File 496 was enacted, Iowa law already prohibited the dissemination of "obscene material" to minors. *See* Iowa Code § 728.2. Iowa law did so according to a definition of "obscene material" that tracked the *Ginsberg* standard; which is to say, the law defined "obscene material" to mean "any material depicting or describing the genitals, sex acts, masturbation, excretory functions or sadomasochistic abuse which the average person, taking the material as a whole and applying contemporary community standards with respect to what is suitable material for minors, would find appeals to the prurient interest and is patently offensive; and the material, taken as a whole, lacks serious literary, scientific, political or artistic value." Iowa Code § 728.1(5). When it enacted Senate File 496, the Iowa Legislature obviously wanted to go beyond the *Ginsberg* standard because otherwise the new law would have been pointless. *See Thomas v. Gavin*, 838 N.W.2d 518, 524 (Iowa 2013) ("Normally we do not interpret statutes so they contain surplusage."); *Postell v. Am. Fam. Mut. Ins. Co.*, 823 N.W.2d 35, 49 (Iowa 2012) ("[W]hen the legislature amends a statute, it raises a presumption that the legislature intended a change in the law."); *see also Brown v. Kemp*, 86 F.4th 745, 777–78 (7th Cir. 2023) (using the state of the law

prior to enactment of the challenged legislation as a guidepost for comparing constitutional and unconstitutional applications). Indeed, the Iowa Legislature considered—but did not enact—a version of Senate File 496 that would have adopted the *Ginsberg* standard. *See* S.S.B. 1145 § 16 (proposing to adopt the obscenity standard set forth in Iowa Code § 728.1).

It follows that if (as the Court believes) the *Ginsberg* standard applies to Senate File 496, the unconstitutional applications of Senate File 496 substantially outweigh the constitutional ones. Indeed, there are almost no "constitutional" applications of Senate File 496 because no books containing obscene material under the *Ginsberg* standard should have been in school libraries before the law was passed, and thus the law should not have resulted in the (constitutional) removal of any such books.

In this regard, it does not matter whether school officials have been applying Senate File 496 correctly in every instance or if they have been over- (or under-) interpreting the law. Take, for example, the Iowa City Community School District, where sixty-four books were removed by officials following their diligent attempt to apply Senate File 496. The record shows—and the Court is independently aware—that many of those books indeed contain descriptions of sex acts, including, for example, *Looking for Alaska*, *Nineteen Minutes*, *The Bluest Eye*, *The Color Purple*, *The Handmaid's Tale*, *The Rape of Nanking*, *Ulysses*, and *Water for Elephants*. (ECF 104-5.) The record further shows—and the Court is independently aware—that "[i]n no way do the descriptions of a sex act in these books make them pornographic or obscene." (ECF 104-1, ¶ 18.) Even if one assumes (despite unrebutted evidence to the contrary) that Iowa City officials have gone overboard in removing books, and that these eight books are the only ones that should have been removed from the school library pursuant to Senate File 496, it is nonetheless the case that the unconstitutional applications of Senate File 496 substantially outweigh the constitutional ones. The former equals eight, and the latter equals zero.

The same is true, by definition, in virtually every other school district in the State. Prior to the enactment of Senate File 496, no school library would have been permitted to contain "obscene material" as defined in *Ginsberg* and Iowa Code § 728.1. Accordingly, even if there are only, say, ten books that were properly removed from school libraries due to containing a "description of a sex act"—for example, *I Know Why the Caged Bird Sings*, *As I Lay Dying*, *Beloved*, *Brave New World*, *1984*, *The Color Purple*, *Native Son*, *Speak*, *Shout*, and *Night*—the unconstitutional

applications of Senate File 496 (ten) would be infinitely higher than the constitutional applications (zero).[5]

To be clear, the Court is not suggesting that books with sexual content would be appropriate for all ages of students. The *Ginsberg* standard would, for example, justify restrictions on descriptions of sex acts in books for elementary school students. The problem for the State Defendants, however, is that there is nothing in the record to suggest such books were ever made available to elementary school students in the first place; instead, unrebutted evidence shows that school officials already limited the access of younger readers to unsuitable books before the enactment of Senate File 496. (ECF 104-1, ¶ 19.) This comports with common sense: it is highly doubtful that elementary school students would have the capacity to read or comprehend books like *1984* or *As I Lay Dying* anyway.

In these circumstances, the Court will not consider hypothetical-but-unrealistic applications of Senate File 496 to elementary school students when applying the *NetChoice* balancing analysis. Indeed, doing so would flip First Amendment principles on their head by allowing Senate File 496's breadth to be a reason for sustaining the law against a facial constitutional challenge. Ordinarily, the First Amendment works the other way around, with broader laws being subject to greater constitutional scrutiny. *See, e.g.*, *Boos v. Barry*, 485 U.S. 312, 319 (1988) (striking down on First Amendment grounds the portion of a law that prohibited "an entire category of speech"); *Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 537 (1980) ("The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic."). And for good reason: "[i]f the marketplace of ideas is to remain free and open, governments must not be allowed to choose which issues are worth discussing or debating . . . To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth." *Id.* at 537–38 (internal punctuation omitted) (citing *Tinker* and *Erznoznik*). It follows that a law that treats a seventeen-year-old high school student like Katelyn Van Gundy the same for First Amendment purposes as

---

[5] The record establishes only one exception: the book *Gender Queer*. Even Plaintiffs appear to concede that it has been properly removed from school libraries due to graphic pictures of sexual content, which reasonably could be construed as pornographic. Accordingly, in the small number (three) of districts where the record shows that book to have been in a school library (ECF 104-5, p. 4), the book's removal due to Senate File 496 was a constitutional application of the law. This does not materially change the balancing of constitutional versus unconstitutional applications of the law.

a five-year-old student in kindergarten should be less likely, not more, to survive a facial constitutional challenge. *See Erznoznik*, 422 U.S. at 213–14 (striking down municipal ordinance that broadly prohibited displays of nudity in drive-in movie theaters despite concerns about exposing minors to nudity).

The bottom line is that the record reveals, at most, one constitutional application of Senate File 496 under the *Ginsberg* standard. When weighed against the significant number of *un*constitutional applications under that standard, Senate File 496 is unconstitutional under the *NetChoice* balancing analysis if the *Ginsberg* standard applies.

> 3. The Unconstitutional Applications of Senate File 496 Substantially Outweigh the Constitutional Applications Under the "Substantial and Reasonable Governmental Interest" Test.

Although the analysis is more complicated, the result is the same under the "substantial and reasonable governmental interest" test established by the plurality opinion in *Pico* and adopted by the Eighth Circuit in *Pratt*, 670 F.2d at 776–77. Plaintiffs have shown that most of the "applications" of Senate File 496 are unconstitutional because the State Defendants have failed to establish a substantial or reasonable governmental interest justifying the removal of books except, at most, in a few instances.

Granted, under the *Pico/Pratt* test, it is not as easy to compare the constitutional and unconstitutional applications of Senate File 496 without being familiar with the contents of each book that has been removed from one or more school libraries. All the same, for reasons explained above, the Court cannot imagine that the Eighth Circuit intended in *GLBT Youth II* to require the parties and Court to read hundreds (or thousands) of books, evaluate whether each one contains a "description of a sex act," and decide in each instance whether there is a substantial and reasonable governmental interest that would justify the book's removal. Instead, the Court again will rely heavily on Lisa Petrie's unrebutted Declaration, which shows that she and other officials in the Iowa City Community School District engaged in a diligent and good faith attempt to apply Senate File 496 and remove books that contain a "description of a sex act." (ECF 104-1.) These efforts resulted in the removal of sixty-four books, which is a representative sample of the 600+ books that have been removed by at least one school district. (ECF 104-5; ECF 104-6.)

Petrie's Declaration further shows that the State Defendants are unlikely to establish a substantial and reasonable governmental interest that would justify the removal of these books. Her Declaration establishes the following:

- None of the books that have been removed are pornographic or obscene. (ECF 104-1, ¶ 19.)

- Many of the books that have been removed are popular and award-winning books that help students participate in Advanced Placement courses and prepare for college. (Id., ¶ 20.)

- The books that have been removed often represent the experiences of victims of sexual abuse or trauma and are designed to help people recognize toxic relationships and make healthy sexual decisions. (Id., ¶¶ 16–18.) By forcing the removal of these books, Senate File 496 has taken away a "lifeline" for students who have been victims of sexual abuse or trauma. (Id., ¶¶ 10, 17.)

- Senate File 496 limits the ability of students to find books with characters and themes the students can relate to and therefore undermines efforts to improve reading proficiency. (Id., ¶¶ 10, 14–15, 18.) "[W]e know that students develop fluency and confidence in reading when they are given the opportunity to choose books they are personally interested in and are given time to read and talk about those books with peers and adults." (Id., ¶ 14.)

- Senate File 496 makes it difficult for educators to comply with the requirements of the Iowa Board of Educational Examiners *Code of Rights and Responsibilities*, such as the requirement to give students access to varying points of view. (Id., ¶ 12.)

- As a result of Senate File 496, students cannot have access to books in the school library that contain descriptions of a sex act even if the students have reached the legal age of sexual consent (16) under Iowa law. (Id., ¶ 16.)

- Before Senate File 496 was enacted, educators took steps to ensure that books that were not suitable for elementary school students were not made available to them. (Id., ¶ 19.)

- The Iowa City Community School District has a process through which community members may challenge school library books. This process includes a committee consisting of a teacher, librarian, administrator, curriculum coordinator, and three community members (including parents). "The committee ultimately votes to remove the book from the school library, limit access to it to a higher grade level, or keep the book." (Id., ¶ 19.)

Other unrebutted evidence shows that the experience in the Iowa City Community School District is representative of what is occurring elsewhere. For example, like Iowa City, the Urbandale School District already allows parents to prevent their children from checking out specific library materials if the parents believe the materials are unsuitable. (ECF 104-3, ¶ 18; ECF 104-9.) This undermines the State Defendants' argument that the book restrictions are somehow designed to give parents greater control over what their children read. Moreover, and more

33

generally, ISEA members have "reported the occurrence and inevitability of the removal of award-winning, critically acclaimed books, which had previously been determined by education professionals to be of educational value, age-appropriate, and consistent with community standards." (ECF 104-10, ¶ 15.) Emily House, who teaches Language Arts in the Southeast Polk Community School District, was required by Senate File 496 to remove books from her classroom library that hold "deep relevance" for students and "open eyes and hearts to the realities of life." (ECF 104-2, ¶ 8.) She also understands the law to require the removal of books that describe sexual assaults, which "robs survivors of the life-saving opportunity to see their experiences depicted and validated as important." (Id., ¶ 9.) Like Petrie, House has "never witnessed pornography or obscene materials in a public school" in her District or elsewhere. (Id., ¶ 13.)

In essence, Senate File 496 does what *Pico* and *Pratt* prohibit: it imposes a puritanical "pall of orthodoxy" over school libraries by concluding that there is no redeeming value to any book that contains a "description" of a "sex act" even if the book is a work of history, self-help guide, award-winning novel, or other piece of serious literature. *See Pico*, 457 U.S. at 871 ("Our Constitution does not permit the official suppression of *ideas*.") (plurality opinion); *see also Tinker*, 393 U.S. at 511 ("In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate."). The fact that the Bible and other religious texts are exempted from Senate File 496 reinforces the problem because it shows that even the Iowa Legislature does not believe all books involving sex acts are devoid of pedagogical value. There is no substantial or reasonable governmental interest that would justify allowing some books with sexual content to be in school libraries but not others. *Cf. Couch*, 737 F. Supp. 2d at 569.

The State Defendants argue, in part, that the book restrictions do not violate the First Amendment because students still can obtain the books from a public library or bookstore; they simply cannot get them through the school library. The Eighth Circuit rejected a nearly identical argument in *Pratt*, holding that "[r]estraint on protected speech generally cannot be justified by the fact that there may be other times, places or circumstances for such expression." 670 F.2d at 779; *see also Reno*, 521 U.S. at 880 ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." (quoting *Schneider v. State of New Jersey (Town of Irvington)*, 308 U.S. 147, 163 (1939)). The availability of the books through other channels therefore does not save the restrictions in Senate File 496 from constitutional infirmity. *See Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1000 (W.D. Ark.

2003) (rejecting argument that student's ability to access book at home precluded First Amendment challenge to school board regulation).

The State Defendants also point out that Senate File 496 is "viewpoint-neutral" in the sense that the definition of "age-appropriate" does not on its face target any ideology. It simply forbids "sex acts" for the sake of them being "sex acts." Although this is true, it is not enough to satisfy the *Pico/Pratt* standard. "Nowhere in *Ginsberg* (or any other case that we can find, for that matter) does the Supreme Court suggest that the government's role in helping parents to be the guardians of their children's well-being is an unbridled license to governments to regulate what minors read and view." *Interactive Digital Software Ass'n v. St. Louis Cnty., Mo.*, 329 F.3d 954, 959–60 (8th Cir. 2003); *see also Brown*, 564 U.S. at 795 ("Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." (quoting *Erznoznik*, 422 U.S. at 213–14)).

Finally, although the State Defendants did not expand the factual record following remand from the Eighth Circuit, they rely on Declarations from December 2023 establishing that parents in the West Des Moines, Urbandale, and Waukee school districts asked for books like *Gender Queer*, *Lawn Boy*, and *All Boys Aren't Blue* to be removed from school libraries, but some school districts rejected those requests. (ECF 45; ECF 102, p. 7.) Plaintiffs appear to concede that *Gender Queer* may be removed without violating the First Amendment due to graphic pictures of sexual activity. Accordingly, the removal of that book is a constitutional application of Senate File 496.

The same is not true for *Lawn Boy* and *All Boys Aren't Blue*. The record shows that a committee in Urbandale considered the contents of those books and decided the instructional and literary value outweighed concerns about offensive language and sexual content to a sufficient degree to make it appropriate to keep the books in the school library. (ECF 45-1, pp. 63, 68.) Moreover, there is nothing in the record to suggest they were made available to anyone other than high school students or were part of any compulsory curriculum. Instead, the books apparently sat passively and harmlessly on the shelves except as to students who wanted to read them. (ECF 45-1, p. 50.) The Court therefore cannot discern any substantial or reasonable governmental interest justifying their removal. *See Erznoznik*, 422 U.S. at 214 ("In most circumstances, the values protected by the First Amendment are no less applicable when government seeks to control the

flow of information to minors.") (internal footnote omitted). It follows that the removal of those books therefore was an unconstitutional application of Senate File 496.

Although the State Defendants did not discuss it in this round of briefing, they also established through Declarations in December 2023 that books with sexual content were part of the mandatory curriculum in an Advanced Placement course for high school students in Johnston (*The Absolutely True Diary of a Part-Time Indian* and *The Hate U Give*) (ECF 45-1, pp. 44–48) and an upper-level English course for high school students in Indianola (*The Kite Runner*) (ECF 45-1, pp. 11–13.) The application of Senate File 496 to these books is constitutional insofar as it prevents educators from requiring students to read those books. It is unconstitutional, however, insofar as it requires the removal of those books from school libraries altogether. Thus, in total, the record shows one fully constitutional application of Senate File 496 and three partially constitutional applications.

By contrast, Plaintiffs have established, at minimum, several dozen unconstitutional applications of Senate File 496 involving books that have undeniable political, artistic, literary, and/or scientific value. This includes books that are: (a) historical classics like *As I Lay Dying*, *Ulysses*, *Brave New World*, *1984*, *Native Son*, and *Slaughterhouse-Five*; (b) modern award-winners or highly acclaimed books like *I Know Why the Caged Bird Sings*, *Song of Solomon*, *Beloved*, *The Bluest Eye*, *The Kite Runner*, *Nineteen Minutes*, *Speak*, *Shout*, *Looking for Alaska*, *The Fault in Our Stars*, and *Last Night at the Telegraph Club*, many of which address bullying, racism, sexual assault, or other forms of trauma and grief; (c) found on the Advanced Placement exam or otherwise serve important educational purposes like *The Color Purple*, *Native Son*, *The Handmaid's Tale*, and other books identified in (a) and (b); (d) non-fiction books about important historical events like *Night*, *Kaffir Boy: The True Story of a Black Youth's Coming of Age in Apartheid South Africa*, *The Rape of Nanking: The Forgotten Holocaust of World War II*, *The Freedom Writers Diary: How a Teacher and 50 Teens Used Writing to Change Themselves and the World Around Them*; (e) designed to help young people avoid being victimized by sexual assault like *Sexual Predators* and *The Truth About Rape*; and (f) non-fiction books about health and anatomy like *Urinary Tract Infections*. (ECF 104, p. 37; ECF 104-3, ¶ 12.) The application of Senate File 496 to each of these books is unconstitutional under the *Pico/Pratt* standard because there is not a substantial and reasonable governmental interest for the removal of any of them.

Thus, the unconstitutional applications of Senate File 496 substantially outweigh the constitutional applications.

In reaching this conclusion, the Court is of course cognizant of the Eighth Circuit's admonition in *GLBT Youth II* that "Iowa is not required to tolerate speech that undermines or is inconsistent with its central mission of educating Iowa children." 114 F.4th at 670. The unrebutted Declarations show, however, that the books that have been removed due to Senate File 496 do not "undermine" the "central mission of educating Iowa children" merely by virtue of being available on library shelves to students who wish to read them. To the contrary, as Petrie and others explain, the availability of those books is wholly consistent with the mission of educating Iowa children because they contribute to reading proficiency and help students understand how to cope with trauma, make informed and healthy decisions about sex, and otherwise understand the complexities of the world around them.

In this regard, the Court heeds the admonition of Justice Alito about the dangers of allowing arguments about a school's "educational mission" to serve as a basis for censoring speech:

> The opinion of the Court does not endorse the broad argument advanced by petitioners and the United States that the First Amendment permits public school officials to censor any student speech that interferes with a school's "educational mission." This argument can easily be manipulated in dangerous ways, and I would reject it before such abuse occurs. The "educational mission" of the public schools is defined by the elected and appointed public officials with authority over the schools and by the school administrators and faculty. As a result, some public schools have defined their educational missions as including the inculcation of whatever political and social views are held by the members of these groups.

> During the *Tinker* era, a public school could have defined its educational mission to include solidarity with our soldiers and their families and thus could have attempted to outlaw the wearing of black armbands on the ground that they undermined this mission. Alternatively, a school could have defined its educational mission to include the promotion of world peace and could have sought to ban the wearing of buttons expressing support for the troops on the ground that the buttons signified approval of war. The "educational mission" argument would give public school authorities a license to suppress speech on political and social issues based on disagreement with the viewpoint expressed. The argument, therefore, strikes at the very heart of the First Amendment.

*Morse*, 551 U.S. at 423 (Alito, J., concurring) (internal citations omitted). Justice Alito's concerns squarely apply here. In essence, the State Defendants are trying to define the "educational mission" of Iowa schools to include protecting even the oldest and most mature students from exposure to

sexual content in books that are not part of the mandatory curriculum. This is not a persuasive argument—much less a substantial and reasonable governmental interest.

    4.   <u>If the *Hazelwood* Standard Applies, the Constitutional Applications of Senate File 496 Outweigh the Unconstitutional Applications.</u>

For ease of appellate review, the Court also will analyze Senate File 496 under the *Hazelwood* standard even though this is not the standard the Court believes should apply. Under *Hazelwood*, the governing question is whether the book restrictions are "reasonably related to legitimate pedagogical concerns." 484 U.S. at 273.

Supreme Court and Eighth Circuit precedent establish that schools have a legitimate pedagogical interest in prohibiting student speech involving sexual content. *See, e.g., Fraser*, 478 U.S. 685 ("A high school assembly or classroom is no place for a sexually explicit monologue directed toward an unsuspecting audience of teenage students."); *Henerey*, 200 F.3d at 1135 (holding that school was permitted to impose disciplinary action against student who passed out condoms as part of his campaign for student body president); *Lacks*, 147 F.3d at 724 (affirming disciplinary action against teacher for "allowing a student to read aloud a poem that describes sexual encounters in the most graphic detail"). Based on this precedent—and notwithstanding the credible arguments made by Plaintiffs about the unreasonableness of a law that requires the removal of dozens (if not hundreds) of award-winning books based on as little as a single sentence describing a "sex act"—the Court feels compelled to conclude that Senate File 496 passes constitutional muster if *Hazelwood* establishes the governing standard and the books are treated as student speech. Simply put, under the *Hazelwood* standard, it appears that schools (or, in this instance, a state legislature) can categorically prohibit sexual content or profanity in schools without running afoul of the First Amendment.

There is, to be sure, an alternative reading of *Hazelwood* in which "legitimate pedagogical concerns" must take into account things like: (a) whether the speech arises in the context of books or other materials authored by non-students (which is to say, the speech is not likely to be understood as the school's own speech); (b) whether the speech in question is being forced upon a captive audience of students or merely made available to interested students on a voluntary basis; (c) the extent to which the speech, when considered in its full context, has literary, political, artistic, or scientific value, measured in relation to potentially offensive content; (d) the age and maturity of the students to whom the speech is directed or made available; and (e) whether and to what extent parents are given the opportunity to prevent their children from exposure to the speech. If

this is the correct interpretation of *Hazelwood*, Senate File 496 would not pass constitutional muster after all. Instead, the Court would apply the *Hazelwood* test in essentially the same way as it applied the "substantial and reasonable governmental interest" from *Pico* and *Pratt* in the preceding section, with the same outcome. In other words, the vast majority of the applications of Senate File 496 would be unconstitutional because the record shows that the law requires dozens (if not hundreds) of books and other materials to be removed from school libraries even though those books and materials: (a) are not written by students or anyone else associated with the schools; (b) are not part of any mandatory curriculum; (c) have tremendous literary, political, artistic, and/or scientific value; (d) are only directed toward or made available to students for whom they are suitable; and (e) are subject to check-out restrictions that give control to parents over whether their children will read or otherwise be exposed to the books. By contrast, the constitutional applications of the law would be limited to books like *Gender Queer* with visual depictions of sexual content and/or books with sexual content that are included as part of mandatory curriculum.

     5.  <u>Summary.</u>

     For reasons set forth above, Plaintiffs are likely to prevail in establishing that the unconstitutional applications of Senate File 496 substantially outweigh the constitutional applications if the governing standard is the *Ginsberg* standard for obscenity as applied to minors and/or the "substantial and reasonable governmental interest" standard established in *Pico* and *Pratt*. Plaintiffs have not, however, satisfied their burden if the *Hazelwood* standard applies unless that standard is to be applied differently in this unique context than it has been applied in prior cases involving true student speech. Because the Court believes the first two standards are the best fit in the circumstances presented here, it concludes that Plaintiffs have satisfied their burden of showing that Senate File 496 is likely facially unconstitutional under the First Amendment.

## VI.   APPLICATION OF THE REMAINING PRELIMINARY INJUNCTION FACTORS.

     "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (quoting *Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011) (per curiam). For this reason alone, injunctive relief is appropriate.

The other factors reinforce this conclusion. As to irreparable harm, "[t]t is well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). This case illustrates the point: educators have removed hundreds of books due to Senate File 496, thus depriving students of the ability to read those books and authors and publishers of the ability to reach their intended audiences through those books. Moreover, the Educator Plaintiffs are at risk of termination, loss of licensure, or other consequences if they are deemed to have violated the book restrictions in Senate File 496.

By contrast, while the temporary invalidation of a duly enacted state law is a serious and significant remedy, the record shows that school districts already have been—and surely will continue—keeping pornographic and obscene materials out of school libraries and restricting access to materials that are unsuitable based on students' age. The balancing of equities therefore weighs in favor of injunctive relief, as does the public interest. *See Parents Defending Educ.*, 83 F.4th at 669 (awarding preliminary injunctive relief).

## VII.    CONCLUSION.

The Court GRANTS Plaintiffs' Motion for Preliminary Injunction. Pending further proceedings, Defendants are hereby ENJOINED from enforcing or acting in furtherance of the provisions of Senate File 496 that require the removal of books from school libraries that are not "age-appropriate."

**IT IS SO ORDERED.**

Dated this 25th day of March, 2025.

_____
Stephen H. Locher
UNITED STATES DISTRICT JUDGE