**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

PENGUIN RANDOM HOUSE LLC; HACHETTE
BOOK GROUP, INC.; HARPERCOLLINS
PUBLISHERS LLC; MACMILLAN PUBLISHING
GROUP, LLC; SIMON & SCHUSTER, LLC; THE
AUTHORS GUILD; LAURIE HALSE
ANDERSON; JODI PICOULT; GRACE VAN
GUNDY,

     Plaintiffs,

     v.

JOHN ROBBINS, in his official capacity as
President of the Iowa State Board of Education;
MCKENZIE SNOW, in her official capacity as
Director of the Iowa Department of Education;
CHAD JANZEN, in his official capacity as Chair of
the Iowa Board of Educational Examiners;
MARGARET YOUNG, JOSH VANRYSWYK,
HANNAH HORTON, KATHERINE HOWSARE,
RACHEL KENT, RODRIGO SANTIZO, and
CARISSA WILLIAMS, in their official capacities
as Members of the Urbandale Community School
District Board of Directors; ROSALIE DACA, in
her official capacity as Urbandale Community
School District Superintendent; CAROL ECKELS,
SAM MCKNIGHT, JAMIE BUFFINGTON,
DENNIS CHEERS, and AMBER TATE, in their
official capacities as Members of the East Union
Community School District Board of Directors;
JUSTIN JEFFS, in his official capacity as East
Union Community School District Superintendent;
MARTY CHITTY, TOM MAIER, TORI
CARSRUD, LEANNE HARTER, and EMILY
SCHAACK, in their official capacities as Members
of the Nevada Community School District Board of
Directors; STEVE GRAY, in his official capacity as
Nevada Community School District Superintendent,

     Defendants.

Case No. 4:23-cv-00478

**THIRD AMENDED
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Plaintiffs Penguin Random House LLC; Hachette Book Group, Inc.; HarperCollins Publishers LLC; Macmillan Publishing Group, LLC; Simon & Schuster, LLC; the Authors Guild; Laurie Halse Anderson; Jodi Picoult; and Grace Van Gundy, by their attorneys, for their Third Amended Complaint against Defendants John Robbins, in his official capacity as President of the Iowa State Board of Education; McKenzie Snow, in her official capacity as Director of the Iowa Department of Education; Chad Janzen, in his official capacity as Chair of the Iowa Board of Educational Examiners; Margaret Young, in her official capacity as President of the Urbandale Community School District Board of Directors; Josh VanRyswyk, in his official capacity as Vice President of the Urbandale Community School District Board of Directors; Hannah Horton, Katherine Howsare, Rachel Kent, Rodrigo Santizo, and Carissa Williams, in their official capacities as Members of the Urbandale Community School District Board of Directors; Rosalie Daca, in her official capacity as Urbandale Community School District Superintendent; Carol Eckels, in her official capacity as the President of the East Union Community School District Board of Directors; Sam McKnight, in his official capacity as Vice President of the East Union Community School District Board of Directors; Jamie Buffington, Dennis Cheers, and Amber Tate, in their official capacities as Members of the East Union Community School District Board of Directors; Justin Jeffs, in his official capacity as East Union Community School District Superintendent; Marty Chitty, in his official capacity as President of the Nevada Community School District Board of Directors; Tom Maier, Vice President of the Nevada Community School District Board of Directors; Tori Carsrud, Leanne Harter, and Emily Schaack, in their official capacities as Members of the Nevada Community School District Board of Directors; and Steve Gray, in his official capacity as Nevada Community School District Superintendent, state as follows:

**INTRODUCTION**

1.      *To Kill a Mockingbird* by Harper Lee, *Animal Farm* by George Orwell, *1984* by George Orwell, *Brave New World* by Aldous Huxley, *Speak* by Laurie Halse Anderson, *Nineteen Minutes* by Jodi Picoult, *I Know Why the Caged Bird Sings* by Maya Angelou, *The Rape of Nanking: The Forgotten Holocaust of World War II* by Iris Chang, and *Native Son* by Richard Wright (the "Removed Books") are some of the many books that have been removed from school library shelves by the Urbandale, East Union, and Nevada Community School Districts pursuant to the Library Restriction[1]—the State of Iowa's law that prohibits school library books that contain a description of a sex act regardless of the book's value and the age of the student.  The removal of these books from high school libraries under the Library Restriction has no relation to any legitimate pedagogical purpose and violates the First Amendment.

2.      Rather than defer to trained professionals, such as teachers or librarians, to determine whether the Removed Books are appropriate and pedagogically valuable for high school libraries, the School District Defendants determined that they must remove those books under the Library Restriction, as interpreted by the State Defendants and given the State Defendants' instruction to err on the side of caution, *i.e.*, on the side of removal.

3.      The Removed Books are timeless classics, renowned for their literary value.  Many of them have won awards or are bestsellers.  They have been on the shelves of school libraries for years.  Their literary merit and pedagogical value are unimpeachable.  And, to the extent that the books describe a sex act, that description is integral to the book's purpose.  Their removal from

---

[1] Iowa Code § 256.11(9)(a) (as amended by Senate File 496 § 2); Iowa Code § 256.11(19) (as amended by Senate File 496 § 4).

the Urbandale, East Union, and Nevada high school library shelves[2] deprives Iowa students from encountering literature that portrays and describes critical aspects of the human experience.

4.      The Library Restriction forces teachers and school librarians to remove books or face penalties, including termination of their employment.  This action concerns solely the removal of the Removed Books from the Urbandale, East Union, and Nevada Community School District high school libraries pursuant to the Library Restriction.  This lawsuit does not concern any of the numerous other provisions of Senate File 496 or the countless other books that have been removed throughout Iowa under the Library Restriction.  The text of Senate File 496 is attached as Exhibit A.

5.      Plaintiffs bring this action to safeguard their fundamental rights under the First Amendment to the U.S. Constitution to disseminate and have others read constitutionally protected books and to receive and read constitutionally protected books.

6.      The First Amendment ensures that authors can communicate their ideas to students without undue interference by the government.  "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.  In most circumstances, the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975).

7.      The right to speak and the right to read are inextricably intertwined.  Just as authors have the right to communicate their ideas to students without undue interference from the

---

[2] The East Union Community School District's middle and high schools share one school library. As used in this Complaint, East Union's "high school library" or "high school library shelves" refers to the shared library's function that serves East Union's high school students.

government, students have a corresponding right to receive those ideas.  Publishers and educators connect authors to students.

8.      Plaintiffs ask this Court to declare unconstitutional the removal of the Removed Books from Urbandale's, East Union's, and Nevada's high school libraries pursuant to the Library Restriction; to permanently enjoin the State Defendants from enforcing the Library Restriction against Urbandale, East Union, and Nevada Community School Districts (the "School Districts") as to the Removed Books; to require the School District Defendants to return the Removed Books to their high school library shelves; and to permanently enjoin the School District Defendants from removing the Removed Books pursuant to the Library Restriction.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because this action is brought under 42 U.S.C. § 1983 and seeks to vindicate civil rights protected by the First and Fourteenth Amendments to the U.S. Constitution.

10.     Venue is proper under 28 U.S.C. § 1391(b) because multiple Defendants reside in this district, all Defendants are residents of the State in which this district is located, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and are occurring in this district.

## PARTIES

11.     Plaintiffs Penguin Random House LLC; Hachette Book Group, Inc.; HarperCollins Publishers LLC; Macmillan Publishing Group, LLC; and Simon & Schuster, LLC (collectively the "Publisher Plaintiffs") are publishers whose books have been removed from school libraries throughout Iowa, including in the School Districts, as a result of the Library Restriction prohibition on books that contain a description of a "sex act."

12.    Plaintiff Penguin Random House LLC ("PRH"), a Delaware Limited Liability Company headquartered in New York, is the U.S. arm of Penguin Random House, the world's largest trade publisher, which comprises more than 300 editorially and creatively independent publishing imprints globally.  PRH's mission is to ignite a universal passion for reading by creating books for everyone and creating a world where independent thinking, free expression, and creativity flourish.  PRH aims to publish books that provide children with a gateway to the whole world, promoting literacy, fostering empathy, and inspiring free and open debate.  Continued inclusion of its books in public school libraries is critical to PRH's mission, especially for books intended for young-adult readers.

13.    Plaintiff Hachette Book Group, Inc. ("Hachette") is a U.S. general-interest book publisher headquartered in New York City.  Hachette's publishing groups include prominent imprints such as Little, Brown and Company; Little, Brown Books for Young Readers; Grand Central Publishing; Basic Books; Orbit Books; Running Press; Algonquin Books; and Workman Publishing.  Hachette is part of Hachette Livre, the world's third-largest trade and educational publisher.  Hachette's books and authors have garnered major awards, including the Pulitzer Prize, National Book Award, Caldecott Medal, Newbery Medal, Booker Prize, and Nobel Peace Prize. Hachette's publishing programs aim to reflect the broad range of backgrounds, experiences, and viewpoints that shape our society.  Its mission is to make it easy for everyone to discover new worlds of ideas, learning, entertainment, and opportunity, and it is fundamental to Hachette's mission that its books remain accessible to students in public school libraries.

14.    Plaintiff HarperCollins Publishers LLC ("HarperCollins"), a subsidiary of News Corp, is the second-largest consumer book publisher in the world, with operations in fifteen countries.  With 200 years of history and more than 120 branded imprints around the world,

HarperCollins publishes approximately 10,000 new books every year in sixteen languages and has a print and digital catalog of more than 250,000 titles. HarperCollins seeks to deliver content that presents a diversity of voices and speaks to the global community. Writing across dozens of genres, its authors include winners of the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize.

15. Plaintiff Macmillan Publishing Group, LLC ("Macmillan") is a New York-based group of U.S. publishers that includes Celadon Books, Farrar, Straus and Giroux, Flatiron Books, Henry Holt & Company, Macmillan Audio, Macmillan Children's Publishing Group, St. Martin's Publishing Group, and Tor Publishing Group. The U.S. publishing group is part of Macmillan Publishers, a global trade book publishing company with prominent imprints around the world. Macmillan publishes a broad range of award-winning books for children and adults in all categories and formats. Macmillan strongly advocates for the right to read, uniting a broad community of authors, educators, librarians, and readers. Macmillan strives to ensure access to diverse literary works, highlighting the critical role of literacy in democracy, championing the transformative power of books in fostering understanding, and working to build an inclusive future.

16. Plaintiff Simon & Schuster, LLC ("S&S"), a global leader in general interest publishing, is dedicated to providing the best in fiction and nonfiction for readers of all ages, and in all printed, digital, and audio formats. Its distinguished roster of authors includes many of the world's most popular and widely recognized writers, and winners of the most prestigious literary honors and awards. It is home to numerous well-known imprints and divisions such as Simon & Schuster, Scribner, Atria Books, Gallery Books, Adams Media, Avid Reader Press, Simon & Schuster Children's Publishing, and Simon & Schuster Audio, and international companies in

Australia, Canada, India, and the United Kingdom, and VBK in the Netherlands and Belgium. It proudly brings the works of its authors to readers in more than 200 countries and territories. S&S is a New York limited liability company that is headquartered in New York.

17. Plaintiff The Authors Guild (the "Guild") was founded in 1912 and is a national non-profit association of more than 15,000 professional, published writers of all genres. The Guild counts historians, biographers, academicians, journalists, and other writers of nonfiction and fiction as members. The Guild also welcomes the estates of deceased authors into its membership, so long as the deceased author's literary work would have qualified the author to be a member of the Guild.

18. The Guild works to promote the rights and professional interest of authors in various areas, including copyright, freedom of expression, and taxation. Many Guild members earn their livelihoods through their writing. Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field. The ability to write on topics of their choosing and to have their work available through bookstores and libraries, including school libraries, is vital to their ability to make a living in their chosen profession. Books written by the Guild's members, including the estates of Richard Wright and Aldous Huxley, have been targeted for removal or removed from school libraries throughout Iowa, including in the School Districts, as a result of the Library Restriction.

19. Plaintiffs Laurie Halse Anderson and Jodi Picoult are authors whose books have been targeted for removal or removed from school libraries throughout Iowa, including in the School Districts, as a result of the Library Restriction. Anderson, Picoult, and the Guild are collectively referred to herein as the "Author Plaintiffs."

20.    Plaintiff Laurie Halse Anderson resides in Pennsylvania.  She has authored ten novels.  Her novels have been selected for many best-of lists, including in the *New York Times*, in *Publishers Weekly*, and on the American Library Association's ("ALA") Amelia Bloomer List.  Her novels have also been recognized by the International Reading Association, the New York Public Library, the Young Adult Library Services Association ("YALSA"), and the Junior Library Guild.  She has won the ALA Margaret A. Edwards Award, the Anne V. Zarrow Award, the Scott O'Dell Award for Historical Fiction, and the Astrid Lindgren Memorial Award during her distinguished career.

21.    Plaintiff Jodi Picoult is a resident of New Hampshire.  She has authored 28 novels that have been translated into 34 languages and sold approximately forty million print copies worldwide.  Picoult's novels have been selected for many best-of lists, including by the *New York Times*, *Publishers Weekly*, and YALSA.  She has won the New England Bookseller Award for Fiction, YALSA's "Alex Award," the Vermont Department of Libraries' "Green Mountain Book Award," the Maryland Association of School Librarians' "Black-Eyed Susan Award," and the Sarah Josepha Hale Award Medal during her venerable career.

22.    For each Author Plaintiff, school libraries are a critical means of reaching their intended audiences and securing the broadest possible readership.  The Author Plaintiffs' books, including the Removed Books, are vehicles for their personal messages and ideas.  The removal of their books from schools, including the associated stigma, causes them personal and professional harm.

23.    Plaintiff Grace Van Gundy was a senior at Urbandale High School when the Second Amended Complaint was filed.  During her senior year, Grace Van Gundy wanted and intended to check out specific books from her school library or her teachers' classroom libraries that were

removed due to the Library Restriction, including *Nineteen Minutes* by Jodi Picoult. To Grace Van Gundy, books are a way to access information and tools for navigating life and to better understand the experiences of others. For those reasons, Grace Van Gundy wanted to have access to *Nineteen Minutes* and other school library books like it.[3]

24.    Defendant John Robbins is the President of the Iowa State Board of Education. He is sued in his official capacity, as chief executive of a state government body responsible for enforcing the provisions of Senate File 496, including the Library Restriction. Under the statute, the "rules of the state board shall require that an age-appropriate, multicultural, and gender-fair approach is used by schools and school districts." Iowa Code § 256.11 (as amended by Senate File 496 § 1). The state board is also responsible for establishing "a definition of and standards for an articulated sequential kindergarten through grade twelve media program." Iowa Code § 256.11(9)(c) (as amended by Senate File 496 § 2).

25.    Defendant McKenzie Snow is the Director of the Iowa Department of Education. She is sued in her official capacity, as chief executive of a state government body responsible for enforcing the provisions of Senate File 496, including the Library Restriction. Senate File 496 gives the Department of Education authority to investigate and enforce certain violations of the statute, including violations related to library programs. Iowa Code § 256.11(9)(a)(3) (as amended by Senate File 496 § 2); Iowa Code § 279.78(4) (as amended by Senate File 496 § 14).

---

[3] To the extent that Student Plaintiff Grace Van Gundy's standing and Plaintiffs' claims that the removal of certain of the Removed Books that are within the scope of the statute are inconsistent with the Eighth Circuit's second opinion in this case, that opinion was issued in an appeal from the issuance of a preliminary injunction and in the very different context of a facial challenge as opposed to the as-applied challenges in this Third Amended Complaint. *See generally Penguin Random House v. Robbins*, 172 F.4th 581 (8th Cir. 2026).

26.     Defendant Chad Janzen is the Chair of the Iowa Board of Educational Examiners. He is sued in his official capacity, as a chief executive of a state government body responsible for enforcing the provisions of Senate File 496, including the Library Restriction.  The Iowa Board of Educational Examiners has the authority to conduct hearings related to violations of the statute, including violations related to library programs, and to take subsequent disciplinary action.  *Id.*

27.     Defendants Robbins, Snow, and Janzen are all officers of the State of Iowa (collectively the "State Defendants").

28.     Defendant Margaret Young is President of the Urbandale Community School District Board of Directors.

29.     Defendant Josh VanRyswyk is Vice President of the Urbandale Community School District Board of Directors.

30.     Defendants Hannah Horton, Katherine Howsare, Rachel Kent, Rodrigo Santizo, and Carissa Williams are Members of the Urbandale Community School District Board of Directors.

31.     The Urbandale Community School District Board of Directors is the seven-member governing body of the Urbandale Community School District ("Urbandale").  The Urbandale Community School District Board of Directors delegates authority to the Superintendent of the Urbandale Community School District, school principals, and other executives to enforce the provisions of Senate File 496, including the Library Restriction.

32.     Defendant Rosalie Daca is the Superintendent of the Urbandale Community School District.  As Superintendent, Daca is the executive officer of the Board of Directors of the Urbandale Community School District and is directly responsible "for the enforcement of all provisions of law relating to the operation of the schools."  Urbandale Community School Board

Policy 0311. She is "delegate[d] . . . the authority and responsibility to administer the District and to implement decisions made by the Board." *Id.* Daca therefore is tasked with implementing Senate File 496, including the Library Restriction. Together, Young, VanRyswyk, Horton, Howsare, Kent, Santizo, Williams, and Daca are referred to as the "Urbandale Defendants." The Urbandale Defendants are responsible for implementing and enforcing the provisions of Senate File 496 concerning school and classroom libraries, such as the Library Restriction. The Urbandale Defendants are sued in their official capacities.

33.     Defendant Carol Eckels is President of the East Union Community School District Board of Directors.

34.     Defendant Sam McKnight is the Vice President of the East Union Community School District Board of Directors.

35.     Defendants Jamie Buffington, Dennis Cheers, and Amber Tate are Members of the East Union Community School District Board of Directors.

36.     The East Union Community School District Board of Directors is the five-member governing body of the East Union Community School District ("East Union"). The East Union Community School District Board of Directors delegates authority to the Superintendent of the East Union Community School District, school principals, and other executives to enforce the provisions of Senate File 496, including the Library Restriction.

37.     Defendant Justin Jeffs is the Superintendent of the East Union Community School District. As Superintendent, Jeffs is the chief executive officer of the Board of Directors of the East Union Community School District and is "ultimately responsible" for the duty "to implement and enforce the policies of the board, to oversee employees, to monitor educational issues confronting the school district, and to inform the board about school district operations." East

Union Community School District Board Policies 300, 302.4.  Specifically, Superintendent Jeffs "[i]nterprets and implements all board policies and all state and federal laws relevant to education." East Union Community School District Board Policy 302.4.  Jeffs therefore is tasked with implementing Senate File 496, including the Library Restriction.  Together, Eckels, McKnight, Buffington, Cheers, Tate, and Jeffs are referred to as the "East Union Defendants."  The East Union Defendants are responsible for implementing and enforcing the provisions of Senate File 496 concerning school and classroom libraries, such as the Library Restriction.  The East Union Defendants are sued in their official capacities.

38.    Defendant Marty Chitty is President of the Nevada Community School District Board of Directors.

39.    Defendant Tom Maier is the Vice President of the Nevada Community School District Board of Directors.

40.    Defendants Tori Carsrud, Leanne Harter, and Emily Schaack are Members of the Nevada Community School District Board of Directors.

41.    The Nevada Community School District Board of Directors is the five-member governing body of the Nevada Community School District ("Nevada").  The Nevada Community School District Board of Directors delegates authority to the Superintendent of the Nevada Community School District, school principals, and other executives to enforce the provisions of Senate File 496, including the Library Restriction.

42.    Defendant Steve Gray is the Superintendent of the Nevada Community School District.  As Superintendent, Gray is the chief executive officer of the Board of Education of the Nevada Community School District and is "ultimately responsible" for the duty "to implement and enforce the policies of the Board, to oversee employees, to monitor educational issues confronting

the District, and to inform the Board about District operations."  Nevada Community School District Board Policies 300, 302.4.  Specifically, Superintendent Gray "[i]nterprets and implements all Board policies and all state and federal laws relevant to education."  Nevada Community School District Board Policy 302.4.  Gray therefore is tasked with implementing Senate File 496, including the Library Restriction.  Together, Chitty, Maier, Carsrud, Harter, Schaack, and Gray are referred to as the "Nevada Defendants."  The Nevada Defendants are responsible for implementing and enforcing the provisions of Senate File 496 concerning school and classroom libraries, such as the Library Restriction.  The Nevada Defendants are sued in their official capacities.

43.      Under Senate File 496, Iowa school districts must establish kindergarten through twelfth grade library programs that contain "only age-appropriate materials."  Iowa Code § 256.11(9)(a)(2) (as amended by Senate File 496 § 2).  "Age-appropriate" materials exclude "material with descriptions . . . of a sex act."  Iowa Code § 256.11(19)(a)(1) (as amended by Senate File 496 § 4) (the "Library Restriction").  The Library Restriction applies to books made available in school libraries.

44.      Iowa school districts, including the Urbandale Defendants, East Union Defendants, and Nevada Defendants, are responsible for implementing and enforcing the Library Restriction.  *See* Iowa Code § 256.11(9)(a) (as amended by Senate File 496 § 2).

45.      Iowa school districts and their educators are also subject to penalties for violating the Library Restriction.  Iowa Code § 256.11(9)(a) (as amended by Senate File 496 § 2); Iowa Code §§ 256.146(4), 279.27(1-2).

46.    All Defendants are state actors operating under the color of state law with respect to all allegations in this complaint.  According to Urbandale, school districts have no discretion under the Library Restriction, which is a state mandate.

47.    The Fourteenth Amendment to the U.S. Constitution incorporates the protections of the First Amendment, which apply to and bind all Defendants.

## FACTUAL ALLEGATIONS

### *School Libraries*

48.    School libraries are and have always been places of self-directed learning.

49.    While a school's prescribed curriculum tells students what texts to read, the school library empowers students to explore authors, topics, and literary styles in a self-directed manner. School libraries enable students to explore their curiosity.  Students frequently discover books, authors, and literary styles they would not have discovered but for access to their school library.

50.    Matching students to books is an inherently individual exercise.  Not every book is for every student at every point in their life.  For that reason, each student has the right to choose whether to read any particular book from a school library.

51.    As the Supreme Court has recognized, the school library "is the principal locus" of a student's freedom "to inquire, to study and to evaluate, to gain new maturity and understanding"—where a student can "explore the unknown" and "discover areas of interest and thought not covered by the prescribed curriculum." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 868-69 (1982) (plurality opinion).

52.    The Eighth Circuit has similarly explained that "the purposes of a school library are to enhance education, supplement classroom learning, and facilitate the development of students' knowledge and skills." *Penguin Random House*, 172 F.4th at 587.  Consequently, to

avoid "run[ning] afoul of the First Amendment," the removal of a school library book must be "reasonably related to legitimate pedagogical concerns." *Id*. at 588 (citation omitted).

53.    The State of Iowa has a proud history of supporting libraries and opposing censorship. In the 1930s, Des Moines Public Library Director Forrest Spaulding drafted an anti-censorship document that evolved into the American Library Association's "Library Bill of Rights." The introduction to Spaulding's document stated as follows: "Now, when indications in many parts of the world point to growing intolerance, suppression of free speech and censorship, affecting the rights of minorities and individuals, the Board of Trustees of the Des Moines Public Library reaffirms these basic policies governing a free public library to serve the best interests of Des Moines and its citizens."

54.    The State of Iowa mandates that each school district establish a "library program" at the direction of a qualified teacher librarian, who shall have "special expertise in identifying resources and technologies to support teaching and learning." Iowa Admin. Code r. 281-12.3(9)(a).

55.    In addition to separate school libraries, many Iowa teachers have a collection of books in their classrooms that are available for students to borrow and read. Classroom libraries serve a similar purpose and function to school libraries.

56.    Senate File 496 does not expressly provide whether the Library Restriction applies to classroom collections, but many Iowa school districts—including Urbandale—have proceeded as if they do. References to "school libraries" or "school library books" in this complaint also refer to "classroom libraries," "classroom collections" or "books in classroom libraries or classroom collections."

***The Library Restriction.***

57.    Under Senate File 496's Library Restriction, a school district's "library program" must contain "only age-appropriate materials." For all grades, age-appropriate materials exclude "any material with descriptions or visual depictions of a sex act." Iowa Code §§ 256.11(9)(a), (19)(a) (as amended by Senate File 496 §§ 2, 4).

58.    The term "sex act" is defined in Iowa Code § 702.17.

59.    The Eighth Circuit ruled that the specific sex acts set forth in Iowa Code and prohibited by the Library Restriction are "detailed" and are not "amorphous." *Penguin Random House*, 172 F.4th at 588.

60.    Accordingly, to fall within the scope of the Library Restriction, a "description" of a "sex act" must be explicit rather than a mere implication, reference, or label. Although the description need not use the same words as the statutory definitions of covered sex acts, it must be similarly specific.

61.    Iowa officials who are responsible for passing and enacting the Library Restriction have acknowledged the intended narrow scope of the Library Restriction.

62.    For example, State Representative Skyler Wheeler, Chair of the House Education Committee, has claimed that the Library Restriction requires only that "sexually explicit material" that is akin to pornography be removed from school libraries: "This is quite simple to me. Porn doesn't belong in school libraries. Books that don't contain porn can remain on the shelves."

63.    Governor Reynolds similarly has stated that the Library Restriction merely prohibits books in school libraries that are "pornography."

64.    Nonetheless, the State Defendants have instructed Iowa school districts to err on the side of caution when enforcing the Library Restriction.

65.     Consequently, the books being removed from schools under the Library Restriction are not pornography, nor are they obscene. *See Miller v. California*, 413 U.S. 15, 24 (1973) (defining obscenity as "limited to works" (a) "which, taken as a whole, appeal to the prurient interest in sex," (b) "which portray sexual conduct in a patently offensive way, and" (c) "which, taken as a whole, do not have serious literary, artistic, political, or scientific value").

66.     At no point have the State Defendants informed an Iowa school district that a book removed supposedly pursuant to the Library Restriction was not actually within the scope of the statute and was not required to be removed.

67.     As a result of the State Defendants' approach to enforcing the Library Restriction, Iowa school districts have removed books that fall outside of the scope of the Library Restriction out of fear of being punished by the State Defendants for not enforcing it as broadly as the State Defendants want.

68.     Nevada maintains a webpage listing books that "have been removed from [Nevada] collections" because they "may violate Iowa Senate File 496."[4]

### Penalties And Procedures

69.     Teachers, librarians, and other educators licensed by the Iowa Board of Educational Examiners face license sanctions and adverse employment actions for violation of the Library Restriction, including termination of their employment.

70.     Senate File 496 establishes penalties for violations of the Library Restriction and provides for enforcement of these penalties beginning January 1, 2024.

> If, after investigation, the [Iowa State Department of Education] determines that a school district or an employee of a school district has violated the [Library Restriction] related to library programs containing only age-appropriate materials, beginning January 1, 2024, the

---

[4] https://www.nevadacubs.org/departments/school-improvement/removed-books/.

school district or employee of the school district, as applicable, shall be subject to the following:

(a) For the first violation . . . , the [Iowa State Department of Education] shall issue a written warning to the board of directors of the school district or the employee, as applicable.

(b) (i) For a second or subsequent violation . . . , if the [Iowa State Department of Education] finds that a school district knowingly violated [the Library Restriction], the superintendent of the school district shall be subject to a hearing conducted by the board of educational examiners . . . which may result in disciplinary action.

(ii) For a second or subsequent violation . . . , if the [Iowa State Department of Education] finds that an employee of the school district who holds a license, certificate, authorization, or statement of recognition issued by the board of educational examiners knowingly violated [the Library Restriction], the employee shall be subject to a hearing conducted by the board of educational examiners . . . which may result in disciplinary action.

Iowa Code § 256.11(9)(a)(3) (as amended by Senate File 496 § 2).

71. Standard IV of the Standards of Professional Conduct and Ethics promulgated by the Iowa Board of Educational Examiners prohibits a licensee from "[f]ailing to comply with federal, state, and local laws applicable to the fulfillment of professional obligations." Violation of such standards may result in the revocation or suspension of an educator's license under Iowa Code section 256.146(4).

72. Iowa Code section 279.27(1) provides that a teacher's employment may be terminated for "just cause," upon recommendation by a superintendent and after a hearing and determination by a school board, and that a superintendent may suspend the teacher pending that hearing and determination by the school board.

73. Just cause "includes but is not limited to a violation of the code of professional conduct and ethics of the board of educational examiners if the board has taken disciplinary action" against the teacher, which includes violations of state law. Iowa Code § 279.27(2).

*The Removed Books*

74.    Under the Library Restriction, highly-regarded books—even ones that have been on shelves for many decades—must be removed from school libraries in Iowa if they contain an explicit description of a sex act, regardless of the literary, scientific, medical, artistic, or political value of the book.

75.    Among the books that have been removed from Iowa school libraries—including high school libraries in Urbandale, East Union, and Nevada—under the Library Restriction are *To Kill a Mockingbird* by Harper Lee, *Animal Farm* by George Orwell, *1984* by George Orwell, *Brave New World* by Aldous Huxley, *Speak* by Laurie Halse Anderson, *Nineteen Minutes* by Jodi Picoult, *I Know Why the Caged Bird Sings* by Maya Angelou, *The Rape of Nanking: The Forgotten Holocaust of World War II* by Iris Chang, and *Native Son* by Richard Wright.[5]

76.    Five of these books clearly do not contain content within the scope of the Library Restriction (*To Kill a Mockingbird, Animal Farm*, *1984*, *Brave New World*, and *Speak*), one does not contain content within the scope of the Library Restriction but is closer to the line (*Nineteen Minutes*), and three contain content within the scope of the Library Restriction (*I Know Why the Caged Bird Sings*, *The Rape of Nanking: The Forgotten Holocaust of World War II*, and *Native Son*).

77.    The removal of these books from Iowa school libraries, including in Urbandale, East Union, and Nevada, under the Library Restriction bears no reasonable relation to any legitimate pedagogical purpose and therefore violates the First Amendment.

---

[5] Attached as Exhibit B is an index that identifies the passages in the Removed Books that are referenced within this Third Amended Complaint.  PDFs of the Removed Books themselves are attached as sealed exhibits B1 through B9.

*A.  To Kill a Mockingbird*

78.     *To Kill a Mockingbird* by Harper Lee was first published in 1960.  It has sold more than 40 million copies and has been translated into more than 40 languages.[6]

79.     *To Kill a Mockingbird* is a novel about a lawyer, Atticus Finch, who is appointed to defend Tom Robinson, a Black man falsely accused of raping a white woman.

80.     While *To Kill a Mockingbird* uses words such as "raped" or "took advantage of," it does not contain content that is within the scope of the Library Restriction, because those words are references or labels, not descriptions.  *See* Exhibit B.

81.     *To Kill a Mockingbird* is one of the most widely read works of fiction in American literature and is nationally recognized for its treatment of racism, prejudice, tolerance, justice, and moral courage in the American South.

82.     The novel has been an inspiration to generations of lawyers, including Justice Brett Kavanaugh, who testified during his Supreme Court confirmation hearing that a sixth-grade lesson from *To Kill a Mockingbird* taught him to "stand in the shoes of others," and that he still kept his sixth-grade copy of the book in his chambers.

83.     In 1961, *To Kill a Mockingbird* was awarded the Pulitzer Prize for fiction.

84.     In 2007, then-President George W. Bush stated that "*To Kill a Mockingbird* has influenced the character of our country for the better.  It's been a gift to the entire world.  As a

---

[6]     https://www.harpercollins.com/blogs/press-releases/harper-lees-to-kill-a-mockingbird-wins-pbss-the-great-american-read#:~:text=To%20Kill%20a%20Mockingbird%20has%20been%20translated%20into%20more%20than%20forty%20languages%2C%20sold%20more%20than%20forty%20million%20copies%20worldwide%2C%20served%20as

model of good writing and humane sensibility, this book will be read and studied forever."[7] President Bush awarded Harper Lee the Presidential Medal of Freedom.

85.     In 2010, the United States House of Representatives passed House Resolution 1525 honoring the 50th anniversary of the publication of *To Kill a Mockingbird*.[8]

86.     Several school districts across the nation assign *To Kill a Mockingbird* in their middle and high school curricula.

87.     *To Kill a Mockingbird* has been tested on College Board Advanced Placement exams.

88.     Plaintiff HarperCollins publishes *To Kill a Mockingbird*.

89.     East Union removed *To Kill a Mockingbird* from its high school library under the Library Restriction.

**B.  Animal Farm**

90.     *Animal Farm* by George Orwell was first published in 1945.  It has sold more than 10 million copies.

---

[7]     https://georgewbush-whitehouse.archives.gov/news/releases/2007/11/images/20071105-1_d-0243-3-515h.html#:~:text=President%20George%20W.%20Bush%20awards%20the%20Presidential%20Medal%20of%20Freedom%20to%20author%20Harper%20Lee%20during%20a%20ceremony%20Monday%2C%20Nov.%205%2C%202007%2C%20in%20the%20East%20Room.%20%22To%20Kill%20a%20Mockingbird%20has%20influenced%20the,It%27s%20been%20a%20gift%20to%20the%20entire%20world.%20As%20a%20model%20of%20good%20writing%20and%20humane%20sensibility%2C%20this%20book%20will%20be%20read%20and%20studied%20forever%2C%22%20said%20the%20President%20about%20Harper%20Lee%27s%20work.

[8]                         https://www.congress.gov/bill/111th-congress/house-resolution/1525/text#:~:text=honors%20Nelle%20Harper%20Lee%20for%20her%20outstanding%20achievement%20in%20the%20field%20of%20American%20literature%20in%20authoring%20%20%E2%80%9CTo%20Kill%20a%20Mockingbird%E2%80%9D.

91.     *Animal Farm* is an allegorical retelling of the Russian Revolution of 1917 and the Soviet Union's descent into Stalinism, told through anthropomorphized farm animals. *Animal Farm* cautions against the descent into totalitarianism.

92.     While *Animal Farm* uses words such as "breeding" in the context of raising livestock, it does not contain content that is within the scope of the Library Restriction. *See* Exhibit B.

93.     *Animal Farm* is one of TIME Magazine's Best 100 English-Language Novels, one of Modern Library's 100 Best Novels, and a winner of the Prometheus Hall of Fame Award, which recognizes classic works of science fiction and fantasy that explore themes of personal freedom and societal control.

94.     Several school districts across the nation assign *Animal Farm* in their middle and high school curricula.

95.     Plaintiff HarperCollins publishes a combined volume of *Animal Farm* and *1984*.

96.     Nevada removed a combined volume of *Animal Farm* and *1984* from its high school library under the Library Restriction.

## C.  *1984*

97.     *1984* by George Orwell was first published in 1949.  It has sold more than 30 million copies.

98.     *1984* is a dystopian novel that explores a totalitarian state ruled by the "Party" in which history is rewritten to align with the Party's ever-changing narrative.  The Party exercises complete control over every aspect of life, including thought, through constant surveillance, propaganda, and the manipulation of language via "Newspeak."

99.     *1984* explores themes such as totalitarianism, censorship, individualism versus collectivism, the manipulation of truth, and the dangers of state surveillance.  It remains a powerful

warning against the dangers of unchecked political power and introduced terms such as "Big Brother," "doublethink," and "Thought Police" into the modern lexicon.

100.     In *1984*, sexual activity is mentioned both as a means of political control and a means of rebellion in support of the book's themes.  However, the book is not explicit and it does not contain content that is within the scope of the Library Restriction.  *See* Exhibit B.

101.     *1984* is one of TIME Magazine's Best 100 English-Language Novels, one of Modern Library's 100 Best Novels, and a winner of the Prometheus Hall of Fame Award.

102.     *1984* is frequently tested on the College Board's Advanced Placement English Literature exam.

103.     Several school districts across the nation assign *1984* in their high school curricula.

104.     Plaintiff PRH publishes *1984*.

105.     Plaintiff HarperCollins publishes a combined volume of *Animal Farm* and *1984*.

106.     Nevada removed *1984* and a combined volume of *Animal Farm* and *1984* from its high school library under the Library Restriction.

**D.  Brave New World**

107.     *Brave New World* by Aldous Huxley was first published in 1932.  It has sold millions of copies.

108.     *Brave New World* is a dystopian novel that offers a chilling depiction of a future society driven by technological advancements and extreme social engineering.  *Brave New World* explores the consequences of sacrificing individuality and freedom for the sake of stability and order and themes such as the loss of individuality, the dehumanizing effects of technology, and the dangers of an all-powerful state.  Huxley's sharp and thought-provoking narrative raises critical questions about the price of progress and the true meaning of happiness, making it a cornerstone of dystopian literature.

109.    While *Brave New World* refers to sex to create a comparison of the promiscuous mores of the World State and the traditional sexual values of the Reservation, the contents of the book are not explicit and the book does not contain content that is within the scope of the Library Restriction.  *See* Exhibit B.

110.    *Brave New World* has won the Prometheus Hall of Fame Award, which recognizes classic works of science fiction and fantasy that explore themes of personal freedom and societal control, and is ranked fifth on Modern Library's 100 Best English-Language Novels of the 20th Century.

111.    *Brave New World* is frequently tested on the College Board's Advanced Placement English Literature exam.

112.    Several school districts across the nation assign *Brave New World* in their middle and high school curricula.

113.    Plaintiff HarperCollins publishes *Brave New World*.

114.    Aldous Huxley's estate, through its executor Jack Miles, is a member of the Authors Guild.

115.    East Union and Nevada removed *Brave New World* from their high school libraries under the Library Restriction.

**E.  Speak**

116.    *Speak* by Laurie Halse Anderson was first published in 1999.  It has sold more than 3 million copies.

117.    *Speak* is a young adult fiction novel based on Anderson's personal experience of having been sexually assaulted as a teenager and the resulting trauma.  The protagonist Melinda Sordino is sexually assaulted at a party, calls the police, and is ostracized as a result.  The book follows Melinda through her freshman year of high school as she becomes increasingly isolated

and nearly stops speaking. *Speak* explores themes of identity, finding one's voice, trauma, and healing.

118.    *Speak* contains one brief passage that implies a "sex act." That passage, however, is not explicit and does not contain content that is within the scope of the Library Restriction. *See* Exhibit B.

119.    Plugged In, a website by Focus on the Family, an organization that "equips families with Christian reviews of . . . books," has recognized that the sole passage in *Speak* concerning sex (a rape scene) contains no "graphic detail[s]" but rather is implied through "sensory details— what the ground smelled like, how hard it was to breathe, how she tried to scream but remained silent."[9]

120.    *Speak* is an important resource for high school students experiencing sexual assault. The National Book Foundation praised the book, writing that Melinda "speaks for many a disenfranchised teenager while demonstrating the importance of speaking up for oneself."

121.    *Speak* won the Golden Kite Award and a Michael Printz Honor and was named as a finalist for the Edgar Allen Poe Award, the *Los Angeles Times* Book Prize, and the National Book Award for Young People's Literature. *Speak* was also named an ALA Best Book for Young Adults and listed in the ALA's Top Ten Best Books for Young Adults.

122.    Several school districts across the nation assign *Speak* in their high school curricula.[10]

123.    Plaintiff Macmillan publishes *Speak*.

---

[9] Speak - Plugged In

[10] The SPEAK list, so far – Laurie Halse Anderson

124.    East Union removed *Speak* from its high school library under the Library Restriction.

## F.  *Nineteen Minutes*

125.    *Nineteen Minutes* by Plaintiff Jodi Picoult, first published in 2007, centers on a school shooting, demonstrating the devastating ramifications of failing a child who has been socially excluded.  Through characters Peter Houghton, who has been mercilessly bullied for most of his life, and Josie Cormier, who is being physically and sexually abused by her boyfriend, *Nineteen Minutes* shows that marginalization can take many different forms.

126.    *Nineteen Minutes* contains one brief passage that implies a "sex act."  That passage, however, is not explicit and does not contain content that is within the scope of the Library Restriction.  *See* Exhibit B.

127.    To the extent that the Court nonetheless finds that this passage does fall within the scope of the Library Restriction, the passage is essential to the plot, because it shows how Josie's relationship with her boyfriend becomes abusive.

128.    *Nineteen Minutes* debuted at #1 on the *New York Times* bestseller list.  It has sold more than 10 million copies.

129.    *Nineteen Minutes* has been used in anti-bullying curricula.  Picoult's website contains resources for educators to teach *Nineteen Minutes* in their anti-bullying curriculum.[11]

130.    Numerous reviewers have recognized the value of *Nineteen Minutes* for the fight against extreme bullying.[12]  The Associated Press wrote that *Nineteen Minutes* "makes you want

---

[11] Jodi Picoult · Nineteen Minutes (2007)

[12] https://www.jodipicoult.com/nineteen-minutes.html#code0slide3

to grab every kid who feels like an outcast and say, 'I promise, this, too, shall pass.'" *USA Today* wrote that the world of *Nineteen Minutes* "could be your community, your neighbor, your family."

131.   In 2010, *Nineteen Minutes* received the Iowa High School Book Award from the Iowa Association of School Librarians.[13]  The American Library Association also listed *Nineteen Minutes* on its list of Outstanding Books for the College Bound and Lifelong Learners.[14]

132.   Several school districts across the nation assign *Nineteen Minutes* in their high school curricula.

133.   Plaintiff S&S publishes *Nineteen Minutes*.

134.   Urbandale and East Union removed *Nineteen Minutes* from their high school libraries under the Library Restriction.

### G.  I Know Why The Caged Bird Sings

135.   *I Know Why the Caged Bird Sings* by Maya Angelou was first published in 1969. The book is Angelou's best-known work.  It has sold more than two million copies.

136.   *I Know Why the Caged Bird Sings* is a nonfiction autobiography that describes Angelou's coming-of-age from approximately ages three to sixteen.  The book recounts Angelou's experience of racism and discrimination in the Jim Crow South.  It also describes Angelou's difficult family upbringing, including her experience of feeling abandoned after her parents divorced and sent her to live with her grandmother.

137.   *I Know Why the Caged Bird Sings* describes how Angelou's love of literature helped her overcome a traumatic childhood and find her place in the world.  As a child, Angelou was sexually assaulted by her mother's then-boyfriend.  As recounted in the book, Angelou lied

---

[13] Jodi Picoult · Nineteen Minutes (2007)

[14] Outstanding Books for the College Bound and Lifelong Learners | ALA

under oath at the boyfriend's trial, and the boyfriend was subsequently murdered.  The trauma of these experiences led Angelou to become largely mute for several years.  Only when a neighbor gave her books to read aloud did she regain her voice and become an adult.

138.    *I Know Why the Caged Bird Sings* also describes Angelou's experience with teenage pregnancy, the birth of her son, and her increasing confidence in her ability as a mother.

139.    *I Know Why the Caged Bird Sings* contains three brief passages that are within the scope of the Library Restriction.  *See* Exhibit B.  These three passages are essential to the plot of the book, because they explain the context for Angelou's false testimony at trial, period of muteness, and decision to become a mother.  They are also essential because the book is a work of nonfiction autobiography and these events were major turning points in Angelou's life.

140.    In 1970, *I Know Why the Caged Bird Sings* was named a National Book Award Finalist.  In 2011, TIME Magazine included *I Know Why the Caged Bird Sings* on its list of the 100 best nonfiction books of all time.[15]

141.    Countless school districts across the nation assign *I Know Why the Caged Bird Sings* in their high school curricula.

142.    In 2000, Maya Angelou received the National Medal of Arts.  In 2011, she received the Presidential Medal of Freedom.

143.    Former President George W. Bush described Angelou as "among the most talented writers of our time" and stated that her work "enriched the culture of our country."[16]

---

[15] https://time.com/archive/7125933/all-time-100-best-nonfiction-books/

[16]    https://www.bushcenter.org/newsroom/statement-by-president-george-w-bush-on-maya-angelou#:~:text=She%20was%20among%20the%20most%20talented%20writers%20of%20our%20time.%20Her%20words%20inspired%20peace%20and%20equality%20and%20enriched%20the%20culture%20of%20our%20country.

144.    Plaintiff PRH publishes *I Know Why the Caged Bird Sings*.

145.    East Union and Nevada removed *I Know Why the Caged Bird Sings* from their high school libraries under the Library Restriction.

### H.  *The Rape of Nanking*

146.    First published in 1997, *The Rape of Nanking: The Forgotten Holocaust of World War II* by Iris Chang is a meticulously researched account of one of the most brutal atrocities of World War II: the massacre and systematic sexual violence committed by Japanese soldiers in the Chinese city of Nanking (now Nanjing) in 1937-1938.  Chang's book weaves together survivors' testimonies, diaries of Western missionaries who remained in the city, and official reports to vividly detail the horrors inflicted on the people of Nanking.

147.    By shedding light on this often-overlooked chapter of history, *The Rape of Nanking* preserves the memory of the victims, underscores the importance of historical accountability, and addresses the lingering tensions between China and Japan over Japan's failure to fully acknowledge or atone for these war crimes.  It has played a pivotal role in bringing international attention to the atrocities committed in Nanking, making it one of the most significant accounts of wartime atrocities in modern history.

148.    The *Rape of Nanking* describes well-documented, historically significant events, some of which are within the scope of the Library Restriction.  *See* Exhibit B.

149.    *The Rape of Nanking* won the Asian American Literary Award for Nonfiction and the Christopher Award.  It is also a Kiriyama Prize Notable Book, a National Book Critics Circle Award Finalist, and a *New York Times* Bestseller.

150.    Plaintiff Hachette publishes *The Rape of Nanking*.

151.    Nevada removed *The Rape of Nanking* from its high school library under the Library Restriction.

## I.  *Native Son*

152.    *Native Son* by Richard Wright was first published in 1940.  It became an immediate bestseller.

153.    Set in Chicago in the 1930s, *Native Son* is the story of Bigger Thomas, a young Black man whose life spirals downward after he kills a young white woman in a moment of panic. This novel both condemns social and racial injustice and paints an unsparing portrait of the Black experience in America at that time, revealing the tragic effects of poverty, racism, and hopelessness on the human spirit.

154.    *Native Son* contains one brief passage that is within the scope of the Library Restriction.  *See* Exhibit B.

155.    The publication of *Native Son* marked a turning point in American culture and Black literature in the 20th Century.  *Native Son* is one of TIME Magazine's Best 100 English-Language Novels and Modern Library's 100 Best Novels.  In addition to its exceptional merit as a literary work, *Native Son* is historically significant in the history of the 20th Century United States.

156.    *Native Son* is widely assigned in high school curricula across the country.

157.    *Native Son* is frequently tested on the College Board's Advanced Placement English Literature exam.

158.    Plaintiff HarperCollins publishes *Native Son*.

159.    Richard Wright's estate, through his daughter Julia Wright, is a member of the Authors Guild.

160.    Urbandale removed *Native Son* from its high school library under the Library Restriction.

**CAUSES OF ACTION**

**COUNT I**
**PLAINTIFF HARPERCOLLINS AGAINST THE STATE DEFENDANTS**
**and THE EAST UNION DEFENDANTS as to *TO KILL A MOCKINGBIRD***
**42 U.S.C. § 1983; First Amendment**

161.    Paragraphs 1–160 are incorporated by reference as if fully set forth herein.

162.    *To Kill a Mockingbird* does not contain content within the scope of the Library Restriction.

163.    Even so, East Union removed *To Kill a Mockingbird* from its high school library and has not reshelved that book.  Due to the State Defendants' threats to penalize Iowa educators who do not comply with the Library Restriction, East Union takes the position that the Library Restriction requires it not to make the book available in its high school library.

164.    On information and belief, the State Defendants have not informed East Union that the Library Restriction does not prohibit *To Kill a Mockingbird* in high school libraries.

165.    The removal of *To Kill a Mockingbird* from East Union's high school library pursuant to the Library Restriction violates HarperCollins's rights under the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because that removal bears no reasonable relation to a legitimate pedagogical purpose given the pedagogical value of that book as a whole.

166.    The removal of *To Kill a Mockingbird* from East Union's high school library injures HarperCollins.  HarperCollins's injuries are traceable to and redressable by the State Defendants and the East Union Defendants.

167.    An actual and substantial controversy as to the constitutionality of the removal of *To Kill a Mockingbird* from East Union's high school library pursuant to the Library Restriction exists between (a) HarperCollins and (b) the State Defendants and the East Union Defendants.

168. Because the removal of *To Kill a Mockingbird* from East Union's high school library pursuant to the Library Restriction infringes on HarperCollins's First Amendment rights, there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that the removal of *To Kill a Mockingbird* pursuant to the Library Restriction is unconstitutional.

169. Declaratory relief as to the constitutionality of the removal of *To Kill a Mockingbird* from East Union's high school library pursuant to the Library Restriction would clarify and settle the legal relations in issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

170. There is no adequate remedy at law for these violations of HarperCollins's constitutional rights. Unless the requested permanent injunctive relief is granted, HarperCollins will suffer immediate and irreparable harm.

**COUNT II**
**PLAINTIFF HARPERCOLLINS AGAINST**
**THE STATE DEFENDANTS and THE NEVADA DEFENDANTS**
**as to COMBINED VOLUME OF *ANIMAL FARM and 1984***
**42 U.S.C. § 1983; First Amendment**

171. Paragraphs 1–160 are incorporated by reference as if fully set forth herein.

172. Neither *Animal Farm* nor *1984* contains content that is within the scope of the Library Restriction.

173. Even so, Nevada removed a combined volume of *Animal Farm* and *1984* from its high school library and has not reshelved that book. Due to the State Defendants' threats to penalize Iowa educators who do not comply with the Library Restriction, Nevada takes the position that the Library Restriction requires it not to make the book available in its high school library.

174. On information and belief, the State Defendants have not informed Nevada that the Library Restriction does not prohibit *Animal Farm* and *1984* in high school libraries.

175.    The removal of the combined volume of *Animal Farm* and *1984* from Nevada's high school library pursuant to the Library Restriction violates HarperCollins's rights under the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because that removal bears no reasonable relation to a legitimate pedagogical purpose given the pedagogical value of that book as a whole.

176.    The removal of the combined volume of *Animal Farm* and *1984* from Nevada's high school library injures HarperCollins.  HarperCollins's injuries are traceable to and redressable by the State Defendants and the Nevada Defendants.

177.    An actual and substantial controversy as to the constitutionality of the removal of the combined volume of *Animal Farm* and *1984* from Nevada's high school library pursuant to the Library Restriction exists between (a) HarperCollins and (b) the State Defendants and the Nevada Defendants.

178.    Because the removal of the combined volume of *Animal Farm* and *1984* from Nevada's high school library pursuant to the Library Restriction infringes on HarperCollins's First Amendment rights, there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that the removal of the combined volume of *Animal Farm* and *1984* pursuant to the Library Restriction is unconstitutional.

179.    Declaratory relief as to the constitutionality of the removal of the combined volume of *Animal Farm* and *1984* from Nevada's high school library pursuant to the Library Restriction would clarify and settle the legal relations in issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

180.    There is no adequate remedy at law for these violations of HarperCollins's constitutional rights.  Unless the requested permanent injunctive relief is granted, HarperCollins will suffer immediate and irreparable harm.

**COUNT III**
**PLAINTIFF PRH AGAINST THE STATE DEFENDANTS**
**and THE NEVADA DEFENDANTS as to *1984***
**42 U.S.C. § 1983; First Amendment**

181.    Paragraphs 1–160 are incorporated by reference as if fully set forth herein.

182.    *1984* does not contain content that is within the scope of the Library Restriction.

183.    Even so, Nevada removed *1984* from its high school library and has not reshelved that book.  Due to the State Defendants' threats to penalize Iowa educators who do not comply with the Library Restriction, Nevada takes the position that the Library Restriction requires it not to make the book available in its high school library.

184.    On information and belief, the State Defendants have not informed Nevada that the Library Restriction does not prohibit *1984* in high school libraries.

185.    The removal of *1984* from Nevada's high school library pursuant to the Library Restriction violates PRH's rights under the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because that removal bears no reasonable relation to a legitimate pedagogical purpose given the pedagogical value of that book as a whole.

186.    The removal of *1984* from Nevada's high school library injures PRH.  PRH's injuries are traceable to and redressable by the State Defendants and the Nevada Defendants.

187.    An actual and substantial controversy as to the constitutionality of the removal of *1984* from Nevada's high school library pursuant to the Library Restriction exists between (a) PRH and (b) the State Defendants and the Nevada Defendants.

35

188.    Because the removal of *1984* from Nevada's high school library pursuant to the Library Restriction infringes on PRH's First Amendment rights, there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that the removal of *1984* pursuant to the Library Restriction is unconstitutional.

189.    Declaratory relief as to the constitutionality of the removal of *1984* from Nevada's high school library pursuant to the Library Restriction would clarify and settle the legal relations in issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

190.    There is no adequate remedy at law for these violations of PRH's constitutional rights.  Unless the requested permanent injunctive relief is granted, PRH will suffer immediate and irreparable harm.

**COUNT IV**
**PLAINTIFFS HARPERCOLLINS AND THE AUTHORS GUILD**
**AGAINST THE STATE DEFENDANTS, THE EAST UNION DEFENDANTS,**
**and THE NEVADA DEFENDANTS as to *BRAVE NEW WORLD***
**42 U.S.C. § 1983; First Amendment**

191.    Paragraphs 1–160 are incorporated by reference as if fully set forth herein.

192.    *Brave New World* does not contain content that is within the scope of the Library Restriction.

193.    Even so, East Union and Nevada removed *Brave New World* from their high school libraries and have not reshelved the books.  Due to the State Defendants' threats to penalize Iowa educators who do not comply with the Library Restriction, Nevada and East Union take the position that the Library Restriction requires them not to make the book available in their high school libraries.

194.    On information and belief, the State Defendants have not informed Nevada and East Union that the Library Restriction does not prohibit *Brave New World* in high school libraries.

195.    The removal of *Brave New World* from East Union's and Nevada's high school libraries pursuant to the Library Restriction violates HarperCollins's and the Authors Guild's rights under the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because that removal bears no reasonable relation to a legitimate pedagogical purpose given the pedagogical value of that book as a whole.

196.    The removal of Brave New World from East Union's and Nevada's high school libraries injures HarperCollins and the Authors Guild.  HarperCollins's and the Authors Guild's injuries are traceable to and redressable by the State Defendants, the East Union Defendants, and the Nevada Defendants.

197.    An actual and substantial controversy as to the constitutionality of the removal of *Brave New World* from East Union's and Nevada's high school libraries pursuant to the Library Restriction exists between (a) HarperCollins and the Authors Guild and (b) the State Defendants, the East Union Defendants, and the Nevada Defendants.

198.    Because the removal of *Brave New World* from East Union's and Nevada's high school libraries pursuant to the Library Restriction infringes on HarperCollins's and the Authors Guild's First Amendment rights, there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that the removal of *Brave New World* pursuant to the Library Restriction is unconstitutional.

199.    Declaratory relief as to the constitutionality of the removal of *Brave New World* from East Union's and Nevada's high school libraries pursuant to the Library Restriction would clarify and settle the legal relations in issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

200. There is no adequate remedy at law for these violations of HarperCollins's and the Authors Guild's constitutional rights. Unless the requested permanent injunctive relief is granted, HarperCollins and the Authors Guild will suffer immediate and irreparable harm.

**COUNT V**
**PLAINTIFFS MACMILLAN and LAURIE HALSE ANDERSON**
**AGAINST THE STATE DEFENDANTS and**
**THE EAST UNION DEFENDANTS as to *SPEAK***
**42 U.S.C. § 1983; First Amendment**

201. Paragraphs 1–160 are incorporated by reference as if fully set forth herein.

202. *Speak* does not contain content that is within the scope of the Library Restriction.

203. Even so, East Union removed *Speak* from its high school library and has not reshelved that book. Due to the State Defendants' threats to penalize Iowa educators who do not comply with the Library Restriction, East Union takes the position that the Library Restriction requires it not to make the book available in its high school library.

204. On information and belief, the State Defendants have not informed East Union that the Library Restriction does not prohibit *Speak* in high school libraries.

205. The removal of *Speak* from East Union's high school library pursuant to the Library Restriction violates Macmillan's and Anderson's rights under the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because that removal bears no reasonable relation to a legitimate pedagogical purpose given the pedagogical value of that book as a whole.

206. The removal of *Speak* from East Union's high school library injures Macmillan and Anderson. Macmillan's and Anderson's injuries are traceable to and redressable by the State Defendants and the East Union Defendants.

38

207.   An actual and substantial controversy as to the constitutionality of the removal of *Speak* from East Union's high school library pursuant to the Library Restriction exists between (a) PRH and (b) the State Defendants and the East Union Defendants.

208.   Because the removal of *Speak* from East Union's high school library pursuant to the Library Restriction infringes on Macmillan's and Anderson's First Amendment rights, there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that the removal of *Speak* pursuant to the Library Restriction is unconstitutional.

209.   Declaratory relief as to the constitutionality of the removal of *Speak* from East Union's high school library pursuant to the Library Restriction would clarify and settle the legal relations in issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

210.   There is no adequate remedy at law for these violations of Macmillan's and Anderson's constitutional rights.  Unless the requested permanent injunctive relief is granted, Macmillan and Anderson will suffer immediate and irreparable harm.

**COUNT VI**
**PLAINTIFFS S&S and JODI PICOULT AGAINST**
**THE STATE DEFENDANTS, THE URBANDALE DEFENDANTS,**
**and THE EAST UNION DEFENDANTS as to *NINETEEN MINUTES***
**42 U.S.C. § 1983; First Amendment**

211.   Paragraphs 1–160 are incorporated by reference as if fully set forth herein.

212.   Nineteen Minutes does not contain content that is within the scope of the Library Restriction.

213.   Even so, Urbandale and East Union removed *Nineteen Minutes* from its high school libraries and have not reshelved that book.  Due to the State Defendants' threats to penalize Iowa educators who do not comply with the Library Restriction, Urbandale and East Union take the

position that the Library Restriction requires them not to make the book available in their high school libraries.

214.    On information and belief, the State Defendants have not informed Urbandale or East Union that the Library Restriction does not prohibit *Nineteen Minutes* in high school libraries.

215.    Because *Nineteen Minutes* does not contain content that is within the scope of the Library Restriction, there is no legitimate pedagogical purpose to Urbandale's and East Union's removal of *Nineteen Minutes* under the Library Restriction.  Consequently, the removal of *Nineteen Minutes* from Urbandale's and East Union's high school libraries pursuant to the Library Restriction violates S&S's and Picoult's rights under the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment.

216.    In the event, however, that the Court determines that *Nineteen Minutes* does contain content that is within the scope of the Library Restriction, the removal of *Nineteen Minutes* from Urbandale's and East Union's high school libraries pursuant to the Library Restriction violates S&S's and Picoult's rights under the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because those removals bear no reasonable relation to a legitimate pedagogical purpose given the pedagogical value of that book as a whole.

217.    The removal of *Nineteen Minutes* from Urbandale's and East Union's high school libraries injures S&S and Picoult.  S&S's and Picoult's injuries are traceable to and redressable by the State Defendants, the East Union Defendants, and the East Union Defendants.

218.    An actual and substantial controversy as to the constitutionality of the removals of *Nineteen Minutes* from Urbandale's high school library pursuant to the Library Restriction exists

between (a) S&S and Picoult and (b) the State Defendants, the Urbandale Defendants, and the East Union Defendants.

219.    Because the removal of *Nineteen Minutes* from Urbandale's and East Union's high school libraries pursuant to the Library Restriction infringes on S&S's and Picoult's First Amendment rights, there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that the removal of *Nineteen Minutes* pursuant to the Library Restriction is unconstitutional.

220.    Declaratory relief as to the constitutionality of the removal of *Nineteen Minutes* from Urbandale's and East Union's high school libraries would clarify and settle the legal relations in issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

221.    There is no adequate remedy at law for these violations of S&S's and Picoult's constitutional rights.  Unless the requested permanent injunctive relief is granted, S&S and Picoult will suffer immediate and irreparable harm.

**COUNT VII**
**PLAINTIFF GRACE VAN GUNDY AGAINST**
**THE STATE DEFENDANTS and THE URBANDALE DEFENDANTS**
**as to *NINETEEN MINUTES***
**42 U.S.C. § 1983; First Amendment**

222.    Paragraphs 1–160 are incorporated by reference as if fully set forth herein.

223.    Nineteen Minutes does not contain content that is within the scope of the Library Restriction.

224.    Even so, Urbandale removed *Nineteen Minutes* from its high school library.  Due to the State Defendants' threats to penalize Iowa educators who do not comply with the Library Restriction, Urbandale took the position that the Library Restriction requires it not to make the book available in its high school library.

41

225.    Urbandale did not reshelve *Nineteen Minutes* before Van Gundy graduated from Urbandale High School.  Van Gundy therefore was unable to check out and read *Nineteen Minutes* from her high school library during her senior year of high school.

226.    On information and belief, the State Defendants did not inform Urbandale that the Library Restriction does not prohibit *Nineteen Minutes* in high school libraries.

227.    Because *Nineteen Minutes* does not contain content that is within the scope of the Library Restriction, there was no legitimate pedagogical purpose to Urbandale's removal of *Nineteen Minutes* under the Library Restriction.  Consequently, the removal of *Nineteen Minutes* from Urbandale's high school library pursuant to the Library Restriction violated Van Gundy's right to access information and ideas within school and classroom libraries under the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment.

228.    In the event, however, that the Court determines that *Nineteen Minutes* does contain content that is within the scope of the Library Restriction, the removal of *Nineteen Minutes* from Urbandale's high school library pursuant to the Library Restriction violated Van Gundy's right to access information and ideas within school and classroom libraries under the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because that removal bore no reasonable relation to a legitimate pedagogical purpose given the pedagogical value of that book as a whole.

229.    The removal of *Nineteen Minutes* from Urbandale's high school library pursuant to the Library Restriction and Urbandale's failure to reshelve *Nineteen Minutes* during Van Gundy's senior year of high school injured Grace Van Gundy.  Van Gundy's injury is traceable to and redressable by the State Defendants and the Urbandale Defendants.

42

230.   Van Gundy seeks nominal damages.

**COUNT VIII**
**PLAINTIFF PRH AGAINST THE STATE DEFENDANTS,**
**THE EAST UNION DEFENDANTS, and THE NEVADA DEFENDANTS**
**as to *I KNOW WHY THE CAGED BIRD SINGS***
**42 U.S.C. § 1983; First Amendment**

231.   Paragraphs 1–160 are incorporated by reference as if fully set forth herein.

232.   The Library Restriction requires Iowa school districts to remove *I Know Why the Caged Bird Sings* from their school libraries.

233.   East Union removed *I Know Why the Caged Bird Sings* from its high school library and has not reshelved that book because it takes the position that the Library Restriction requires it not to make the book available in its high school library.

234.   *I Know Why the Caged Bird Sings* is on Nevada's list of books that "have been removed from [Nevada] collections" because they "may violate Iowa Senate File 496."

235.   Nevada removed *I Know Why the Caged Bird Sings* from its high school library and has not reshelved that book because it takes the position that the Library Restriction requires it not to make the book available in its high school library.

236.   The removal of *I Know Why the Caged Bird Sings* from East Union's and Nevada's high school libraries pursuant to the Library Restriction violates PRH's rights under the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because those removals bear no reasonable relation to a legitimate pedagogical purpose given the pedagogical value of that book as a whole.

237.   The removal of *I Know Why the Caged Bird Sings* from East Union's and Nevada's high school libraries injures PRH.  PRH's injuries are traceable to and redressable by the State Defendants, the East Union Defendants, and the Nevada Defendants.

43

238.    An actual and substantial controversy as to the constitutionality of the removals of *I Know Why the Caged Bird Sings* from East Union's and Nevada's high school libraries pursuant to the Library Restriction exists between (a) PRH and (b) the State Defendants, the East Union Defendants, and the Nevada Defendants.

239.    Because the removal of *I Know Why the Caged Bird Sings* from East Union's and Nevada's high school libraries pursuant to the Library Restriction infringes on PRH's First Amendment rights, there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that those removals of *I Know Why the Caged Bird Sings* pursuant to the Library Restriction are unconstitutional.

240.    Declaratory relief as to the constitutionality of the removal of *I Know Why the Caged Bird Sings* from East Union's and Nevada's high school libraries would clarify and settle the legal relations in issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

241.    There is no adequate remedy at law for these violations of PRH's constitutional rights.  Unless the requested permanent injunctive relief is granted, PRH will suffer immediate and irreparable harm.

**COUNT IX**
**PLAINTIFF HACHETTE AGAINST THE STATE DEFENDANTS**
**and THE NEVADA DEFENDANTS as to *THE RAPE OF NANKING***
**42 U.S.C. § 1983; First Amendment**

242.    Paragraphs 1–160 are incorporated by reference as if fully set forth herein.

243.    The Library Restriction requires Iowa school districts to remove *The Rape of Nanking* from their school libraries.

244.    *The Rape of Nanking* is on Nevada's list of books that "have been removed from [Nevada] collections" because they "may violate Iowa Senate File 496."

44

245.     Nevada removed *The Rape of Nanking* from its high school library and has not reshelved that book because it takes the position that the Library Restriction requires it not to make the book available in its high school library.

246.     The removal of *The Rape of Nanking* from Nevada's high school library pursuant to the Library Restriction violates Hachette's rights under the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because that removal bears no reasonable relation to a legitimate pedagogical purpose given the pedagogical value of that book as a whole.

247.     The removal of *The Rape of Nanking* from Nevada's high school library injures Hachette.  Hachette's injuries are traceable to and redressable by the State Defendants and the Nevada Defendants.

248.     An actual and substantial controversy as to the constitutionality of the removal of *The Rape of Nanking* from Nevada's high school library pursuant to the Library Restriction exists between (a) Hachette and (b) the State Defendants and the Nevada Defendants.

249.     Because the removal of *The Rape of Nanking* from Nevada's high school library pursuant to the Library Restriction infringes on Hachette's First Amendment rights, there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that the removal of *The Rape of Nanking* pursuant to the Library Restriction is unconstitutional.

250.     Declaratory relief as to the constitutionality of the removal of *The Rape of Nanking* from Nevada's high school library would clarify and settle the legal relations in issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

251.    There is no adequate remedy at law for these violations of Hachette's constitutional rights.  Unless the requested permanent injunctive relief is granted, Hachette will suffer immediate and irreparable harm.

**COUNT X**
**PLAINTIFFS HARPERCOLLINS AND THE AUTHORS GUILD**
**AGAINST THE STATE DEFENDANTS**
**and THE URBANDALE DEFENDANTS as to *NATIVE SON***
**42 U.S.C. § 1983; First Amendment**

252.    Paragraphs 1–160 are incorporated by reference as if fully set forth herein.

253.    The Library Restriction requires Iowa school districts to remove *Native Son* from their school libraries.

254.    Urbandale removed *Native Son* from its high school library and has not reshelved that book because it takes the position that the Library Restriction requires it not to make the book available in its high school library.

255.    The removal of *Native Son* from Urbandale's high school library pursuant to the Library Restriction violates HarperCollins's and the Authors Guild's rights under the Free Speech Clause of the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, because that removal bears no reasonable relation to a legitimate pedagogical purpose given the pedagogical value of that book as a whole.

256.    The removal of *Native Son* from Urbandale's high school library injures HarperCollins and the Authors Guild.  HarperCollins's and the Authors Guild's injuries are traceable to and redressable by the State Defendants and the Urbandale Defendants.

257.    An actual and substantial controversy as to the constitutionality of the removal of *Native Son* from Urbandale's high school library pursuant to the Library Restriction exists between (a) HarperCollins and the Authors Guild and (b) the State Defendants and the Urbandale Defendants.

258.    Because the removal of *Native Son* from Urbandale's high school library pursuant to the Library Restriction infringes on HarperCollins's and the Authors Guild's First Amendment rights, there is sufficient immediacy and reality to warrant the issuance of a declaratory judgment finding that the removal of *Native Son* pursuant to the Library Restriction is unconstitutional.

259.    Declaratory relief as to the constitutionality of the removal of *Native Son* from Urbandale's high school library would clarify and settle the legal relations in issue and would terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

260.    There is no adequate remedy at law for these violations of HarperCollins's and the Authors Guild's constitutional rights.  Unless the requested permanent injunctive relief is granted, HarperCollins and the Authors Guild will suffer immediate and irreparable harm.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

A.    Declaring that the removal of *To Kill a Mockingbird* by Harper Lee from East Union's high school library under the Library Restriction is unconstitutional and entering a permanent injunction (1) enjoining the State Defendants and each of their agents, attorneys, servants, employees, and other representatives from enforcing the Library Restriction against East Union as to *To Kill a Mockingbird* by Harper Lee; (2) requiring the East Union Defendants to return *To Kill a Mockingbird* by Harper Lee to East Union's high school library shelves; and (3) enjoining the East Union Defendants from removing *To Kill a Mockingbird* by Harper Lee from East Union's high school library under the Library Restriction;

B.    Declaring that the removal of the combined volume of *Animal Farm* and *1984* by George Orwell from Nevada's high school library under the Library Restriction is unconstitutional and entering a permanent injunction (1) enjoining the State Defendants and each of their agents,

attorneys, servants, employees, and other representatives from enforcing the Library Restriction against Nevada as to the combined volume of *Animal Farm* and *1984* by George Orwell; (2) requiring the Nevada Defendants to return the combined volume of *Animal Farm* and *1984* by George Orwell to Nevada's high school library shelves; and (3) enjoining the Nevada Defendants from removing the combined volume of *Animal Farm* and *1984* by George Orwell from Nevada's high school library under the Library Restriction;

C.      Declaring that the removal of *1984* by George Orwell from Nevada's high school library under the Library Restriction is unconstitutional and entering a permanent injunction (1) enjoining the State Defendants and each of their agents, attorneys, servants, employees, and other representatives from enforcing the Library Restriction against Nevada as to *1984* by George Orwell; (2) requiring the Nevada Defendants to return *1984* by George Orwell to Nevada's high school library shelves; and (3) enjoining the Nevada Defendants from removing *1984* by George Orwell from Nevada's high school library under the Library Restriction;

D.      Declaring that the removal of *Brave New World* by Aldous Huxley from East Union's and Nevada's high school libraries under the Library Restriction is unconstitutional and entering a permanent injunction (1) enjoining the State Defendants and each of their agents, attorneys, servants, employees, and other representatives from enforcing the Library Restriction against East Union and Nevada as to *Brave New World* by Aldous Huxley; (2) requiring the East Union and Nevada Defendants to return *Brave New World* by Aldous Huxley to East Union's and Nevada's high school library shelves; and (3) enjoining the East Union and Nevada Defendants from removing *Brave New World* by Aldous Huxley from East Union's and Nevada's high school libraries under the Library Restriction;

48

E.      Declaring that the removal of *Speak* by Laurie Halse Anderson from East Union's high school library under the Library Restriction is unconstitutional and entering a permanent injunction (1) enjoining the State Defendants and each of their agents, attorneys, servants, employees, and other representatives from enforcing the Library Restriction against East Union as to *Speak* by Laurie Halse Anderson; (2) requiring the East Union Defendants to return *Speak* by Laurie Halse Anderson to East Union's high school library shelves; and (3) enjoining the East Union Defendants from removing *Speak* by Laurie Halse Anderson from East Union's high school library under the Library Restriction;

F.      Declaring that the removal of *Nineteen Minutes* by Jodi Picoult from Urbandale's and East Union's high school libraries under the Library Restriction is unconstitutional and entering a permanent injunction (1) enjoining the State Defendants and each of their agents, attorneys, servants, employees, and other representatives from enforcing the Library Restriction against Urbandale and East Union as to *Nineteen Minutes* by Jodi Picoult; (2) requiring the Urbandale and East Union Defendants to return *Nineteen Minutes* by Jodi Picoult to Urbandale's and East Union's high school library shelves; and (3) enjoining the Urbandale and East Union Defendants from removing *Nineteen Minutes* by Jodi Picoult from Urbandale's and East Union's high school library under the Library Restriction;

G.      Declaring that the removal of *I Know Why the Caged Bird Sings* by Maya Angelou from East Union's and Nevada's high school libraries under the Library Restriction is unconstitutional and entering a permanent injunction (1) enjoining the State Defendants and each of their agents, attorneys, servants, employees, and other representatives from enforcing the Library Restriction against East Union and Nevada as to *I Know Why the Caged Bird Sings* by Maya Angelou; (2) requiring the East Union and Nevada Defendants to return *I Know Why the*

49

*Caged Bird Sings* by Maya Angelou to East Union's and Nevada's high school library shelves; and (3) enjoining the East Union and Nevada Defendants from removing *I Know Why the Caged Bird Sings* by Maya Angelou from East Union's and Nevada's high school libraries under the Library Restriction;

H.      Declaring that the removal of *The Rape of Nanking: The Forgotten Holocaust of World War II* by Iris Chang from Nevada's high school library under the Library Restriction is unconstitutional and entering a permanent injunction (1) enjoining the State Defendants and each of their agents, attorneys, servants, employees, and other representatives from enforcing the Library Restriction against Nevada as to *The Rape of Nanking: The Forgotten Holocaust of World War II* by Iris Chang; (2) requiring the Nevada Defendants to return *The Rape of Nanking: The Forgotten Holocaust of World War II* by Iris Chang to Nevada's high school library shelves; and (3) enjoining the Nevada Defendants from removing *The Rape of Nanking: The Forgotten Holocaust of World War II* by Iris Chang from Nevada's high school library under the Library Restriction;

I.      Declaring that the removal of *Native Son* by Richard Wright from Urbandale's high school library under the Library Restriction is unconstitutional and entering a permanent injunction (1) enjoining the State Defendants and each of their agents, attorneys, servants, employees, and other representatives from enforcing the Library Restriction against Urbandale as to *Native Son* by Richard Wright; (2) requiring the Urbandale Defendants to return *Native Son* by Richard Wright to Urbandale's high school library shelves; and (3) enjoining the Urbandale Defendants from removing *Native Son* by Richard Wright from Urbandale's high school library under the Library Restriction;

50

J.      Awarding nominal damages in the amount of $1 to Grace Van Gundy for the loss of her First Amendment rights;

K.      Awarding Plaintiffs the costs of this action;

L.      Awarding Plaintiffs their reasonable attorneys' fees and other expenses pursuant to 42 U.S.C. § 1988; and

M.      Granting such other relief as the Court deems just and proper.


Dated:  July 27, 2026

WEINHARDT & LANTZ, P.C.

By: /s/ Mark E. Weinhardt
     Mark E. Weinhardt    AT0008280
     Todd M. Lantz      AT0010162
     Jason R. Smith     AT0014862
     2600 Grand Avenue, Suite 450
     Des Moines, Iowa 50312
     Telephone: (515) 244-3100
     mweinhardt@weinhardtlantz.com
     tlantz@weinhardtlantz.com
     jsmith@weinhardtlantz.com

     Frederick J. Sperling
     Adam J. Diederich
     Kirstie Brenson
     ArentFox Schiff LLP
     233 South Wacker Drive, Suite 7100
     Chicago, Illinois 60606
     Telephone: (312) 258-5500
     frederick.sperling@afslaw.com
     adam.diederich@afslaw.com
     kirstie.brenson@afslaw.com
     (admitted *pro hac vice*)

     *Attorneys for Plaintiffs*