**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| PENGUIN RANDOM HOUSE LLC; et al.,<br>*Plaintiffs*,<br>v.<br>JOHN ROBBINS, in his official capacity as President of the Iowa State Board of Education; et al.,<br>*Defendants*. | Case No. 4:23-cv-00478<br><br>**STATE DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS** |

**TABLE OF CONTENTS**

INTRODUCTION ........ 1
BACKGROUND FACTS ........ 2
MOTION TO DISMISS STANDARD ........ 3
ARGUMENT ........ 4
I. Plaintiffs' First Amendment rights are not implicated in this case. ........ 4
A. Students have no right to receive information from public school libraries. ........ 4
B. Publisher and Author Plaintiffs lack an affirmative right to have their books placed in public schools ........ 5
C. School library collection decisions are government speech. ........ 7
II. Even if Plaintiffs' First Amendment rights are implicated, they are not entitled to relief. . 9
A. Plaintiffs state no claim as to the six books they say the Library Section never reached. ........ 10
B. The Library Section's application to the three books Plaintiffs concede it covers is reasonably related to legitimate pedagogical concerns. ........ 14
C. Sovereign immunity bars Van Gundy's claim for nominal damages. ........ 19
CONCLUSION ........ 20

## INTRODUCTION

Iowa enacted Senate File 496 to ensure public school libraries contain appropriate books. To achieve that goal SF496 requires schools to adopt a library program that includes only age-appropriate materials in school libraries ("Library Section") and excludes "descriptions or visual depictions of sex acts" from the definition of "age appropriate." Plaintiffs here, led by Penguin Random House, have twice sought to preliminarily enjoin enforcement of the Library Section. And the Eighth Circuit has twice vacated the preliminary injunctions. *See GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 671 (8th Cir. 2024); *Penguin Random House, LLC v. Robbins*, 172 F.4th 581, 588 (8th Cir. 2026). Most recently, the Eighth Circuit rejected Plaintiffs' asserted First Amendment rights under *Hazelwood*'s school-sponsored-speech standard, because a school library is "part of the school's curriculum" and because SF496's school-library-book restrictions "address legitimate pedagogical concerns." *Robbins*, 172 F.4th at 586–88.

Plaintiffs amend their complaint (again) to seek as-applied declaratory and injunctive relief from the removal of nine books from school libraries under the Library Section. They challenge two categories of books: (1) books that they plead do not contain depictions of sex acts and therefore fall outside the scope of the Library Section and (2) books that they plead do contain depictions of sex acts and fall within the scope of the Library Section. And one Plaintiff, a former student, seeks nominal damages for the loss of her purported First Amendment right to receive. Each of their claims fails.

*First*, the Eighth Circuit already held that the "First Amendment does not guarantee students the right to access books of their choosing at taxpayer expense." *Robbins*, 172 F.4th at 586. Yet Publisher and Author Plaintiffs plead that their asserted First Amendment rights here are "intertwined" with students' right to receive. Dkt. 132 ¶ 7. But because there is no student right to receive the library books, there is no intertwined or derivative First Amendment right for publishers or authors to require Defendants to place certain books within a school library.

*Second*, even if the Court finds there is a constitutional right implicated, Plaintiffs' claims fail. For those books that, as Plaintiffs plead it, fall outside the scope of the Library Section, the

Court should avoid the constitutional question and decline to enter a permanent injunction instructing Defendants to obey the law. And for those books that, as Plaintiffs plead it, fall within the scope of the Library Section, Defendants "have a legitimate pedagogical interest in prohibiting speech involving sexual content." *Robbins*, 172 F.4th at 588. So the Library Section, as applied to those books, does not violate the First Amendment because those applications address legitimate pedagogical concerns and thus satisfy *Hazelwood*. The Court should dismiss the complaint.

**BACKGROUND FACTS**

Plaintiffs bring as-applied First Amendment challenges to S.F.496's Library Section. The Library Section requires schools to adopt a kindergarten through twelfth grade library program that includes only age-appropriate materials in school libraries. "'Age-appropriate' means topics, messages, and teaching methods suitable to particular ages or age groups of children and adolescents, based on developing cognitive, emotional, and behavioral capacity typical for the age or age group." Iowa Code § 256.11(19)(*a*). The library program must contain "only age-appropriate materials," and "age-appropriate" excludes "any material with descriptions or visual depictions of a sex act." Iowa Code §§ 256.11(9)(*a*)(2), (19)(*a*)(1).

Plaintiffs are five major publishers, the Authors Guild, two individual authors, and a former Urbandale student, Grace Van Gundy, who has since graduated. Dkt. 132 ¶¶ 12–23. Defendants are Iowa state officials responsible for enforcing the Library Section (the "State Defendants") and school board members and superintendents from the Urbandale, East Union, and Nevada Community School Districts ("School District Defendants"). *Id.* ¶¶ 24–42.

Plaintiffs challenge the removal of nine books—*To Kill a Mockingbird*, *Animal Farm*, *1984*, *Brave New World*, *Speak*, *Nineteen Minutes*, *I Know Why the Caged Bird Sings*, *The Rape of Nanking*, and *Native Son*—from the high school libraries of three Iowa school districts. *Id.* ¶ 1. Plaintiffs place the Removed Books into three categories. First, Plaintiffs allege that only three of the nine pleaded books—*I Know Why the Caged Bird Sings*, *The Rape of Nanking*, and *Native Son*—contain content precluding shelving under the Library Section. *Id.* ¶¶ 76, 139, 148, 154. As to those three books, Plaintiffs do not dispute that the statute covers the removed content; they

contend instead that the books' literary, historical, or pedagogical value should have excused their removal notwithstanding that coverage. *Id.* ¶¶ 139, 147–49, 155.

Plaintiffs next allege that one book, *Nineteen Minutes*, is "closer to the line" than the rest, conceding that it "contains one brief passage that implies a 'sex act.'" *Id.* ¶¶ 76, 126. But Plaintiffs plead that book does not contain content that is within the Library Section's scope. *Id.* ¶ 126.

Finally, Plaintiffs allege that the remaining five books—*To Kill a Mockingbird*, *Animal Farm*, *1984*, *Brave New World*, and *Speak*—do not contain content within the scope of the Library Section. *Id.* ¶ 76. Plaintiffs allege that any sexual content in those books is conveyed only through reference, label, or implication rather than explicit description. *Id.* ¶¶ 80, 92, 100, 109, 118. State Defendants see two categories: books Iowa law requires districts to remove, and books it does not reach.

The complaint alleges the School District Defendants removed the books because the State Defendants instructed Iowa school districts generally "to err on the side of caution" in enforcing the Library Section, *id.* ¶ 64, and because school employees face license discipline and termination for noncompliance, *id.* ¶¶ 69–73. Plaintiffs affirmatively allege that "[a]t no point have the State Defendants informed an Iowa school district that a book removed supposedly pursuant to the Library Restriction was not actually within the scope of the statute and was not required to be removed." *Id.* ¶ 66.

Plaintiff Grace Van Gundy was a senior at Urbandale High School when the Second Amended Complaint was filed and has since graduated. *Id.* ¶ 23. She alleges that during her senior year she wanted to check out *Nineteen Minutes* and other removed books from her school library, and that Urbandale did not reshelve those books before she graduated. *Id.* ¶¶ 23, 225. She seeks nominal damages of one dollar. *Id.* ¶ 230; *id.* at 51 (Prayer ¶ J).

**MOTION TO DISMISS STANDARD**

To survive a motion to dismiss for failure to state a claim, a complaint must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Vandevender v. Sass*, 970 F.3d 972, 975 (8th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009)). The Court may also consider the exhibits attached to the complaint, including the Removed Books. Fed. R. Civ. P. 10(c); *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). Courts accept all well-pleaded factual assertions as true, but that presumption does not extend to legal conclusions. *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 953 (8th Cir. 2023).

## ARGUMENT

### I. Plaintiffs' First Amendment rights are not implicated in this case.

In the First Amendment analysis, the first question is "whether the activity at issue is speech protected by the First Amendment." *People for Ethical Treatment of Animals, Inc. v. Reynolds*, 173 F.4th 959, 966 (8th Cir. 2026). Books are speech, of course. But the activity at issue here is not the writing or reading of books; it is a school's decision about which books to place on its own shelves. No Plaintiff has a First Amendment right to control that decision.

The student Plaintiff has no right to receive information. *See GLBT Youth*, 114 F.4th at 671; *Robbins*, 172 F.4th at 586–87; *see also Walls v. Sanders*, 144 F.4th 995, 1003 (8th Cir. 2025) ("Students do not possess a supercharged right to receive information in public schools[.]"). And the publisher and author Plaintiffs allege their rights rise and fall with the student's right. So as Plaintiffs have pleaded, no Plaintiff has a First Amendment right to the placement of books in public school libraries, and the complaint should be dismissed.

#### A. Students have no right to receive information from public school libraries.

Plaintiffs allege that student Plaintiff Grace Van Gundy was a senior at Urbandale High School when she wanted to read *Nineteen Minutes* by Jodi Picoult. *See* Dkt. 132 ¶ 23. And Plaintiffs further allege Urbandale School District removed the book when implementing the Library Section. *See id.* ¶ 224. Van Gundy's claim is premised on her "right to access information and ideas within school and classroom libraries." *Id.* ¶ 228. But the Eighth Circuit held otherwise in the appeal in this case.

Plaintiffs suggest that *Robbins* does not govern because it arose from a preliminary injunction and addressed a facial challenge. Dkt. 132 at 10 n.3. A published holding of the Eighth

Circuit binds this Court whatever the posture that produced it. And the as-applied label changes nothing here, because whether a student may demand a particular book at taxpayer expense does not depend on which book she wants.

"The First Amendment does not guarantee students the right to access books of their choosing at taxpayer expense." *Robbins*, 172 F.4th at 586 (citing *Walls*, 144 F.4th at 1003). Removing a book from a school library shelf does not prevent a student from "receiving" the information or ideas it contains, because of the "ready availability of the books elsewhere." *Robbins*, 172 F.4th at 586; *see Bd. of Educ. v. Pico*, 457 U.S. 853, 915 (1982) (Rehnquist, J., dissenting). A disappointed student "can order it online, buy it from a bookstore, or borrow it from a friend." *Little v. Llano Cnty.*, 138 F.4th 834, 838 (5th Cir. 2025). When a book leaves the school library shelf, the only thing the student loses is "a book of their choice at taxpayer expense," which "is not a right guaranteed by the First Amendment." *Id.* at 848.

Here, Van Gundy's only claim is that her rights were violated because she could not obtain the book from her high school library. Dkt. 132 ¶ 228. She asks this Court to recognize an affirmative entitlement to have the government make a particular book available to her at a particular place, a right the Eighth Circuit already rejected when Van Gundy's mother asserted it on her behalf earlier in this case. *See Robbins*, 172 F.4th at 586; *Walls*, 144 F.4th at 1003; *see also Fayetteville Pub. Libr. v. Crawford Cnty., Ark.*, 183 F.4th 1020, 1039–40 (8th Cir. 2026) (Colloton, C.J., concurring in the judgment) (similar). This Court should apply those cases and dismiss the student Plaintiff's claim.

**B. Publisher and Author Plaintiffs lack an affirmative right to have their books placed in public schools.**

The publisher and author Plaintiffs' claims fare no better. They rely on a right "to communicate their ideas to students without undue interference from the government." Dkt. 132 ¶¶ 6–7. And they plead that their "right to speak and the right to read are inextricably intertwined. Just as authors have the right to communicate their ideas to students without undue interference

from the government, students have a corresponding right to receive those ideas." *Id.* ¶ 7. That claim fails for two reasons.

*First*, if the two rights are intertwined and the student has no right to receive information, then the publisher lacks a right to communicate within the school library. *See Robbins*, 172 F.4th at 586. Plaintiffs allege that the publisher and author Plaintiffs' interest in reaching student readers rises or falls together with the students' own right to receive their work. *See* Dkt. 132 ¶ 7. But a speaker's right to communicate through the right-to-receive doctrine has never existed independently of a listener's right to receive. *See Kleindienst v. Mandel*, 408 U.S. 753, 775 (1972) (Marshall, J., dissenting) ("The freedom to speak and the freedom to hear are inseparable; they are two sides of the same coin.").

Follow Plaintiffs' theory out. If a publisher, an author, or a student has a First Amendment right to keep a book on a school library shelf, the same right would let any of them force the school to buy the book in the first place. *See Little*, 138 F.4th at 845 ("[I]f people can challenge which books libraries remove, they can challenge which books libraries buy."); *Pico*, 457 U.S. at 892 (Burger, C.J., dissenting) ("[I]f the First Amendment commands that certain books cannot be removed, does it not equally require that the same books be acquired?"); *see also Fayetteville Pub. Libr.*, 183 F.4th at 1039 (Colloton, C.J., concurring in the judgment). Not even Plaintiffs claim that much.

Students have no First Amendment right to compel a school library to retain any book. Neither do the publishers and authors whose books those are. *See Robbins*, 172 F.4th at 586. Because there is no listener-side right to receive here, there is no derivative speaker-side right to communicate through the library's shelves. *Compare id.*, *with* Dkt. 132 ¶¶ 6–7. The author and publisher Plaintiffs cannot manufacture a constitutional interest more robust than the one belonging to the readers whose right they say is inseparable from their own. So, their claims should fail.

*Second,* publishers and authors have no independent First Amendment right to keep their books on a school library shelf. For that claimed right, Plaintiffs rely on *Erznoznik v. City of*

*Jacksonville*, 422 U.S. 205, 213–14 (1975). Dkt. 132 ¶ 6. *Erznoznik* struck down a municipal ban on nudity in drive-in movies visible from the street—a direct restriction on what a speaker could show through a medium the speaker—not the government—controlled. 422 U.S. at 206–07. It said nothing about whether a government institution curating its own collection must keep an item at the speaker's insistence. *Erznoznik* does not reach speech "subject to some other legitimate proscription." *Id.* at 213–14. Speech in a school library is. *Robbins*, 172 F.4th at 587–88.

**C. School library collection decisions are government speech.**

Plaintiffs' free speech claims further fail at the threshold because a school library's selection of which books to place on, or remove from, its shelves is government speech, not subject to Free Speech Clause scrutiny. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause . . . does not regulate government speech."). And a school library shelf is the government's own curated collection, to which the government need never have admitted the speaker's work at all. A seven-judge plurality of the en banc Fifth Circuit reached that conclusion in *Little*, and its reasoning is persuasive here. 138 F.4th at 837.

The Eighth Circuit's own precedent points the same way. In *Walls*, the court treated the State's selection of curriculum as government speech. 144 F.4th at 1002–06. And in this case, the Eighth Circuit held that a school library "is properly characterized as part of the school's curriculum." *Robbins*, 172 F.4th at 587. If the curriculum is government speech, and the school library is part of the curriculum, then a school's choice of which books to keep on that library's shelves is the government speaking. *Robbins* did not reject that conclusion. It reserved it. *Id.* ("[I]f school libraries are not government speech, no standard more exacting than *Hazelwood* applies."). This Court should complete *Robbins*'s syllogism.

*Little*'s plurality reflects a similar approach. *Little* explained that a public "library's collection decisions are government speech and therefore not subject to Free Speech challenge." *Little*, 138 F.4th at 837 (plurality op.). The plurality reasoned that, just as a newspaper speaks by choosing which editorials to run and a museum speaks by choosing which art to display, a library "expresses itself by deciding how to shape its collection." *Id.* Applying *Summum* and *PETA v.*

*Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005), *Little*'s plurality explained that "the government speaks through its selection of which books to put on the shelves and which books to exclude." *Id.* That expression is distinct from the books' content—no patron thinks the library is endorsing every idea in every book it carries—but the library nonetheless conveys its own message through the act of curation. *Id.* at 837–38. That same logic applies here: when a school district determines that its library program will "contain[] only age-appropriate materials," Iowa Code § 256.11(9)(*a*)(2), it is engaging in the same expressive curatorial function the *Little* plurality recognized as government speech, now exercised under statewide legislative standards rather than local discretion alone.

State Defendants recognize that *GLBT Youth* used contrary language—but that is not the end of the story. 114 F.4th at 667–68. *GLBT Youth*'s discussion came in the standing analysis, not the merits, and *Robbins* left the question open. *Id.* at 667–68; *Robbins*, 172 F.4th at 587.

Given the government speech doctrine, publishers cannot establish a freestanding constitutional entitlement to have their works remain shelved in a particular government library. The right to receive information, where it exists at all, protects a listener's interest in obtaining another's speech free of government interference, but it has never been understood to confer on the *speaker* an affirmative right to have the government distribute that speech on the speaker's behalf. *See Stanley v. Georgia*, 394 U.S. 557, 564 (1969). Publishers and authors occupy the speaking side of that relationship, not the receiving side, and no precedent recognizes a speaker's right to compel a government institution to serve as the vehicle for that speech. The Supreme Court's decision in *United States v. American Library Ass'n, Inc.* casts doubt on this theory: "[a] public library does not acquire Internet terminals in order to create a public forum for Web publishers to express themselves, *any more than it collects books in order to provide a public forum for the authors of books to speak.*" *United States v. ALA, Inc.*, 539 U.S. 194, 206 (2003) (emphasis added).

Plaintiffs seemingly attempt to thread a narrower needle: they claim their right is not a right to compel the acquisition or placement of their books at all, but only a right against removing books once shelved. That distinction does not survive scrutiny.

The Eighth Circuit rejected a similar argument in *Walls*. *See Walls*, 144 F.4th at 1005–06. There, the court held that students had no First Amendment right to stop the State from removing material from the curriculum. *Id.* at 1005. The court reasoned there was "no basis in the Free Speech Clause to conclude the students would have a right to prevent something from being removed from the curriculum based on ideology if they do not also have a right to require the school to add materials." *Id.* And Plaintiffs here cannot contest either.

A library's collection decisions reflect its own discretionary judgment about which materials to provide; that discretion belongs to the library, not to the authors and publishers who would prefer their work be included. *ALA*, 539 U.S. at 204–05; *see also Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) (The government speaks when it "compil[es]" the "speech of third parties" in a public library.). The publisher and author Plaintiffs' claim, standing alone and independent of the student's claim, therefore must fail because the compilation of third-party speech to curate a message facilitating the pedagogical mission of Iowa's public schools is the epitome of government speech. So no Plaintiff, student, author, or publisher, states a Free Speech claim, and the Court need go no further.

## II. Even if Plaintiffs' First Amendment rights are implicated, they are not entitled to relief.

The First Amendment analysis involves three steps. *PETA*, 173 F.4th at 966. First, is the activity speech protected by the First Amendment? Second, what level of scrutiny applies? Third, does the challenged action survive that scrutiny? Even assuming Plaintiffs clear the first step, they cannot clear the rest. The Eighth Circuit has already held that, at most, *Hazelwood*'s school-sponsored-speech standard governs. *Robbins*, 172 F.4th at 587–88. So Plaintiffs' claim must turn on the third step, and they fail.

The six books that fall outside the Library Section present no constitutional question, and any injunction as to them would do no more than order Defendants to obey the law. The three books within the Library Section's scope were removed for reasons reasonably related to legitimate

pedagogical concerns. And the State Defendants are immune from Van Gundy's claim for nominal damages.

### D. Plaintiffs state no claim as to the six books they say the Library Section never reached.

Plaintiffs allege six of the nine removed books fall outside the Library Section's scope because they do not contain descriptions of sex acts. State Defendants accept that allegation for purposes of this motion. On Plaintiffs' own theory, then, the school districts misread the statute. Misreading a state statute is not a First Amendment violation, and an injunction directing Defendants to read it correctly would be an improper obey-the-law injunction. *See Tincher v. Noem*, 164 F.4th 1097, 1099 (8th Cir. 2026).

Three independent grounds resolve those counts. First, *Pennhurst* bars a federal court from ordering state officials to apply state law correctly. Second, an injunction that tells Defendants to follow the Library Section is an obey-the-law injunction that Rule 65(d) does not permit. Third, the constitutional-avoidance principle counsels resolving these counts on the narrower, state-law ground that the districts' own curatorial authority and the statute's review procedures supply.

#### *1. Pennhurst bars an order telling Iowa officials how to read Iowa law.*

Start with what Plaintiffs actually want for the six books they say the Library Section never covered. They want a declaration that removing those books was unconstitutional, an order barring the State Defendants from enforcing the Library Section as to those titles, and an order putting the books back on the shelves. Dkt. 132 at 47–50 (Prayer ¶¶ A–F). Strip off the constitutional label and the request is straightforward: read Iowa Code section 256.11(19)(*a*)(1) the way Plaintiffs read it, and make Iowa school officials read it the same way.

The Eleventh Amendment does not permit that. "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). So *Ex parte Young* is "inapplicable in a suit against state officials on the basis of state law." *Id.* And the bar does not turn on the remedy sought. Relief against state officials because of state law,

"whether prospective or retroactive, does not vindicate the supreme authority of federal law." *Id.* Nor does the choice of a federal-sounding hook matter: "neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment." *Id.* at 121.

The Eighth Circuit applies that rule. "The Eleventh Amendment bars federal court jurisdiction over state law claims against unconsenting states or state officials when the state is the real, substantial party in interest, regardless of the remedy sought." *Cooper v. St. Cloud State Univ.*, 226 F.3d 964, 968 (8th Cir. 2000) (citing *Pennhurst*, 465 U.S. at 100–01). Here the State is that party. The State Defendants are sued in their official capacities alone, Dkt. 132 ¶¶ 24–27, and an official-capacity suit "is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

Plaintiffs may answer that they plead the First Amendment, not the Iowa Code. The label does not control. "[A] violation of state law, without more, does not state a claim under the federal Constitution or 42 U.S.C. § 1983." *Collins v. Bellinghausen*, 153 F.3d 591, 596 (8th Cir. 1998) (citation omitted). Take Plaintiffs' allegations as true, as the Court must. *To Kill a Mockingbird* contains no description of a sex act, Dkt. 132 ¶ 80. The Library Section thus never reaches it. And East Union removed it anyway. Perhaps for another independent reason. But Plaintiffs plead a mistake about what Iowa law requires. It does not plead that Iowa forbade anything Iowa law allowed the district to keep.

*Ex parte Young* cannot carry those counts either. *Ex parte Young* permits prospective relief against state officers to remedy an ongoing violation of federal law. *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002). Counts I through VII allege the opposite—that Iowa officials departed from Iowa law—and a federal court cannot correct that departure by injunction, by declaration, or other order. Iowa's own courts say what Iowa statutes mean, and the Legislature built a review process into S.F.496 for exactly that complaint. Iowa Code § 279.77(1)(*b*). Counts I through VII should be dismissed as to the State Defendants.

#### *2. Any injunctive relief here would be an improper obey-the-law injunction.*

The Court should not grant injunctive relief compelling State Defendants to reshelve these books and prohibiting them from removing them on account of the Library Seciton. An injunction that does nothing more than direct a defendant to comply with an existing legal obligation, like the Library Section, is precisely the kind of "obey the law" injunction that courts routinely refuse to issue. *See Tincher*, 164 F.4th at 1099 ("obey the law" injunctions are "too vague" to warrant injunctive relief).

An injunction ordering Defendants to reshelve these titles and not remove them on the basis of the Library Section would simply instruct Defendants to correctly apply the Library Section going forward—an obligation Defendants are already under as a matter of state law, with or without a federal injunction. Federal Rule of Civil Procedure 65(d) requires that every injunction "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). An order that amounts to "correctly apply the statute" supplies no meaningful specificity beyond what the statute already requires and offers Defendants no workable standard by which to measure adherence. *See Tincher*, 164 F.4th at 1099.

This Court should decline Plaintiffs' request for injunctive relief.

#### *3. This Court should resolve these counts on state-law grounds and avoid the constitutional question.*

The books were either removed (1) through an errant application of the statute, with a remedy available under section 279.77(1)(*b*), or (2) for another reason within the library collection authority of the school district. Either approach independently gives this Court a narrower ground to resolve Plaintiffs' claims regarding those books without reaching the constitutional question—and the constitutional-avoidance canon instructs that the Court do exactly that. *See GLBT Youth*, 114 F.4th at 670–71; *Xiong v. Lynch*, 836 F.3d 948, 950 (8th Cir. 2016) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.") (citation omitted). That principle applies with full force here: Plaintiffs allege the books do not contain material within the Library Section's

scope, the removal decision does not implicate the statute at all and thus does not require the Court to resolve any First Amendment question about those books.

*First*, if a book was removed based on an incorrect application of the statute—which Plaintiffs have pleaded for six of the nine books—then Plaintiffs' remedy lies in the administrative and procedural mechanisms the statute itself provides, not the First Amendment. S.F.496 contemplated local review of those decisions, which confirms that the dispute is one over state law. Iowa Code § 279.77(1)(*a*). And districts must also provide policies and procedures for individuals to request review of decisions the district has already made, including through the school board petition process established in Iowa Code section 279.8B. *Id.* § 279.77(1)(*b*).

But Plaintiffs have not pleaded that they availed themselves of those statutory remedies.[1] Nor have they pleaded that a re-shelving request under section 279.77(1)(*b*) was ever submitted to, let alone denied by, the relevant school district. Because that alternative procedure exists and remains unused, this Court should not intervene to resolve a dispute that can instead be settled on a narrower, non-constitutional ground. *See Xiong*, 836 F.3d at 950.

*Second*, the school districts possessed the authority to remove these books regardless of whether they fell within the Library Section's scope, because the districts possess inherent curatorial discretion. "Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them." *ALA*, 539 U.S. at 205. That principle applies with at least equal, and likely greater, force in the school library context. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (explaining that student speech rights "must be applied in light of the special characteristics of the school environment").

A school library's collection decisions have never been treated as a neutral, mechanical sorting process subject to judicial second-guessing. *See Robbins*, 172 F.4th at 588 (citing *Hazelwood*, 484 U.S. at 273) ("As explained by the *Hazelwood* Court, federal judges are not tasked with the responsibility of educating the Nation's youth."). Like public libraries, school libraries do

[1] State Defendants do not contend that section 1983 requires exhaustion. *See Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982). The point is narrower. When a plaintiff's own theory is that officials misread a state statute, the dispute turns on state law, and a federal court should resolve it, if at all, without reaching the Constitution

not collect books "in order to provide a public forum for the authors of books to speak." *ALA*, 539 U.S. at 206 (plurality op.).

Selecting some materials over others is a core function of the school district. That authority necessarily includes declining to include, or removing, materials a librarian or school official judges unsuitable.

Because the school districts' curatorial authority does not depend on the Library Section alone, a book's removal was lawful—and outside the scope of any constitutional inquiry—even where the Library Section itself did not independently compel that result. Either way, no constitutional ruling is necessary, and Counts I–VII should be dismissed.

### E. The Library Section's application to the three books Plaintiffs concede it covers is reasonably related to legitimate pedagogical concerns.

School library book curation is school-sponsored speech subject to *Hazelwood*'s deferential standard, and the Library Section is reasonably applied to the three books within the law's scope. And it is reasonably related to legitimate pedagogical concerns. Plaintiffs plead *Nineteen Minutes* both ways. Dkt. 132 ¶¶ 126–127, 216, 228. To the extent the Court finds that book within the Library Section's scope, it fails like the three books below, for the same reasons. That is because each book contains descriptions of sex acts. And as this Court previously noted, "under the *Hazelwood* standard, it appears that schools (or, in this instance, a state legislature) can categorically prohibit sexual content or profanity in schools without running afoul of the First Amendment." *Penguin Random House LLC v. Robbins*, 774 F. Supp. 3d 1001, 1036 (S.D. Iowa 2025). Restrictions on the books at issue in Counts VI-X do not violate the First Amendment.

#### *1. At most, school libraries are school-sponsored speech subject to* **Hazelwood***'s deferential standard.*

The Eighth Circuit made clear that—at most—the *Hazelwood* school-sponsored speech standard applies. *Robbins*, 172 F.4th at 587. And under that standard, the Supreme Court has long recognized that "the First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings and must be applied in light of the special

characteristics of the school environment." *Hazelwood*, 484 U.S. at 266 (cleaned up); *see also Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). For that reason, First Amendment principles developed outside the school context provide little guidance here.

Courts recognize three categories of speech occurring in the school setting. *Robbins*, 172 F.4th at 587. At one end is purely private student expression, like the armbands in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969). *Hazelwood*, 484 U.S. at 271. At the other end is government speech, such as the selection of curricular materials. *Walls*, 144 F.4th at 999–1000; *Chiras v. Miller*, 432 F.3d 606, 618–20 (5th Cir. 2005). Between the two lies school-sponsored speech which is expressive activity "supervised by faculty members and designed to impart particular knowledge or skills to student[s]" that "might reasonably [be perceived] to bear the imprimatur of the school." *Hazelwood*, 484 U.S. at 271. Limitations on school-sponsored speech "do not offend the First Amendment" so long as they are "reasonably related to legitimate pedagogical concerns." *Id.* at 273. That is a rational-basis style review.

If government speech does not apply, then school libraries fall within that middle category. *See Robbins*, 172 F.4th at 587 ("Given these aspects, under *Hazelwood*, a school library bears the imprimatur of the school and is properly characterized as part of the school's curriculum."). "The purpose of public school libraries is to advance the school curriculum—that is, to facilitate the pedagogical mission of the school, which may involve some limitation of expression." *GLBT Youth*, 114 F.4th at 670 (citing *Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.*, 200 F.3d 1128, 1133–36 (8th Cir. 1999)). School librarians necessarily evaluate content when deciding what books to acquire. *See Little*, 138 F.4th at 848. Those curating decisions reflect the policies of the districts and support "the student achievement goals of the total school curriculum." Iowa Code § 256.11(9)(*a*)(2); *see Henerey*, 200 F.3d at 1135–36.

Under *Hazelwood*, "Iowa is not required to tolerate speech that undermines or is inconsistent with its central mission of educating Iowa children," *GLBT Youth*, 114 F.4th at 670. That remains true for each of the books that fall within the scope of the Library Section.

### 2. *The Library Section is reasonably related to legitimate pedagogical concerns for books containing offending content.*

Descriptions of the statutorily defined sexual content covered by the Library Section raise well-recognized pedagogical concerns, particularly where the materials may be accessed by children of every age and grade level. The Supreme Court has already held that a school has a legitimate pedagogical interest in restricting far less explicit material than what the Library Section addresses. In *Hazelwood*, the Court found a legitimate pedagogical interest in preventing circulation of a student newspaper article discussing students' "sexual histories and their use or nonuse of birth control" and did so even though that article "did not contain graphic accounts of sexual activity." 484 U.S. at 274–75.

If a school may legitimately restrict a comparatively restrained discussion of teenage sexual activity, it follows that schools may restrict Maya Angelou's *I Know Why the Caged Bird Sings*, which does not merely discuss sexual activity in the abstract but graphically depicts the repeated sexual assault and eventual rape of an eight-year-old child. The book describes the perpetrator pulling the child "to him" and putting "his hand between [her] legs," and further describes her being forced to hold his penis, which she describes as "mushy and squirmy like the inside of a freshly killed chicken." Ex. B7, at 87[2]; *see* Iowa Code § 702.17(3).

The Eighth Circuit has likewise held it "too plain for argument" that a school has a legitimate pedagogical interest in prohibiting a student from reading aloud in class "a poem that describe[d] sexual encounters in the most graphic detail." *Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718, 724 (8th Cir. 1998). Iris Chang's *The Rape of Nanking* exceeds that description with graphic sexual violence, including an account of a Japanese soldier assaulting a sixty-year-old woman who was "ordered to 'clean the penis by her mouth,'" a sixty-two-year-old woman who, after protesting that she was too old for sex, was assaulted by soldiers who "rammed a stick up her instead," and passages describing soldiers using "bayonets to slice off the women's

[2] Plaintiffs filed copies of the nine books under seal. *See* Dkt. 133. Although State Defendants quote relevant parts of the books in this public filing, Plaintiffs' counsel informed State Defendants' counsel that such quotations did not need to be filed under seal.

breasts, revealing the pale white ribs inside their chests," piercing "their bayonets into the women's genitals," and using "wooden bats, hard reed rods, and even turnips" forced "into the women's vagina[s]" while beating them to death. Ex. B8, at 107, 307; *see* Iowa Code §§ 702.17(2), (3), (5).

So too with Richard Wright's *Native Son*, which describes the main character's rape and murder of his girlfriend. The description of the act includes descriptions of digital penetration. *See* Ex. B9, at 246 ("His icy fingers touched inside of her and at once she spoke, not a word, but a sound that gave forth a meaning of horror accepted."). Iowa Code §§ 702.17(1), (3). And the novel describes how the main character overcame his victim's resistance to continue the sex act. *See* Ex. B9, at 247 ("Bessie's hands were on his chest, her fingers spreading protestingly open, pushing him away. . . He had to now Yes. Bessie. His desire was naked and hot in his hand and his fingers were touching her."); Iowa Code §§ 702.17(1), (3). The book then describes the main character bludgeoning his victim with a brick. *See ex.* B9, at 250.

Jodi Picoult's *Nineteen Minutes* similarly contains content that falls within the Library Section. The book describes a sexual encounter between two high school aged children "nearly naked" before the male character "pinned her hands over her head and ground his hips against" the female character so she "could feel his erection, hot against her stomach." Ex. B6 at 313; Iowa Code § 702.17(3). The male character then "pushed her thighs apart." And then the passage describes the two engaging in sexual intercourse in detail. *Id.* ("Matt was inside her, pumping so hard that she scooted backward on the carpet, burning the backs of her legs. 'Wait,' Josie said, trying to roll away beneath him, but he clamped his hand over her mouth and drove harder and harder until Josie felt him come."); Iowa Code § 702.17(1). Finally, the passage concludes by describing, "Semen, sticky and hot, pooled on the carpet beneath her." *Id.*; Iowa Code § 702.17(4).

The Supreme Court has recognized that it is "a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse." *Fraser*, 478 U.S. at 683. The graphic descriptions of sexual intercourse, assault, mutilation, and rape in these four books go well beyond the "elaborate, graphic, and explicit sexual metaphor" in *Fraser*. *Id.* at 678.

Plaintiffs concede the books at issue in counts VIII–X fall within the Library section's scope but still argue that their "removal bore no reasonable relation to a legitimate pedagogical purpose given the pedagogical value of that book as a whole." *See* Dkt. 132 ¶¶ 76–77. That cannot be reconciled with the binding legal conclusion that S.F.496 addresses "legitimate pedagogical concerns." *Robbins*, 172 F.4th at 587. And school-sponsored actions "reasonably related to legitimate pedagogical concerns" do not violate the First Amendment. *See id.* (citing *Hazelwood*, 484 U.S. at 273).

As this Court previously concluded in the alternative, *Robbins*, 774 F. Supp. 3d at 1035, the State has a legitimate pedagogical interest in regulating sexually explicit material in public school libraries, and Plaintiffs‘ policy disagreement with that judgment does not disturb it. *See Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 289 (4th Cir. 2021) (maintaining "the age-appropriateness of school-sponsored expressive activities is a pedagogical concern that passes muster under Hazelwood").

And courts owe "substantial deference to educators' stated pedagogical concerns," *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 925 (10th Cir. 2002), "it is not a court's obligation to determine which messages of social or moral values are appropriate in a classroom," *Robertson*, 989 F.3d at 289 (cleaned up). As the Supreme Court has explained, educating "the Nation‘s youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Hazelwood*, 484 U.S. at 273.

Avoiding controversy is itself a legitimate, independently sufficient pedagogical interest. *Henerey*, 200 F.3d at 1136 ("The District has a legitimate interest in divorcing its extracurricular programs from controversial and sensitive topics."). Books containing descriptions of sexual conduct at issue here generate exactly the kind of controversy schools may legitimately seek to avoid. *See Henerey*, 200 F.3d at 1136.

But Plaintiffs allege the Removed Books, despite their descriptions of sex acts, are "renowned for their literary" and "unimpeachable" value and thus should not be removed. Dkt. 132 ¶ 3. Seemingly, Plaintiffs' position is that the Court should consider the "literary, scientific,

medical, artistic, or political value" of a removed book in an as-applied challenge. *See id.* ¶ 74. But *Robbins* forecloses that inquiry. *See* 172 F.4th at 587–88. In holding that school library curation is, at most, school-sponsored speech governed by *Hazelwood*, the court did not consider whether any removed book had literary, artistic, or scientific merit; and did not distinguish an isolated sentence from a sustained passage. Nor does *Hazelwood* require weighing a book's redeeming value against its sexual content. *See id.*; *Hazelwood*, 484 U.S. at 273 (considering only whether the curation decision is "reasonably related to legitimate pedagogical concerns.").

Importing literary value into *Hazelwood* would revive the *Pico* plurality and *Pratt*, and the Eighth Circuit has held that neither binds. *Walls*, 144 F.4th at 1004–05; *Robbins*, 172 F.4th at 586–87. This Court reached the same conclusion when it applied *Hazelwood* in the alternative. *Robbins*, 774 F. Supp. 3d at 1035–36.

For those reasons, there is no First Amendment violation for the removal of the books that fall within the scope of S.F.496's Library Section. Those removals were reasonably related to a legitimate pedagogical concern and did not offend the First Amendment. *Robbins*, 172 F.4th at 587; *Hazelwood*, 484 U.S. at 270–73. So, the Court should dismiss Counts VIII-X.

**F. Sovereign immunity bars Van Gundy's claim for nominal damages.**

Finally, Van Gundy's claim fails for an independent reason. She has graduated, Dkt. 132 ¶¶ 23, 225, so she cannot receive prospective injunctive relief and thus seeks only nominal damages, *id.* ¶ 230. The State Defendants are sued only in their official capacities. *Id.* ¶¶ 24–27. A suit against a state official in his official capacity "is not a suit against the official but rather is a suit against the official's office," and so "is no different from a suit against the State itself." *Will*, 491 U.S. at 71. Two conclusions follow. State officials sued for damages in their official capacities are not "persons" under § 1983. Id. And the Eleventh Amendment independently bars a damages award against them in federal court. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Nominal damages are damages. *Ex parte Young* permits only prospective relief, and Van Gundy has no prospective claim left. Count VII should be dismissed as to the State Defendants.

**CONCLUSION**

The Court should dismiss the Plaintiffs' third amended complaint for declaratory and injunctive relief.

September 28, 2026

Respectfully submitted,

BRENNA BIRD
Attorney General of Iowa

ERIC WESSAN
*Solicitor General*

PATRICK C. VALENCIA
*Deputy Solicitor General*

*/s/Ankit Pal*
ANKIT PAL
*Assistant Solicitor General*
Iowa Department of Justice
Hoover State Office Building
Des Moines, Iowa 50319
(515) 281-5164 / (515) 281-5132
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov
ankit.pal@ag.iowa.gov

ATTORNEYS FOR STATE DEFENDANTS

*Original filed electronically.*
*Copy electronically served on all parties of record.*