**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**

| | |
|---|---|
| PENGUIN RANDOM HOUSE LLC; HACHETTE BOOK GROUP, INC.; HARPERCOLLINS PUBLISHERS LLC; MACMILLAN PUBLISHING GROUP, LLC; SIMON & SCHUSTER, LLC; THE AUTHORS GUILD; LAURIE HALSE ANDERSON; JODI PICOULT; GRACE VAN GUNDY,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN ROBBINS, in his official capacity as President of the Iowa State Board of Education; MCKENZIE SNOW, in her official capacity as Director of the Iowa Department of Education; CHAD JANZEN, in his official capacity as Chair of the Iowa Board of Educational Examiners; MARGARET YOUNG, JOSH VANRYSWYK, HANNAH HORTON, KATHERINE HOWSARE, RACHEL KENT, RODRIGO SANTIZO, and CARISSA WILLIAMS, in their official capacities as Members of the Urbandale Community School District Board of Directors; ROSALIE DACA, in her official capacity as Urbandale Community School District Superintendent; CAROL ECKELS, SAM MCKNIGHT, JAMIE BUFFINGTON, DENNIS CHEERS, and AMBER TATE, in their official capacities as Members of the East Union Community School District Board of Directors; JUSTIN JEFFS, in his official capacity as East Union Community School District Superintendent; MARTY CHITTY, TOM MAIER, TORI CARSRUD, LEANNE HARTER, and EMILY SCHAACK, in their official capacities as Members of the Nevada Community School District Board of Directors; STEVE GRAY, in his official capacity as Nevada Community School District Superintendent,<br><br>Defendants. | Case No. 4:23-cv-00478<br><br>**PLAINTIFFS' RESISTANCE TO DEFENDANTS' MOTIONS TO DISMISS** |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .... iii

INTRODUCTION .... 1

FACTUAL BACKGROUND .... 2

I. The Library Restriction. .... 2

II. The State's Central Role In Removing Books Under The Library Restriction. .... 3

III. The School District Defendants' Central Role In Removing Books Under The Library Restriction. .... 4

IV. Procedural History. .... 5

V. The Third Amended Complaint. .... 6

A. Books Inside The Scope. .... 7

B. Books Outside The Scope. .... 8

LEGAL STANDARD .... 11

ARGUMENT .... 12

I. Contrary To The State Defendants' Contention, Plaintiffs Have Standing To Bring Their Claims. .... 12

A. The Eighth Circuit Has Already Rejected The State's Government-Speech Argument. .... 12

B. Publishers Have Standing To Bring Their Claims. .... 16

II. The Removal Of The Removed Books Under The Library Restriction Violates The First Amendment. .... 20

A. The Removal Of The Books Inside The Scope Pursuant To The Library Restriction Violates The First Amendment. .... 22

B. The Removal Of The Books Outside The Scope Pursuant To The Library Restriction Violates The First Amendment. .... 27

III. Plaintiffs Have Properly Pleaded Claims Against The School District Defendants In Their Capacity As State Actors. .... 31

IV. The Board Member Defendants Do Not Duplicate The Superintendent Defendants. .... 34

CONCLUSION .... 34

# TABLE OF AUTHORITIES

**Cases**

*Am. Atheists, Inc. v. Rapert*, 507 F. Supp. 3d 1057 (E.D. Ark. 2020) .......... 31
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 11
*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) .......... 18
*Bay Area Unitarian Universalist Church v. Paxton*, No. 4:20-CV-3081, 2021 WL 3852174, (S.D. Tex. Aug. 27, 2021) .......... 32
*Bd. of Dirs. of the Ind. Sch. Dist. of Waterloo v. Green*, 147 N.W.2d 854 (Iowa 1967) .......... 34
*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982) .......... 3, 16
*Bennett v. Spear*, 520 U.S. 154 (1997) .......... 29
*Bethesda Lutheran Homes & Services, Inc. v. Leean*, 154 F.3d 716 (7th Cir. 1998) .......... 32
*Burnham v. Ianni*, 119 F.3d 668 (8th Cir. 1997) .......... 19
*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) .......... 19
*Echols v. Parker*, 909 F.2d 957 (5th Cir. 1990) .......... 32, 33
*Elrod v. Burns*, 427 U.S. 347 (1976) .......... 31
*Entergy, Arkansas, Inc. v. Nebraska*, 241 F.3d 979 (8th Cir. 2001) .......... 17
*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) .......... 23
*Ex parte Young*, 209 U.S. 123 (1908) .......... 31
*Fleming v. Jefferson Cnty. Sct. Dist. R-1*, 298 F.3d 918 (10th Cir. 2002) .......... 27
*Giambalvo v. Suffolk County, New York,* 155 F.4th 163 (2d Cir. 2025) .......... 31, 32
*Gibb v. Scott*, 958 F.2d 814 (8th Cir. 1992) .......... 12, 30
*GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660 (2024) .......... passim
*GSA Network v. Morath*, 821 F. Supp. 3d 753 (S.D. Tex. 2026) .......... 33
*Hamby v. Iowa*, 185 F.4th 816 (8th Cir. 2026) .......... 31
*Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988) .......... 6
*Howe v. Varity Corp.*, 36 F.3d 746, 752 (8th Cir. 1994) .......... 17
*Hrdlicka v. Reniff*, 631 F.3d 1044 (9th Cir. 2011) .......... 18
*Kleindienst v. Mandel*, 408 U.S. 753 (1972) .......... 17
*Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718 (8th Cir. 1998) .......... 24
*Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025) .......... 15
*Mader v. United States*, 654 F.3d 794 (8th Cir. 2011) .......... 20
*Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221 (D.C. Cir. 1993) .......... 12
*Matal v. Tam*, 582 U.S. 218 (2017) .......... 13, 15
*Miller v. California*, 413 U.S. 15 (1973) .......... 23
*Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928 (8th Cir. 2012) .......... 12
*Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577 (6th Cir. 1976) .......... 18
*Minn. Voters All. v. Mansky*, 585 U.S. 1 (2018) .......... 19
*Minnesota RFL Republican Farmer Lab. Caucus v. Moriarty*, 108 F.4th 1035 (8th Cir. 2024) .. 17
*Missouri Broadcasters Ass'n v. Lacy*, 846 F.3d 295 (8th Cir. 2017) .......... 11

*Moody v. NetChoice*, 603 U.S. 707 (2024) ..... 5
*Nat'l Republican Senatorial Comm. v. Fed. Election Comm.*, 609 U.S. 908 (2026) ..... 14
*Penguin Random House, LLC v. Robbins*, 172 F.4th 581 (8th Cir. 2026) ..... passim
*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) ..... 29
*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) ..... 13
*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009) ..... 13
*Prison Legal News v. Livingston*, 683 F.3d 201 (5th Cir. 2012) ..... 18
*Pusey v. City of Youngstown*, 11 F.3d 652 (6th Cir. 1993) ..... 32
*Shurtleff v. City of Boston*, 596 U.S. 243 (2022) ..... 15
*Thornburgh v. Abbott*, 490 U.S. 401 (1989) ..... 18
*Tincher v. Noem*, 164 F.4th 1097 (8th Cir. 2026) ..... 30
*United States v. American Library Association*, 539 U.S. 19 (2003) ..... 18
*Vitay Corp. v. Howe*, 516 U.S. 489 (1996) ..... 17
*Vives v. City of New York*, 524 F.3d 346 (2d Cir. 2008) ..... 33
*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015) ..... 13, 15
*Walls v. Sanders*, 144 F.4th 995 (8th Cir. 2025) ..... 15, 18
*Wilson v. Lamp*, 995 F.3d 628 (8th Cir. 2021) ..... 17

**Statutes**

Iowa Code § 256.11 ..... 3, 4
Iowa Code § 274.3 ..... 34
Iowa Code § 274.7 ..... 34
Iowa Code § 279.20 ..... 34
Iowa Code § 279.78 ..... 3
Iowa Code § 702.17 ..... 6, 27
Iowa Code §§ 256.11 ..... 2

**Other Authorities**

East Union School Board Policy 605.3, 605.3R1 ..... 29
Nevada School Board Policy 605.3 ..... 29
Senate File 496 § 2 ..... 2, 3
Senate File 496 § 4 ..... 2, 4
Senate File 496 § 14 ..... 3
Urbandale Community School Board Policy 631C ..... 29

**Rules**

Iowa Admin. Code R. 281-12.3 ..... 3

## INTRODUCTION

This case concerns nine books of unimpeachable pedagogical value: *To Kill a Mockingbird* by Harper Lee, *Animal Farm* by George Orwell, *1984* by George Orwell, *Brave New World* by Aldous Huxley, *Speak* by Laurie Halse Anderson, *Nineteen Minutes* by Jodi Picoult, *I Know Why the Caged Bird Sings* by Maya Angelou, *The Rape of Nanking: The Forgotten Holocaust of World War II* by Iris Chang, and *Native Son* by Richard Wright (the "Removed Books"). These books have been removed from high school library shelves in Urbandale, East Union, and Nevada school districts due to the State and School District Defendants' enforcement of the Library Restriction, a statute that requires the removal of school-library books that contain detailed descriptions of "sex acts," as defined by Iowa statute.

Defendants offer no arguments that justify dismissal. Instead, the State and the School District Defendants point fingers at each other, each asserting that the other is the true culprit behind the removal of the Removed Books. But they both bear responsibility for Plaintiffs' injuries.

The State repeatedly contends that it is the School District Defendants who have removed these books and requests that this Court give deference to what the State calls the "authority" of "librarian[s]." (State Mot. at 14.) But the Removed Books were initially placed on the shelves under librarians' authority and were removed only because Defendants determined removal was necessary under the Library Restriction. Moreover, the State cannot escape responsibility for the removal of the Removed Books. The State has enforcement power against the school districts, has repeatedly instructed school districts such as the School District Defendants to err on the side of over-removal of books, and has refused to offer meaningful guidance to school districts as to what the State believes is the Library Restriction's reach. In its motion, the State walks this same line, very carefully avoiding stating whether it believes that the Removed Books were correctly or

incorrectly removed under the Library Restriction. And throughout its motion, the State attempts to relitigate stale issues that have already been decided against them in this case and offers theories that are contrary to the allegations in Plaintiffs' complaint.

The School District Defendants wrongly contend that they cannot be responsible for their unconstitutional removal of the Removed Books because they do not have a policy that requires it. But the School District Defendants are state actors who operate under the color of state law who are equally responsible as the State for Plaintiffs' injuries.

As Plaintiffs alleged in their complaint, publishers and authors have First Amendment rights to challenge the removal of the Removed Books from high school libraries. Those First Amendment rights have been confirmed twice now in this case by the Eighth Circuit, and they are not abrogated by the government-speech doctrine. The removal of the Removed Books violated Plaintiffs' First Amendment rights because the removals were not reasonably related to the pedagogical concerns identified by the Eighth Circuit. Moreover, the removals did not take into account the purpose of libraries, the value of each book as a whole, and the high school age of the students who could access the books. Finally, the School District Defendants, who are state actors tasked with implementing and enforcing the Library Restriction, are proper defendants. The Court should deny Defendants' motions.

## FACTUAL BACKGROUND

### I. The Library Restriction.

The Library Restriction requires that a school district's "library program" contain "only age-appropriate materials." Iowa Code §§ 256.11(9)(a), (19)(a) (as amended by Senate File 496 §§ 2, 4). "Age-appropriate" is a misnomer, however, because the Library Restriction applies the same standard for removal regardless of the age of the student.

Iowa has a proud history of supporting libraries. (Compl. ¶ 53.) Historically, school libraries in Iowa have been places of self-directed learning, where students have the freedom "to inquire, to study and to evaluate, to gain new maturity and understanding"—where a student can "explore the unknown" and "discover areas of interest and thought not covered by the prescribed curriculum." (*Id.* ¶¶ 48, 49, 51 (citing *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 868-69 (1982) (plurality opinion).) As the Eighth Circuit recognized, "the purposes of a school library are to enhance education, supplement classroom learning, and facilitate the development of students' knowledge and skills." *Penguin Random House, LLC v. Robbins*, 172 F.4th 581, 587 (8th Cir. 2026) ("*PRH II*"). Consistent with those purposes, the State of Iowa mandates that qualified teacher librarians direct school library programs, due to those librarians' "special expertise in identifying resources and technologies to support teaching and learning." (Compl. ¶ 54 (citing Iowa Admin. Code R. 281-12.3(9)(a)).)

## II. The State's Central Role In Removing Books Under The Library Restriction.

The State plays a central role in implementing and enforcing the Library Restriction against school districts and educators. The State is responsible for establishing definitions of and standards for the school-library program, including as limited by the Library Restriction. The State's enforcement powers are extensive, including the authority to investigate and enforce statutory violations related to the school-library program and to conduct hearings and take disciplinary action related to those statutory violations. (Compl. ¶¶ 25–26 (citing Iowa Code § 256.11(9)(a)(3) (as amended by Senate File 496 § 2); Iowa Code § 279.78(4) (as amended by Senate File 496 § 14)).) Those enforcement activities may be taken against school district boards of directors and their superintendents. (Compl. ¶ 70 (citing Iowa Code § 256.11(9)(a)(3) (as amended by Senate File 496 § 2).)

With these enforcement powers at its disposal, the State has compelled school districts, who act as agents of the State, to apply an overbroad interpretation of the Library Restriction and remove books that do not fall within its scope. (Compl. ¶ 67.) The State has instructed school districts to err on the side of over-removing books. (*Id.* ¶ 64.) At the same time, the State has actively avoided providing guidance to school districts concerning the State's interpretation of precisely what content is required to be removed under the Library Restriction. (*Id.* ¶ 66.) At no point has the State ever informed a school district that it had removed a library book under the Library Restriction that actually did not have to be removed per the statute. (*Id.*) This lack of guidance means that school districts cannot clearly determine what books the State believes the Library Restriction reaches. (*Id.* ¶ 67.) Consequently, school districts have removed books that do not actually implicate the Library Restriction out of fear of being punished by the State for not implementing the Library Restriction as broadly as the State believes is required. (*Id.*)

**III. The School District Defendants' Central Role In Removing Books Under The Library Restriction.**

The School District Defendants are also critical to the removal of school-library books, such as the Removed Books, under the Library Restriction. Tasked with implementing and enforcing the Library Restriction by law, the School District Defendants are the ultimate actors in the causation chain. (*Id.* ¶ 44 (citing Iowa Code § 256.11(19)(a)(1) (as amended by Senate File 496 § 4).) It is the School District Defendants, acting as agents of the State, who required school libraries to remove the Removed Books. (Compl. ¶¶ 32, 37, 42.)

While the State and the School District Defendants each try to avoid blame for the implementation and enforcement of the Library Restriction by pointing to the others' role, the truth is that these two sets of defendants are both responsible for enforcing the law. Both play a necessary role in the chain of causation that has led to the removal of the Removed Books.

Plaintiffs need not choose one set of defendants, because both the State and the School District Defendants have injured Plaintiffs. All defendants are state actors who operate under the color of state law with regard to the removal of books under the Library Restriction. (*Id.* ¶ 46.) Indeed, Urbandale has previously confirmed its view that school districts have no discretion under the Library Restriction, which is a state mandate. (*Id.* ¶ 46.)

**IV. Procedural History.**

This case has been before the Eighth Circuit twice now. In *GLBT Youth in Iowa Schs. Task Force v. Reynolds* ("*PRH I*"), the Eighth Circuit concluded that Plaintiffs—including publishers, authors, and a student—had standing to pursue their First Amendment claims. 114 F.4th, 660 667–68 (2024). The Eighth Circuit also rejected the State's argument that the Library Restriction is exempt from scrutiny under the First Amendment as "government speech." *Id.*

The Eighth Circuit vacated the Court's prior preliminary injunction and remanded to permit Plaintiffs "to pursue injunctive relief" under *Moody v. NetChoice*, 603 U.S. 707 (2024). *Id.* at 671. On remand, Plaintiffs did so and this Court again entered a preliminary injunction, which the State appealed. (ECF Nos. 113, 115.)

The Eighth Circuit subsequently vacated the preliminary injunction and remanded. *PRH II*, 172 F.4th at 585. In doing so, the Eighth Circuit contradicted part of its earlier decision in *PRH I*, this time holding that the Student Plaintiff did not have a First Amendment right to receive information in school libraries and therefore could not challenge the Library Restriction. *Id.* at 586–87.

The Eighth Circuit reaffirmed its prior holding that publishers and authors have standing and held that the publishers' and authors' claims challenging the Library Restriction were governed by the standard set forth in *Hazelwood*, a form of First Amendment scrutiny that requires a speech restriction to be "reasonably related to legitimate pedagogical concerns. *Id.* at 587–88 (quoting

*Hazelwood*, 484 U.S. at 271, 273). The panel's decision held that under the school-sponsored speech doctrine Plaintiffs were unlikely to succeed on the merits of their facial overbreadth claims, which required a showing that the unconstitutional applications of the Library Restriction substantially outweighed their constitutional applications. *Id.* at 588. As the State acknowledged, the Eighth Circuit "did not consider whether any removed book had literary, artistic, or scientific merit; and did not distinguish an isolated sentence from a sustained passage." (State Mot. at 19.)

The Eighth Circuit further held that the statutory definition of "sex act" is "detailed" and not "amorphous." *PRH II*, 172 F.4th at 588 (citing Iowa Code § 702.17). The consequence of the Eighth Circuit's ruling is that, to be sufficiently detailed to be considered a "sex act" under Iowa law, the description must be explicit and not merely an implication, reference, or label. (Compl. ¶ 60.) That description need not use identical language to the statutory definition of "sex act," but it must be similarly specific and detailed. (*Id.*)

**V. The Third Amended Complaint.**

In their third amended complaint, Plaintiffs now bring as-applied claims, as the Eighth Circuit previously encouraged them to do (*PRH I*, 114 F.4th at 671), concerning the removal of nine books pursuant to the Library Restriction. Three of the books contain content within the scope of the Library Restriction ("Books Inside the Scope"), but their removal was nonetheless unconstitutional because those removals were unreasonable in relation to the legitimate pedagogical concern recognized by the Eighth Circuit. (Compl. ¶ 76.) Five of the books fall clearly outside of the scope of the Library Restriction, despite the fact that they were removed pursuant to the Library Restriction. (*Id.*) Those removals are unconstitutional because there is no legitimate pedagogical concern that justifies the removals. Finally, one book does not contain content within the scope of the Library Restriction but falls closer to the line (collectively with the preceding five books, "Books Outside the Scope"). (*Id.*)

**A. Books Inside The Scope.**

The State and the School District Defendants caused the following books to be removed pursuant to the Library Restriction. While these books contain content inside the scope of the Library Restriction, their removals from high school libraries were unconstitutional because they were unreasonable in relation to pedagogical concerns.

***I Know Why the Caged Bird Sings* by Maya Angelou** is a nonfiction autobiography that recounts Angelou's experience of racism and discrimination in the Jim Crow South. (Compl. ¶ 136.) Angelou, like many others, experienced sexual trauma when she was a child. (*Id.* ¶ 137.) That trauma affected her greatly, leading her to become largely mute for several years; it was only after a neighbor gave her books to read aloud that Angelou regained her voice. (*Id.*) In 1970, *I Know Why the Caged Bird Sings* was named a National Book Award Finalist. (*Id.* ¶ 140.) In 2011, TIME Magazine included *I Know Why the Caged Bird Sings* on its list of the 100 best nonfiction books of all time. (*Id.*) Angelou has been honored by the President of the United States (*id.* ¶ 142) and her likeness has been etched onto American currency.[1] In recognition of the value of this book as a whole, countless school districts across the country assign *I Know Why the Caged Bird Sings* in their high school curricula. (Compl. ¶ 141.) *I Know Why the Caged Bird Sings* is published by Plaintiff PRH and was unconstitutionally removed pursuant to the Library Restriction from East Union's and Nevada's high school libraries. (*Id.* ¶¶ 144–45.)

***The Rape of Nanking, the Forgotten Holocaust of World War II* by Iris Chang** is a meticulously researched non-fiction book concerning of one of the most brutal atrocities of World War II: the massacre and systematic sexual violence committed by Japanese soldiers in the Chinese

[1] *First Coin in United States Mint American Women Quarters™ Program Available February 7*, United States Mint (February 1, 2022), https://www.usmint.gov/news/press-releases/first-coin-in-united-states-mint-american-women-quarters-program-available-february-7.

city of Nanking (now Nanjing) in 1937–38. (*Id.* ¶ 146.) Chang's book weaves together primary sources such as survivors' testimonies, diaries of Western missionaries who remained in the city, and official reports to vividly detail the horrors inflicted on the people of Nanking. (*Id.*) *The Rape of Nanking* is an award-winning book that has played a pivotal role in bringing international attention to the atrocities committed in Nanking, making it one of the most significant accounts of wartime atrocities in modern history. (*Id.* ¶ 147.) *The Rape of Nanking* is published by Plaintiff Hachette Book Group and was unconstitutionally removed pursuant to the Library Restriction from Nevada's high school library. (*Id.* ¶¶ 150–51.)

***Native Son* by Richard Wright** is a novel that focuses on themes of social and racial injustice, as well as the tragic effects of poverty, racism, and hopelessness. (*Id.* ¶ 153.) The publication of *Native Son* marked a turning point in American culture and Black literature in the 20th Century. (*Id.* ¶ 155.) *Native Son* is one of TIME Magazine's 100 Best English-Language Novels and Modern Library's 100 Best Novels. (*Id.*) In addition to its exceptional merit as a literary work, *Native Son* is historically significant in the history of the 20th Century United States. (*Id.*) Educators across the country have included *Native Son* in their high school curricula, and it is frequently tested on the College Board's Advanced Placement English Literature exam. (*Id.* ¶¶ 156–57.) *Native Son* is published by Plaintiff HarperCollins and was unconstitutionally removed pursuant to the Library Restriction from Urbandale's high school library. (*Id.* ¶¶ 158, 160.)

**B. Books Outside The Scope.**

The State and the School District Defendants caused the following books to be removed pursuant to the Library Restriction, even though these books do not contain content inside the scope of the Library Restriction.

***To Kill A Mockingbird* by Harper Lee** is one of the most widely read works of fiction in American literature and is nationally recognized for its treatment of racism, prejudice, tolerance,

justice, and moral courage in the American South. (*Id.* ¶ 81.) The book was awarded the Pulitzer Prize for fiction and has been lauded by public officials such as Justice Brett Kavanaugh and President George W. Bush. (*Id.* ¶¶ 82–84.) School districts across the country assign *To Kill a Mockingbird* in their middle and high school curricula, and it is often tested on Advanced Placement exams. (*Id.* ¶¶ 86–87.) *To Kill a Mockingbird* is published by Plaintiff HarperCollins and was unconstitutionally removed pursuant to the Library Restriction from East Union's high school library. (*Id.* ¶¶ 88–89.)

***1984* by George Orwell** is a dystopian novel that explores a totalitarian state ruled by the "Party" in which history is rewritten to align with the Party's ever-changing narrative. (*Id.* ¶ 98.) *1984* explores themes such as totalitarianism, censorship, individualism versus collectivism, the manipulation of truth, and the dangers of state surveillance. (*Id.* ¶¶ 98–99.) It remains a powerful warning against the dangers of unchecked political power. (*Id.* ¶ 99.) *1984* is one of TIME Magazine's Best 100 English-Language Novels, one of Modern Library's 100 Best Novels, and a winner of the Prometheus Hall of Fame Award. (*Id.* ¶ 101.) It is frequently tested on Advanced Placement exams and included in high school curricula nationwide. (*Id.* ¶¶ 102–103.) *1984* is published by Plaintiff Penguin Random House. (*Id.* ¶ 104.) *1984* was unconstitutionally removed pursuant to the Library Restriction from Nevada's high school library. (*Id.* ¶ 106.)

***Animal Farm* by George Orwell** is an allegorical retelling of the Russian Revolution of 1917 and the Soviet Union's descent into Stalinism, which cautions against the descent into totalitarianism. (*Id.* ¶ 91.) It has won multiple awards and is assigned across the nation in middle and high school curricula. (*Id.* ¶¶ 93–94.) A combined volume of *1984* and *Animal Farm* is published by Plaintiff HarperCollins. (*Id.* ¶ 105.) The combined volume of *Animal Farm* and

*1984* was unconstitutionally removed pursuant to the Library Restriction from Nevada's high school library. (*Id.* ¶ 106.)

***Brave New World* by Aldous Huxley** is a dystopian novel that explores the consequences of sacrificing individuality and freedom for the sake of stability and order and themes such as the loss of individuality, the dehumanizing effects of technology, and the dangers of an all-powerful state. (*Id.* ¶ 108.) Huxley's sharp and thought-provoking narrative raises critical questions about the price of progress and the true meaning of happiness, making it a cornerstone of dystopian literature. (*Id.*) *Brave New World* has won multiple awards, is frequently tested on Advanced Placement exams, and is often assigned in middle and high school curricula across the nation. (*Id.* ¶¶ 110–112.) *Brave New World* is published by Plaintiff HarperCollins and was unconstitutionally removed pursuant to the Library Restriction from East Union's and Nevada's high school libraries. (*Id.* ¶¶ 113, 115.)

***Speak* by Laurie Halse Anderson** is a young adult fiction novel based on Anderson's personal experience of having been sexually assaulted as a teenager and the resulting trauma. (*Id.* ¶ 117.) *Speak* explores themes of identity, finding one's voice, trauma, and healing. (*Id.*) *Speak* is an important resource for high school students experiencing sexual assault. (*Id.* ¶ 120.) The National Book Foundation praised the book, writing that the protagonist "speaks for many a disenfranchised teenager while demonstrating the importance of speaking up for oneself." (*Id.*) *Speak* has won multiple awards and is frequently assigned in high school curricula across the country. (*Id.* ¶¶ 121–22.) *Speak* is published by Plaintiff Macmillan and was unconstitutionally removed pursuant to the Library Restriction from East Union's high school library. (*Id.* ¶¶ 123–24.)

***Nineteen Minutes* by Jodi Picoult**[2] concerns a school shooting and the devastating ramifications of failing a child who has been socially excluded. (*Id.* ¶ 125.) Through characters Peter, who has been mercilessly bullied for most of his life, and Josie, who is being physically and sexually abused by her boyfriend, *Nineteen Minutes* shows that marginalization can take many different forms. (*Id.*) *Nineteen Minutes* is used across the country in anti-bullying curricula and has been lauded as valuable in the fight against extreme bullying. (*Id.* ¶¶ 129–30.) In 2010, *Nineteen Minutes* received the Iowa High School Book Award from the Iowa Association of School Librarians. (*Id.* ¶ 131.) The American Library Association also listed *Nineteen Minutes* on its list of Outstanding Books for the College Bound and Lifelong Learners. (*Id.*) *Nineteen Minutes* is published by Plaintiff Simon & Schuster and was unconstitutionally removed pursuant to the Library Restriction from Urbandale's and East Union's high school libraries. (*Id.* ¶¶ 133–34.)

## LEGAL STANDARD

Courts deny motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) where the complaint pleads facts that state a plausible claim for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To decide a motion to dismiss, the court accepts "as true all factual allegations in the complaint and draw[s] all reasonable inferences in favor of the nonmoving party." *Missouri Broadcasters Ass'n v. Lacy*, 846 F.3d 295, 300 (8th Cir. 2017) (reversing the district court and holding that the plaintiffs' amended complaint stated a claim for violation of the plaintiffs' First Amendment rights) (quotations and citation omitted).

---

[2] *Nineteen Minutes* contains one brief passage that implies rather than explicitly describes a "sex act." That passage does not contain content that is within the scope of the Library Restriction. The Court need not determine the factual question of whether *Nineteen Minutes* falls within or outside the scope of the Library Restriction for the purposes of this motion. However, to the extent that the Court nonetheless finds that this passage falls within the scope of the Library Restriction, the removal of *Nineteen Minutes* still does not satisfy the *Hazelwood* standard. *See infra* at pp. 29-30.

The court may not consider factual matters outside the scope of the Complaint. *See Gibb v. Scott*, 958 F.2d 814, 816 (8th Cir. 1992). The court may, however, consider "matters incorporated by reference [and] exhibits attached to the complaint whose authenticity is unquestioned." *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012). The court may resolve purely legal issues on a motion to dismiss. *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

## ARGUMENT

### I. Contrary To The State Defendants' Contention, Plaintiffs Have Standing To Bring Their Claims.

In their motion, the State argues that the Publisher Plaintiffs' claims must fail because, in their view, those claims are precluded by the government-speech doctrine and a purported lack of standing. Both of those arguments fly in the face of this Court's and the Eighth Circuit's prior holdings in this case. The State offers no new facts or law to support its stale government-speech argument, and its publisher-standing argument is directly contrary to long-standing law. Moreover, to the extent that the State contends that students lack First Amendment rights with regard to school-library books, that argument misrepresents the state of the law in the Eighth Circuit given the initial (and still binding) Eighth Circuit decision in this case. This Court should reject the State's arguments.

#### A. The Eighth Circuit Has Already Rejected The State's Government-Speech Argument.

Contrary to the State's contention, the removal of school-library books is not government speech. By making their government-speech argument again, the State attempts to relitigate an issue that both this Court and the Eighth Circuit have soundly rejected. Neither the facts nor the law support the State's government-speech doctrine argument.

Both this Court and the Eighth Circuit correctly held that school-library books are not government speech under the Supreme Court's three-part test. The State entirely ignores the Supreme Court's test for government speech, which it cannot satisfy. The Supreme Court has instructed that, to determine whether the government-speech doctrine applies, courts must consider whether (1) the State has historically "communicated messages" through the medium; (2) the medium is "closely identified in the public mind" with the State such that the government "has endorsed that message," and (3) the State directly controls "the messages conveyed" through that medium. *See Walker v. Texas Div., Sons of Confederate Veterans, Inc*., 576 U.S. 200, 209–213 (2015); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 472–73 (2009); *Matal v. Tam*, 582 U.S. 218, 238 (2017) (assessing whether trademarks are government speech by applying "three factors [*Walker*] distilled from *Summum*"). The Eighth Circuit previously assessed those "considerations set forth by the Supreme Court combined with the Court's directive to 'exercise great caution before extending our government-speech precedents.'" *PRH I*, 114 F.4th at 668 (quoting *Matal*, 582 U.S. at 235.) Each of those considerations, the Eighth Circuit held, weighed against the State's government-speech argument.

In its second opinion in this case, the Eighth Circuit confirmed its rejection of the government-speech doctrine and held that publishers and authors have First Amendment rights with regard to school-library books. *PRH II*, 172 F.4th at 587 (distinguishing between the *Hazelwood* standard that the Eighth Circuit ultimately adopted and government speech). Despite the State's contention, the Eighth Circuit's holding is not to be afforded any less weight because it was made in the context of standing. Government speech is, at heart, a standing inquiry (or as the State refers to it, a "threshold" issue (State Mot. at 7)). When government speech applies, the First Amendment does not. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) ("The Free

Speech Clause . . . does not regulate government speech."). Therefore, whether Plaintiffs have First Amendment rights—whether they have suffered injury-in-fact sufficient for standing—is directly related to whether the government-speech doctrine applies. Here, as the Eighth Circuit held, the government-speech doctrine does not. *PRH I*, 114 F.4th at 668.

Even setting aside the fact that the government-speech doctrine is an issue that has been thoroughly resolved in this case, the State's argument fails. The State bears the burden on its government-speech argument, and it has not met that burden. *See Nat'l Republican Senatorial Comm. v. Fed. Election Comm.*, 609 U.S. 908, 919 (2026) ("[W]hen the government restricts speech, the government bears the burden of proving the constitutionality of its actions."). The State fails to apply the three factors set forth in the Supreme Court's test and offers no facts in support of its argument.

Instead, the State points to an isolated sentence in the Eighth Circuit's opinion, which states that "if school libraries are not government speech, no standard more exacting than *Hazelwood* applies." (State Mot. at 7.) The State then challenges this Court to "complete the syllogism," contending that this single sentence supports their government-speech argument. (*Id.*) The State is wrong. The Eighth Circuit in fact held that the removal of school-library books is subject to First Amendment scrutiny—using the *Hazelwood* standard. *PRH II*, 172 F.4th at 587–88. Because the removal of school-library books is subject to First Amendment scrutiny, it is necessarily not government speech. The syllogism is complete.

Neither *Walls* nor *Little* changes that result. The Eighth Circuit expressly considered both cases in connection with its holding that publishers and authors have First Amendment rights concerning school-library books. *PRH II*, 172 F.4th at 586. Moreover, in *Walls*, the Eighth Circuit expressly distinguished between the classroom instruction and materials that it found were

government speech and school library books. *Walls v. Sanders*, 144 F.4th 995, 1004 (8th Cir. 2025) ("Here, we deal not with books in a library, but instead with in-classroom instruction and materials in a high school.").

And while the State relies heavily on the Fifth Circuit's decision in *Little v. Llano County*, only seven of the seventeen judges on the *en banc* panel—a minority—joined the section of the opinion concerning government speech. 138 F.4th 834 (5th Cir. 2025) (*en banc*). Like the *Little* minority, the State asserts that collections of books are government speech without regard to the messages in the books themselves. Under Eighth Circuit and Supreme Court precedent, however, that level of generality is much too high. As the Eighth Circuit explained,

> [I]t is doubtful that the public would view the placement and removal of books in public libraries as the government speaking. Take routine examples of historic tomes on political science. A well-appointed school library could include copies of Plato's *The Republic,* Machiavelli's *The Prince,* Thomas Hobbes' *Leviathan,* Karl Marx and Freidrich Engels' *Das Kapital,* Adolph Hitler's *Mein Kampf,* and Alexis de Tocqueville's *Democracy in America*. As Plaintiffs noted, if placing these books on the shelf of public school libraries constitutes government speech, the State "is babbling prodigiously and incoherently."

*PRH I*, 114 F.4th at 668 (quoting *Matal*, 582 U.S. at 236). *See also Shurtleff*, 596 U.S. at 256 (explaining that the "most salient feature" of the case was the defendant's failure to "control[] the flags' *content and meaning*" (emphasis added)); *Walker*, 576 U.S. at 213 (explaining that vanity license plates are government speech because Texas's control over the plates extended to "the design, typeface, color, and alphanumeric pattern for all license plates"). Ultimately, the State does not select books for inclusion on school library shelves. As the State itself acknowledges, local school librarians do. (State Mot. at 9 ("A library's collection decisions reflect its own discretionary judgment about which materials to provide; that distraction belongs to the library[.]"), 14 ("Selecting some materials over others is a core function of the school districts.").) The Court should again reject the State's government-speech argument.

### B. Publishers Have Standing To Bring Their Claims.

Publishers and authors have First Amendment rights to communicate with student readers through school-library books without impermissible state interference. Plaintiffs have never claimed the right to "force the school to buy [a] book in the first place," as the State contends. (State Mot. at 6.)[3] Instead, the Removed Books had already been purchased for and shelved in school libraries by librarians who had recognized their pedagogical value. Plaintiffs seek only to remedy the First Amendment injuries that they have suffered by the removal of the Removed Books pursuant to the Library Restriction that was unrelated to any legitimate pedagogical concern.

The Eighth Circuit has recognized publishers' and authors' rights twice now in this case. The State, however, totally disregards the Eighth Circuit's holdings and asserts that (1) publishers and authors have no independent First Amendment rights to communicate through school-library books (which contradicts the Eighth Circuit's holdings in this case, as well as Supreme Court precedent); and (2) "there is no listener-side right to receive here, [therefore] there is no derivative speaker-side right to communicate through library's shelves" (which misrepresents both the state of the law in the Eighth Circuit and Plaintiffs' arguments). (State Mot. at 6–7.) This Court should reject the State's arguments.

---

[3] As a practical matter, acquisition decisions are unlikely to be subject to judicial review because there are literally millions of books from which to choose, countless factors that schools and their librarians consider in deciding which books to acquire, and limited resources. *See Pico*, 457 at 853 n.1 (Blackmun, J., concurring in part and concurring in the judgment) ("There is a profound practical and evidentiary distinction between the two actions: removal, more than failure to acquire, is likely to suggest that an impermissible political motivation may be present. There are many reasons why a book is not acquired, the most obvious being limited resources, but there are few legitimate reasons why a book, once acquired, should be removed from a library not filled to capacity." (quotation modified)).

As the Eighth Circuit has held in this case, publishers and authors have First Amendment rights in school libraries that are independent of student rights. Despite instructing this Court that it is bound by a "published holding of the Eighth Circuit" (State Mot. at 4–5), the State ignores the Eighth Circuit's prior published holdings in this case, both of which expressly recognized publishers' and authors' rights. *See PRH I*, 114 F.4th at 667–68; *PRH II*, 172 F.4th at 587. In the Eighth Circuit, "every question decided by the appellate court, whether expressly or by necessary implication, is finally settled and determined." *Wilson v. Lamp*, 995 F.3d 628, 634 (8th Cir. 2021). Because the Eighth Circuit's holdings that publishers and authors have independent First Amendment rights, that issue is settled and binding as the law of the case. *See Minnesota RFL Republican Farmer Lab. Caucus v. Moriarty*, 108 F.4th 1035, 1037–38 (8th Cir. 2024) (prior panel's decision on a legal question at the preliminary injunction stage was law of the case on a subsequent appeal where the parties had not presented materially different evidence); *Entergy, Arkansas, Inc. v. Nebraska*, 241 F.3d 979, 987 (8th Cir. 2001) ("We carefully considered the Eleventh Amendment issue before deciding it in the course of the preliminary injunction appeal, and our holding that Nebraska waived its immunity from claims by the Commission, including claims for damages, is now the law of the case."); *Howe v. Varity Corp.*, 36 F.3d 746, 752 (8th Cir. 1994), *aff'd*, 516 U.S. 489 (1996) (contract interpretation holding in prior panel's decision at preliminary injunction stage was law of the case). Rather than acknowledge the Eighth Circuit's binding holdings in this case, the State relies solely on a dissenting opinion. (State Mot. at 6 (citing *Kleindienst v. Mandel*, 408 U.S. 753, 775 (1972) (Marshall, J., dissenting).) But that opinion is of no precedential value and does not govern here.[4]

[4] The State separately asserts that the Supreme Court's plurality decision in *United States v. American Library Association* "casts doubt" on publishers' and authors' standing. (State Mot. at 8.) That case concerned government subsidies conditioned upon the use of internet-filtering

The Supreme Court and other Courts of Appeals have long recognized that publishers and authors have First Amendment rights that are independent of their readers' right to receive information. *See*, *e.g.*, *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 583 (6th Cir. 1976) (holding that the removal of school library books was unconstitutional because "[f]reedom of speech presupposes a willing speaker [but] where a speaker exists" the "protection afforded is to the communication, to its source and to its recipients both"). *See also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64, n.6 (1963) (explaining that the "constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication" and holding that the creation of a state commission that operated to "curtail the circulation" of books violated the First Amendment); *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) ("In this case, there is no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners."); *Prison Legal News v. Livingston*, 683 F.3d 201, 213 (5th Cir. 2012) (rejecting argument that *Thornburgh*'s holding is limited to solicited materials and holding that the First Amendment protects the right of distributors of information to send materials to prisoners who have not solicited those materials); *Hrdlicka v. Reniff*, 631 F.3d 1044, 1049 (9th Cir. 2011) ("A First Amendment interest in distributing and receiving information does not depend on a recipient's prior request for that information.").[5]

---

software to block obscene images or child pornography in public libraries—not library books. 539 U.S. 194, 198-99 (2003).

[5] Plaintiffs have consistently explained that, while the "Free Speech Clause's protection of a speaker's ability to disseminate information includes a reciprocal right to receive that information," *Walls*, 144 F.4th at 1002, speakers such as publishers and authors also have independent First Amendment rights. The State misrepresents Plaintiffs' argument, characterizing it as an allegation that publishers' and authors' First Amendment rights "rise[] or fall[] together with the students' own right to receive their work." (State Mot. at 6.) Plaintiffs have never contended that student rights are the only source of publishers' and authors' rights.

The State also incorrectly argues that there is no precedent for a "speaker's right to compel a government institution to serve as the vehicle for that speech." (State Mot. at 8.) Plaintiffs do not seek to compel school libraries to stock their books. Instead, Plaintiffs seek only to prevent the State from unconstitutionally removing books that were already found to have pedagogical value from library shelves. It is well-established that the government may not impose improper restrictions on speech—even when the government provides the "vehicle"—or forum—for that speech. *See*, *e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985) (requiring that content-based restrictions in nonpublic forums be reasonable in light of the purpose of the forum and view-point neutral); *Minn. Voters All. v. Mansky*, 585 U.S. 1, 12, 16 (2018) (holding that the state must "articulate some sensible basis for distinguishing what [speech is allowed] from what [speech is not allowed]" inside a polling place); *Burnham v. Ianni*, 119 F.3d 668, 676 (8th Cir. 1997) (holding that "the suppression of exactly [the] type of information" the forum was created for "was simply not reasonable").

In addition, by contending that students no longer have a First Amendment right to receive information in school libraries, the State misrepresents the state of Eighth Circuit law. In *PRH I*, the Eighth Circuit expressly held that students such as the Student Plaintiff have First Amendment rights with regard to school-library books. 114 F.4th at 667, 668. As the Eighth Circuit explained, the State's "threatened enforcement effort implicates First Amendment rights," including the right of the Student Plaintiff. *Id*. (citation omitted). The First Amendment injury suffered by the Student Plaintiff—an injury to her right to receive information in her school library—provided her with standing. *See id*. at 668.

Although the Eighth Circuit subsequently contradicted its prior holding, that portion of the Eighth Circuit's opinion has no effect. In the Eighth Circuit, it is a "cardinal rule . . . that one panel

is bound by the decision of a prior panel." *Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) (*en banc*). In the event that a later panel issues a decision that conflicts with the holding of the initial panel, "the earliest opinion must be followed 'as it should have controlled the subsequent panels that created the conflict.'" *Id.* at 800. The Eighth Circuit's language concerning student rights in *PRH II* is of no effect because it directly conflicts with the holding of the prior panel in *PRH I*.

The State is therefore incorrect that "the student has no right to receive information, [and therefore] the publisher lacks a right to communicate within the school library." (State Mot. at 6 (citing *PRH II*, 172 F.4th at 586).) To the extent that the State characterizes publisher and author rights as solely "derivative" of student rights with no independent basis (*id.*), then the State's own reasoning actually supports Plaintiffs' argument: since a student's right to receive information in school libraries is alive and well in the Eighth Circuit, publishers and authors also have the right to communicate through school-library books.[6]

## II. The Removal Of The Removed Books Under The Library Restriction Violates The First Amendment.

The removal of the Removed Books is contrary to the standard set forth in *Hazelwood* and therefore violates the First Amendment. The Eighth Circuit instructed that "the purposes of a school library are to enhance education, supplement classroom learning, and facilitate the development of students' knowledge and skills." *PRH II*, 172 F.4th at 587. Consequently, to avoid "run[ning] afoul of the First Amendment," the removal of a school library book must be

[6] While the State is incorrect in asserting that students no longer have the right to receive information in school libraries, it is correct that Plaintiff Van Gundy may not seek damages from individual state officials. Plaintiff Van Gundy withdraws her claims against the State.

"reasonably related to legitimate pedagogical concerns" in the context of those purposes. *Id*. at 588 (citation omitted).

The Eighth Circuit concluded that the Library Restriction is not facially unconstitutional, but it did not (and could not) offer a wholesale endorsement of the Library Restriction. As the State acknowledges, the Eighth Circuit "did not consider whether any removed book had literary, artistic, or scientific merit, and did not distinguish an isolated sentence from a sustained passage." (State Mot. at 19.) The Eighth Circuit did not consider any particular application of the law, nor did it hold that all applications of the Library Restriction pass scrutiny under *Hazelwood*. That is because the only claims before the Eighth Circuit were facial overbreadth claims, which required a showing that the Library Restriction's unconstitutional applications substantially outweighed its constitutional applications. The Eighth Circuit held that the Library Restriction was not overbroad under the *Hazelwood* standard. Plaintiffs now assert as-applied challenges to particular applications, and those as-applied challenges require a book-by-book assessment.

The removal of the Removed Books from high school libraries under the Library Restriction is not reasonably related to any legitimate pedagogical concern. The Books Inside the Scope were selected for high school libraries by trained librarians based on the books' educational value and literary merit when considered as a whole. These are award-winning books that confront important educational themes and are often included in high school curricula. Their removal, therefore, was unreasonable in relation to pedagogical concerns, given the purpose of school libraries, the pedagogical value of the those books, and the high school age of prospective readers.

As to the Books Outside the Scope, Plaintiffs allege that those books were removed pursuant to the Library Restriction. While the books do not fall within the statute's scope, the State has pressed the School District Defendants to apply the Library Restriction in an overbroad

manner, which resulted in the removal of these books. Against the backdrop of their statutory enforcement power against school districts, the State has both instructed school districts to remove more rather than fewer books and refused to provide guidance to school districts as to what it believes the scope of the Library Restriction is. The State has therefore caused the removal of the Books Outside the Scope. Since those books are not required to be removed under the Library Restriction, which was the sole alleged justification for their removal, there is no legitimate pedagogical purpose for their removal. Those removals are therefore unconstitutional. The Court should deny the State's motion.

### A. The Removal Of The Books Inside The Scope Pursuant To The Library Restriction Violates The First Amendment.

Plaintiffs challenge the removal of three books that fall within the scope of the statute: *I Know Why the Caged Bird Sings* by Maya Angelou, *The Rape of Nanking* by Iris Chang, and *Native Son* by Richard Wright. Each of those books was selected for inclusion on high school library shelves by trained librarians who determined that the books had pedagogical value for high schoolers when considered as a whole. The State's argument for the removal of these books is based on two false premises: first, that these books "may be accessed by children of every age and grade level" (State Mot. at 16) and second, that these books were restricted by schools on their own, rather than at the behest of the State under the Library Restriction. (*Id.*) Plaintiffs' challenge concerns the removal of these books only from high school libraries. The State provides no support for its suggestion that Plaintiffs also challenge their removal from elementary or middle school libraries. Furthermore, the Complaint does not contain any allegation that the school districts removed these books of their own accord. Instead, Plaintiffs allege that the school districts, who are agents of the State, were compelled by the State to remove these books. The Court should

disregard the State's repeated and transparent attempt to dodge responsibility and point fingers at the schools, which has no basis in the Complaint's allegations.

The Eighth Circuit held that speech restrictions—here, the removal of each Book Inside the Scope from high school libraries—are to be assessed using the standard set forth in *Hazelwood*. In *Hazelwood*, the Supreme Court evaluated separately (1) the legitimacy of the particular pedagogical purposes advanced by the school official and (2) the reasonableness of each speech restriction given those pedagogical purposes. 484 U.S. at 274–75. Each evaluation was conducted with attention to the particular facts of the situation. This is consistent with the approach that the Supreme Court has taken in evaluating other restrictions on speech. *See Miller v. California*, 413 U.S. 15, 24 (1973) (requiring evaluation of each work "taken as a whole" to determine whether the work is obscenity and therefore unprotected by the First Amendment); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 n.11 (1975) ("[T]he age of a minor is a significant factor.").

*Hazelwood*'s fact-specific evaluation therefore requires consideration of the context in which the speech regulation arises, as well as a determination that the particular speech restriction was reasonable given that context. *Hazelwood* concerned a high school principal's decision to remove articles from a newspaper published as part of the school's journalism curriculum, which was "a regular classroom activit[y]." 484 U.S. at 263–64, 268–69. One article "described three [] students' experiences with pregnancy" and the other article "discussed the impact of divorce on students at the school." *Id*. at 263. Both articles were written so that those students "might be identifiable from the text." *Id*. To determine both the legitimacy of the restriction's purpose and the reasonableness of the restriction in light of that purpose, the Supreme Court focused on the particular language used in the school newspaper articles at issue, the school principal's concern for the privacy interests of the students referenced in the articles and others, whether the principal

considered any less-restrictive means of regulating the speech, and journalistic standards as a whole. *Id*. at 263–64, 268–69, 274–75, 275 n.8. The Eighth Circuit has taken the same context-driven approach in evaluating speech restrictions under *Hazelwood*. *See*, *e.g.*, *Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718, 724 (8th Cir. 1998) (evaluating the frequency of prohibited profanity in student plays ("more than 150 times in approximately forty minutes" and the fact that the speech occurred in the context of a compulsory classroom environment). Due to the fact-specific and context-driven nature of the analysis required by *Hazelwood*, the constitutionality of the removal of the Inside Books is not susceptible to resolution on a motion to dismiss. *See id.* at 720 (district court denied motion to dismiss Lacks' First Amendment claim).

While the Eighth Circuit has opined that "schools have a legitimate pedagogical interest in prohibiting speech involving sexual content," it has not evaluated whether the removal of particular books—including any of the Books Inside the Scope—is reasonably related to that interest. *See PRH II*. *See also* State Mot. at 19. The State now suggests a second purportedly "legitimate, independently sufficient pedagogical interest": "[a]voiding controversy." (State Mot. at 18.) This supposed interest is not tethered to any allegation in the complaint and therefore is not properly considered on a motion to dismiss.

In its brief, the State seeks to shock this Court with individual sentences or passages from the three Books Inside the Scope, presented devoid of all context and without regard to the overarching merit of each book when considered as a whole. The State's tunnel-vision, however, is inconsistent with *Hazelwood*'s context-driven, fact-specific approach. Under the State's theory, it does not matter whether the content in question is merely a sentence or short passage in a much larger work. Its theory similarly pays no attention to whether the content in question is historically significant, advances a key plot point, is central to character development, or is a critical event

recorded in a memoir. Without the benefit of a fact-specific, contextual review, it is impossible to evaluate whether the speech restrictions—book removals—were reasonable given the stated pedagogical purpose.

The review required by *Hazelwood* confirms that the removal of the Books Inside the Scope is unrelated to any legitimate pedagogical concern. In each of these books, the passages identified by the State Defendants as justifying their removal are central and critical to the purpose, themes, or plots of the books. The books are not compulsory reading but rather are accessed only by high school students who voluntarily choose to read them.

*I Know Why the Caged Bird Sings*—a nonfiction autobiography—concerns childhood sexual assault. This is a serious topic, to be sure, but it is also an unfortunate reality for many. The State contends that the removal of *I Know Why the Caged Bird Sings* from the school library shelf is reasonable because it "graphically depicts the repeated sexual assault and eventual rape of an eight-year-old child." (State Mot. at 16.) In support of its contention, the State identifies two short passages. (*Id.*) But those passages alone do not justify the removal of this book from high school libraries under the Library Restriction. To the contrary, those passages are essential plot points for the inspirational and overarching theme of the book, which concerns overcoming past trauma and regaining self-confidence. School librarians determined that *I Know Why the Caged Bird Sings* had pedagogical value for their students, just as countless other school districts across the country have also determined in assigning the book as part of their curricula.

*The Rape of Nanking, the Forgotten Holocaust of World War II* is another nonfiction book that would not be as effective without the passages that implicate the Library Restriction. As with *I Know Why the Caged Bird Sings*, the subject-matter of *The Rape of Nanking* is challenging: it concerns one of the most brutal atrocities of World War II: the massacre and systematic sexual

violence committed by Japanese soldiers in the Chinese city of Nanking. (Compl. ¶ 146.) Those passages are based on or taken from primary sources such as survivors' testimonies, diaries of Western missionaries who remained in the city, and official reports to vividly detail the horrors inflicted on the people of Nanking. (*Id.*) The State contends that these passages—which are not prurient but rather recount actual events in a matter-of-fact tone—justified the mandatory removal of *The Rape of Nanking* from high school libraries. But that removal was unreasonable. It would be difficult, if not impossible, to provide an educational and accurate account of this historical event without explaining the horrific actions that occurred. *The Rape of Nanking* has great pedagogical value, as underscored by the pivotal role it has played in bringing international attention to the wartime atrocities committed in Nanking. Without the historically accurate passages of which the State complains, many of which are taken directly from primary sources, the book would sanitize the history and not be as effective.

*Native Son* by Richard Wright is a novel that focuses on themes of social and racial injustice, as well as the tragic effects of poverty, racism, and hopelessness. The State points to the single passage in *Native Son* that it contends justified its removal. That passage, however, is both short in comparison to the length of the novel as a whole and also a key plot point: The book's central plot is the main character's accidental killing of a white woman, prosecution, conviction, and death sentence, and the contrast with his intentional killing of his black girlfriend elucidates the novel's core themes.

Same too for *Nineteen Minutes* by Jodi Picoult. *Nineteen Minutes* has been lauded as valuable and critical to the nationwide movement against extreme bullying, with many schools using this book in their high school curriculum. The passage in *Nineteen Minutes* that the State Defendants identify as problematic does not actually describe a sex act as defined by statute, much

less in an explicit, "detailed" way as the Eighth Circuit has instructed is required to implicate the Library Restriction. *Compare* Iowa Code § 702.17 *with* State Mot. at 17. *See also PRH II*, 172 F.4th at 588. The passage does not contain the language from the statute or sufficient detail to unambiguously identify any acts that are set forth in the statute. Nonetheless, to the extent that the Court determines that *Nineteen Minutes* is within the scope of the Library Restriction, its removal from school libraries was similarly unreasonable. *Nineteen Minutes* is a book about, among other things, a character's sexual assault and the ensuing trauma from that assault that the victim suffers. The passage in question is the sole "description" of that sexual assault—it is only one page of the novel and is set forth in a matter-of-fact, nonprurient manner. It is not difficult to understand why school librarians have decided to make this book available to high school students. Many high schoolers have experienced sexual assault or sexual trauma. Books such as *Nineteen Minutes* provide those students with a way to safely process their experiences.

Plaintiffs and the State agree that deference is due to the decisions of educators. (State Mot. at 18 (citing *Fleming v. Jefferson Cnty. Sct. Dist. R-1*, 298 F.3d 918, 925 (10th Cir. 2002).) But that deference cuts against the State's arguments because the removal of the Books Inside the Scope is contrary to the discretion that educators had exercised in including these books on library shelves in the first place. Each of these books was placed on school library shelves by trained librarians (who report to principals, who report to superintendents and school boards), who determined in their expertise and discretion that the books had pedagogical value for the students who might read them. (Compl. ¶ 2.)

### B. The Removal Of The Books Outside The Scope Pursuant To The Library Restriction Violates The First Amendment.

The removal of the Books Outside the Scope violates the First Amendment. These books were removed from school libraries, even though they do not contain explicit content, because of

an overbroad application of the Library Restriction. (*Id.* ¶¶ 75–76.) That overbroad application was compelled by the State and enacted by the School District Defendants. (*Id.* ¶ 67.)

The Eighth Circuit held that the specific sex acts set forth in Iowa Code and prohibited by the Library Restriction are "detailed" and not "amorphous." *PRH II*, 172 F.4th at 588. To fall within the scope of the Library Restriction, a "description" of a "sex act" must be explicit rather than a mere implication, reference, or label. None of the Books Outside the Scope include content that is sufficiently explicit to fall within the Library Restriction. Instead, the descriptions of sex acts, if any, in these books are merely passing references or implications. The pedagogical concerns that the Eighth Circuit endorsed in connection with the Library Restriction therefore do not apply to these books, and there was *no* legitimate pedagogical concern to justify the removal of those books based on the Library Restriction. Consequently, the removal of these books does not satisfy the *Hazelwood* standard and was unconstitutional.

The State attempts to circumvent the First Amendment, contending that if the content of these books does not fall within the Library Restriction, then there is no First Amendment issue with their removal. (State Mot. at 12.) But the State ignores that Plaintiffs' claims are that the removals violate the First Amendment and that Plaintiffs seek to stop the State from causing school district officials to apply the Library Restriction in an overbroad manner that violates the First Amendment. Because the Library Restriction has been applied to remove the Books Outside the Scope, which do not contain the requisite content, there was no pedagogical purpose to their removal and therefore those removals were unconstitutional. Plaintiffs seek relief to remedy those

injuries, which are constitutional in nature.[7] (State Mot. at 11.) For the same reason, there is therefore no "narrower ground to resolve Plaintiffs' claims." (State Mot. at 12.)[8]

The State seeks to evade liability for the unconstitutional removal of the Books Outside the Scope by contending that Plaintiffs allege only that "the school districts misread the statute." (State Mot. at 10.) That contention misrepresents Plaintiffs' allegations and the State's role. Plaintiffs need not allege that the State Defendants' actions "are the very last step in the chain of causation" to sustain their claims, especially where the "determinative and coercive effect" of their enforcement powers contribute to the actions of the School District Defendants. *See Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). Under Iowa law, the State has the power and responsibility to enforce the Library Restriction against school districts. (Compl. ¶¶ 24–26, 70.) The State has further instructed the school districts to err on the side of over-removing books. (*Id.* ¶ 64.) The State does not and cannot dispute its enforcement powers or its instructions to school districts. Nor can it dispute the climate in which the statute was enacted and in which it has been implemented, where school officials reasonably fear that the State will charge them with pushing "pornography" on students for not erring on the side of caution. (*Id.* ¶¶ 62-63.) As a result, the School District Defendants, agents of the State who have responsibility for enforcing the Library Restriction, have

[7] The State's *Pennhurst* argument (State Mot. at 10–11) is inapplicable because Plaintiffs seek to "vindicate federal rights and hold state officials responsible to the supreme authority" of the First Amendment, not state law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984).

[8] The State also contends that, as to the Books Outside the Scope, "Plaintiffs' remedy lies in the administrative and procedural mechanisms the statute itself provides, not the First Amendment." (State Mot. at 13.) That makes no sense. The procedural mechanisms to which the State refers are the "policies and procedures for individuals to request review of decisions the district has already made." (*Id.*) But those policies and procedures provide review mechanisms only for "[m]embers of the school district community," not publishers or authors. *See* Urbandale Community School Board Policy 631C. *See also* East Union School Board Policy 605.3, 605.3R1 (same); Nevada School Board Policy 605.3 (same).

removed the Books Outside the Scope to avoid punishment by the State for not enforcing the Library Restriction as broadly as the State would like.

At no point has the State ever informed an Iowa school district that a book that was removed pursuant to the Library Restriction was not actually within the scope of the statute and was not required to be removed. (*Id.* ¶ 66.) In fact, it still avoids stating whether the Books Outside the Scope were wrongfully removed—a fact that the State would have to admit or deny were it to answer the complaint. Instead, the State is careful to hedge its statements about these books. (*See, e.g.*, State Mot. at 10–12.) The State could have issued meaningful guidance regarding the meaning and scope of the Library Restriction but has elected not to in an attempt to coerce the over-removal of books. This is consistent with the approach that it has taken since the passage of the Library Restriction—it publicly disparages the books in question, urges school districts to err on side of removing more books under the Library Restriction, and refuses to temper its coercion by advising school districts as to what exactly the State believes implicates the Library Restriction.

The State also repeatedly speculates that the Books Outside the Scope may have been removed "for another reason within the library collection authority of the school district." (State Mot. at 12–13.) This baseless assertion is improper and should be disregarded on a motion to dismiss. *See Gibb*, 958 F.2d at 816 (reversing dismissal where the district court considered and relied on material outside the face of the complaint).

Finally, the State's "obey-the-law injunction" argument (State Mot. at 12) mischaracterizes the law and the relief Plaintiffs seek. As the State recognizes, Plaintiffs seek "an order barring the State Defendants from enforcing the Library Section as to [specific] titles." (*Id.* at 10.) Such an order would not be "too vague." *Tincher v. Noem*, 164 F.4th 1097, 1099 (8th Cir. 2026). In fact, it is hard to imagine a more specific order.

None of the State's arguments merits dismissal of Plaintiffs' claims. This Court should deny the State's motion.

## III. Plaintiffs Have Properly Pleaded Claims Against The School District Defendants In Their Capacity As State Actors.

The School District Defendants raise only one basis to dismiss Plaintiffs' Complaint in its entirety:[9] they argue that Plaintiffs fail to state a claim under 42 U.S.C. § 1983 because Plaintiffs have not pleaded a school district policy or custom to establish municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978). (Sch. Dist. Mot. at 5–13.) The School District Defendants misunderstand Plaintiff's claims. Plaintiffs do not allege that the School District Defendants are liable as municipalities under *Monell*. Rather, Plaintiffs sued the individual School District Defendants in their official capacities as agents of the State of Iowa for their actions implementing and enforcing the Library Restriction. *See Ex parte Young*, 209 U.S. 123 (1908). Because Plaintiffs do not assert *Monell* municipal liability claims, Plaintiffs do not need to plead any policy or custom of the School District Defendants.

*Monell* claims against municipalities differ from suits against local officials in their official capacities to enjoin their enforcement of a state law. *Giambalvo v. Suffolk County, New York* illustrates the distinction. 155 F.4th 163 (2d Cir. 2025). In *Giambalvo*, plaintiffs challenged a county police department's enforcement of a state statute under 42 U.S.C. § 1983. *Id.* at 170, 173. While "Suffolk County itself likely cannot be enjoined from implementing mandatory state laws

[9] The School District Defendants mention the statute of limitations in a footnote, but "do not raise a statute of limitations argument." (Sch. Dist. Mot. at 4 n.2.) Even if the School District Defendants raised such an argument, Iowa's two-year statute of limitations does not apply to any of the book removals at issue, because each day that a government denies a person their First Amendment rights is a "new or continuing violation." *Hamby v. Iowa*, 185 F.4th 816, 827–28 (8th Cir. 2026); *Am. Atheists, Inc. v. Rapert*, 507 F. Supp. 3d 1057, 1066-67 (E.D. Ark. 2020). A First Amendment violation for even a minimal period constitutes an injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Here, each day that the books at issue remain removed for an improper reason is a "new or continuing" First Amendment violation. *See Hamby*, 185 F.4th at 828.

as to which it exercises no discretion" under *Monell*, the court did not reach the issue "because the individual County defendants *can* be enjoined from implementing the challenged mandatory state laws." *Id.* at 176 n.3 (emphasis added). *See also Bay Area Unitarian Universalist Church v. Paxton*, No. 4:20-CV-3081, 2021 WL 3852174, at *11 (S.D. Tex. Aug. 27, 2021) ("Plaintiffs are not trying to hold a municipality liable for an individual officer or policymaker's actions. Plaintiffs seek injunctive relief related to a state law."). Here, Plaintiffs brought claims challenging the School District Defendants' enforcement of a state law—the Library Restriction.

Courts recognize the principle that when a local official enforces state law, the official acts as a state agent. *Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993) ("[A] city official pursues her duties as a state agent when enforcing state law or policy."); *Echols v. Parker*, 909 F.2d 795, 801 (5th Cir. 1990) ("When a state statute directs the actions of an official, as here, the officer, be he state or local, is acting as a state official.").[10] The School District Defendants agree. (*See* Sch. Dist. Mot. at 11.) They quote *Bethesda Lutheran Homes & Services, Inc. v. Leean* for the proposition that "[w]hen the municipality is acting under compulsion of state or federal law, it is the policy contained in that state or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury." 154 F.3d 716, 718 (7th Cir. 1998). This is exactly right—and it means that School District Defendants are state agents when they act under compulsion of the Library Restriction.

Further, because Plaintiffs seek prospective, injunctive relief against the School District Defendants, there is no inequity in allowing Plaintiffs' claims to go forward. While courts have recognized the unfairness in holding local governments monetarily liable for following state laws

[10] By contrast, a county official "acts as a county agent when he is enforcing county law or policy." *Echols*, 909 F.2d at 801.

they are bound to honor, *see*, *e.g.*, *Vives v. City of New York*, 524 F.3d 346, 353 (2d Cir. 2008), that concern is not at play here. The policy rationale underlying *Monell*—that a municipality must be at fault to be liable—is irrelevant. Plaintiffs seek a declaration that the removal of specific books pursuant to the Library Restriction is unconstitutional and an order that the School District Defendants not remove those books under the Library Restriction. This remedy is appropriate because when an Iowa school district follows the Library Restriction, it enforces the Library Restriction as to specific books. *See Echols*, 909 F.2d at 801 ("[T]he State cannot dissociate itself from actions taken under its laws by labeling those it commands to act as local officials."). Accordingly, Plaintiffs state a claim that the School District Defendants enforce the Library Restrictions as state agents, and the removal of the books at issue pursuant to the Library Restriction is unconstitutional. *Monell* has no role in this case.

Moreover, the School District Defendants' argument is incompatible with the Supremacy Clause of the U.S. Constitution (article VI, clause 2). "[L]ike all government entities, school districts remain obligated to comply *first and foremost* with federal law, even when doing so requires disregarding contrary state directives." *GSA Network v. Morath*, 821 F. Supp. 3d 753, 772–73 (S.D. Tex. 2026). If the School District Defendants were correct that 42 U.S.C. § 1983 requires a local policy or custom for an injured party to obtain prospective, injunctive relief against local government officials, myriad plaintiffs would be unable to secure their constitutional rights solely because the local government happened to be violating those rights pursuant to a state law. That result would fatally undermine federal courts' power to guarantee constitutional rights and would effectively render the Library Restriction a higher law than the First Amendment.

As a matter of federalism and constitutional structure, Plaintiffs have a claim against the School Districts Defendants for violating the First Amendment. Plaintiffs' claim cannot be

foreclosed merely because the reason for the constitutional violation happens to be a state law. For these reasons, the School District Defendants' motion to dismiss should be denied.

**IV. The Board Member Defendants Do Not Duplicate The Superintendent Defendants.**

Plaintiffs' claims against the Board Member Defendants are not redundant or duplicative of their claims against the Superintendent Defendants because, under Iowa law, the Board Member Defendants are the highest authorities of each district. The School District Defendants note as much, observing that school districts are governed by their boards of directors. (Sch. Dist. Mot. at 14 (citing Iowa Code § 274.7).) Iowa law further specifies that each district's board of directors "shall operate, control, and supervise all public schools located within its district boundaries and may exercise any broad and implied power, not inconsistent with the laws of the general assembly and administrative rules adopted by state agencies pursuant thereto, related to the operation, control, and supervision of those public schools." Iowa Code § 274.3(1). *See also Bd. of Dirs. of the Ind. Sch. Dist. of Waterloo v. Green*, 147 N.W.2d 854, 857 (Iowa 1967) ("The board of directors of each school district is its governing body.").

Here, Plaintiffs have not sued the school districts. Instead, Plaintiffs sued the Board Member Defendants, in their official capacities, because only the Board Members possess the authority to govern each district. The Superintendent Defendants are employees of each District who enforce the Board's policies and state law. Iowa Code §§ 274.3, 279.20. It is not sufficient to name only the Superintendents as defendants, because the Board Members, not the Superintendents, embody the corporate body constituting each District. *See id.* Thus, the School District Defendants' motion to dismiss as to the Board Member Defendants should also be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny the State Defendants' and School District Defendants' motions to dismiss.

Dated: November 12, 2026

WEINHARDT & LANTZ, P.C.

By: /s/ *Mark E. Weinhardt*

Mark E. Weinhardt AT0008280
Todd M. Lantz AT0010162
Jason R. Smith AT0014862
2600 Grand Avenue, Suite 450
Des Moines, Iowa 50312
Telephone: (515) 244-3100
mweinhardt@weinhardtlantz.com
tlantz@weinhardtlantz.com
jsmith@weinhardtlantz.com

Frederick J. Sperling
Adam J. Diederich
Kirstie Brenson
ArentFox Schiff LLP
233 South Wacker Drive, Suite 7300
Chicago, Illinois 60606
Telephone: (312) 258-5500
frederick.sperling@afslaw.com
adam.diederich@afslaw.com
kirstie.brenson@afslaw.com
(admitted *pro hac vice*)

*Attorneys for Plaintiffs*

PROOF OF SERVICE

The undersigned certifies that the foregoing instrument was served upon the parties to this action by serving a copy upon each of the attorneys of record on November 12, 2026 via CM/ECF

Signature: /s/ Madison Politoski